**IN THE UNITED STATES DISTRIC COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| RACHEL MILLER; TEXAS DEMOCRATIC PARTY; DNC SERVICES CORP., d/b/a DEMOCRATIC NATIONAL COMMITTEE; DSCC; and DCCC, | |
| *Plaintiffs*, | |
| v. | CIVIL ACTION NO. 1:19-cv-01071 |
| RUTH HUGHS, in her official capacity as the Texas Secretary of State, | |
| *Defendant*. | |

**THE TEXAS SECRETARY OF STATE'S MOTION TO DISMISS**

Introduction ..................................................................................................................1

Background ..................................................................................................................2

Argument ....................................................................................................................3

    I.    The Secretary of State Is Not a Proper Defendant ...................................3

        A.    The Secretary Does Not Enforce the Ballot Order Statute .........................4

        B.    Plaintiffs Cannot Overcome Sovereign Immunity ...................................5

        C.    Plaintiffs Do Not Have Standing to Sue the Secretary ............................7

    II.    Plaintiffs Lack Standing to Challenge the Ballot Order Statute ..................8

        A.    Miller Has Not Alleged an Injury in Fact ...............................................8

        B.    The Committee Plaintiffs Lack Standing ..............................................10

        C.    The Committee Plaintiffs Lack Statutory Standing ..............................14

    III.    The Political Question Doctrine Bars Consideration of Plaintiffs' Claims ..........15

    IV.    The Ballot Order Statute Is Constitutional ...........................................16

        A.    The Ballot Order Statute Does Not Burden the Right to Vote ...............16

        B.    Plaintiffs' Equal Protection Claim Also Fails ........................................22

    V.    Plaintiffs Are Not Entitled to Relief ...................................................22

Conclusion ................................................................................................................25

## INTRODUCTION

Texas's Ballot Order Statute provides a simple rule for determining the order in which candidates appear on the ballot. For each race, candidates are arranged in a consistent party order, based on how many votes their parties received in the last gubernatorial election.

That has been the law since 1963, when Texas Democrats first enacted the Ballot Order Statute. But after reaffirming that law in 1975 and 1985, when they controlled both chambers of the Texas Legislature by overwhelming majorities and the Governor's mansion, Texas Democrats have had a change of heart. All of a sudden, they believe the Ballot Order Statute is unconstitutional.

This Court should dismiss Plaintiffs' claims for five reasons. First, Plaintiffs cannot sue the Secretary of State because she does not enforce the Ballot Order Statute. The Secretary does not cause Plaintiffs' purported injuries, and she cannot redress them. In reality, Plaintiffs' suit is an impermissible attempt to sue the State itself. For these reasons, sovereign immunity bars Plaintiffs' claims, and they lack standing.

Second, the Ballot Order Statute does not injure Plaintiffs. Whether a plaintiff's preferred political party is likely to win various elections is not a cognizable injury in fact.

Third, Plaintiffs' challenge presents a nonjusticiable political question. The Constitution does not define what a "fair" ballot order would be. Plaintiffs' complaints are political, not legal.

Fourth, the Ballot Order Statute is constitutional. It does not burden anyone's constitutional rights, and it furthers the State's weighty interests in preventing gamesmanship, avoiding voter confusion, making voting easier, and simplifying administration.

Finally, Plaintiffs are not entitled to the equitable relief they seek. Texas Democrats caused the Ballot Order Statute to be enacted and, on Plaintiffs' own theory, benefited from the statute for years thereafter. Instead of challenging the Ballot Order Statute at their first opportunity, Plaintiffs waited decades. They should not now be heard to complain about the Ballot Order Statute.

In Texas, local officials prepare ballots. *See* Tex. Elec. Code § 52.002. The Election Code instructs them how to do so. *See id.* §§ 52.001–.095. Plaintiffs challenge one such instruction.

In a general election, ballots are "arranged in vertical columns separated by parallel lines." *Id.* § 52.065(a). The leftmost column lists the "title of [each] office to be voted on." *Id.* § 52.065(b). "The name of each political party with a nominee on the ballot shall be printed at the top of the second and as many succeeding columns as necessary." *Id.* § 52.065(c). Candidate names "appear opposite the office [for which they are running] in the appropriate party column." *Id.* Spaces for independent and write-in candidates are included to the right of the party columns. *Id.* § 52.065(c)–(d).

The Ballot Order Statute governs the order in which party columns appear. For "parties with nominees for statewide or district offices," the columns are "arranged in descending order of the number of votes received statewide by each party's candidate for governor in the most recent gubernatorial general election, beginning on the left with the party whose candidate received the highest number of votes." *Id.* § 52.091.

Plaintiffs challenge this provision. What they do not mention is that a Legislature dominated by Democrats enacted the Ballot Order Statute more than fifty-five years ago.

In 1963, Texas's first Ballot Order Statute provided that party columns would be "arranged in the order of the number of votes cast for each party's candidate for Governor at the preceding general election." Act of May 4, 1963, 58th Leg., R.S., ch. 424, § 35, 1963 Tex. Gen. Laws 1017, 1051 (previously codified in Tex. Rev. Civ. Stat. Elec. Code art. 6.05b (West Supp. 1964)). At that time, the Texas Senate contained thirty-one Democrats and zero Republicans. The Texas House contained at

least one hundred forty Democrats and ten Republicans. The Governor was also a Democrat.[1]

In 1975, the Legislature amended the Ballot Order Statute but retained the same rule for party order. *See* Act of May 28, 1975, 64th Leg., R.S., ch. 682, § 15, 1975 Tex. Gen. Laws 2080, 2091 (previously codified at Tex. Rev. Civ. Stat. Elec. Code art. 6.05b (West Supp. 1975)). At that time, the Texas Senate contained twenty-nine Democrats and two Republicans. The Texas House contained one hundred thirty-two Democrats and eighteen Republicans. The governor was also a Democrat.

In 1985, the Legislature recodified the Election Code. It again amended the Ballot Order Statute and again retained the same rule for party order. *See* Act of May 13, 1985, 69th Leg., R.S., ch. 211, § 1, 1985 Tex. Gen. Laws 802, 872 (codified at Tex. Elec. Code § 52.091(b)). At that time, the Texas Senate contained twenty-five Democrats and six Republicans. The Texas House contained ninety-five Democrats and fifty-five Republicans. The Governor was also a Democrat.

But now, Plaintiffs—the Texas Democratic Party, the Democratic National Committee, the Democratic Senatorial Campaign Committee, the Democratic Congressional Campaign Committee, and an individual supporter of Democratic candidates—argue the Ballot Order Statute violates the Constitution. And they have brought this suit against the Secretary of State, rather than any officials who enforce the law at issue.

The Secretary respectfully moves to dismiss Plaintiffs' claims for lack of subject-matter jurisdiction and failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1), (6).

## ARGUMENT

### I. The Secretary of State Is Not a Proper Defendant

Plaintiffs complain about the manner in which ballots are prepared. But the Secretary does

---

[1] Information regarding the partisan affiliations of legislators and Governors is from the Legislative Reference Library of Texas. *See* Texas Legislators: Past & Present, https://lrl.texas.gov/legeLeaders/members/member search.cfm; Governors of Texas: 1846–present, https://lrl.texas.gov/legeLeaders/governors/govBrowse.cfm.

not prepare ballots.  Plaintiffs cannot sue the Secretary for something she does not do.

## A. The Secretary Does Not Enforce the Ballot Order Statute

Under Texas law, various local officials are charged with preparing ballots, depending on the type of election.  *See* Tex. Elec. Code § 52.002.  As a result, local officials implement the Ballot Order Statute.  The Secretary does not.[2]

Local officials have independent legal obligations to comply with the Ballot Order Statute, regardless of any action or inaction by the Secretary of State.  The Secretary does not supervise local officials' compliance with the Ballot Order Statute, and she is not empowered to ensure or prevent such compliance.

If local officials do not comply with the Ballot Order Statute, their actions may be reviewable in an election contest.  *See id.* § 221.003(a) (requiring the tribunal "to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because . . . (2) an election officer . . . (C) engaged in other fraud or illegal conduct or made a mistake").  But that is a private cause of action brought by the losing candidate, not an enforcement action brought by the Secretary of State.  *See id.* § 232.002 ("Any candidate . . . may contest the election.").

Although the Election Code charges the Secretary of State with "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of this code," *id.* § 31.003, it does not

---

[2] Plaintiffs contend that the Secretary of State "is specifically responsible for prescribing 'the form of the ballot.'"  Compl. ¶ 18 (quoting Tex. Elec. Code § 105.002(c)).  But that provision relates to a "State Write-In Ballot" for "Voting by Military Personnel or Other Persons Overseas."  Tex. Elec. Code ch. 105 (title); *id.* § 105.002 (title).  The State Write-In Ballot is rarely applicable today.  *See, e.g.*, Election Advisory 2018-04 (Jan. 9, 2018), https://www.sos.texas.gov/elections/laws/advisory2018-04.shtml ("As a practical matter, these changes to the FWAB mean that the State Write-In Ballot (SWAB) under Section 105.002 of the Code has little importance in the general election for state and county officers."); Election Advisory 2016-18 (Sept. 15, 2016), https://www.sos.texas.gov/elections/laws/advisory2016-18.shtml (same).  In any event, the State Write-In Ballot, as its name suggests, allows voters to "write in" their preferred candidates.  Voters do not select names from pre-printed lists of candidates.  Thus, the Ballot Order Statute cannot apply.  In short, the Secretary's authority under § 105.002(c) has nothing to do with Plaintiffs' claims.

provide her the power to coerce local officials. Instead, it authorizes the Secretary of State to "assist and advise all election authorities with regard to the application, operation, and interpretation of this code." *Id.* § 31.004(a). Thus, the Secretary "maintain[s] an informational service for answering inquiries of election authorities relating to the administration of the election laws or the performance of their duties." *Id.* § 31.004(b). The Secretary's other enforcement powers would not allow her to coerce a local official in a case like this. *See, e.g., id.* § 31.005.

In light of the Secretary's limited role under state law, Plaintiffs' claims suffer from two jurisdictional defects: (1) Plaintiffs cannot overcome sovereign immunity, and (2) they lack standing.

### B.     Plaintiffs Cannot Overcome Sovereign Immunity

Sovereign immunity bars Plaintiffs' claims. "[T]he principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, subject to an established exception: the *Ex parte Young* doctrine." *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted). Thus, Plaintiffs' claims fail unless they fit the *Ex parte Young* exception.

*Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation . . . ." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). As a consequence, *Ex parte Young* applies only when the defendant enforces the challenged statute. *See Ex parte Young*, 209 U.S. 123, 157 (1908) ("In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party."); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) ("The required connection is not merely the general duty to see that the laws of the

state are implemented, but the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." (quotations omitted)).

As the Fifth Circuit explained in an opinion just last week, even when a government official "*has* the authority to enforce" a challenged statute, a plaintiff still must show the official "is likely to do [so] here." *City of Austin v. Paxton*, No. 18-50646, 2019 WL 6520769, at *6, — F.3d — (5th Cir. Dec. 4, 2019). Without evidence of likely enforcement, the government official "lacks the requisite connection to the enforcement of" the challenged law. *Id.* (quotations omitted).

This case follows *a fortiori* from *Paxton*. As explained above, the Secretary *cannot* enforce the Ballot Order Statute. She does not enforce the law herself, nor does she control local officials' enforcement of it. She therefore necessarily lacks any connection to the challenged statute for purposes of *Ex parte Young*. Plaintiffs have not, and cannot, plausibly allege that the Secretary "is likely to" enforce the Ballot Order Statute. *Paxton*, 2019 WL 6520769, at *6.

But even if the Secretary could control local officials' enforcement, a federal court could not order her to exercise such power. Sovereign immunity forbids it.

The *Ex parte Young* exception is limited to prohibitory injunctions "prevent[ing] [a state official] from doing that which he has no legal right to do." *Ex parte Young*, 209 U.S. at 159. It does not authorize mandatory injunctions directing "affirmative action." *Id.*; *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 (1949) ("Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property."). Thus, sovereign immunity bars "cases where the [defendant] sued could satisfy the court decree only by acting in an official capacity." *Zapata v. Smith*, 437 F.2d 1024, 1026 (5th Cir. 1971) (Frankfurter, J., dissenting).

6

## C. Plaintiffs Do Not Have Standing to Sue the Secretary

Plaintiffs cannot establish standing to sue the Secretary because her actions do not cause their alleged injuries. Whether and how a particular ballot complies with the Ballot Order Statute depends on the actions of local officials, not the Secretary of State. Thus, Plaintiffs' asserted injuries are not "fairly traceable to the challenged action of the defendant"; they are "the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation and alterations omitted). Plaintiffs' argument that *the statute* causes their injuries is irrelevant to the question at hand: whether *Defendant* causes Plaintiffs' injuries. *See Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (dismissing for lack of standing and explaining that courts should not "confuse[] *the statute*'s immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the *defendants*").

For similar reasons, Plaintiffs' purported injuries are not redressable. Relief against the Secretary would not accomplish anything. Plaintiffs' requested injunction preventing "the Secretary of State . . . from implementing, enforcing, or giving any effect to the Ballot Order Statute" would not meaningfully change the status quo. Compl. 17. The Secretary does not implement, enforce, or give effect to the Ballot Order Statute. [3]

Plaintiffs' alternative request—an injunction "requiring the Secretary of State to use a ballot order system that gives similarly situated major-party candidates an equal opportunity to be listed first

---

[3] That the Secretary is the "Chief Election Officer" is irrelevant. Compl. ¶ 18 (citing Tex. Elec. Code § 31.001(a)). Although the Fifth Circuit once cited this statutory language in finding standing, *see OCA-Greater Hous. v. Tex.*, 867 F.3d 604, 613–14 (5th Cir. 2017), that case's reasoning does not apply when the challenged statute is enforced through a private cause of action. In *Okpalobi*, the en banc Fifth Circuit found abortion doctors did not have standing to sue state officials regarding a law regulating their conduct because the law was enforced by a private cause of action, not by the state officials. *See* 244 F.3d at 426–27. But in *OCA-Greater Houston*, there was "no private right of action," so the court distinguished *Okpalobi*. *OCA-Greater Hous.*, 867 F.3d at 613. Here, there is a private right of action, so *Okpalobi* controls. The Ballot Order Statute regulates local officials, and it is enforced through an election contest brought by the losing candidate, not the Secretary.

on the ballot"—would be equally ineffective. *Id.* Because the Secretary does not prepare the relevant ballots, the Secretary's "use [of] a ballot order system" could not redress Plaintiffs' purported injuries.

Local officials, unaffected by the judgment in this case but bound by state law, would presumably continue to implement the Ballot Order Statute just as they do now. Plaintiffs do not request an injunction ordering the Secretary of State to order local officials to disregard the Ballot Order Statute, but even if they did, this Court could not grant it. *See Okpalobi*, 244 F.3d at 427 (emphasizing "the elemental fact that a state official cannot be enjoined to act in any way that is beyond his authority to act in the first place").

When, "[f]or all practical purposes," any relief entered against the defendant would be "utterly meaningless," the plaintiff cannot establish redressability. *Id.* at 426. That is the case here.

As a result, this Court lacks jurisdiction over Plaintiffs' claims. The Secretary does not enforce the challenged statute, and she cannot control the local officials who do. That means Plaintiffs cannot overcome the State's sovereign immunity and lack standing. But even if the Secretary could control local officials, she could do so only in her official capacity, and sovereign immunity does not allow a suit to compel affirmative action by a state official.

## II.      Plaintiffs Lack Standing to Challenge the Ballot Order Statute

Plaintiffs lack Article III standing to sue any defendant because they have not suffered cognizable injuries in fact. In addition, Plaintiffs lack statutory standing because they cannot use Section 1983 to sue for alleged violations of third parties' rights.

### A.      Miller Has Not Alleged an Injury in Fact

The only individual plaintiff in this case, Rachel Miller, claims to be injured because the Ballot Order Statute reduces the likelihood that Democratic candidates will win elections. Compl. ¶ 13 (alleging Miller "will suffer" "[a]s a result" of Republican candidates having an "advantage" in the election). But complaints about election results are generalized grievances common to all supporters

of the losing party, not injuries in fact.  *See Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018) ("[T]his Court is not responsible for vindicating generalized partisan preferences.").

When a "preferred candidate . . . has less chance of being elected," the "harm" is not "a restriction on voters' rights and by itself is not a legally cognizable injury sufficient for standing." *Becker v. FEC*, 230 F.3d 381, 390 (1st Cir. 2000); *see also Gottlieb v. FEC*, 143 F.3d 618, 622 (D.C. Cir. 1998).  Indeed, even the loss of a preferred candidate is not an injury in fact.  *See Berg v. Obama*, 586 F.3d 234, 240 (3d Cir. 2009) (explaining that a plaintiff's "wish that . . . voters had chosen a different presidential candidate" is not "a legal harm").

Even if losing an election might injure a *candidate*, that loss would not constitute an injury in fact for *voters*.  "Several other Circuit Courts have also concluded that a voter fails to present an injury-in-fact when the alleged harm is abstract and widely shared or is only derivative of a harm experienced by a candidate."  *Crist v. Comm'n on Presidential Debates*, 262 F.3d 193, 195 (2d Cir. 2001).  Moreover, Miller has not plausibly alleged that any particular candidate will in fact lose an election because of the Ballot Order Statute.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (requiring an injury to be "certainly impending"); *Wagner v. Cruz*, No. 2:16-cv-55, 2016 WL 1089245, at *3 (D. Utah Mar. 18, 2016) (describing as speculative an alleged injury that turned on whether a candidate would win an election), *aff'd*, 662 F. App'x 554, 555 (10th Cir. 2016) (agreeing with "the district court's cogent, thoughtful analysis of the standing question").

Miller also claims that she suffers an injury in fact from the extra time she spends trying to help Democratic candidates avoid defeat at the polls.  But that purported injury rests on the same shaky foundation.  Because the defeat of a Democratic candidate is not a cognizable injury, neither are the costs Miller incurs in an effort to avoid that non-injury.  A plaintiff "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that does not itself qualify as an injury in fact.  *Clapper*, 568 U.S. at 402.  Those costs are, at most, self-inflicted injuries that do not

provide Article III standing. *See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 923 (D.C. Cir. 2015) (Henderson, J., concurring in the judgment) ("[I]njury attendant on the avoidance of an uncognizable injury is itself insufficient for standing because, for one thing, it is self-imposed.").

Miller cannot plausibly allege any other injury in fact. The Ballot Order Statute does not affect her ability to vote. Based on her own allegations, the statute does not prevent her from "vot[ing] consistently for Democratic Party candidates." Compl. ¶ 13.

Nor has Miller suffered a vote-dilution injury. *See id.* "The harm of vote dilution . . . . arises when an election practice—most commonly, the drawing of district lines—devalues one citizen's vote as compared to others." *Gill*, 138 S. Ct. at 1935 (Kagan, J., concurring). For example, in one-person-one-vote cases, the injury is that a vote in an "overpopulated district . . . count[s] for less than" a vote in an underpopulated district. *Id.* Similarly, in cracking or packing cases, the injury is "be[ing] placed in legislative districts deliberately designed to 'waste' . . . votes in elections where their chosen candidates will win in landslides (packing) or are destined to lose by closer margins (cracking)." *Id.* at 1930 (majority).

In this case, however, Miller's vote is neither devalued nor wasted. Miller does not complain about her districts. She claims only that her vote does not lead to electoral success because other voters choose a different candidate. Compl. ¶ 13. That is not vote dilution. It is losing an election. Miller has pled nothing to distinguish her supposed injury from the "injury" suffered by every voter who supports a losing candidate. *See Thornburg v. Gingles*, 478 U.S. 30, 57 (1986) ("[L]oss of political power through vote dilution is distinct from the mere inability to win a particular election . . . ."). That is not enough for Article III standing.

### B. The Committee Plaintiffs Lack Standing

The Committee Plaintiffs do not have either associational standing or organizational standing.

1. **Associational Standing**

The Committee Plaintiffs have not established associational standing. A plaintiff cannot have associational standing unless one of its members would have standing to sue individually. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019). Thus, the Committee Plaintiffs must "identify members who have suffered the requisite harm" for injury in fact. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (requiring evidence of "a specific member").

Because the Committee Plaintiffs have not alleged the existence of specific members, let alone specific members with individual standing, their claims should be dismissed. *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (dismissing under Rule 12(b)(1) because plaintiff did not identify a member who was affected by the challenged regulation).

At least some of the Committee Plaintiffs may not be able to allege that they have individual members at all. The DSCC and the DCCC, for example, do not describe themselves as membership organizations. Compl. ¶¶ 16–17. Not having members is fatal to associational standing. *See Hunt*, 432 U.S. at 344 (requiring "indicia of membership in an organization" for associational standing); *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267–68 (D.C. Cir. 2002).

To be sure, the Committee Plaintiffs work on behalf of various candidates, but the beneficiaries of a plaintiff's services do not qualify as members for purposes of associational standing. *See Ne. Ohio Coal. for Homeless v. Blackwell*, 467 F.3d 999, 1010 n.4 (6th Cir. 2006) ("[T]he Northeast Ohio Coalition for the Homeless apparently seeks to assert a form of representational standing never recognized by any court—standing on behalf of the group served by the organization.").

The only voter identified in the Complaint is Miller, but the Complaint does not allege that Miller is currently a member of any of the associational plaintiffs. Compl. ¶ 13. She therefore cannot

give them associational standing. But even if she were a member, that would not help the Committee Plaintiffs because Miller lacks standing for the reasons explained above. *See supra* Part II.A.

### 2. Organizational Standing

The Committee Plaintiffs do not have organizational standing because they have not plausibly alleged that they, as organizations, will suffer injuries in fact. At minimum, they cannot allege cognizable injuries unless the Ballot Order Statute will affect the outcomes of individual races. But Plaintiffs do not allege that ballot order will be outcome determinative in any particular race.

An organization has standing to sue if it satisfies the same Article III requirements of injury-in-fact, causation, and redressability applicable to individuals. *City of Kyle, Tex.*, 626 F.3d at 237 (citing *Lujan*, 504 U.S. at 560–61). "[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to" conduct its routine "'activities—with the consequent drain on the organization's resources[.]'" *Id.* at 238 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Not every diversion of resources to counteract [a] defendant's conduct, however, establishes an injury in fact." *Id.* Rather, any "[s]uch injury must be 'concrete and demonstrable.'" *Id.*

Thus, to establish standing, "an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its 'routine [] activities,'" and must "identify 'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Def. Distributed v. U.S. Dep't of State*, No. 1:15-cv-372, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238). *See also, e.g., ACORN v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999) (holding that organization's expenditures must be "caused by an[] action by" the defendant that the organization "claims is illegal, as opposed to part of the normal, day-to-day operations of the group" to confer standing) (citing *Fair Hous. Council of Suburban Phila. v. Montgomery*

*Newspapers*, 141 F.3d 71, 78 & n.5 (3d Cir. 1998)).[4]

Plaintiffs allege that Texas has had close races in the past, Compl. ¶¶ 29–31, and that "[t]here are likely to be even more highly competitive races in Texas in 2020," *id.* ¶ 33. But Plaintiffs conspicuously fail to allege that the Ballot Order Statute will cause any Democratic candidate to lose a race he otherwise would have won. Plaintiffs leave the Court to speculate about whether any given candidate will lose his next election and whether the Ballot Order Statute would be the cause of such a loss. *See Clapper*, 568 U.S. at 410–11. No such injury is "certainly impending." *Id.* at 410.

True, Plaintiffs allege that they expend resources to avoid the *possibility* of losing elections due to the Ballot Order Statute. Compl. ¶¶ 14–17. But Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416; *see also supra* Part II.A.

But even if the Committee Plaintiffs could rely on their reaction to the Ballot Order Statute, it still would not constitute an injury in fact. First, Plaintiffs' alleged reaction is to support Democratic candidates for election, which is what they do anyway. Thus, "Plaintiffs have not explained how the activities" they say the Ballot Order Statute leads them to undertake "differ from [their] routine [political] activities." *City of Kyle*, 626 F.3d at 238.

Second, "Plaintiffs have not identified any specific projects that [they] had to put on hold or otherwise curtail in order to respond to the" Ballot Order Statute. *Id.*; *see also La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000). Vague references to "efforts in other states" do not suffice. Compl. ¶¶ 16–17.

---

[4] *See also, e.g.*, *Advocacy Ctr. v. La. Tech Univ.*, No. 18-cv-0934, 2019 WL 1303212, at *4 (W.D. La. Mar. 6, 2019) ("[A]lthough an organization conceivably could have standing if it incurred [] costs [], the organization still must show that it would not have incurred these costs in the absence of defendant's illegal conduct."), *report and recommendation adopted*, 2019 WL 1301983 (W.D. La. Mar. 21, 2019) (citing *ACORN v. Fowler*, 178 F.3d at 357-58).

Thus, Plaintiffs have not plausibly pled Article III standing. Their claims should be dismissed.

## C.     The Committee Plaintiffs Lack Statutory Standing

Even if the Committee Plaintiffs had Article III standing, they would still lack statutory standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (explaining statutory standing). Section 1983 provides a cause of action only when *the plaintiff* suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a *third party's* rights.

Thus, Section 1983 follows the general rule that a plaintiff "must assert [her] own legal rights and interests, and cannot rest [her] claim to relief on the legal rights or interests of third parties." *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)) (alterations in original). When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of Article III standing. *Id.*; *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999).

Here, both of Plaintiffs' claims depend on the right to vote. Compl. ¶ 50 (basing Count I on "the fundamental right to vote"); *id.* ¶ 54 (basing Count II on "the right to vote on equal terms"). But the Committee Plaintiffs, as artificial entities, do not have voting rights. "It goes without saying that political parties, although the principal players in the political process, do not have the right to vote." *Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002); *see also Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 91 (2d Cir. 2015). The Committee Plaintiffs are necessarily asserting the rights of third parties.

The Committee Plaintiffs therefore lack statutory standing to sue under Section 1983. Because this follows from the statute itself, Plaintiffs cannot invoke any exceptions related to prudential standing. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016)

("Because Congress specified in the statute who may sue, prudential standing principles do not apply.").

But even if the Committee Plaintiffs could invoke prudential-standing exceptions, their Complaint does not do so. Plaintiffs do not allege that they have "a 'close' relationship with" voters, and there is no reason to think voters face any "hindrance" to protecting their "own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (noting the Supreme Court has generally "not looked favorably upon third-party standing").

## III. The Political Question Doctrine Bars Consideration of Plaintiffs' Claims

Sometime "the judicial department has no business entertaining [a] claim of unlawfulness— because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) (quotation omitted). Such claims present nonjusticiable "political questions" because they are "outside the courts' competence and therefore beyond the courts' jurisdiction." *Id.* "Among the political question cases the Court has identified are those that lack 'judicially discoverable and manageable standards for resolving [them].'" *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

*Rucho* held that partisan gerrymandering presented a political question for three reasons. First, "the Framers' decision to entrust districting to political entities" precluded "hold[ing] that legislators cannot take partisan interests into account." *Id.* at 2497. Thus, the relevant question is when political gerrymandering "has gone too far," not whether it is permissible at all. *Id.* (quotation omitted). Second, courts cannot "even begin to answer" whether gerrymandering "has gone too far" unless they know the "fair" baseline from which to measure departures. *Id.* at 2500–01. Third, in the gerrymandering context, "fairness" could be defined in different ways, and "[t]here are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral." *Id.* at 2500.

So too here.  First, the Framers entrusted political entities with control over ballots.  To be sure, the Secretary believes the Ballot Order Statute is justified by non-partisan interests, but Plaintiffs argue otherwise.  To the extent the Ballot Order Statute reflects partisan interests, the question is whether it goes "too far."  Second, courts cannot determine whether the statute goes too far without defining a "fair" baseline.  And third, "it is not even clear what fairness looks like in this context."  *Id.*

Does fairness require that no *votes* be affected by ballot order?  That no *candidate* receives a net benefit from ballot order?  That no *party* receives a net benefit from ballot order?  That each candidate or party have an *equal chance* of receiving any benefit from ballot order?  To complicate matters, Plaintiffs seem to concede that minor parties and independent candidates can be denied not only any benefit from ballot order but also any chance of receiving any benefit from ballot order.  *See* Compl. 9 n.3.  As in *Rucho*, Plaintiffs have not put forward any "legal standards discernible in the Constitution for" answering these questions.  139 S. Ct. at 2500.  As a result, Plaintiffs' claims are political, not judicial, and should be dismissed as non-justiciable.

## IV.  The Ballot Order Statute Is Constitutional

Plaintiffs assert two claims: that the Ballot Order Statute (1) imposes an undue burden on the right to vote, Compl. ¶¶ 44–51, and (2) violates the Equal Protection Clause, *id.* ¶¶ 52–56.  Both claims fail as a matter of law.

### A.  The Ballot Order Statute Does Not Burden the Right to Vote

Plaintiffs' right-to-vote claim fails for two independent reasons.  First, the Ballot Order Statute is not subject to the *Anderson-Burdick* framework because it does not implicate the right to vote.  Second, even if it were subject to that framework, it would easily pass constitutional muster.

#### 1.  The *Anderson-Burdick* Framework Does Not Apply

"The Constitution provides that States may prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives,' and the Court therefore has recognized that

States retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting U.S. Const. art. I, § 4). Given this broad authority, Texas decided to guide local officials in their preparation of ballots. "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Id.* (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Because the Ballot Order Statute governs the formatting local officials use in preparing ballots, it does not regulate, much less infringe, the right to vote. But the *Anderson-Burdick* test, on which Plaintiffs rely, Compl. ¶¶ 45–46, applies only when a court "evaluate[s] a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 204 (2008) (Scalia, J., concurring). That is because "[t]he right to vote derives from the right of association," as even the most expansive applications of the right to vote recognize. *Lubin v. Panish*, 415 U.S. 709, 721 n.* (1974) (Douglas, J., concurring) (quoting *Storer*, 415 U.S. at 756 (Brennan, J., dissenting)).

The ability to vote for a particular candidate may implicate the right of association, *see Burdick*, 504 U.S. at 433, but the Ballot Order Statute does not. It is unlike the restrictive ballot-access laws in *Anderson* and *Burdick*, which would have prevented supporters of certain candidates from voting for those candidates. *Anderson v. Celebrezze*, 460 U.S. 780, 782–83 (1983); *Burdick*, 504 U.S. at 430.

Regardless of the order used on a ballot, each voter remains equally able to vote for and associate with any candidate. "[M]ere ballot order denies neither the right to vote, nor the right to appear on the ballot, nor the right to form or associate in a political organization." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 717 (4th Cir. 2016). "[A]ccess to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not a constitutional concern." *Id.* at 719

(quoting *New All. Party v. N.Y. State Bd. of Elections*, 861 F. Supp. 282, 295 (S.D.N.Y. 1994)).

If, as Plaintiffs assert, the Ballot Order Statute makes it harder for some candidates to win elections, that is because fewer voters want to support a particular candidate, not because those candidates' supporters cannot vote as they wish. In substance, Plaintiffs complain that voters refuse to associate with them, not that voters cannot associate with them. "The First Amendment right to associate and to advocate provides no guarantee that a speech will persuade or that advocacy will be effective." *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 464–65 (1979) (citations and quotations omitted).

### 2. In Any Event, the Ballot Order Statute Satisfies *Anderson-Burdick*

If the Court concludes *Anderson-Burdick* applies, the Ballot Order Statute should easily pass muster. The burden on Plaintiffs, if any, is *de minimis*, and the statute advances weighty State interests.

Plaintiffs cannot claim any serious burden on the right to vote. As the Southern District of Texas found in a similar challenge to Texas's ballot order scheme, "[u]nder *Anderson*, the character and magnitude of the plaintiff's asserted constitutional violation is slight. Voters who wish to support him may look a bit further down the ballot . . . ." *Meyer v. Texas*, No. H-10-cv-3860, 2011 WL 1806524, at *6 (S.D. Tex. May 11, 2011) (citation and quotations omitted) (rejecting a write-in candidate's claim).

According to the Seventh Circuit, being listed third or even lower on the ballot "may result" in a "relatively slight disadvantage." *Bd. of Election Comm'rs of Chi. v. Libertarian Party of Ill.*, 591 F.2d 22, 27 (7th Cir. 1979). Surely being listed second, the purported plight of Plaintiffs' preferred candidates, is *de minimis*. Because the Ballot Order Statute does not seriously burden the right to vote, it is subject to relaxed scrutiny. *See Burdick*, 504 U.S. at 434. Thus, "even assuming some positional advantage here, the voters' right to choose their representatives is not sufficiently infringed as to warrant strict scrutiny . . . ." *Clough v. Guzzi*, 416 F. Supp. 1057, 1067 (D. Mass. 1976) (upholding the listing of incumbents first).

The Ballot Order Statute furthers weighty State interests that are more than sufficient to satisfy *Anderson-Burdick*. Those interests include: preventing gamesmanship, avoiding voter confusion, making voting easier, and simplifying administration. *See Burdick*, 504 U.S. at 433 (recognizing State interests in "fair and honest" elections characterized by "order, rather than chaos").

Preventing Gamesmanship: If the order in which a candidate appears on the ballot provides a benefit, that benefit should be allocated in a way that avoids gamesmanship by government officials. And if Texas citizens believe ballot order matters, avoiding the appearance of gamesmanship is also important. That requires the use of a neutral, easy-to-implement, and easy-to-enforce rule announced in advance. That is exactly what the Ballot Order Statute provides. *See Meyer*, 2011 WL 1806524, at *6 (noting the "state's regulatory interests in organizing a clear and intelligible ballot, presenting a logical arrangement based on the reasonable and nondiscriminatory basis of historical strength of support, and displaying candidates in a simple way that avoids voter confusion.").

The statute is neutral because it turns on gubernatorial elections, which either party can win. *Cf. Graves v. McElderry*, 946 F. Supp. 1569 (W.D. Okla. 1996) (holding unconstitutional a statute requiring Democratic candidates to be listed first). It also ensures local officials cannot improperly alter ballot order on a case-by-case basis. The ease of implementation, and the ease of ensuring the statute was implemented correctly, make any deviations from the Ballot Order Statute particularly obvious. That encourages compliance by local officials and citizen trust in government.

Avoiding Voter Confusion: Many voters choose candidates based on partisan affiliation. *See* Compl. ¶ 13; *Libertarian Party of Va.*, 826 F.3d at 719. Thus, using a consistent party order avoids voter confusion. If voters see that Party A is to the left, Party B is in the middle, and Party C is on the right, they are more likely to successfully pick their preferred candidates. If the party order on a ballot is inconsistent, then a voter is more likely to accidentally select a candidate from a party that he does not prefer. *See Libertarian Party of Va.*, 826 F.3d at 720 ("The ballot law ensures that if a party's candidate

for United States Senator is listed second, for example, then candidates from that party will be second in lists for other offices as well. This again advances the state's interest in efficient procedures for the election of public officials. It makes the ballot more easily decipherable, especially for voters looking for candidates affiliated with a given party." (quotation and citation omitted)); *Green Party of Tenn. v. Hargett*, No. 3:11-cv-692, 2016 WL 4379150, at *40 (M.D. Tenn. Aug. 17, 2016), *aff'd*, No. 16-6299, 2017 WL 4011854 (6th Cir. May 11, 2017) ("[T]he State's interest in party-order symmetry is also an important interest that is sufficiently weighty to justify the ballot-order statute.").

Making Voting Easier: To be sure, voters can determine partisan identification in other ways. But keeping a consistent party order eases the burden on voters. "Listing candidates by party allows voters to more quickly find their preferred choice for a given office, especially when party loyalties influence many voters' decisions." *Libertarian Party of Va.*, 826 F.3d at 719. That makes the individual voting experience more pleasant and makes lines to vote move more quickly.

Ordering parties in terms of past popularity enables most voters to reach their preferred candidates more quickly. "Additionally, other federal courts have noted a state's legitimate interests in basing ballot placement upon a showing of past strength amongst the electorate." *Meyer*, 2011 WL 1806524, at *6; *see also Bd. of Election Comm'rs of Chi. v. Libertarian Party of Ill.*, 591 F.2d 22, 27 (7th Cir. 1979) ("[W]e think that it was permissible to choose the alternative that would make the ballot as convenient and intelligible as possible for the great majority of voters, who, history indicated, would wish to vote for a candidate of one of the two major parties.").

Texas has a strong interest in making voting easier. That is why it requires local officials to prepare sample ballots that voters can study before the election. *See* Tex. Elec. Code § 52.008. Under the Ballot Order Statute, sample ballots are helpful because they mirror what every voter in that locality will see when voting. Any system that gives differently ordered ballots to different voters within a

locality would make sample ballots much less useful, and potentially confusing. That would, in turn, make voting more difficult.

Ease of Administration: Finally, the Ballot Order Statute is easy for local officials to administer. It requires almost no resources because they can simply refer to previous election results. Plaintiffs suggest randomized ballot order in general elections. Compl. ¶ 1. But randomized order would have disadvantages that the State reasonably seeks to avoid. While Plaintiffs fail to provide any indication of how local election officials would administer a randomized ballot system, it would undoubtedly require more resources to administer. Hosting lotteries, for example, costs time and money.

Second, it is harder to monitor compliance. Whether a local official complies with the current Ballot Order Statute is obvious. That improves not only compliance but also voter trust in government. Whether a local official actually uses a randomization process can be difficult to determine. Because a random process could lead to any result, no result would be conclusive evidence of official malfeasance. Thus, using a randomized order might diminish both actual election integrity and voter confidence in election integrity. *See Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) (explaining that a state "indisputably has a compelling interest in preserving the integrity of its election process" (citing *Rosario v. Rockefeller*, 410 U.S. 752, 761 (1973))).

That the State uses randomized order in primary elections does not undermine the arguments above. Compl. ¶ 1. The State has good reasons for distinguishing general elections from primary elections. In primary elections, candidates cannot be placed in party order because all candidates are, by definition, members of the same party. Thus, Texas does not have the option of using the Ballot Order Statute to govern primary elections. Moreover, randomized order is more likely to be beneficial in primary elections than in general elections. On Plaintiffs' theory, voters in primary elections are more likely to be swayed by ballot order due to the lack of partisan identifiers to distinguish candidates.

For these reasons, the Ballot Order Statute does not violate anyone's right to vote.

## B.     Plaintiffs' Equal Protection Claim Also Fails

The Ballot Order Statute does not violate the Equal Protection Clause.  Plaintiffs have not plausibly alleged intentional or purposeful discrimination in which one class is favored over another. *See Bd. of Election v. Libertarian Party*, 591 F.2d 22, 24-25 (7th Cir. 1979) (ballot placement claim under the Equal Protection Clause requires a showing of "an intentional or purposeful discrimination"); *cf. Republican Party of N.C. v. Martin*, 980 F.2d 943, 955 (4th Cir. 1992) (equal protection claim involving voting rights requires allegation of "intentional discrimination against an identifiable political group and an actual discriminatory effect on that group") (internal citation omitted); *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc) (stating that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause" (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977))).

The Ballot Order Statute applies equally to everyone, regardless of political party.  Ballot order is determined by an objective rule announced in advance.  Sometimes, Democrats have been listed before Republicans.  Other times, the opposite.  Statutes providing neutral rules, which might benefit any political party, are not rendered discriminatory by the fact that they benefit one party when applied in particular circumstances.  S*ee Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 10 n.10 (1982) (holding that "a statute providing that all such vacancies [in the legislature] be filled by appointment does not have a special impact on any discrete group of voters or candidates" and thus is not discriminatory for equal-protection purposes).  Moreover, if the statute it discriminatory at all, it is subject to rational basis review, which it easily survives for the same reasons it survives under the *Anderson-Burdick* framework.  *See supra* Part IV.A.1.

## V.     Plaintiffs Are Not Entitled to Relief

Plaintiffs are not entitled to the equitable relief they seek.  "[T]he declaratory judgment and

injunctive remedies are equitable in nature, and other equitable defenses may be interposed." *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Here, Plaintiffs' claims fail because of laches, the benefits Plaintiffs previously accepted, unclean hands, and *in pari delicto*.

"Laches is founded on the notion that equity aids the vigilant and not those who slumber on their rights." *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 708 (5th Cir. 1994) (quotation omitted). "The defense consists of three elements: (1) a delay on the part of the plaintiff in instituting suit; (2) that is not excused; and (3) that results in undue prejudice to the defendant's ability to present an adequate defense." *Id.* Each element is met here.

Plaintiffs have certainly delayed instituting suit. Texas law has been consistent since 1963. Plaintiffs could have challenged the Ballot Order Statute in the decades since then, but they did not. Instead, they waited. *See White v. Daniel*, 909 F.2d 99, 103 (4th Cir. 1990) (laches barred challenges to redistricting decisions made in 1971 and 1981 when suit was not filed until 1988).

Plaintiffs have no excuse for their delay. They are sophisticated parties represented by sophisticated counsel. *Cf. Nat'l Ass'n of Gov't Emps.*, 40 F.3d at 709. And given their involvement in the political process, Plaintiffs also must have been aware of the Ballot Order Statute and its alleged effect on electoral results. According to Plaintiffs' Complaint, the effect of ballot order was "a commonly known and accepted fact" at least as early as 1958. Compl. ¶ 19 (quoting *Kautenburger v. Jackson*, 85 Ariz. 128, 130–31 (Ariz. 1958)).

Plaintiffs' inexcusable delay has prejudiced the Secretary. "Delay and prejudice are a complimentary ratio: the more delay demonstrated, the less prejudice need be shown." *Marshall v. Meadows*, 921 F. Supp. 1490, 1494 (E.D. Va. 1996); *see also White*, 909 F.2d at 103 ("Given that plaintiffs' delay is inexcusable and unreasonable, the County need not show the degree of prejudice that would be required if the delay had been less aggravated."). But in this case, the prejudice is serious.

Plaintiffs' Complaint suggests they will rely on evidence of the Legislature's intent when it enacted the Ballot Order Statute. *See* Compl. ¶ 46 (invoking strict scrutiny). To the extent the intent of the 1963 Legislature is relevant, the Secretary faces prejudice from the loss of evidence. Laches prevents Plaintiffs from allowing their claims "to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Nat'l Ass'n of Gov't Emps.*, 40 F.3d at 710.

Moreover, the Secretary has already explained the benefits the Ballot Order Statute gives the State. Losing those benefits would be prejudice enough, but the transition to a new system would have costs of its own. Local officials are accustomed to complying with the Ballot Order Statute, and switching procedures would require retraining. Similarly, voters are accustomed to the current system, and changing it would impose voter-education costs. These harms are more significant because of how long the statute has already been in effect. If Plaintiffs had sued earlier, they probably would have been lessened.

But even if Plaintiffs had sued earlier, they would be the last people entitled to equitable relief. Plaintiffs' claims are premised on attributing to themselves the alleged harm suffered by Democratic candidates and officeholders. *But see supra* Part II. If those harms are attributable to Plaintiffs, then the actions of Democratic officeholders should be too.

As discussed above, the Democratic Party was responsible for the Ballot Order Statute in the first place. Democratic officeholders passed it, and Democratic officeholders reaffirmed it. Thus, if the Ballot Order Statute is a problem—contrary to the Secretary's arguments above—then it is a problem of Plaintiffs' own making.

And if the Ballot Order Statute provides an unconstitutional partisan advantage—again, contrary to the Secretary's arguments above—it has provided that advantage to Democrats. Texas had Democratic governors from 1965 to 1979, 1983 to 1987, and 1991 to 1995. To whatever extent the Ballot Order Statute benefits the Governor's party, it benefited Plaintiffs for decades.

Plaintiffs' fundamental inconsistency—passing a statute and accepting its alleged benefits before challenging the same statute when it allegedly benefits a competitor—precludes equitable relief. Multiple doctrines support this conclusion. For example, "[t]he Court will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits." *Fahey v. Mallonee*, 332 U.S. 245, 255 (1947) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring)). Plaintiffs' current complaints stand in stark contrast to their earlier silence, when they received the alleged benefit of the Ballot Order Statute. *See Wilkinson v. Legal Servs. Corp.*, 80 F.3d 535, 538 (D.C. Cir. 1996) (holding a federal employee could not challenge his termination on a constitutional ground that would also call into question the compensation he had previously earned).

Similarly, "[t]he equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage." *Bein v. Heath*, 47 U.S. 228, 247 (1848). Here, Plaintiffs' preferred political party was responsible for the enactment of the Ballot Order Statute. And on Plaintiffs' theory, that enactment provided a significant and unconstitutional benefit to their preferred party for years thereafter. Such behavior certainly qualifies as "gain[ing] an advantage" by "unfair means." *Id.* If a political party is to challenge the Ballot Order Statute, it should not be the one that enacted and benefited from the law.

Plaintiffs' claims therefore fail under the doctrines of unclean hands and *in pari delicto*. *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933) (holding that unclean hands preclude relief "where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation"); *Rogers v. McDorman*, 521 F.3d 381, 389 (5th Cir. 2008) (explaining that the *in pari delicto* doctrine asks whether "the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress").

## CONCLUSION

The Secretary respectfully requests that the Court dismiss Plaintiffs' Complaint.

Date: December 12, 2019

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy Attorney General for Legal Counsel

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Associate Deputy for Special Litigation

TODD LAWRENCE DISHER
Deputy Chief, Special Litigation Unit

MATTHEW H. FREDERICK
Deputy Solicitor General

WILLIAM T. THOMPSON
Special Counsel for Civil Litigation

MICHAEL R. ABRAMS
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-076)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
todd.disher@oag.texas.gov
matthew.frederick@oag.texas.gov
will.thompson@oag.texas.gov
michael.abrams@oag.texas.gov

**COUNSEL FOR THE TEXAS SECRETARY OF STATE**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on December 12, 2019, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN