**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE DEMOCRATIC NATIONAL COMMITTEE; DSCC, AKA Democratic Senatorial Campaign Committee; THE ARIZONA DEMOCRATIC PARTY, <br> *Plaintiffs-Appellants*, <br><br> v. <br><br> KATIE HOBBS, in her official capacity as Secretary of State of Arizona; MARK BRNOVICH, Attorney General, in his official capacity as Arizona Attorney General, <br> *Defendants-Appellees*, <br><br> THE ARIZONA REPUBLICAN PARTY; BILL GATES, Councilman; SUZANNE KLAPP, Councilwoman; DEBBIE LESKO, Sen.; TONY RIVERO, Rep., <br> *Intervenor-Defendants-Appellees*. | No. 18-15845 <br><br> D.C. No. 2:16-cv-01065-DLR <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Douglas L. Rayes, District Judge, Presiding

2                         DNC v. Hobbs

Argued and Submitted En Banc March 27, 2019
San Francisco, California

Filed January 27, 2020

Before:  Sidney R. Thomas, Chief Judge, and Diarmuid F.
O'Scannlain, William A. Fletcher, Marsha S. Berzon[*],
Johnnie B. Rawlinson, Richard R. Clifton, Jay S. Bybee,
Consuelo M. Callahan, Mary H. Murguia, Paul J. Watford,
and John B. Owens, Circuit Judges.

Opinion by Judge W. Fletcher;
Concurrence by Judge Watford;
Dissent by Judge O'Scannlain;
Dissent by Judge Bybee

---

[*] Judge Berzon was drawn to replace Judge Graber. Judge Berzon has read the briefs, reviewed the record, and watched the recording of oral argument held on March 27, 2019.

# SUMMARY[**]

### Civil Rights

The en banc court reversed the district court's judgment following a bench trial in favor of defendants, the Arizona Secretary of State and Attorney General in their official capacities, in an action brought by the Democratic National Committee and others challenging, first, Arizona's policy of wholly discarding, rather than counting or partially counting, ballots cast in the wrong precinct; and, second, House Bill 2023, a 2016 statute criminalizing the collection and delivery of another person's ballot.

Plaintiffs asserted that the out-of-precinct policy (OOP) and House Bill (H.B.) 2023 violated Section 2 of the Voting Rights Act of 1965 as amended because they adversely and disparately affected Arizona's American Indian, Hispanic, and African American citizens. Plaintiffs also asserted that H.B. 2023 violated Section 2 of the Voting Rights Act and the Fifteenth Amendment to the United States Constitution because it was enacted with discriminatory intent. Finally, plaintiffs asserted that the OOP policy and H.B. 2023 violated the First and Fourteenth Amendments because they unduly burden minorities' right to vote.

The en banc court held that Arizona's policy of wholly discarding, rather than counting or partially counting, OOP ballots, and H.B. 2023's criminalization of the collection of another person's ballot, have a discriminatory impact on

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

American Indian, Hispanic, and African American voters in Arizona, in violation of the "results test" of Section 2 of the Voting Rights Act. Specifically, the en banc court determined that plaintiffs had shown that Arizona's OOP policy and H.B. 2023 imposed a significant disparate burden on its American Indian, Hispanic, and African American citizens, resulting in the "denial or abridgement of the right of its citizens to vote on account of race or color." 52 U.S.C. § 10301(a). Second, plaintiffs had shown that, under the "totality of circumstances," the discriminatory burden imposed by the OOP policy and H.B. 2023 was in part caused by or linked to "social and historical conditions" that have or currently produce "an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives" and to participate in the political process. *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986); 52 U.S.C. § 10301(b).

The en banc court held that H.B. 2023's criminalization of the collection of another person's ballot was enacted with discriminatory intent, in violation of the "intent test" of Section 2 of the Voting Rights Act and of the Fifteenth Amendment. The en banc court held that the totality of the circumstances—Arizona's long history of race-based voting discrimination; the Arizona legislature's unsuccessful efforts to enact less restrictive versions of the same law when preclearance was a threat; the false, race-based claims of ballot collection fraud used to convince Arizona legislators to pass H.B. 2023; the substantial increase in American Indian and Hispanic voting attributable to ballot collection that was targeted by H.B. 2023; and the degree of racially polarized voting in Arizona—cumulatively and unmistakably revealed that racial discrimination was a motivating factor in enacting H.B. 2023. The en banc court further held that Arizona had

DNC v. HOBBS 5

not carried its burden of showing that H.B. 2023 would have been enacted without the motivating factor of racial discrimination. The panel declined to reach DNC's First and Fourteenth Amendment claims.

Concurring, Judge Watford joined the court's opinion to the extent it invalidated Arizona's out-of-precinct policy and H.B. 2023 under the results test. Judge Watford did not join the opinion's discussion of the intent test.

Dissenting, Judge O'Scannlain, joined by Judges Clifton, Bybee and Callahan, stated that the majority drew factual inferences that the evidence could not support and misread precedent along the way. In so doing, the majority impermissibly struck down Arizona's duly enacted policies designed to enforce its precinct-based election system and to regulate third-party collection of early ballots.

Dissenting, Judge Bybee, joined by Judges O'Scannlain, Clifton and Callahan, wrote separately to state that in considering the totality of the circumstances, which took into account long-held, widely adopted measures, Arizona's time, place, and manner rules were well within our American democratic-republican tradition.

## COUNSEL

Bruce V. Spiva (argued), Marc E. Elias, Elisabeth C. Frost, Amanda R. Callais, and Alexander G. Tischenko, Perkins Coie LLP, Washington, D.C.; Daniel C. Barr and Sarah R. Gonski, Perkins Coie LLP, Phoenix, Arizona; Joshua L. Kaul, Perkins Coie LLP, Madison, Wisconsin; for Plaintiffs-Appellants.

Andrew G. Pappas (argued), Joseph E. La Rue, Karen J. Hartman-Tellez, and Kara M. Karlson, Assistant Attorneys General; Dominic E. Draye, Solicitor General; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Defendants-Appellees.

Brett W. Johnson (argued) and Colin P. Ahler, Snell & Wilmer LLP, Phoenix, Arizona, for Intervenor-Defendants-Appellees.

John M. Gore (argued), Principal Deputy Assistant Attorney General; Thomas E. Chandler and Erin H. Flynn, Attorneys; Gregory B. Friel, Deputy Assistant Attorney General; Eric S. Dreiband, Assistant Attorney General; Department of Justice, CRD–Appellate Section, Washington, D.C.; for Amicus Curiae United States.

Kathleen E. Brody, ACLU Foundation of Arizona, Phoenix, Arizona; Dale Ho, American Civil Liberties Union Foundation, New York, New York; Davin Rosborough and Ceridwen Chery, American Civil Liberties Union Foundation, Washington, D.C.; for Amici Curiae American Civil Liberties Union & American Civil Liberties Union of Arizona.

## OPINION

W. FLETCHER, Circuit Judge:

The right to vote is the foundation of our democracy. Chief Justice Warren wrote in his autobiography that the precursor to one person, one vote, *Baker v. Carr*, 369 U.S. 186 (1962), was the most important case decided during his tenure as Chief Justice—a tenure that included *Brown v. Board of Education*, 347 U.S. 483 (1954). Earl Warren, *The Memoirs of Earl Warren* 306 (1977). Chief Justice Warren wrote in *Reynolds v. Sims*, 377 U.S. 533, 555 (1964): "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." Justice Black wrote in *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964): "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."

For over a century, Arizona has repeatedly targeted its American Indian, Hispanic, and African American citizens, limiting or eliminating their ability to vote and to participate in the political process. In 2016, the Democratic National Committee and other Plaintiffs-Appellants (collectively, "DNC" or "Plaintiffs") sued Arizona's Secretary of State and Attorney General in their official capacities (collectively, "Arizona") in federal district court.

DNC challenged, first, Arizona's policy of wholly discarding, rather than counting or partially counting, ballots cast in the wrong precinct ("out-of-precinct" or "OOP"

policy); and, second, House Bill 2023 ("H.B. 2023"), a 2016 statute criminalizing the collection and delivery of another person's ballot. DNC contends that the OOP policy and H.B. 2023 violate Section 2 of the Voting Rights Act of 1965 as amended ("VRA") because they adversely and disparately affect Arizona's American Indian, Hispanic, and African American citizens. DNC also contends that H.B. 2023 violates Section 2 of the VRA and the Fifteenth Amendment to the United States Constitution because it was enacted with discriminatory intent. Finally, DNC contends that the OOP policy and H.B. 2023 violate the First and Fourteenth Amendments because they unduly burden minorities' right to vote.

Following a ten-day bench trial, the district court found in favor of Arizona on all claims. *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824 (D. Ariz. 2018) (*Reagan*). DNC appealed, and a divided three-judge panel of our court affirmed. *Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686 (9th Cir. 2018) (*DNC*). A majority of non-recused active judges voted to rehear this case en banc, and we vacated the decision of the three-judge panel. *Democratic Nat'l Comm. v. Reagan*, 911 F.3d 942 (9th Cir. 2019).

We review the district court's conclusions of law de novo and its findings of fact for clear error. *Gonzalez v. Arizona*, 677 F.3d 383, 406 (9th Cir. 2012) (en banc). We may "correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (internal quotation marks omitted); *see Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 591 (9th Cir. 1997) (*Salt River*). We review for clear error the district

court's overall finding of vote dilution or vote denial in violation of the VRA. *Gingles*, 478 U.S. at 78; *Salt River*, 109 F.3d at 591.

Reviewing the full record, we conclude that the district court clearly erred. We reverse the decision of the district court. We hold that Arizona's policy of wholly discarding, rather than counting or partially counting, out-of-precinct ballots, and H.B. 2023's criminalization of the collection of another person's ballot, have a discriminatory impact on American Indian, Hispanic, and African American voters in Arizona, in violation of the "results test" of Section 2 of the VRA. We hold, further, that H.B. 2023's criminalization of the collection of another person's ballot was enacted with discriminatory intent, in violation of the "intent test" of Section 2 of the VRA and of the Fifteenth Amendment. We do not reach DNC's First and Fourteenth Amendment claims.

## I. Out-of-Precinct Policy and H.B. 2023

DNC challenges (1) Arizona's policy of wholly discarding, rather than counting or partially counting, ballots cast out-of-precinct ("OOP"), and (2) H.B. 2023, a statute that, subject to certain exceptions, criminalizes the collection of another person's early ballot. *See* Ariz. Rev. Stat. §§ 16-122, -135, -584; H.B. 2023, 52nd Leg., 2d Reg. Sess. (Ariz. 2016), *codified as* Ariz. Rev. Stat. § 16-1005(H), (I).

Arizona offers two methods of voting: (1) in-person voting at a precinct or vote center either on election day or during an early-vote period, or (2) "early voting" whereby the voter receives the ballot via mail and either mails back the voted ballot or delivers the ballot to a designated drop-off

location. Arizona's OOP policy affects in-person voting. H.B. 2023 affects early voting.

We describe in turn Arizona's OOP policy and H.B. 2023.

### A. Out-of-Precinct Policy

#### 1. Policy of Entirely Discarding OOP Ballots

Arizona law permits each county to choose a vote-center or a precinct-based system for in-person voting. *Reagan*, 329 F. Supp. 3d at 840. In counties using the vote-center system, registered voters may vote at any polling location in the county. *Id.* In counties using the precinct-based system, registered voters may vote only at the designated polling place in their precinct. Approximately 90 percent of Arizona's population lives in counties using the precinct-based system.

In precinct-based counties, if a voter arrives at a polling place and does not appear on the voter rolls for that precinct, that voter may cast a provisional ballot. *Id.*; Ariz. Rev. Stat. §§ 16-122, -135, -584. After election day, county election officials in close elections review all provisional ballots to determine the voter's identity and address. If, after reviewing a provisional ballot, election officials determine that the voter voted out of precinct, the county discards the OOP ballot in its entirety. In some instances, all of the votes cast by the OOP voter will have been cast for candidates and propositions for which the voter was legally eligible to vote. In other instances, most of the votes cast by the OOP voter will have been cast properly, in the sense that the voter was eligible to vote on those races, but one or more votes for local candidates or propositions will have been cast improperly.

In both instances, the county discards the OOP ballot in its entirety. *Reagan*, 329 F. Supp. 3d at 840. That is, the county discards not only the votes of an OOP voter for the few local candidates and propositions for which the OOP voter may have been ineligible to vote. The county also discards the votes for races for which the OOP voter was eligible to vote, including U.S. President, U.S. Senator, and (almost always) Member of the U.S. House of Representatives; all statewide officers, including Governor, and statewide propositions; (usually) all countywide officers and propositions; and (often) local candidates and propositions.

### 2. Comparison with Other States

The district court found that Arizona "consistently is at *or near* the top of the list of states that collect and reject the largest number of provisional ballots each election." *Id.* at 856 (emphasis added). The district court's finding understates the matter. Arizona is consistently at the very top of the list by a large margin.

Dr. Jonathan Rodden, Professor of Political Science and Senior Fellow at the Hoover Institution at Stanford University, provided expert reports to the district court. The court gave "great weight" to Dr. Rodden's analysis of the "rates and causes of OOP voting" in Arizona. *Id.* at 835. Dr. Rodden reported: "Since 2012, Arizona has clearly become the national leader in both provisional ballots cast and especially in provisional ballots rejected among in-person voters." Jonathan Rodden, Expert Report (Rodden) at 25.

Dr. Rodden reported that, from 2006 to 2010, between 9 to 13 percent of all in-person ballots cast in Arizona were

12                    DNC V. HOBBS

provisional ballots. *Id.* at 24. In the 2012 general election,
more than 22 percent of all in-person ballots cast were
provisional ballots. *Id.* In Maricopa County, Arizona's most
populous county, close to one in three in-person ballots cast
in 2012 were provisional ballots. *Id.* at 27–28. In the 2014
midterm election, over 18 percent of in-person ballots cast in
the State were provisional ballots. *Id.* at 25. These numbers
place Arizona at the very top of the list of States in collection
of provisional ballots.

Arizona also rejects a higher percentage of provisional
ballots than any other State. The district court found:

> In 2012 alone "[m]ore than one in every five
> [Arizona in-person] voters . . . was asked to
> cast a provisional ballot, and over 33,000 of
> these—more than 5 percent of all in-person
> ballots cast—were rejected. No other state
> rejected a larger share of its in-person ballots
> in 2012."

*Reagan*, 329 F. Supp. 3d at 856 (alterations in original)
(quoting Rodden at 24–25).

One of the most frequent reasons for rejecting provisional
ballots in Arizona is that they are cast out-of-precinct. *Id.*;
*see also* Rodden at 26–29. From 2008 to 2016, Arizona
discarded a total of 38,335 OOP ballots cast by registered
voters—29,834 ballots during presidential general elections,
and 8,501 ballots during midterm general elections. *Reagan*,
329 F. Supp. 3d at 856.

As the figure below shows, Arizona is an extreme outlier
in rejecting OOP ballots:

DNC v. HOBBS                                        13



Figure 6: Rejected out-of-precinct ballots as a share of in-person ballots cast according to 2012 EAC Report

Rodden at 26. The percentage of rejected OOP votes in Arizona is eleven times that in Washington, the State with the second-highest percentage.

The percentage of OOP ballots in Arizona, compared to all ballots cast, has declined in recent years. But the percentage of in-person ballots cast, compared to all ballots cast, has declined even more. *See* Jonathan Rodden, Rebuttal Report (Rodden Rebuttal) at 10. As a result, as a percentage

14              DNC v. Hobbs

of in-person ballots between 2008 and 2014, the percentage
of OOP ballots has increased.

### 3. Reasons for OOP Ballots

Three key factors leading to OOP ballots are frequent
changes in polling locations; confusing placement of polling
locations; and high rates of residential mobility.  These
factors disproportionately affect minority voters.  Dr. Rodden
summarized:

> Voters must invest significant effort in order
> to negotiate a dizzying array of precinct and
> polling place schemes that change from one
> month to the next.  Further, Arizona's
> population is highly mobile and residential
> locations are fluid, especially for minorities,
> young people, and poor voters, which further
> contributes to confusion around voting
> locations.

Rodden at 2; *see also Reagan*, 329 F. Supp. 3d at 857–58
(discussing these reasons).

### a. Frequent Changes in Polling Locations

Arizona election officials change voters' assigned polling
places with unusual frequency.  Maricopa County, which
includes Phoenix, is a striking example.  The district court
found that between 2006 and 2008, "at least 43 percent of
polling locations" changed.  *Reagan*, 329 F. Supp. 3d at 858.
Between 2010 and 2012, approximately 40 percent of polling
place locations were changed again.  *Id.*  These changes
continued in 2016, "when Maricopa County experimented

with 60 vote centers for the presidential preference election
[in March], then reverted to a precinct-based system with
122 polling locations for the May special election, and then
implemented over 700 assigned polling places [for] the
August primary and November general elections." *Id.* The
OOP voting rate was 40 percent higher for voters whose
polling places were changed. *Id.* As Chief Judge Thomas put
it, "the paths to polling places in the Phoenix area [are] much
like the changing stairways at Hogwarts, constantly moving
and sending everyone to the wrong place." *DNC*, 904 F.3d at
732 (Thomas, C.J., dissenting).

White voters in Maricopa County are more likely than
minority voters to have continuity in their polling place
location. Rodden at 60–61. Dr. Rodden wrote that between
the February and November elections in 2012, "the rates at
which African Americans and Hispanics experienced stability
in their polling places were each about 30 percent lower than
the rate for whites." *Id.*

### b. Confusing Placement of Polling Locations

Some polling places are located so counterintuitively that
voters easily make mistakes. In Maricopa and Pima
Counties, many polling places are located at or near the edge
of precincts. *Id.* at 50. An example is the polling place for
precinct 222 in Maricopa County during the 2012 election.
Dr. Rodden wrote:

> [A] group of 44 voters who were officially
> registered to vote in precinct 222, . . . showed
> up on Election Day at the Desert Star School,
> the polling location for precinct 173. It is
> easy to understand how they might have made

16                    DNC v. HOBBS

this mistake. Polling place 173 is the local elementary school, and the only polling place in the vicinity. It is within easy walking distance, and is the polling place for most of the neighbors and other parents at the school, yet due to a bizarre placement of the [polling place at the] Southern border of precinct 222, these voters were required to travel 15 minutes by car (according to [G]oogle maps) to vote in polling location 222, passing four other polling places along the way.

*Id.* at 47–48.

This map illustrates Dr. Rodden's point:



*Id.* at 47.

In 2012, approximately 25 percent of OOP voters lived closer to the polling place where they cast their OOP ballot than to their assigned polling place. *Id.* at 53. Voters who live more than 1.4 miles from their assigned polling place are 30 percent more likely to vote OOP than voters who live within 0.4 miles of their assigned polling place. *Id.* at 54. American Indian and Hispanic voters live farther from their assigned polling places than white voters. *Id.* at 60.

American Indian voters are particularly disadvantaged. The district court found: "Navajo voters in Northern Apache County lack standard addresses, and their precinct assignments for state and county elections are based upon guesswork, leading to confusion about the voter's correct polling place." *Reagan*, 329 F. Supp. 3d at 873; Rodden Second at 52–53.

### c. Renters and Residential Mobility

High percentages of renters and high rates of residential mobility correlate with high rates of OOP voting. *Reagan*, 329 F. Supp. 3d at 857. The district court found that rates of OOP voting are "higher in neighborhoods where renters make up a larger share of householders." *Id.* Between 2000 and 2010, almost 70 percent of Arizonans changed their residential address, the second highest rate of any State. *Reagan*, 329 F. Supp. 3d at 857; Rodden at 11–12. The district court found that "[t]he vast majority of Arizonans who moved in the last year moved to another address within their current city of residence." *Reagan*, 329 F. Supp. 3d at 857.

The need to locate the proper polling place after moving—particularly after moving a short distance in an urban area—leads to a high percentage of OOP ballots. Dr. Rodden wrote:

> An individual who faces a rent increase in one apartment complex and moves to another less than a mile away might not be aware that she has moved into an entirely new precinct—indeed, in many cases . . . she may still live closest to her old precinct, but may now be

> required to travel further in order to vote in
> her new assigned precinct. Among groups for
> whom residential mobility is common,
> requirements of in-precinct-voting—as well
> as the requirement that they update their
> registration with the state every time that they
> move even a short distance within a
> county—can make it substantially more
> burdensome to participate in elections.

Rodden at 11.

The district court found that minority voters in Arizona
have "disproportionately higher rates of residential mobility."
*Reagan*, 329 F. Supp. 3d at 872. The court found, "OOP
voting is concentrated in relatively dense precincts that are
disproportionately populated with renters and those who
move frequently. These groups, in turn, are
disproportionately composed of minorities." *Id.*

### 4. Disparate Impact on Minority Voters

The district court found that Arizona's policy of wholly
discarding OOP ballots disproportionately affects minority
voters. *Reagan*, 329 F. Supp. 3d at 871. During the general
election in 2012 in Pima County, compared to white voters,
the rate of OOP ballots was 123 percent higher for Hispanic
voters, 47 percent higher for American Indian voters, and
37 percent higher for African American voters. Rodden
at 43. During the 2014 and 2016 general elections in Apache,
Navajo, and Coconino Counties, the vast majority of OOP
ballots were in areas that are almost entirely American
Indian. Rodden Rebuttal at 53–54, 58; Jonathan Rodden,
Second Expert Report (Rodden Second) at 22. In all

likelihood, the reported numbers underestimate the degree of disparity. Dr. Rodden wrote, "[A]lthough the racial disparities described . . . are substantial, they should be treated as a *conservative* lower bound on the true differences in rates of out-of-precinct voting across groups." Rodden Second at 15 (emphasis in original). The district court found, "Dr. Rodden credibly explained that the measurement error for Hispanic probabilities leads only to the under-estimation of racial disparities." *Reagan*, 329 F. Supp. 3d at 838.

Racial disparities in OOP ballots in 2016 "remained just as pronounced" as in 2012 and 2014. Rodden Second at 3. For example, the rates of OOP ballots in Maricopa County "were twice as high for Hispanics, 86 percent higher for African Americans, and 73 percent higher for Native Americans than for their non-minority counterparts." *Reagan*, 329 F. Supp. 3d at 871–72; Rodden Second at 29. "In Pima County, rates of OOP voting were 150 percent higher for Hispanics, 80 percent higher for African Americans, and 74 percent higher for Native Americans than for non-minorities." *Reagan*, 329 F. Supp. 3d at 872. "[I]n Pima County the overall rate of OOP voting was higher, and the racial disparities larger, in 2016 than in 2014." *Id.*; Rodden Second at 33.

The district court found:

> Among all counties that reported OOP ballots in the 2016 general election, a little over 1 in every 100 Hispanic voters, 1 in every 100 African-American voters, and 1 in every 100 Native American voters cast an OOP ballot. For non-minority voters, the figure was around 1 in every 200 voters.

*Reagan*, 329 F. Supp. 3d at 872. That is, in the 2016 general election, as in the two previous elections, American Indians, Hispanics, and African Americans voted OOP at twice the rate of whites.

### B. H.B. 2023

#### 1. Early Voting and Ballot Collection

Arizona has permitted early voting for over 25 years. *Id.* at 839. "In 2007, Arizona implemented permanent no-excuse early voting by mail, known as the Permanent Early Voter List ("PEVL")." *Id.* Under PEVL, Arizonans may either (a) request an early vote-by-mail ballot on an election-by-election basis, or (b) request that they be placed on the Permanent Early Voter List. *See id.*; Ariz. Rev. Stat. §§ 16-542, -544. Some counties permit voters to drop their early ballots in special drop boxes. All counties permit the return of early ballots by mail, or in person at a polling place, vote center, or authorized election official's office. Early voting is by far "the most popular method of voting [in Arizona]." *Reagan*, 329 F. Supp. 3d at 839. Approximately 80 percent of all ballots cast in the 2016 general election were early ballots. *Id.* Until the passage of H.B. 2023, Arizona did not restrict collection and drop-off of voted ballots by third parties.

The district court heard extensive testimony about the number of ballots collected and turned in by third parties. *Id.* at 845. A Maricopa County Democratic Party organizer testified that during the course of her work for the party she personally saw 1,200 to 1,500 early ballots collected and turned in by third-party volunteers. These were only a portion of the total ballots collected by her organization. The

organizer testified that during the 2010 election the Maricopa County Democratic Party collected hundreds of ballots from a heavily Hispanic neighborhood in one state legislative district alone. A representative of Citizens for a Better Arizona testified that the organization collected approximately 9,000 early ballots during the 2012 Maricopa County Sheriff's election. A member of the Arizona Democratic Party testified that the party collected "a couple thousand ballots" in 2014. *Id.* A community advocate testified before the Arizona Senate Elections Committee that in one election he collected 4,000 early ballots. *Id.* A Phoenix City Councilmember testified that she and her volunteers collected about 1,000 early ballots in an election in which she received a total of 8,000 votes.

### 2. Minority Voters' Reliance on Third-Party Ballot Collection

The district court found "that prior to H.B. 2023's enactment minorities generically were more likely than non-minorities to return their early ballots with the assistance of third parties." *Id.* at 870. The court recounted: "Helen Purcell, who served as the Maricopa County Recorder for 28 years from 1988 to 2016, observed that ballot collection was disproportionately used by Hispanic voters." *Id.* Individuals who collected ballots in past elections "observed that minority voters, especially Hispanics, were more interested in utilizing their services." *Id.* One ballot collector testified about what she termed a "case study" demonstrating the extent of the disparity. In 2010, she and her fellow organizers collected "somewhere south of 50 ballots" in one area. The area was later redistricted before the next election to add the heavily Hispanic neighborhood of Sunnyslope. In

2012, the organization "pulled in hundreds of ballots, [with the] vast majority from that Sunnyslope area."

The district court found that, in contrast, the Republican Party has "not significantly engaged in ballot collection as a GOTV [Get Out the Vote] strategy." *Id.* The base of the Republican Party in Arizona is white. *Id.* Individuals who engaged in ballot collection in past elections observed that voters in predominately white areas "were not as interested in ballot collection services." *Id.*

Minority voters rely on third-party ballot collection for many reasons. Joseph Larios, a community advocate who has collected ballots in past elections, testified that "returning early mail ballots presents special challenges for communities that lack easy access to outgoing mail services; the elderly, homebound, and disabled voters; socioeconomically disadvantaged voters who lack reliable transportation; voters who have trouble finding time to return mail because they work multiple jobs or lack childcare services; and voters who are unfamiliar with the voting process and therefore do not vote without assistance or tend to miss critical deadlines." *Id.* at 847–48 (summarizing Larios' testimony). These burdens fall disproportionately on Arizona's minority voters.

Arizona's American Indian and Hispanic communities frequently encounter mail-related problems that make returning early ballots difficult. In urban areas of heavily Hispanic counties, many apartment buildings lack outgoing mail services. *Id.* at 869. Only 18 percent of American Indian registered voters have home mail service. *Id.* White registered voters have home mail service at a rate over 350 percent higher than their American Indian counterparts. *Id.* Basic mail security is an additional problem. Several

witnesses testified that incoming and outgoing mail often go missing. *Id.* The district court found that especially in low-income communities, frequent mail theft has led to "distrust" in the mail service. *Id.*

A lack of transportation compounds the issue. "Hispanics, Native Americans, and African Americans . . . are significantly less likely than non-minorities to own a vehicle, more likely to rely upon public transportation, [and] more likely to have inflexible work schedules[.]" *Id.* In San Luis—a city that is 98 percent Hispanic—a major highway separates almost 13,000 residents from their nearest post office. *Id.* The city has no mass transit, a median income of $22,000, and many households with no cars. *Id.* On the Navajo Reservation, "most people live in remote communities, many communities have little to no vehicle access, and there is no home incoming or outgoing mail, only post office boxes, sometimes shared by multiple families." *Id.* "[R]esidents of sovereign nations often must travel 45 minutes to 2 hours just to get a mailbox." *DNC*, 904 F.3d at 751–52 (Thomas, C.J., dissenting). As a result, voting "requires the active assistance of friends and neighbors" for many American Indians. *Reagan*, 329 F. Supp. 3d at 870 (quoting Rodden Second at 60).

The adverse impact on minority communities is substantial. Without "access to reliable and secure mail services" and without reliable transportation, many minority voters "prefer instead to give their ballots to a volunteer." *Id.* at 869. These communities thus end up relying heavily on third-party collection of mail-in ballots. Dr. Berman wrote with respect to Hispanic voters:

> [T]he practice of collecting ballots, used principally in Hispanic areas, ha[s] contributed to more votes being cast in those places tha[n] would have been cast without the practice. . . . That the practice has increased minority turnout appears to have been agreed upon or assumed by both sides of the issue[.] Democrats and Hispanic leaders have seen reason to favor it, Republicans have not.

Berman, Expert Reply Report at 8–9. Similarly, LeNora Fulton, a member of the Navajo Nation and previous Apache County Recorder, testified that it was "standard practice" in Apache County and the Nation to vote by relying on non-family members with the means to travel. *Reagan*, 329 F. Supp. 3d at 870.

### 3.  History of H.B. 2023

Before the passage of H.B. 2023, Arizona already criminalized fraud involving possession or collection of another person's ballot. The district court wrote:

> [B]allot tampering, vote buying, or discarding someone else's ballot all were illegal prior to the passage of H.B. 2023. Arizona law has long provided that any person who knowingly collects voted or unvoted ballots and does not turn those ballots in to an elections official is guilty of a class 5 felony. A.R.S. § 16-1005. Further, Arizona has long made all of the following class 5 felonies: "knowingly mark[ing] a voted or unvoted ballot or ballot

26                          DNC V. HOBBS

> envelope with the intent to fix an election;"
> "receiv[ing] or agree[ing] to receive any
> consideration in exchange for a voted or
> unvoted ballot;" possessing another's voted or
> unvoted ballot with intent to sell; "knowingly
> solicit[ing] the collection of voted or unvoted
> ballots by misrepresenting [one's self] as an
> election official or as an official ballot
> repository or . . . serv[ing] as a ballot drop off
> site, other than those established and staffed
> by election officials;" and "knowingly
> collect[ing] voted or unvoted ballots and . . .
> not turn[ing] those ballots in to an election
> official . . . or any . . . entity permitted by law
> to transmit post." A.R.S. §§ 16-1005(a)–(f).
> The early voting process also includes a
> number of other safeguards, such as tamper
> evident envelopes and a rigorous voter
> signature verification procedure.

*Reagan*, 329 F. Supp. 3d at 854 (alterations in original)
(internal record citations omitted).

There is no evidence of any fraud in the long history of
third-party ballot collection in Arizona. Despite the extensive
statutory provisions already criminalizing fraud involving
possession or collection of another person's ballot, and
despite the lack of evidence of any fraud in connection with
third-party ballot collection, Republican State Senator
Don Shooter introduced a bill in February 2011. S.B. 1412,
50th Leg., 1st Reg. Sess. (introduced) (Ariz. 2011),
http://www.azleg.gov/legtext/50leg/1r/bills/sb1412p.htm.

Senator Shooter's bill criminalized non-fraudulent third-party ballot collection.  The district court had no illusions about Senator Shooter's motivation.  It found:

> Due to the high degree of racial polarization in his district, Shooter was in part motivated by a desire to eliminate what had become an effective Democratic GOTV strategy.  Indeed, Shooter's 2010 election was close:  he won with 53 percent of the total vote, receiving 83 percent of the non-minority vote but only 20 percent of the Hispanic vote.

*Reagan*, 329 F. Supp. 3d at 879–80.

The state legislature amended Senator Shooter's bill several times, watering it down significantly.  As finally enacted, the bill—included as part of a series of election-related changes in Senate Bill 1412 ("S.B. 1412")—restricted the manner in which unrelated third parties could collect and turn in more than ten voted ballots.  S.B. 1412, 50th Leg., 1st Reg. Sess. (engrossed), Sec. 3 at D (Ariz. 2011), https://legiscan.com/AZ/text/SB1412/id/233492/Arizona-2011-SB1412-Engrossed.html.  If a third-party ballot collector turned in more than ten ballots, the collector was required to provide photo identification.  After each election, the Secretary of State was required to compile a statewide public report listing ballot collectors' information.  The bill did not criminalize any violation of its provisions.

When S.B. 1412 became law, Arizona was still subject to preclearance under the Voting Rights Act.  S.B. 1412 therefore could not go into effect until it was precleared by the U.S. Department of Justice ("DOJ") or a three-judge

federal district court. On May 18, 2011, the Arizona
Attorney General submitted S.B. 1412 to DOJ for
preclearance. Arizona Attorney General Thomas Horne,
*Effect of* Shelby County *on Withdrawn Preclearance
Submissions*, (August 29, 2013), https://www.azag.gov/opi
nions/i13-008-r13-013. On June 27, 2011, DOJ precleared all
provisions of S.B. 1412 except the provision regulating third-
party ballot collection. *Reagan*, 329 F. Supp. 3d at 880.

DOJ sent a letter to Arizona concerning the third-party
ballot collection provision, stating that the information
provided with the preclearance request was "insufficient to
enable [DOJ] to determine that the proposed changes have
neither the purpose nor will have the effect of denying or
abridging the right to vote on account of race, color, or
membership in a language minority group." *Id.* at 880–81.
DOJ requested additional information and stated that it "may
object" to the proposed change if no response was received
within sixty days. *Id.* at 881.

Instead of responding with the requested information, the
Arizona Attorney General withdrew the preclearance request
for the third-party ballot collection provision. *Id.* The
Attorney General did so for good reason. According to DOJ
records, Arizona's Elections Director, who had helped draft
the provision, had admitted to DOJ that the provision was
"targeted at voting practices in predominantly Hispanic
areas."

The state legislature formally repealed the provision after
receiving the letter from DOJ. Withdrawing a preclearance
request was not common practice in Arizona. Out of
773 proposals that Arizona submitted for preclearance over

almost forty years, the ballot collection provision of S.B. 1412 was one of only six that Arizona withdrew.  *Id.*

Two years later, on June 25, 2013, the United States Supreme Court decided *Shelby County v. Holder*, 570 U.S. 529 (2013).  The Court declared unconstitutional the formula in Section 4(b) of the VRA for determining "covered jurisdictions," thereby eliminating preclearance under Section 5 for any previously covered jurisdiction, including Arizona. On June 19, 2013, Arizona's Governor had signed a new bill, H.B. 2305, which entirely banned partisan ballot collection and required non-partisan ballot collectors to complete an affidavit stating that they had returned the ballot. *Reagan*, 329 F. Supp. 3d at 881; H.B. 2305, 51st Leg., 1st Reg. Sess. (engrossed), at Secs. 3 and 5 (Ariz. 2013), https://legiscan.com/AZ/text/HB2305/id/864002.  Violation of H.B. 2305 was a criminal misdemeanor.

H.B. 2305 "was passed along nearly straight party lines in the waning hours of the legislative session."  *Reagan*, 329 F. Supp. 3d at 881.  "Shortly after its enactment, citizen groups organized a referendum effort[.]"  *Id.*  They "collected more than 140,000 signatures"—significantly more than the required amount—"to place H.B. 2305 on the ballot for a straight up-or-down [statewide] vote" in the next election. *Id.* Arizona law provided that repeal by referendum prevented the legislature from enacting future related legislation without a supermajority vote.  Moreover, any such future legislation could only "further[]"—not undercut—"the purposes" of the referendum.  Ariz. Const. art. IV, pt. 1, § 1(6)(C), (14). "Rather than face a referendum, Republican legislators . . . repealed their own legislation along party lines."  *Reagan*, 329 F. Supp. 3d at 881.  The primary sponsor of H.B. 2305, then-State Senator Michele Reagan (a future Secretary of

State of Arizona and an original defendant in this action),
"admitted that the legislature's goal [in repealing H.B. 2305]
was to break the bill into smaller pieces and reintroduce
individual provisions 'a la carte.'" *Id.*

During the 2015 and 2016 legislative sessions,
Republican legislators again sought to criminalize ballot
collection by third parties, culminating in 2016 in the passage
of H.B. 2023, the measure challenged in this suit. The district
court found that Republican legislators had two motivations
for passing H.B. 2023. First, Republican legislators were
motivated by the "unfounded and often farfetched allegations
of ballot collection fraud" made by former State Senator
Shooter—who had introduced the bill to limit third-party
ballot collection in 2011. *Id.* at 880 (finding Shooter's
allegations "demonstrably false"). Second, Republican
legislators were motivated by a "racially-tinged" video
known as the "LaFaro Video." *Id.*

The video gave proponents of H.B. 2023 their best and
only "evidence" of voter fraud. During legislative hearings
on previous bills criminalizing third-party collection, the
district court wrote, "Republican sponsors and proponents
[had] expressed beliefs that ballot collection fraud regularly
was occurring but struggled with the lack of direct evidence
substantiating those beliefs." *Id.* at 876. In 2014,
Republicans' "perceived 'evidence' arrived in the form of a
racially charged video created by Maricopa County
Republican Chair A.J. LaFaro . . . and posted on a blog." *Id.*
The court summarized:

> The LaFaro Video showed surveillance
> footage of a man of apparent Hispanic
> heritage appearing to deliver early ballots. It

> also contained a narration of "Innuendos of illegality . . . [and] racially tinged and inaccurate commentary by . . . LaFaro." LaFaro's commentary included statements that the man was acting to stuff the ballot box; that LaFaro did not know if the person was an illegal alien, a dreamer, or citizen, but knew that he was a thug; and that LaFaro did not follow him out to the parking lot to take down his tag number because he feared for his life.

*Id.* (alterations in original and internal record citations omitted). A voice-over on the video described "ballot parties" where people supposedly "gather en mass[e] and give their un-voted ballots to operatives of organizations so they can not only collect them, but also vote them illegally." *Id.* at 876–77.

The district court found, "The LaFaro Video did not show any obviously illegal activity and there is no evidence that the allegations in the narration were true." *Id.* at 877. The video "merely shows a man of apparent Hispanic heritage dropping off ballots and not obviously violating any law." *Id.* The video "became quite prominent in the debates over H.B. 2023." *Id.* The court wrote:

> The LaFaro video also was posted on Facebook and YouTube, shown at Republican district meetings, and was incorporated into a television advertisement—entitled "Do You Need Evidence Terry?"—for Secretary Reagan when she ran for Secretary of State. In the ad, the LaFaro Video plays after a clip of then-Arizona Attorney General Terry

> Goddard stating he would like to see evidence
> that there has been ballot collection fraud.
> While the video is playing, Secretary
> Reagan's narration indicates that the LaFaro
> Video answers Goddard's request for
> evidence of fraud.

*Id.* (internal record citations omitted). The court found,
"Although no direct evidence of ballot collection fraud was
presented to the legislature or at trial, Shooter's allegations
and the LaFaro Video were successful in convincing H.B.
2023's proponents that ballot collection presented
opportunities for fraud that did not exist for in-person
voting[.]" *Id.* at 880.

The district court found that H.B. 2023 is no harsher than
any of the third-party ballot collection bills previously
introduced in the Arizona legislature. The court found:

> [A]lthough Plaintiffs argue that the legislature
> made H.B. 2023 harsher than previous ballot
> collection bills by imposing felony penalties,
> they ignore that H.B. 2023 in other respects is
> more lenient than its predecessors given its
> broad exceptions for family members,
> household members, and caregivers.

*Id.* at 881. In so finding, the district court clearly erred. Both
S.B. 1412 and H.B. 2305 were more lenient than H.B. 2023.

For example, S.B. 1412, which was presented to DOJ for
preclearance, required a third party collecting more than ten
voted ballots to provide photo identification. There were no
other restrictions on third-party ballot collection. There were

DNC v. HOBBS                    33

no criminal penalties.  By contrast, under H.B. 2023 a third
party may collect a ballot only if the third party is an official
engaged in official duties, or is a family member, household
member, or caregiver of the voter.  Ariz. Rev. Stat. § 16-
1005(H), (I); *Reagan*, 329 F. Supp. 3d at 839–40.  A third
party who violates H.B. 2023 commits a class 5 felony.

In 2011, the relatively permissive third-party ballot
collection provision of S.B. 1412 was withdrawn from
Arizona's preclearance request when DOJ asked for more
information.  In 2016, in the wake of *Shelby County* and
without fear of preclearance scrutiny, Arizona enacted H.B.
2023.

## II.  Section 2 of the VRA

"Congress enacted the Voting Rights Act of 1965 for the
broad remedial purpose of 'rid[ding] the country of racial
discrimination in voting.'"  *Chisom v. Roemer*, 501 U.S. 380,
403 (1991) (alteration in original) (quoting *South Carolina v.
Katzenbach*, 383 U.S. 301, 315 (1966)).  "The Act create[d]
stringent new remedies for voting discrimination where it
persists on a pervasive scale, and . . . strengthen[ed] existing
remedies for pockets of voting discrimination elsewhere in
the country."  *Katzenbach*, 383 U.S. at 308.

When Section 2 of the Voting Rights Act was originally
enacted in 1965, it read:

> SEC.   2.   No   voting   qualification   or
> prerequisite to voting, or standard, practice, or
> procedure shall be imposed or applied by any
> State   or   political   subdivision   to   deny   or

> abridge the right of any citizen of the United
> States to vote on account of race or color.

*Chisom*, 501 U.S. at 391 (citing 79 Stat. 437). "At the time
of the passage of the Voting Rights Act of 1965, § 2, unlike
other provisions of the Act, did not provoke significant debate
in Congress because it was viewed largely as a restatement of
the Fifteenth Amendment." *Id.* at 392. The Fifteenth
Amendment provides that "[t]he right of citizens of the
United States to vote shall not be denied or abridged by the
United States or by any State on account of race, color, or
previous condition of servitude," and it authorizes Congress
to enforce the provision "by appropriate legislation." U.S.
Const. amend. XV. In *City of Mobile v. Bolden*, 446 U.S. 55
(1980) (plurality), the Supreme Court held that the "coverage
provided by § 2 was unquestionably coextensive with the
coverage provided by the Fifteenth Amendment; the
provision simply elaborated upon the Fifteenth Amendment."
*Chisom*, 501 U.S. at 392. That is, the Court held that proof of
intentional discrimination was necessary to establish a
violation of Section 2. *Id.* at 393.

Congress responded to *Bolden* by amending Section 2,
striking out "to deny or abridge" and substituting "in a
manner which *results* in a denial or abridgement of." *Id.*
(quoting amended Section 2; emphasis added by the Court);
*see also Gingles*, 478 U.S. at 35. "Under the amended
statute, proof of intent [to discriminate] is no longer required
to prove a § 2 violation." *Chisom*, 501 U.S. at 394. Rather,
plaintiffs can now prevail under Section 2 either by
demonstrating proof of intent to discriminate or "by
demonstrating that a challenged election practice has resulted
in the denial or abridgment of the right to vote based on color
or race." *Id.* That is, a Section 2 violation can "be

established by proof of discriminatory results alone." *Chisom*, 501 U.S. at 404. The Supreme Court summarized: "Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the '*results test*.'" *Gingles*, 478 U.S. at 35 (emphasis added).

A violation of Section 2 may now be shown under either the results test or the intent test. *Id.* at 35, 44. In the sections that follow, we analyze Plaintiffs' challenges under these two tests. First, we analyze Arizona's OOP policy and H.B. 2023 under the results test. Second, we analyze H.B. 2023 under the intent test.

### A. Results Test: OOP Policy and H.B. 2023

#### 1. The Results Test

Section 2 of the VRA "'prohibits all forms of voting discrimination' that lessen opportunity for minority voters." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 238 (4th Cir. 2014) (quoting *Gingles*, 478 U.S. at 45 n.10). As amended in 1982, Section 2 of the VRA provides:

> (a) No voting qualification or prerequisite to voting or *standard, practice, or procedure* shall be imposed or applied by any State or political subdivision in a manner *which results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

> (b) A violation of subsection (a) is established if, based on the *totality of circumstances*, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301 (emphases added).

The results test of Section 2 applies in both vote dilution and vote denial cases. "Vote dilution claims involve challenges to methods of electing representatives—like redistricting or at-large districts—as having the effect of diminishing minorities' voting strength." *Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated on other grounds*, 2014 WL 10384647 (6th Cir. 2014). A vote denial claim is generally understood to be "any claim that is not a vote dilution claim." *Id.* The case now before us involves two vote-denial claims.

The jurisprudence of vote-denial claims is relatively underdeveloped in comparison to vote-dilution claims. As explained by the Fourth Circuit, "[T]he predominance of vote dilution in Section 2 jurisprudence likely stems from the effectiveness of the now-defunct Section 5 preclearance requirements that stopped would-be vote denial from occurring in covered jurisdictions[.]" *League of Women Voters*, 769 F.3d at 239.

In evaluating a vote-denial challenge to a "standard, practice, or procedure" under the "results test" of Section 2, most courts, including our own, engage in a two-step process. We first did so, in abbreviated fashion, in *Smith v. Salt River Project Agricultural Improvement & Power District*, 109 F.3d 586 (9th Cir. 1997). We later did so, at somewhat greater length, in *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc). Other circuits have subsequently used a version of the two-step analysis. *See Veasey v. Abbott*, 830 F.3d 216, 244–45 (5th Cir. 2016); *League of Women Voters*, 769 F.3d at 240 (4th Cir. 2014); *Husted*, 768 F.3d at 554 (6th Cir. 2014). *Compare Frank v. Walker*, 768 F.3d 744, 755 (7th Cir. 2014) ("We are skeptical about the second of these steps[.]").

First, we ask whether the challenged standard, practice or procedure results in a disparate burden on members of the protected class. That is, we ask whether, "as a result of the challenged practice or structure[,] plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Gingles*, 478 U.S. at 44. The mere existence—or "bare statistical showing"—of a disparate impact on a racial minority, in and of itself, is not sufficient. *See Salt River*, 109 F.3d at 595 ("[A] bare statistical showing of disproportionate *impact* on a racial minority does not satisfy the § 2 'results' inquiry." (emphasis in original)).

Second, if we find at the first step that the challenged practice imposes a disparate burden, we ask whether, under the "totality of the circumstances," there is a relationship between the challenged "standard, practice, or procedure," on the one hand, and "social and historical conditions" on the other. The purpose of the second step is to evaluate a

disparate burden in its real-world context rather than in the abstract. As stated by the Supreme Court, "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives" or to participate in the political process. *Gingles*, 478 U.S. at 47; 52 U.S.C. § 10301(b). To determine at the second step whether there is a legally significant relationship between the disparate burden on minority voters and the social and historical conditions affecting them, we consider, as appropriate, factors such as those laid out in the Senate Report accompanying the 1982 amendments to the VRA. *Id.* at 43 ("The Senate Report which accompanied the 1982 amendments elaborates on the nature of § 2 violations and on the proof required to establish these violations."); *Veasey*, 830 F.3d at 244–45.

The Senate Report provides:

> If as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice, there is a violation of this section. To establish a violation, plaintiffs could show a variety of factors, depending on the kind of rule, practice, or procedure called into question.

> Typical factors include:

>> 1. the extent of any history of official discrimination in the state or political

DNC v. Hobbs                    39

subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S. Rep. No. 97-417 ("S. Rep."), at 28–29 (1982); *see Gingles*, 478 U.S. at 36–37 (quoting the Senate Report).

The Senate Committee's list of "typical factors" is neither comprehensive nor exclusive. S. Rep. at 29. "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* "[T]he question whether the political processes are 'equally open' depends on a searching practical evaluation of the 'past and present reality.'" *Id.* at 30. An evaluation of the totality

of circumstances in a Section 2 results claim, including an evaluation of appropriate Senate factors, requires "a blend of history and an intensely local appraisal[.]" *Gingles*, 478 U.S. at 78 (quoting *White v. Regester*, 412 U.S. 755, 769–70 (1973)). The Senate factors are relevant to both vote-denial and vote-dilution claims. *Gingles*, 478 U.S. at 45 (Senate factors will be "pertinent to certain types of § 2 claims," including vote denial claims, but will be "particularly [pertinent] to vote dilution claims.").

Our sister circuits have struck down standards, practices, or procedures in several vote-denial cases after considering the Senate factors. In *Husted*, the Sixth Circuit upheld a district court's finding that an Ohio law limiting early voting violated the results test of Section 2. The court wrote,

> We find Senate factors one, three, five, and nine particularly relevant to a vote denial claim in that they specifically focus on how historical or current patterns of discrimination "hinder [minorities'] ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37 (quoting Senate factor five). All of the factors, however, can still provide helpful background context to minorities' overall ability to engage effectively on an equal basis with other voters in the political process.

*Husted*, 768 F.3d at 555. In *Veasey*, the Fifth Circuit upheld a district court's finding that Texas's requirement that a photo ID be presented at the time of voting violated the results test. *Veasey*, 830 F.3d at 256–64 (considering Senate factors one, two, five, six, seven, eight, and nine). In *League of Women*

*Voters*, the Fourth Circuit held that the district court had clearly erred in finding that the results test had not been violated by North Carolina's elimination of same-day registration, and by North Carolina's practice of wholly discarding out-of-precinct ballots. *League of Women Voters*, 769 F.3d at 245–46 (considering Senate factors one, three, and nine).

### 2. OOP Policy and the Results Test

Uncontested evidence in the district court established that minority voters in Arizona cast OOP ballots at twice the rate of white voters. The question is whether the district court clearly erred in holding that Arizona's policy of entirely discarding OOP ballots does not violate the "results test" of Section 2.

### a. Step One: Disparate Burden

The question at step one is whether Arizona's policy of entirely discarding OOP ballots results in a disparate burden on a protected class. The district court held that Plaintiffs failed at step one. The district court clearly erred in so holding.

Extensive and uncontradicted evidence in the district court established that American Indian, Hispanic, and African American voters are over-represented among OOP voters by a ratio of two to one. *See* Part II(A), *supra*. The district court wrote, "Plaintiffs provided quantitative and statistical evidence of disparities in OOP voting through the expert testimony of Dr. Rodden . . . . Dr. Rodden's analysis is credible and shows that minorities are over-represented among the small number of voters casting OOP ballots."

*Reagan*, 329 F. Supp. 3d at 871.  Dr. Rodden reported that this pattern was consistent over time and across counties. Based on this evidence, the court found that during the 2016 general election, American Indian, Hispanic, and African American voters were twice as likely as white voters to vote out-of-precinct and not have their votes counted.  *Id.* at 872.

Despite these factual findings, the district court held that Arizona's policy of entirely discarding OOP ballots does not impose a disparate burden under the results test.  The court gave two reasons to support its holding.

First, the district court discounted the disparate burden on the ground that there were relatively few OOP ballots cast in relation to the total number of ballots.  *Id.* at 872.  The district court clearly erred in so doing.

The district court pointed out that the absolute number of OOP ballots in Arizona fell between 2012 and 2016.  It pointed out, further, that as a percentage of all ballots cast, OOP ballots fell from 0.47 percent to 0.15 percent during that period.  *Id.*  The numbers and percentages cited by the district court are accurate.  Standing alone, they may be read to suggest that locating the correct precinct for in-person voting has become easier and that OOP ballots, as a percentage of in-person ballots, have decreased accordingly.

However, the opposite is true.  Arizona's OOP policy applies only to in-person ballots.  The proper baseline to measure OOP ballots to is thus not all ballots, but all *in-person* ballots.  The district court failed to point out that the absolute number of all in-person ballots fell more than the absolute number of OOP ballots, and that, as a result, as a

percentage of in-person ballots, OOP ballots increased rather than decreased.

Even putting aside the potentially misleading numbers and percentages cited by the district court and focusing only on the decline in the absolute number of OOP ballots, the court clearly erred. As indicated above, the vote-denial category encompasses all cases that are not vote-dilution cases. The number of minority voters adversely affected, and the mechanism by which they are affected, may vary considerably. For example, if a polling place denies an individual minority voter her right to vote based on her race or color, Section 2 is violated based on that single denial. However, a different analysis may be appropriate when a facially neutral policy adversely affects a number of minority voters. Arizona's OOP policy is an example. We are willing to assume in such a case that more than a de minimis number of minority voters must be burdened before a Section 2 violation based on the results test can be found. Even on that assumption, however, we conclude that the number of OOP ballots cast in Arizona's general election in 2016—3,709 ballots—is hardly de minimis.

We find support for our conclusion in several places. The Department of Justice submitted an amicus brief to our en banc panel in support of Arizona. Despite its support for Arizona, DOJ specifically disavowed the district court's conclusion that the number of discarded OOP ballots was too small to be cognizable under the results test. DOJ wrote:

> [T]he district court's reasoning was not correct to the extent that it suggested that plaintiffs' Section 2 claim would fail solely

> because of the small number of voters
> affected. . . .
>
> That is not a proper reading of the statute.
> Section 2 prohibits any "standard, practice, or
> procedure" that "results in a denial or
> abridgement of the right of *any* citizen of the
> United States to vote on account of race or
> color." 52 U.S.C. 10301(a) (emphasis added);
> *see also Frank v. Walker*, 819 F.3d 384, 386
> (7th Cir. 2016) (*Frank II*) ("The right to vote
> is personal and is not defeated by the fact that
> 99% of other people can secure the necessary
> credentials easily."). Section 2 safeguards a
> personal right to equal participation
> opportunities. A poll worker turning away a
> single voter because of her race plainly results
> in "less opportunity * * * to participate in the
> political process and to elect representatives
> of [her] choice." 52 U.S.C. 10301(b).

DOJ Amicus Brief at 28–29. DOJ's brief appears to treat as
equivalent the case of an individually targeted single minority
voter who is denied the right to vote and the case where a
facially neutral policy affects a single voter. We do not need
to go so far. We need only point out that in the case before us
a substantial number of minority voters are disparately
affected by Arizona's OOP policy. As long as an adequate
disparate impact is shown, as it has been shown here, and as
long as the other prerequisites for finding a Section 2 violate
are met, each individual in the affected group is protected
under Section 2.

Further, in *League of Women Voters*, "approximately 3,348 out-of-precinct provisional ballots" cast by African American voters would have been discarded under the challenged North Carolina law. 769 F.3d at 244 (quoting the district court). The district court had held that this was a "minimal" number of votes, and that Section 2 was therefore not violated. The Fourth Circuit reversed, characterizing the district court's ruling as a "grave error." *Id.* at 241.

Finally, in the 2000 presidential election, the official margin of victory for President George W. Bush in Florida was 537 votes. Federal Election Commission, *2000 Official Presidential General Election Results* (Dec. 2001), *available at* https://transition.fec.gov/pubrec/2000presgeresults.htm. If there had been 3,709 additional ballots cast in Florida in 2000, in which minority voters had outnumbered white voters by a ratio of two to one, it is possible that a different President would have been elected.

Second, the district court concluded that Arizona's policy of rejecting OOP ballots does not impose a disparate burden on minority voters because Arizona's policy of entirely discarding OOP ballots "is not the cause of the disparities in OOP voting." *Reagan*, 329 F. Supp. 3d at 872. The court wrote that Plaintiffs "have not shown that Arizona's policy to not count OOP ballots causes minorities to show up to vote at the wrong precinct at rates higher than their non-minority counterparts." *Id.* at 873. Again, the district court clearly erred.

The district court misunderstood what Plaintiffs must show. Plaintiffs need not show that Arizona caused them to vote out of precinct. Rather, they need only show that the result of entirely discarding OOP ballots has an adverse

disparate impact, by demonstrating "a causal connection between the challenged voting practice and a prohibited discriminatory *result*." *Salt River*, 109 F.3d at 595 (emphasis added). Here, "[t]he challenged practice—not counting OOP ballots—results in 'a prohibited discriminatory result'; a substantially higher percentage of minority votes than white votes are discarded." *DNC*, 904 F.3d at 736 (Thomas, C.J., dissenting).

We hold that the district court clearly erred in holding that Arizona's policy of entirely discarding OOP ballots does not result in a disparate burden on minority voters. We accordingly hold that Plaintiffs have succeeded at step one of the results test.

### b. Step Two: Senate Factors

The question at step two is whether, under the "totality of circumstances," the disparate burden on minority voters is linked to social and historical conditions in Arizona so as "to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives" or to participate in the political process. *Gingles*, 478 U.S. at 47; 52 U.S.C. § 10301(b). The district court wrote that because in its view Plaintiffs failed at step one, discussion of step two was unnecessary. *Reagan*, 329 F. Supp. 3d at 873. The court nonetheless went on to discuss step two and, after considering various Senate factors, to hold that Plaintiffs failed at this step as well. The district court clearly erred in so holding.

At step two, we consider relevant Senate factors. Some Senate factors are "more important to" vote-denial claims, or to some vote-denial claims, and others, "[i]f present, . . . are supportive of, but *not essential to*" the claim. *Gingles*, 478 at

48 n.15 (emphasis in original). That is, Senate factors vary in importance depending on whether a court is dealing with a vote-dilution or a vote-denial case. The same factors may also vary in importance from one vote-denial case to another.

We emphasize that the relative importance of the Senate factors varies from case to case. For example, as we will describe in a moment, Arizona has a long and unhappy history of official discrimination connected to voting. Other States may not have such a history, but depending on the existence of other Senate factors they may nonetheless be found to have violated the results test of Section 2.

The district court considered seven of the nine Senate factors: factor one, the history of official discrimination connected to voting; factor two, racially polarized voting patterns; factor five, the effects of discrimination in other areas on minority groups' access to voting; factor six, racial appeals in political campaigns; factor seven, the number of minorities in public office; factor eight, officials' responsiveness to the needs of minority groups; and factor nine, the tenuousness of the justification for the challenged voting practice.

We analyze below each of these factors, indicating whether we agree or disagree with the district court's analysis as to each. Of the various factors, we regard Senate factors five (the effects of discrimination in other areas on minorities access to voting) and nine (the tenuousness of the justification for the challenged voting practices) as particularly important. We also regard factor one (history of official discrimination) as important, as it bears on the existence of discrimination generally and strongly supports our conclusion under factor five. Though "not essential," *Gingles*, 478 U.S. at 48 n.15,

the other factors provide "helpful background context." *Husted*, 768 F.3d at 555.

### i. Factor One: History of Official Discrimination Connected to Voting

Arizona has a long history of race-based discrimination against its American Indian, Hispanic, and African American citizens. Much of that discrimination is directly relevant to those citizens' ability "to register, to vote, or otherwise to participate in the democratic process." *Id.* We recount the most salient aspects of that history.

Dr. David Berman, a Professor Emeritus of Political Science at Arizona State University, submitted an expert report and testified in the district court. The court found Dr. Berman "credible" and gave "great weight to Dr. Berman's opinions." *Reagan*, 329 F. Supp. 3d at 834. The following narrative is largely drawn from Dr. Berman's report and the sources on which he relied.

### (A) Territorial Period

Arizona's history of discrimination dates back to 1848, when it first became an American political entity as a United States territory. "Early territorial politicians acted on the belief that it was the 'manifest destiny' of the Anglos to triumph in Arizona over the earlier Native American and Hispanic civilizations." David Berman, Expert Report (Berman) at 4. Dr. Berman wrote that from the 1850s through the 1880s there were "blood thirsty efforts by whites to either exterminate" Arizona's existing American Indian population or "confine them to reservations." *Id.* at 5. In 1871, in the Camp Grant Massacre, white settlers "brutal[ly]

murder[ed] over 100 Apaches, most of whom were women and children." *Id.* Arizona's white territorial legislature passed a number of discriminatory laws, including anti-miscegenation laws forbidding marriage between whites and Indians. *See* James Thomas Tucker et al., *Voting Rights in Arizona: 1982–2006*, 17 S. Cal. Rev. L. & Soc. Just. 283, 283 n.3 (2008) (Tucker et al., *Voting Rights*). Dr. Berman wrote: "By the late 1880s and the end of th[e] Indian wars, the realities of life for Native Americans in Arizona were confinement to reservations, a continuous loss of resources (water, land, minerals) to settlers, poverty, and pressure to abandon their traditional cultures." Berman at 5.

White settlers also discriminated against Arizona's Hispanic population. Dr. Berman wrote:

> Although Hispanics in the territory's early period commonly held prominent roles in public and political life, as migration continued they were overwhelmed by a flood of Anglo-American and European immigrants. While a small group of Hispanics continued to prosper, . . . most Hispanics toiled as laborers who made less than Anglos even though they performed the same work.

*Id.* (footnote omitted). Hispanics in Arizona "found it difficult to receive acceptance or fair treatment in a society that had little tolerance for people of Latin American extraction, and particularly those whose racial make-up included Indian or African blood." *Id.* at 5–6 (quoting Oscar J. Martinez, *Hispanics in Arizona*, *in* Arizona at Seventy-

Five: The Next Twenty-Five Years 88–89 (Ariz. State Univ.
Pub. History Program & the Ariz. Historical Soc'y, 1987)).

Pursuant to the Treaty of Guadalupe Hidalgo that ended
the Mexican-American War, the United States conferred
citizenship on the approximately 100,000 Hispanics living in
Arizona. In 1909, the Arizona territorial legislature passed a
statute imposing an English language literacy test as a
prerequisite to voter registration. *Id.* at 10. The test was
specifically designed to prevent the territory's Hispanic
citizens—who had lower English literacy rates than white
citizens—from voting. *Id.* At the time, Indians were not
citizens and were not eligible to vote.

In 1910, Congress passed a statute authorizing Arizona,
as a prelude to statehood, to draft a state constitution. Upon
approval of its constitution by Congress, the President, and
Arizona voters, Arizona would become a State. *Id.* at 11.
Members of Congress viewed Arizona's literacy test as a
deliberate effort to disenfranchise its Hispanic voters. *Id.*
The authorizing statute specifically provided that Arizona
could not use its newly adopted literacy test to prevent
Arizona citizens from voting on a proposed constitution. *Id.*

That same year, Arizona convened a constitutional
convention. *Id.* at 7. Although Congress had ensured that
Arizona would not use its literacy test to prevent Hispanic
citizens from voting on the constitution, Hispanics were
largely excluded from the drafting process. With the
exception of one Hispanic delegate, all of the delegates to the
convention were white. *Id.* By comparison, approximately
one-third of the delegates to the 1910 New Mexico
constitutional convention were Hispanic, and one-sixth of the

48 delegates to the 1849 California constitutional convention were Hispanic. *Id.*

The influence of Hispanic delegates is evident in those States' constitutions. For example, New Mexico's constitution provides that the "right of any citizen of the state to vote, hold office or sit upon juries, shall never be restricted, abridged or impaired on account of . . . race, language or color, or inability to speak, read or write the English or Spanish languages." N.M. Const. art. VII, § 3 (1910). It also requires the legislature to provide funds to train teachers in Spanish instruction. N.M. Const. art. XII, § 8 (1910). California's constitution required all state laws to be published in Spanish as well as English. Cal. Const. art. XI, § 21 (1849).

By contrast, Arizona's constitution did not include such provisions. Indeed, two provisions required precisely the opposite. The Arizona constitution provided that public schools "shall always be conducted in English" and that "[t]he ability to read, write, speak, and understand the English language sufficiently well to conduct the duties of the office without the aid of an interpreter, shall be a necessary qualification for all State officers and members of the State Legislature." Ariz. Const. art. XX, §§ 7, 8 (1910).

(B) Early Statehood

(1) Literacy Test

Arizona became a State in 1912. That same year, the Arizona legislature passed a statute reimposing an English literacy test—the test that had been imposed by the territorial legislature in 1909 and that Congress had forbidden the State

to use for voting on the state constitution.  Berman at 11; *see also* James Thomas Tucker, *The Battle Over Bilingual Ballots: Language Minorities and Political Access Under the Voting Rights Act* 20 (Routledge, 2016) (Tucker, *Bilingual Ballots*).  According to Dr. Berman, the statute was enacted "to limit 'the ignorant Mexican vote.'"  David R. Berman, *Arizona Politics and Government: The Quest for Autonomy, Democracy, and Development* 75 (Univ. of Neb. Press, 1998) (Berman, *Arizona Politics*) (quoting letter between prominent political leaders); Berman at 12.

County registrars in Arizona had considerable discretion in administering literacy tests.  Registrars used that discretion to excuse white citizens from the literacy requirement altogether, to give white citizens easier versions of the test, and to help white citizens pass the test.  *See also Katzenbach*, 383 U.S. at 312 (describing the same practice with respect to African American citizens in southern States).  In contrast, Hispanic citizens were often required to pass more difficult versions of the test, without assistance and without error.  Berman, *Arizona Politics* at 75; *see also* Berman at 12.

The literacy test was used for the next sixty years.  The year it was introduced, Hispanic registration declined so dramatically that some counties lacked enough voters to justify primaries.  Berman at 12.  One county had recall campaigns because enough Hispanic voters had been purged from voting rolls to potentially change the electoral result. *Id.*  Arizona would use its literacy test not only against Hispanics, but also against African Americans and, once they became eligible to vote in 1948, against American Indians. The test was finally repealed in 1972, two years after an amendment to the Voting Rights Act banned literacy tests nationwide.  *Id.*

(2)  Disenfranchisement of American Indians

In 1912, when Arizona became a State, Indians were not citizens of Arizona or of the United States.  In 1924, Congress passed the Indian Citizenship Act, declaring all Indians citizens of the United States and, by extension, of their States of residence.  Indian Citizenship Act of 1924, Pub. L. No. 68-175, 43 Stat. 253 (codified at 8 U.S.C. § 1401(b)).

Indian voting had the potential to change the existing white political power structure of Arizona.  *See* Patty Ferguson-Bohnee, *The History of Indian Voting Rights in Arizona: Overcoming Decades of Voter Suppression*, 47 Ariz. St. L.J. 1099, 1103–04 (2015) (Ferguson-Bohnee).  Indians comprised over 14 percent of the population in Arizona, the second-highest percentage of Indians in any State. *Id.* at 1102 n.19, 1104.  Potential power shifts were even greater at the county level.  According to the 1910 Census, Indians comprised over 66 percent of the population of Apache County, over 50 percent of Navajo County, over 34 percent of Pinal County, and over 34 percent of Coconino County. *Id.* at 1104.

Enacted under the Fourteenth and Fifteenth Amendments, the Indian Citizenship Act should have given Indians the right to vote in Arizona elections.  The Attorney General of Arizona initially agreed that the Act conferred the right to vote, and he suggested in 1924 that precinct boundaries should be expanded to include reservations. *Id.* at 1105. However, in the years leading up to the 1928 election, Arizona's Governor, county officials, and other politicians sought to prevent Indians from voting. *Id.* at 1106–08. The Governor, in particular, was concerned that Indian voter

registration—specifically, registration of approximately 1,500 Navajo voters—would hurt his reelection chances. *Id.* at 1107–08. The Governor sought legal opinions on ways to exclude Indian voters, *id.*, and was advised to "adopt a systematic course of challenging Indians at the time of election." *Id.* at 1108 (quoting Letter from Samuel L. Pattee to George W.P. Hunt, Ariz. Governor (Sept. 22, 1928)). County officials challenged individual Indian voter registrations. *Id.* at 1107–08.

Prior to the 1928 election, two Indian residents of Pima County brought suit challenging the county's rejection of their voter registration forms. *Id.* at 1108. The Arizona Supreme Court sided with the county. The Arizona constitution forbade anyone who was "under guardianship, *non compos mentis*, or insane" from voting. Ariz. Const. art. VII, § 2 (1910). The Court held that Indians were "wards of the nation," and were therefore "under guardianship" and not eligible to vote. *Porter v. Hall*, 271 P. 411, 417, 419 (Ariz. 1928).

Arizona barred Indians from voting for the next twenty years. According to the 1940 census, Indians comprised over 11 percent of Arizona's population. Ferguson-Bohnee at 1111. They were the largest minority group in Arizona. "One-sixth of all Indians in the country lived in Arizona." *Id.*

After World War II, Arizona's Indian citizens returned from fighting the Axis powers abroad to fight for the right to vote at home. Frank Harrison, a World War II veteran and member of the Fort McDowell Yavapai Nation, and Harry Austin, another member of the Fort McDowell Yavapai Nation, filed suit against the State. In 1948, the Arizona Supreme Court overturned its prior decision in *Porter v. Hall*.

*Harrison v. Laveen*, 196 P.2d 456, 463 (Ariz. 1948). Almost a quarter century after enactment of the Indian Citizenship Act of 1924, Indian citizens in Arizona had the legal right to vote.

### (C) The 1950s and 1960s

For decades thereafter, however, Arizona's Indian citizens often could not exercise that right. The Arizona Supreme Court's decision in *Harrison v. Laveen* did not result in "a large influx" of new voters because Arizona continued to deny Indian citizens—as well as Hispanic and African American citizens—access to the ballot through other means. Berman at 15.

The biggest obstacle to voter registration was Arizona's English literacy test. In 1948, approximately 80 to 90 percent of Indian citizens in Arizona did not speak or read English. Tucker et al., *Voting Rights* at 285; *see also* Berman at 15. In the 1960s, about half the voting-age population of the Navajo Nation could not pass the English literacy test. Ferguson-Bohnee at 1112 n.88. For Arizona's Indian—and Hispanic and African American—citizens who did speak and read English, discriminatory administration of the literacy test by county registrars often prevented them from registering. *See, e.g.*, Berman, *Arizona Politics* at 75 ("As recently as the 1960s, registrars applied the test to reduce the ability of blacks, Indians and Hispanics to register to vote.").

Voter intimidation during the 1950s and 60s often prevented from voting those American Indian, Hispanic, and African American citizens who had managed to register. According to Dr. Berman:

> During the 1960s, it was . . . clear that more than the elimination of the literacy test in some areas was going to be needed to protect minorities. Intimidation of minority-group members—Hispanics, African Americans, as well as Native Americans—who wished to vote was . . . a fact of life in Arizona. Anglos sometimes challenged minorities at the polls and asked them to read and explain "literacy" cards containing quotations from the U.S. Constitution. These intimidators hoped to frighten or embarrass minorities and discourage them from standing in line to vote. Vote challenges of this nature were undertaken by Republican workers in 1962 in South Phoenix, a largely minority Hispanic and African-American area. . . . [In addition,] [p]eople in the non-Native American community, hoping to keep Native Americans away from the polls, told them that involvement could lead to something detrimental, such as increased taxation, a loss of reservation lands, and an end to their special relationship with the federal government.

Berman at 14–15.

Intimidation of minority voters continued throughout the 1960s. For example, in 1964, Arizona Republicans undertook voter intimidation efforts throughout Arizona "as part of a national effort by the Republican Party called 'Operation Eagle Eye.'" *Id*. at 14. According to one account:

> The approach was simple: to challenge voters, especially voters of color, at the polls throughout the country on a variety of specious pretexts. If the challenge did not work outright—that is, if the voter was not prevented from casting a ballot (provisional ballots were not in widespread use at this time)—the challenge would still slow down the voting process, create long lines at the polls, and likely discourage some voters who could not wait or did not want to go through the hassle they were seeing other voters endure.

*Id.* (quoting Tova Andrea Wang, *The Politics of Voter Suppression: Defending and Expanding Americans' Right to Vote* 44–45 (Cornell Univ. Press, 2012)).

Compounding the effects of the literacy test and voter intimidation, Arizona "cleansed" its voting rolls. In 1970, Democrat Raul Castro narrowly lost the election for Governor. (He would win the governorship four years later to become Arizona's first and only Hispanic Governor.) Castro received 90 percent of the Hispanic vote, but he lost the election because of low Hispanic voter turnout. Dr. Berman explained:

> [C]ontributing to that low turnout was "a decision by the Republican-dominated legislature to cleanse the voting rolls and have all citizens reregister. This cleansing of the rolls erased years of registration drives in barrios across the state. It seems certain that many Chicanos did not understand that they

had to reregister, were confused by this development, and simply stayed away from the polls."

*Id.* at 17 (quoting F. Chris Garcia & Rudolph O. de la Garza, *The Chicano Political Experience* 105 (Duxbury Press, 1977)).

(D)  Voting Rights Act and Preclearance under Section 5

Congress passed the Voting Rights Act in 1965. *See* Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437–446 (codified as amended at 52 U.S.C. §§ 10301–10314, 10501–10508, 10701, 10702). Under Section 4(b) of the Act, a State or political subdivision qualified as a "covered jurisdiction" if it satisfied two criteria. *Id.* § 4(b). The first was that on November 1, 1964—the date of the presidential election—the State or political subdivision had maintained a "test or device," such as a literacy test, restricting the opportunity to register or vote. The second was *either* that (a) on November 1, 1964, less than 50 percent of the voting-age population in the jurisdiction had been registered to vote, *or* (b) less than 50 percent of the voting-age population had actually voted in the presidential election of 1964. Seven States qualified as covered jurisdictions under this formula: Alabama, Alaska, Georgia, Louisiana, Mississippi, South Carolina, and Virginia. Determination of the Director of the Census Pursuant to Section 4(b)(2) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897-02 (Aug. 7, 1965). Political subdivisions in four additional States—Arizona, Hawai'i, Idaho, and North Carolina—also qualified as covered jurisdictions. *See id.*; Determination of the Director of the Census Pursuant to Section 4(b)(2) of the Voting Rights Act of 1965, 30 Fed. Reg. 14,505-02 (Nov. 19, 1965).

Under Section 4(a) of the VRA, covered jurisdictions were forbidden for a period of five years from using a "test or device," such as a literacy test, as a prerequisite to register to vote, unless a three-judge district court of the District of Columbia found that no such test had been used by the jurisdiction during the preceding five years for the purpose of denying the right to vote on account of race or color. Voting Rights Act of 1965, Pub. L. No. 89-110, § 4(a). Under Section 5, covered jurisdictions were forbidden from changing "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" unless the jurisdiction "precleared" that change, by either obtaining approval (a) from a three-judge district court of the District of Columbia acknowledging that the proposed change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color," or (b) from the Attorney General if a proposed change has been submitted to DOJ and the Attorney General has not "interposed an objection" within sixty days of the submission. *Id.* § 5.

Three counties in Arizona qualified as "covered jurisdictions" under the 1965 Act: Apache, Coconino, and Navajo Counties. *See* Determination of the Director of the Census Pursuant to Section 4(b)(2) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897-02, 14,505-02. Those counties were therefore initially prohibited from using the literacy test as a prerequisite to voter registration. All three counties were majority American Indian, and there was a history of high use of the literacy test and correspondingly low voter turnout. Berman at 12. However, in 1966, in a suit brought by the counties against the United States, a three-judge district court held that there was insufficient proof that a literacy test had been used by the counties in a discriminatory fashion during

the immediately preceding five years. *See Apache Cty. v. United States*, 256 F. Supp. 903 (D.D.C. 1966). The Navajo Nation had sought to intervene and present evidence of discrimination in the district court, but its motion to intervene had been denied. *Id.* at 906–13.

Congress renewed and amended the VRA in 1970, extending it for another five years. Voting Rights Act of 1970, Pub. L. No. 91-285, 84 Stat. 314 (1970). Under the VRA of 1970, the formula for determining covered jurisdictions under Section 4(b) was changed to add the presidential election of 1968 to the percentage-of-voters criterion. *Id.* § 4(b). As a result, eight out of fourteen Arizona counties—including Apache, Navajo, and Coconino Counties—qualified as covered jurisdictions. Tucker et al., *Voting Rights* at 286. Under the 1970 Act, non-covered jurisdictions were forbidden from using a "test or device," such as a literacy test, to the same degree as covered jurisdictions. The 1970 Act thus effectively imposed a nationwide ban on literacy tests. Voting Rights Act of 1970, Pub. L. No. 91-285, § 201.

Arizona immediately challenged the ban. In *Oregon v. Mitchell*, 400 U.S. 112, 132 (1970), the Court unanimously upheld the ban on literacy tests. Justice Black wrote,

> In enacting the literacy test ban . . . [,] Congress had before it a long history of the discriminatory use of literacy tests to disfranchise voters on account of their race. . . . Congress . . . had evidence to show that voter registration in areas with large Spanish-American populations was consistently below the state and national

> averages.  In Arizona, for example, only two
> counties out of eight with Spanish surname
> populations in excess of 15% showed a voter
> registration equal to the state-wide average.
> Arizona also has a serious problem of
> deficient voter registration among Indians.

Two years after the Court's decision, Arizona finally repealed
its literacy test.  Tucker, *Bilingual Ballots*, at 21.

In 1975, Congress again renewed and amended the VRA.
Voting Rights Act of 1975, Pub. L. No. 94-73, 89 Stat. 400
(1975).  Under the VRA of 1975, the formula for determining
covered jurisdictions under Section 4(b) was updated to add
the presidential election of 1972.  *Id.* § 202.  In addition,
Congress expanded the definition of "test or device" to
address discrimination against language minority groups.  *Id.*
§ 203 (Section 4(f)).  Pursuant to this amended formula and
definition, any jurisdiction where a single language minority
group (e.g., Spanish speakers who spoke no other language)
constituted more than 5 percent of eligible voters was subject
to preclearance under Section 5 if (a) the jurisdiction did not
offer bilingual election materials during the 1972 presidential
election, and (b) less than 50 percent of the voting-age
population was registered to vote, or less than 50 percent of
the voting-age population actually voted in the 1972
presidential election.  *Id.* §§ 201–203.

Every jurisdiction in Arizona failed the new test.  As a
result, the entire State of Arizona became a covered
jurisdiction.  Berman at 20–21.

(E)  Continued Obstacles to Voting: The Example of
Apache County

The VRA's elimination of literacy tests increased political participation by Arizona's American Indian, Hispanic, and African American citizens.  However, state and county officials in Arizona continued to discriminate against minority voters.  Apache County, which includes a significant part of the Navajo Reservation, provides numerous examples of which we recount only one.

In 1976, a school district in Apache County sought to avoid integration by holding a special bond election to build a new high school in a non-Indian area of the county.  *See Apache Cty. High Sch. Dist. No. 90 v. United States*, No. 77-1815 (D.D.C. June 12, 1980); *see also* Tucker et al., *Voting Rights* at 324–26 (discussing the same).  Less than a month before the election, the school district, a "covered jurisdiction" under the VRA, sought preclearance under Section 5 for proposed changes in election procedures, including closure of nearly half the polling stations on the Navajo Reservation.  Letter from J. Stanley Pottinger, Assistant Attorney Gen., Civil Rights Div., Dep't of Justice, to Joe Purcell, Gust, Rosenfeld, Divelbess & Henderson (Oct. 4, 1976).  DOJ did not complete its review before the election.  The school district nonetheless held the bond election using the proposed changes.  After the election, DOJ refused to preclear the proposed changes, finding that they had a discriminatory purpose or effect.  *Id.* (and subsequent letters from Assistant Attorney Gen. Drew S. Days III on May 3, 1977, and June 10, 1977).  The school district brought suit in a three-judge district court, seeking a declaratory judgment that the election did not violate the VRA.

The district court found that "[t]he history of Apache County reveals pervasive and systemic violations of Indian voting rights." *Apache Cty. High Sch. Dist. No. 90*, No. 77-1815, at 6. The court found that the school district's behavior was neither "random[]" nor "unconscious[]." *Id.* at 14–15. "Rather, its campaign behavior served to effectuate the unwritten but manifest policy of minimizing the effect of the Navajos' franchise, while maximizing the Anglo vote." *Id.* at 15.

### (F) *United States v. Arizona* and Preclearance during the 1980s and 1990s

During the following two decades, DOJ refused to preclear numerous proposed voting changes in Arizona. *See, e.g.*, *Goddard v. Babbitt*, 536 F. Supp. 538, 541, 543 (D. Ariz. 1982) (finding that a state legislative redistricting plan passed by the Arizona state legislature "dilut[ed] the San Carlos Apache Tribal voting strength and divid[ed] the Apache community of interest"); *see also* Tucker et al., *Voting Rights* at 326–28 (discussing additional examples). In 1988, the United States sued Arizona, alleging that the State, as well as Apache and Navajo Counties, violated the VRA by employing election standards, practices, and procedures that denied or abridged the voting rights of Navajo citizens. *See United States v. Arizona*, No. 88-1989 (D. Ariz. May 22, 1989) (later amended Sept. 27, 1993); *see also* Tucker et al., *Voting Rights* at 328–30 (discussing the same). A three-judge district court summarized the complaint:

> The challenged practices include alleged discriminatory voter registration, absentee ballot, and voter registration cancellation procedures, and the alleged failure of the

> defendants to implement, as required by
> Section 4(f)(4), effective bilingual election
> procedures, including the effective
> dissemination of election information in
> Navajo and providing for a sufficient number
> of adequately trained bilingual persons to
> serve as translators for Navajo voters needing
> assistance at the polls on election day.

*United States v. Arizona*, No. 88-1989, at 1–2.

Arizona and the counties settled the suit under a Consent
Decree. *Id.* at 1–26. The Decree required the defendants to
make extensive changes to their voting practices, including
the creation of a Navajo Language Election Information
Program. *See id*. at 4–23. More than a decade later, those
changes had not been fully implemented. *See* U.S. Gov't
Accountability Office, *Department of Justice's Activities to
Address Past Election-Related Voting Irregularities* 91–92
(2004), available at http://www.gao.gov/new.items/d04104
1r.pdf (identifying significant deficiencies and finding that
implementation of the Navajo Language Election Information
Program by Apache and Navajo Counties was "inadequate").

During the 1980s and 1990s, DOJ issued seventeen
Section 5 preclearance objections to proposed changes in
Arizona election procedures, concluding that they had the
purpose or effect of discriminating against Arizona's
American Indian and/or Hispanic voters. *See* U.S. Dep't of
Justice, *Voting Determination Letters for Arizona*,
https://www.justice.gov/crt/voting-determination-letters-
arizona (last updated Aug. 7, 2015). Three of these
objections were for statewide redistricting plans, one in the
1980s and two in the 1990s. *Id.* Other objections concerned

plans for seven of Arizona's fifteen counties. *Id.* (objections to plans for Apache, Cochise, Coconino, Graham, La Paz, Navajo, and Yuma Counties).

### (G)  Continuation to the Present Day

Arizona's pattern of discrimination against minority voters has continued to the present day.

### (1)  Practices and Policies

We highlight two examples of continued discriminatory practices and policies.  First, as the district court found, the manner in which Maricopa County—home to over 60 percent of Arizona's population—administers elections has "been of considerable concern to minorities in recent years." *Reagan*, 329 F. Supp. 3d at 871; Berman at 20.  During the 2016 presidential primary election, Maricopa County reduced the number of polling places by 70 percent, from 200 polling places in 2012 to just 60 polling places in 2016.  Berman at 20.  The reduction in number, as well as the locations, of the polling places had a disparate impact on minority voters. Rodden at 61–68.  Hispanic voters were "under-served by polling places relative to the rest of the metro area," *id.* at 62, and Hispanic and African American voters were forced to travel greater distances to reach polling places than white, non-Hispanic voters.  *Id.* at 64–68.  The reduction in the number of polling places "resulted in extremely long lines of people waiting to vote—some for five hours—and many people leaving the polls, discouraged from voting by the long wait."  Berman at 20.

Second, the district court found that Maricopa County has repeatedly misrepresented or mistranslated key information

in Spanish-language voter materials. *Reagan*, 329 F. Supp. 3d at 875 ("Along with the State's hostility to bilingual education, Maricopa County has sometimes failed to send properly translated education[al] materials to its Spanish speaking residents, resulting in confusion and distrust from Hispanic voters."); Berman at 20. In 2012, the official Spanish-language pamphlet in Maricopa County told Spanish-speaking voters that the November 6 election would be held on November 8. Berman at 20. The county did not make the same mistake in its English-language pamphlet. Four years later, Spanish-language ballots in Maricopa County provided an incorrect translation of a ballot proposition. *Id.*

### (2)  Voter Registration and Turnout

Voter registration of Arizona's minority citizens lags behind that of white citizens. In November 2016, close to 75 percent of white citizens were registered to vote in Arizona, compared to 57 percent of Hispanic citizens. *See* U.S. Census Bureau, *Reported Voting and Registration by Sex, Race, and Hispanic Origin for November 2016*, tbl. 4b.

Arizona has one of the lowest voter turnout rates in the United States. A 2005 study ranked Arizona forty-seventh out of the fifty States. *See* Ariz. State Univ., Morrison Inst. for Pub. Policy, *How Arizona Compares: Real Numbers and Hot Topics* 47 (2005) (relying on Census data); *see also* Tucker et al., *Voting Rights* at 359. In 2012, Arizona ranked forty-fourth in turnout for that year's presidential election. Rodden at 19.

The turnout rate for minority voters is substantially less than that for white voters. In 2002, 59.8 percent of registered

Hispanic voters turned out for the election, compared to 72.4 percent of total registered voters.  Tucker et al., *Voting Rights* at 359–60 (relying on Census data).  In the 2012 presidential election, 39 percent of Arizona's Hispanic voting-age population and 46 percent of Arizona's African American voting-age population turned out for the election, compared to 62 percent of Arizona's white population.  Rodden at 20–21.  The national turnout rate for African Americans in that election was 66 percent.  *Id.*  In the 2000 and 2004 presidential elections, turnout of Arizona's American Indian voters was approximately 23 percentage points below the statewide average.  Tucker et al., *Voting Rights* at 360.

### (H) District Court's Assessment of Factor One

The district court recognized Arizona's history of discrimination, but minimized its significance.  Quoting Dr. Berman, the court wrote:

> In sum, "[d]iscriminatory action has been more pronounced in some periods of state history than others . . . [and] each party (not just one party) has led the charge in discriminating against minorities over the years."  Sometimes, however, partisan objectives are the motivating factor in decisions to take actions detrimental to the voting rights of minorities.  "[M]uch of the discrimination that has been evidenced may well have in fact been the unintended consequence of a political culture that simply ignores the needs of minorities."  Arizona's

recent history is a mixed bag of advancements
and discriminatory actions.

*Id.* at 875–76 (alterations in original).

The fact that each party in Arizona "has led the charge in
discriminating against minorities" does not diminish the legal
significance of that discrimination. Quite the contrary. That
fact indicates that racial discrimination has long been deeply
embedded in Arizona's political institutions and that both
parties have discriminated when it has served their purposes.
Further, the "mixed bag of advancements and discriminatory
actions" in "Arizona's recent history" does not weigh in
Arizona's favor. As Chief Judge Thomas wrote: "Rather,
despite some advancements, most of which were mandated
by courts or Congress [through Section 5 preclearance],
Arizona's history is marred by discrimination." *DNC*,
904 F.3d at 738 (Thomas, C.J., dissenting). The "history of
official discrimination" in Arizona and its political
subdivisions "touch[ing] the right of the members of the
minority group to register, to vote, or otherwise to participate
in the democratic process" is long, substantial, and
unambiguous. *Gingles*, 478 U.S. at 36–37 (quoting S. Rep.
at 28–29).

The district court clearly erred in minimizing the strength
of this factor in Plaintiffs' favor.

ii. Factor Two: Racially Polarized Voting Patterns

Voting in Arizona is racially polarized. The district court
found, "Arizona has a history of racially polarized voting,
which continues today." *Reagan*, 329 F. Supp. 3d at 876. In
recent years, the base of the Republican party in Arizona has

been white. Putting to one side "landslide" elections, in statewide general elections from 2004 to 2014, 59 percent of white Arizonans voted for Republican candidates, compared with 35 percent of Hispanic voters. The district court found that in the 2016 general election, exit polls "demonstrate that voting between non-minorities and Hispanics continues to be polarized along racial lines." *Id.* In the most recent redistricting cycle, the Arizona Independent Redistricting Commission "found that at least one congressional district and five legislative districts clearly exhibited racially polarized voting." *Id.*

Voting is particularly polarized when Hispanic and white candidates compete for the same office. In twelve non-landslide district-level elections in 2008 and 2010 between a Hispanic Democratic candidate and a white Republican candidate, an average of 84 percent of Hispanics, 77 percent of American Indians, and 52 percent of African Americans voted for the Hispanic candidate compared to an average of only 30 percent of white voters.

The district court did not clearly err in assessing the strength of this factor in Plaintiffs' favor.

### iii. Factor Five: Effects of Discrimination

It is undisputed that "members of the minority group[s]" in Arizona "bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37 (quoting S. Rep. at 28–29). The district court found, "Racial disparities between minorities and non-minorities in socioeconomic standing, income, employment, education, health, housing, transportation, criminal justice,

and electoral representation have persisted in Arizona."
*Reagan*, 329 F. Supp. 3d at 876.

The district court made factual findings in four key
areas—education, poverty and employment, home ownership,
and health. The district court concluded in each area that the
effects of discrimination "hinder" minorities' ability to
participate effectively in the political process.

First, the district court wrote:

> From 1912 until the Supreme Court's decision
> in *Brown v. Board of Education*, segregated
> education was widespread throughout Arizona
> and sanctioned by both the courts and the state
> legislature. In fact, the Tucson Public Schools
> only recently reached a consent decree with
> the DOJ over its desegregation plan in 2013.
> The practice of segregation also extended
> beyond schools; it was common place to have
> segregated public spaces such as restaurants,
> swimming pools, and theaters. Even where
> schools were not segregated, Arizona enacted
> restrictions on bilingual education. As
> recently as 2000, Arizona banned bilingual
> education with the passage of Proposition
> 203.

> Arizona has a record of failing to provide
> adequate funding to teach its non-English
> speaking students. This underfunding has
> taken place despite multiple court orders
> instructing Arizona to develop an adequate
> funding formula for its programs, including a

> 2005 order in which Arizona was held in contempt of court for refusing to provide adequate funding for its educational programs. "According to the Education Law Center's latest National Report Card that provided data for 2013, Arizona ranked 47th among the states in per-student funding for elementary and secondary education."

*Id.* at 874–75 (internal citations omitted).

White Arizonans "remain more likely than Hispanics, Native Americans, and African Americans to graduate from high school, and are nearly three times more likely to have a bachelor's degree than Hispanics and Native Americans." *Id.* at 868. "[I]n a recent survey, over 22.4 percent of Hispanics and 11.2 percent of Native Americans rated themselves as speaking English less than 'very well,' as compared to only 1.2 percent of non-minorities." *Id.* The district court found that, due to "lower levels of [English] literacy and education, minority voters are more likely to be unaware of certain technical [voting] rules, such as the requirement that early ballots be received by the county recorder, rather than merely postmarked, by 7:00 p.m. on Election Day." *Id.*

Second, Hispanics and African Americans in Arizona live in poverty at nearly two times the rate of whites. American Indians live in poverty at three times the rate of whites. *Id.* "Wages and unemployment rates for Hispanics, African Americans, and Native Americans consistently have exceeded non-minority unemployment rates for the period of 2010 to 2015." *Id.* The district court found that minority voters are more likely to work multiple jobs, less likely to own a car, and more likely to lack reliable access to

transportation, *id.* at 869, all of which make it more difficult to travel to a polling place—or between an incorrect polling place and a correct polling place.

Third, the district court found that "[i]n Arizona, 68.9 percent of non-minorities own a home, whereas only 32.3 percent of African Americans, 49 percent of Hispanics, and 56.1 percent of Native Americans do so." *Id.* at 868. Lower rates of homeownership and correspondingly higher rates of renting and residential mobility contribute to higher rates of OOP voting.

Fourth, the district court found that "[a]s of 2015, Hispanics, Native Americans, and African Americans fared worse than non-minorities on a number of key health indicators." *Id.* at 868–69. "Native Americans in particular have much higher rates of disability than non-minorities, and Arizona counties with large Native American populations have much higher rates of residents with ambulatory disabilities." *Id.* at 869. "For example, '17 percent of Native Americans are disabled in Apache County, 22 percent in Navajo County, and 30 percent in Coconino County.'" *Id.* "Further, '11 percent [of individuals] have ambulatory difficulties in Apache County, 13 percent in Navajo County, and 12 percent in Coconino County, all of which contain significant Native American populations and reservations.'" *Id.* (alteration in original). Witnesses credibly testified that ambulatory disabilities—both alone and combined with Arizona's transportation disparities—make traveling to and between polling locations difficult.

The district court did not clearly err in assessing the strength of this factor in Plaintiffs' favor.

74                    DNC v. HOBBS

iv.  Factor Six:  Racial Appeals in Political Campaigns

Arizona's "political campaigns have been characterized by overt [and] subtle racial appeals" throughout its history. *Gingles*, 478 U.S. at 37 (quoting S. Rep. at 28–29).  The district court found that "Arizona's racially polarized voting has resulted in racial appeals in campaigns."  *Reagan*, 329 F. Supp. 3d at 876.

For example, when Raul Castro, a Hispanic man, successfully ran for governor in the 1970s, Castro's opponent, a white man, urged voters to support him instead because "he looked like a governor."  *Id.*  "In that same election, a newspaper published a picture of Fidel Castro with a headline that read 'Running for governor of Arizona.'"  *Id.*  In his successful 2010 campaign for State Superintendent of Public Education, John Huppenthal, a white man running against a Hispanic candidate, ran an advertisement in which the announcer said that Huppenthal was "one of us," was opposed to bilingual education, and would "stop La Raza," an influential Hispanic civil rights organization.  *Id.*  When Maricopa County Attorney Andrew Thomas, a white man, ran for governor in 2014, he ran an advertisement describing himself as "the only candidate who has stopped illegal immigration."  *Id.*  The advertisement "simultaneously show[ed] a Mexican flag with a red strikeout line through it superimposed over the outline of Arizona."  *Id.*  Further, "racial appeals have been made in the specific context of legislative efforts to limit ballot collection."  *Id.*  The district court specifically referred to the "racially charged" LaFaro Video, falsely depicting a Hispanic man, characterized as a "thug," "acting to stuff the ballot box."  *Id.*

The district court did not clearly err in assessing the strength of this factor in Plaintiffs' favor.

### v. Factor Seven: Number of Minorities in Public Office

The district court recognized that there has been a racial disparity in elected officials but minimized its importance. The court wrote, "Notwithstanding racially polarized voting and racial appeals, the disparity in the number of minority elected officials in Arizona has declined." *Id.* at 877. Citing an expert report by Dr. Donald Critchlow—an expert whose opinion the court otherwise afforded "little weight," *id.* at 836—the court wrote, "Arizona has been recognized for improvements in the number of Hispanics and Native Americans registering and voting, as well as in the overall representation of minority elected officials," *id.* at 877.

As recounted above, it is undisputed that American Indian, Hispanic, and African American citizens are under-represented in public office in Arizona. Minorities make up 44 percent of Arizona's total population, but they hold 25 percent of Arizona's elected offices. *Id.* Minorities hold 22 percent of state congressional seats and 9 percent of judgeships. No American Indian or African American has ever been elected to represent Arizona in the United States House of Representatives. Only two minorities have been elected to statewide office in Arizona since the passage of the VRA. Arizona has never elected an American Indian candidate to statewide office. No American Indian, Hispanic, or African American candidate has ever been elected to serve as a United States Senator representing Arizona.

Arizona's practice of entirely discarding OOP ballots is especially important in statewide and United States Senate

elections.  Some votes for local offices may be improperly
cast in an OOP ballot, given that the voter has cast the ballot
in the wrong precinct.  But no vote for statewide office or for
the United States Senate is ever improperly cast in an OOP
ballot.  Arizona's practice of wholly discarding OOP ballots
thus has the effect of disproportionately undercounting
minority votes, by a factor of two to one, precisely where the
problem of under-representation in Arizona is most acute.

The district court clearly erred in minimizing the strength
of this factor in Plaintiffs' favor.

### vi.  Factor Eight:  Officials' Responsiveness to the Needs of Minority Groups

The district court found that "Plaintiffs' evidence . . . is
insufficient to establish a lack of responsiveness on the part
of elected officials to particularized needs of minority
groups."  *Id*.  In support of its finding, the court cited the
activity of one organization, the Arizona Citizens Clean
Elections Commission, which "engages in outreach to various
communities, including the Hispanic and Native American
communities, to increase voter participation" and "develops
an annual voter education plan in consultation with elections
officials and stakeholders," and whose current Chairman is an
enrolled member of the San Carlos Apache Tribe. *Id.*

The district court's finding ignores extensive undisputed
evidence showing that Arizona has significantly underserved
its minority population.  "Arizona was the last state in the
nation to join the Children's Health Insurance Program,
which may explain, in part, why forty-six states have better
health insurance coverage for children."  *DNC*, 904 F.3d
at 740 (Thomas, C.J., dissenting).  Further, "Arizona's public

schools are drastically underfunded; in fact, in 2016 Arizona ranked 50th among the states and the District of Columbia in per pupil spending on public elementary and secondary education." *Id.* "Given the well-documented evidence that minorities are likelier to depend on public services[,] . . . Arizona's refusal to provide adequate state services demonstrates its nonresponsiveness to minority needs." *Id.*; *cf. Myers v. United States*, 652 F.3d 1021, 1036 (9th Cir. 2011) (holding that the district court clearly erred when it ignored evidence contradicting its findings).

Further, the district court's finding is contradicted elsewhere in its own opinion. Earlier in its opinion, the court had written that Arizona has a "political culture that simply ignores the needs of minorities." *Id.* at 876 (citation omitted). Later in its opinion, the court referred to "Arizona's history of advancing partisan objectives with the unintended consequence of ignoring minority interests." *Id.* at 882.

The district court clearly erred in finding that this factor does not weigh in Plaintiffs's favor.

vii. Factor Nine: Tenuousness of Justification of the Policy Underlying the Challenged Restriction

The ninth Senate factor is "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 37 (quoting S. Rep. at 28). The district court found that Arizona's policy of entirely discarding OOP ballots is justified by the importance of Arizona's precinct-based system of elections. The court held:

> Precinct-based voting helps Arizona
> counties estimate the number of voters who
> may be expected at any particular precinct,
> allows for better allocation of resources and
> personnel, improves orderly administration of
> elections, and reduces wait times. The
> precinct-based system also ensures that each
> voter receives a ballot reflecting only the
> races for which that person is entitled to vote,
> thereby promoting voting for local candidates
> and issues and making ballots less confusing.
> Arizona's policy to not count OOP ballots is
> one mechanism by which it strictly enforces
> this system to ensure that precinct-based
> counties maximize the system's benefits.
> This justification is not tenuous.

*Reagan*, 329 F. Supp. 3d at 878.

The court misunderstood the nature of Plaintiffs' challenge. Plaintiffs do not challenge Arizona's precinct-based system of voting. Indeed, their challenge assumes both its importance and its continued existence. Rather, their challenge is to Arizona's policy, within that system, of entirely discarding OOP ballots. The question before the district court was not the justification for Arizona's precinct-based system. The question, rather, was the justification for Arizona's policy of entirely discarding OOP ballots.

There is no finding by the district court that would justify, on any ground, Arizona's policy of entirely discarding OOP ballots. There is no finding that counting or partially counting OOP ballots would threaten the integrity of Arizona's precinct-based system. Nor is there a finding that

Arizona has ever sought to minimize the number of OOP ballots. The lack of such findings is not surprising given the extreme disparity between OOP voting in Arizona and such voting in other states, as well as Arizona's role in causing voters to vote OOP by, for example, frequently changing the location of polling places.

The only plausible justification for Arizona's OOP policy would be the delay and expense entailed in counting OOP ballots, but in its discussion of the Senate factors, the district court never mentioned this justification. Indeed, the district court specifically found that "[c]ounting OOP ballots is administratively feasible." *Id.* at 860.

Twenty States, including Arizona's neighboring States of California, Utah, and New Mexico, count OOP ballots. *Id.*; Cal. Elec. Code §§ 14310(a)(3), 14310(c)(3), 15350; Utah Code Ann. § 20A-4-107(1)(b)(iii), 2(a)(ii), 2(c); N.M. Stat. Ann § 1-12-25.4(F); N.M. Admin. Code 1.10.22.9(N). The district court wrote: "Elections administrators in these and other states have established processes for counting only the offices for which the OOP voter is eligible to vote." *Reagan*, 329 F. Supp. 3d at 861. "Some states, such as New Mexico, use a hand tally procedure, whereby a team of elections workers reviews each OOP ballot, determines the precinct in which the voter was qualified to vote, and marks on a tally sheet for that precinct the votes cast for each eligible office." *Id.*; *see* N.M. Admin Code 1.10.22.9(H)–(N). "Other states, such as California, use a duplication method, whereby a team of elections workers reviews each OOP ballot, determines the precinct in which the voter was qualified to vote, obtains a new paper ballot for the correct precinct, and duplicates the votes cast on the OOP ballot onto the ballot for the correct precinct." *Reagan*, 329 F. Supp. 3d at 861. "Only the offices

that appear on both the OOP ballot and the ballot for the correct precinct are copied. The duplicated ballot then is scanned through the optical scan voting machine and electronically tallied." *Id.*

Arizona already uses a duplication system, similar to that used in California, for provisional ballots cast by voters eligible to vote in federal but not state elections, as well as for damaged or mismarked ballots that cannot be read by an optical scanner. *Id.* The district court briefly discussed the time that might be required to count or partially count OOP ballots, but it did not connect its discussion to its consideration of the Senate factors. The court cited testimony of a Pima County election official that the county's duplication procedure "takes about twenty minutes per ballot." *Id.* The court did not mention that this same official had stated in his declaration that the procedure instead takes fifteen minutes per ballot. The court also did not mention that a California election official had testified that it takes a very short time to count or partially count the valid votes on an OOP ballot. That official testified that it takes "several minutes" in California to confirm the voter's registration— which is done for all provisional ballots, in Arizona as well as in California. Once that is done, the official testified, it takes one to three minutes to duplicate the ballot.

The district court clearly erred in finding that this factor does not weigh in Plaintiffs' favor.

### viii. Assessment of Senate Factors

The district court's "overall assessment" of the Senate factors was: "In sum, of the germane Senate Factors, the Court finds that some are present in Arizona and others are

not." *Id.* at 878. Based on this assessment, the court held that Plaintiffs had not carried their burden at step two. The district court clearly erred in so holding. The district court clearly erred in minimizing the strength in favor of Plaintiffs of Senate factors one (official history of discrimination) and seven (number of minorities in public office). Further, the district court clearly erred in finding that Senate factors eight (officials' responsiveness to the needs of minority groups) and nine (tenuousness of the justification of the policy underlying the challenged provision) do not favor Plaintiffs. Plaintiffs have successfully shown that all of the considered Senate factors weigh in their favor. Most important, plaintiffs have shown that the most pertinent factors, five and nine, weigh very strongly in their favor.

### c. Summary

We hold that the district court clearly erred in holding that Plaintiffs' challenge to Arizona's OOP policy failed under the results test. We hold that Plaintiffs have carried their burden at both steps one and two. First, they have shown that Arizona's OOP policy imposes a significant disparate burden on its American Indian, Hispanic, and African American citizens, resulting in the "denial or abridgement of the right" of its citizens to vote "on account of race or color." 52 U.S.C. § 10301(a). Second, they have shown that, under the "totality of circumstances," the discriminatory burden imposed by the OOP policy is in part caused by or linked to "social and historical conditions" that have or currently produce "an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives" and to participate in the political process. *Gingles*, 478 U.S. at 47; 52 U.S.C. § 10301(b).

We therefore hold that Arizona's OOP policy violates the results test of Section 2 of the Voting Rights Act.

### 3.  H.B. 2023 and the Results Test

Uncontested evidence in the district court established that, prior to the enactment of H.B. 2023, a large and disproportionate number of minority voters relied on third parties to collect and deliver their early ballots.  Uncontested evidence also established that, beginning in 2011, Arizona Republicans made sustained efforts to limit or eliminate third-party ballot collection.  The question is whether the district court clearly erred in holding that H.B. 2023 does not violate the "results test" of Section 2.

### a.  Step One:  Disparate Burden

The question at step one is whether H.B. 2023 results in a disparate burden on a protected class.  The district court held that Plaintiffs failed at step one.  The district court clearly erred in so holding.

Extensive and uncontradicted evidence established that prior to the enactment of H.B. 2023, third parties collected a large and disproportionate number of early ballots from minority voters.  Neither the quantity nor the disproportion was disputed.  Numerous witnesses testified without contradiction to having personally collected, or to having personally witnessed the collection of, thousands of early ballots from minority voters.  There is no evidence that white voters relied to any significant extent on ballot collection by third parties.

The district court recognized the disparity in third-party ballot collection between minority and white citizens. It wrote that "[t]he Democratic Party and community advocacy organizations . . . focused their ballot collection efforts on low-efficacy voters, who trend disproportionately minority." *Reagan*, 329 F. Supp. 3d at 870. "In contrast," the court wrote, "the Republican Party has not significantly engaged in ballot collection as a GOTV strategy." *Id.*

The district court nonetheless held that this evidence was insufficient to establish a violation at step one. To justify its holding, the court wrote, "[T]he Court finds that Plaintiffs' circumstantial and anecdotal evidence is insufficient to establish a cognizable disparity under § 2." *Id.* at 868. The court wrote further:

> Considering the vast majority of Arizonans, minority and non-minority alike, vote without the assistance of third-parties who would not fall within H.B. 2023's exceptions, it is unlikely that H.B. 2023's limitations on who may collect an early ballot cause a meaningful inequality in the electoral opportunities of minorities as compared to non-minorities.

*Id.* at 871.

First, the court clearly erred in discounting the evidence of third-party ballot collection as merely "circumstantial and anecdotal." The evidence of third-party ballot collection was not "circumstantial." Rather, as recounted above, it was direct evidence from witnesses who had themselves acted as third-party ballot collectors, had personally supervised third-party ballot collection, or had personally witnessed third-

84                    DNC v. HOBBS

party ballot collection by others. Nor was the evidence merely "anecdotal." As recounted above, numerous witnesses provided consistent and uncontradicted testimony about third-party ballot collection they had done, supervised, or witnessed. This evidence established that many thousands of early ballots were collected from minority voters by third parties. The court itself found that white voters did not significantly rely on third-party ballot collection. No better evidence was required to establish that large and disproportionate numbers of early ballots were collected from minority voters.

Second, the court clearly erred by comparing the number of early ballots collected from minority voters to the much greater number of all ballots cast "without the assistance of third parties," and then holding that the relatively smaller number of collected early ballots did not cause a "meaningful inequality." *Id.* at 871. In so holding, the court repeated the clear error it made in comparing the number of OOP ballots to the total number of all ballots cast. Just as for OOP ballots, the number of ballots collected by third parties from minority voters surpasses any de minimis number.

We hold that H.B. 2023 results in a disparate burden on minority voters, and that the district court clearly erred in holding otherwise. We accordingly hold that Plaintiffs have succeeded at step one of the results test.

### b. Step Two: Senate Factors

The district court did not differentiate between Arizona's OOP policy and H.B. 2023 in its discussion of step two. Much of our analysis of the Senate factors for Arizona's OOP policy applies with equal force to the factors for H.B. 2023.

Again, we regard Senate factors five (the effects of discrimination in other areas on minorities access to voting) and nine (the tenuousness of the justification for the challenged voting practices) as particularly important, given the nature of Plaintiffs' challenge to H.B. 2023. We also regard factor one (history of official discrimination) as important, as it strongly supports our conclusion under factor five. Though "not essential," *Gingles*, 478 U.S. at 48 n.15, the other less important factors provide "helpful background context." *Husted*, 768 F.3d at 555.

We do not repeat here the entirety of our analysis of Arizona's OOP policy. Rather, we incorporate that analysis by reference and discuss only the manner in which the analysis is different for H.B. 2023.

### i. Factor One: History of Official Discrimination Connected to Voting

We recounted above Arizona's long history of race-based discrimination in voting. H.B. 2023 grows directly out of that history. During the Republicans' 2011 attempt to limit ballot collection by third parties, Arizona was still subject to preclearance under Section 5. When DOJ asked for more information about whether the relatively innocuous ballot-collection provision of S.B. 1412 had the purpose or would have the effect of denying minorities the right to vote and requested more information, Arizona withdrew the preclearance request. It did so because there was evidence in the record that the provision intentionally targeted Hispanic voters. In 2013, public opposition threatened to repeal H.B. 2305 by referendum. If passed, the referendum would have required that any future bill on the same topic pass the legislature by a supermajority. Republicans repealed H.B.

2305 rather than face a referendum. Finally, after the Supreme Court's decision in *Shelby County* eliminated preclearance, Arizona enacted H.B. 2023, making third-party ballot collection a felony. The campaign was marked by race-based appeals, most prominently in the LaFaro Video described above.

As it did with respect to OOP voting, the district court clearly erred in minimizing the strength of this factor in Plaintiffs' favor.

### ii. Factor Two: Racially Polarized Voting Patterns

H.B. 2023 connects directly to racially polarized voting patterns in Arizona. The district court found that "H.B. 2023 emerged in the context of racially polarized voting." *Reagan*, 329 F. Supp. 3d at 879. Senator Shooter, who introduced the bill that became S.B. 1412—the predecessor to H.B. 2023— was motivated by the "high degree of racial polarization in his district" and introduced the bill following a close, racially polarized election. *Id*.

The district court did not clearly err in assessing the strength of this factor in Plaintiffs' favor.

### iii. Factor Five: Effects of Discrimination

H.B. 2023 is closely linked to the effects of discrimination that "hinder" the ability of American Indian, Hispanic, and African American voters "to participate effectively in the political process." *Gingles*, 478 U.S. at 37. The district court found that American Indian, Hispanic, and African American Arizonans "are significantly less likely than non-minorities to own a vehicle, more likely to rely upon

public transportation, more likely to have inflexible work schedules, and more likely to rely on income from hourly wage jobs." *Reagan*, 329 F. Supp. 3d at 869. In addition, "[r]eady access to reliable and secure mail service is nonexistent in some minority communities." *Id.* Minority voters in rural communities disproportionately lack access to outgoing mail, while minority voters in urban communities frequently encounter unsecure mailboxes and mail theft. *Id.* These effects of discrimination hinder American Indian, Hispanic, and African American voters' ability to return early ballots without the assistance of third-party ballot collection.

The district court did not clearly err in assessing the strength of this factor in Plaintiffs' favor.

### iv. Factor Six: Racial Appeals in Political Campaigns

The enactment of H.B. 2023 was the direct result of racial appeals in a political campaign. The district court found that "racial appeals [were] made in the specific context of legislative efforts to limit ballot collection." *Id.* at 876. Proponents of H.B. 2023 relied on "overt or subtle racial appeals," *Gingles*, 478 U.S. at 37, in advocating for H.B. 2023, including the "racially tinged" LaFaro Video, *Reagan*, 329 F. Supp. 3d at 876–77 (characterizing the LaFaro Video as one of the primary motivators for H.B. 2023). The district court concluded, "[Senator] Shooter's allegations and the LaFaro video were successful in convincing H.B. 2023's proponents that ballot collection presented opportunities for fraud that did not exist for in-person voting." *Reagan*, 329 F. Supp. 3d at 880.

The district court did not clearly err in assessing the strength of this factor in Plaintiff's favor.

v.  Factor Seven:  Number of Minorities in Public Office

Because Arizona's OOP policy had a particular connection to the election of minorities to statewide office and to the United States Senate, we concluded that the factor of minorities in public office favored Plaintiffs. That particular connection to statewide office does not exist between H.B. 2023 and election of minorities. However, H.B. 2023 is likely to have a pronounced effect in rural counties with significant American Indian and Hispanic populations who disproportionately lack reliable mail and transportation services, and where a smaller number of votes can have a significant impact on election outcomes. In those counties, there is likely to be a particular connection to election of American Indian and Hispanic candidates to public office.

As it did with respect to OOP voting, the district court clearly erred in minimizing the strength of this factor in Plaintiffs' favor.

vi.  Factor Eight:  Officials' Responsiveness to the Needs of Minority Groups

The district court found that "Plaintiffs' evidence . . . is insufficient to establish a lack of responsiveness on the part of elected officials to particularized needs of minority groups." *Id.* at 877. As discussed above, this finding ignores extensive evidence to the contrary and is contradicted by the court's statements elsewhere in its opinion.

The district court clearly erred in finding that this factor does not weigh in Plaintiffs' favor.

vii. Factor Nine:  Tenuousness of Justification of the
     Policy Underlying the Challenged Restriction

The district court relied on two justifications for H.B. 2023:  That H.B. 2023 is aimed at preventing ballot fraud "by creating a chain of custody for early ballots and minimizing the opportunities for ballot tampering, loss, and destruction"; and that H.B. 2023 is aimed at improving and maintaining "public confidence in election integrity."  *Id.* at 852.  We address these justifications in turn.

First, third-party ballot collection was permitted for many years in Arizona before the passage of H.B. 2023.  No one has ever found a case of voter fraud connected to third-party ballot collection in Arizona.  This has not been for want of trying.   The district court described the Republicans' unsuccessful attempts to find instances of fraud:

> The Republican National Lawyers Association ("RNLA") performed a study dedicated to uncovering cases of voter fraud between 2000 and 2011.  The study found no evidence of ballot collection or delivery fraud, nor did a follow-up study through May 2015. Although the RNLA reported instances of absentee ballot fraud, none were tied to ballot collection and delivery.   Likewise, the Arizona Republic conducted a study of voter fraud in Maricopa County and determined that, out of millions of ballots cast in Maricopa County from 2005 to 2013, a total of 34 cases of fraud were prosecuted.  Of these, 18 involved a felon voting without her rights first being restored.  Fourteen involved

non-Arizona citizens voting.   The study
uncovered no cases of fraud perpetrated
through ballot collection.

*Id.* at 853 (internal citations omitted).

The district court wrote, "[T]here has never been a case
of voter fraud associated with ballot collection charged in
Arizona." *Id.* at 852.  "No specific, concrete example of
voter fraud perpetrated through ballot collection was
presented by or to the Arizona legislature during the debates
on H.B. 2023 or its predecessor bills." *Id.* at 852–53.  "No
Arizona county produced evidence of confirmed ballot
collection fraud in response to subpoenas issued in this case,
nor has the Attorney General's Office produced such
information." *Id.* at 853.

Ballot-collection-related fraud was already criminalized
under Arizona law when H.B. 2023 was enacted.  Collecting
and failing to turn in someone else's ballot was already a
class 5 felony.  Ariz. Rev. Stat. § 16-1005(F).  Marking
someone else's ballot was already a class 5 felony. *Id.* § 16-
1005(A).  Selling one's own ballot, possessing someone
else's ballot with the intent to sell it, knowingly soliciting the
collection of ballots by misrepresenting one's self as an
election official, and knowingly misrepresenting the location
of a ballot drop-off site were already class 5 felonies. *Id.*
§ 16-1005(B)–(E).  These criminal prohibitions are still in
effect.  Arizona also takes measures to ensure the security of
early ballots, such as using "tamper evident envelopes and a
rigorous voter signature verification procedure." *Reagan*,
329 F. Supp. 3d at 854.

DNC v. HOBBS                    91

The history of H.B. 2023 shows that its proponents had other aims in mind than combating fraud. H.B. 2023 does not forbid fraudulent third-party ballot collection. It forbids *non-fraudulent* third-party ballot collection. To borrow an understated phrase, the anti-fraud rationale advanced in support of H.B. 2023 "seems to have been contrived." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

Second, we recognize the importance of public confidence in election integrity. We are aware that the federal bipartisan Commission on Federal Election Reform, charged with building public confidence, recommended *inter alia* that States "reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." *Building Confidence in U.S. Elections* § 5.2 (Sept. 2005). We are aware of the recent case of voter fraud in North Carolina involving collection and forgery of absentee ballots by a political operative hired by a Republican candidate. And we are aware that supporters of H.B. 2023 and its predecessor bills sought to convince Arizona voters, using false allegations and racial innuendo, that third-party ballot collectors in Arizona have engaged in fraud.

Without in the least discounting either the common sense of the bipartisan commission's recommendation or the importance of public confidence in the integrity of elections, we emphasize, first, that the Supreme Court has instructed us in Section 2 cases to make an "intensely local appraisal." *Gingles*, 478 U.S. at 78. The third-party ballot collection fraud case in North Carolina has little bearing on the case before us. We are concerned with Arizona, where third-party ballot collection has had a long and honorable history, and where the acts alleged in the criminal indictment in North

92              DNC v. HOBBS

Carolina were illegal under Arizona law before the passage of H.B. 2023, and would still be illegal if H.B. 2023 were no longer the law.

We emphasize, further, that if some Arizonans today distrust third-party ballot collection, it is because of the fraudulent campaign mounted by proponents of H.B. 2023. Those proponents made strenuous efforts to persuade Arizonans that third-party ballot collectors have engaged in election fraud. To the degree that there has been any fraud, it has been the false and race-based claims of the proponents of H.B. 2023. It would be perverse if those proponents, who used false statements and race-based innuendo to create distrust, could now use that very distrust to further their aims in this litigation.

The district court clearly erred in finding that this factor does not weigh in Plaintiffs' favor. This factor either weighs in Plaintiffs' favor or is, at best, neutral.

### viii.  Assessment

The district court made the same overall assessment of the Senate factors in addressing H.B. 2023 as in addressing Arizona's policy of discarding OOP ballots. As it did with respect to OOP ballots, the court concluded that Plaintiffs had not carried their burden at step two. Here, too, the district court's conclusion was clearly erroneous. Contrary to the court's conclusion, Plaintiffs have successfully shown that six of the Senate factors weigh in their favor and that the remaining factor weighs in their favor or is neutral.

### c. Summary

We hold that the district court clearly erred in holding that Plaintiffs' challenge to H.B. 2023 failed under the results test. We hold that Plaintiffs have carried their burden at both steps one and two. First, they have shown that H.B. 2023 imposes a disparate burden on American Indian, Hispanic, and African American citizens, resulting in the "denial or abridgement of the right" of its citizens to vote "on account of race or color." 52 U.S.C. § 10301(a). Second, they have shown that, under the "totality of circumstances," the discriminatory burden imposed by H.B. 2023 is in part caused by or linked to "social and historical conditions" that have or currently produce "an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives" and to participate in the political process. *Gingles*, 478 U.S. at 47; 52 U.S.C. § 10301(b).

We therefore conclude that H.B. 2023 violates the results test of Section 2 of the Voting Rights Act.

### B. Intent Test: H.B. 2023

As indicated above, uncontested evidence in the district court established that before enactment of H.B. 2023, a large and disproportionate number of minority voters relied on third parties to collect and deliver their early ballots. Uncontested evidence also established that, beginning in 2011, Arizona Republicans made sustained efforts to outlaw third-party ballot collection. After a racially charged campaign, they finally succeeded in passing H.B. 2023. The question is whether the district court clearly erred in holding that H.B. 2023 does not violate the "intent test" of Section 2.

94              DNC v. HOBBS

### 1. The Intent Test

*Village of Arlington Heights v. Metropolitan Housing Development Corp*., 429 U.S. 252 (1977), provides the framework for analyzing a claim of intentional discrimination under Section 2. *See, e.g.*, *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 220–21 (4th Cir. 2016). Under *Arlington Heights*, Plaintiffs have an initial burden of providing "[p]roof of racially discriminatory intent or purpose." *Arlington Heights*, 429 U.S. at 265. Plaintiffs need not show that discriminatory purpose was the "sole[]" or even a "primary" motive for the legislation. *Id.* Rather, Plaintiffs need only show that discriminatory purpose was "*a* motivating factor." *Id.* at 265–66 (emphasis added).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266. "[D]iscriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976). Because "[o]utright admissions of impermissible racial motivation are infrequent[,] . . . plaintiffs often must rely upon other evidence," including the broader context surrounding passage of the legislation. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). "In a vote denial case such as the one here, where the plaintiffs allege that the legislature imposed barriers to minority voting, this holistic approach is particularly important, for '[d]iscrimination today is more subtle than the visible methods used in 1965.'" *N.C. State Conference of NAACP*, 831 F.3d at 221 (quoting H.R. Rep. No. 109–478, at 6 (2006)).

*Arlington Heights* provided a non-exhaustive list of factors that a court should consider. *Arlington Heights*, 429 U.S. at 266. The factors include (1) the historical background; (2) the sequence of events leading to enactment, including any substantive or procedural departures from the normal legislative process; (3) the relevant legislative history; and (4) whether the law has a disparate impact on a particular racial group. *Id.* at 266–68.

"Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). In determining whether a defendant's burden has been carried, "courts must scrutinize the legislature's *actual* non-racial motivations to determine whether they *alone* can justify the legislature's choices." *N.C. State Conference of NAACP*, 831 F.3d at 221 (emphases in original) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 728 (1982)). "In the context of a § 2 discriminatory intent analysis, one of the critical background facts of which a court must take notice is whether voting is racially polarized." *Id.* "[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose." *Id.* at 222.

## 2. H.B. 2023 and the Intent Test

### a. *Arlington Heights* Factors and Initial Burden of Proof

The district court wrote, "Having considered [the *Arlington Heights*] factors, the Court finds that H.B. 2023 was not enacted with a racially discriminatory purpose." *Reagan*, 329 F. Supp. 3d at 879. The court then went on to discuss each of the four factors, but did not attach any particular weight to any of them. In holding that the Plaintiffs had not shown that discriminatory purpose was "a motivating factor," the district court clearly erred.

We address the *Arlington Heights* factors in turn.

#### i. Historical Background

"A historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose." *N.C. State Conference of NAACP*, 831 F.3d at 223–24; *see Arlington Heights*, 429 U.S. at 267 ("The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes."). As recounted above, the Arizona legislature has a long history of race-based discrimination, disenfranchisement, and voter suppression, dating back to Arizona's territorial days. Further, the history of H.B. 2023 itself reveals invidious purposes.

In addressing the "historical background" factor, the district court mentioned briefly the various legislative efforts to restrict third-party ballot collection that had been "spearheaded" by Senator Shooter, described briefly

Senator Shooter's allegations of third-party ballot fraud, and alluded to the "racially-tinged" LaFaro Video. *Reagan*, 329 F. Supp. 3d at 879–80. But the district court discounted their importance. We discuss the court's analysis below, under the third *Arlington Heights* factor.

### ii. Sequence of Events Leading to Enactment

"The specific sequence of events leading up to the challenged decision . . . may shed some light on the decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. We recounted above the sequence of events leading to the enactment of H.B. 2023. The district court acknowledged this history but again discounted its importance. We discuss the court's analysis below, under the third *Arlington Heights* factor.

### iii. Relevant Legislative History

"The legislative . . . history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body[.]" *Id.* at 268. The district court found that legislators voted for H.B. 2023 in response to the "unfounded and often farfetched allegations of ballot collection fraud" made by former Senator Shooter, and the "racially-tinged LaFaro Video." *Reagan*, 329 F. Supp. 3d at 880. As Chief Judge Thomas wrote: "Because there was 'no direct evidence of ballot collection fraud . . . presented to the legislature or at trial,' the district court understood that Shooter's allegations and the LaFaro Video were *the* reasons the bill passed." *DNC*, 904 F.3d at 748 (Thomas, C.J., dissenting) (quoting *Reagan*, 329 F. Supp. 3d at 880) (emphasis in original).

Senator Shooter was one of the major proponents of the efforts to limit third-party ballot collection and was influential in the passage of H.B. 2023. *Reagan*, 329 F. Supp. 3d at 879. According to the district court, Senator Shooter made "demonstrably false" allegations of ballot collection fraud. *Id.* at 880. Senator Shooter's efforts to limit ballot collection were motivated in substantial part by the "high degree of racial polarization in his district." *Id.* at 879. He was "motivated by a desire to eliminate" the increasingly effective efforts to ensure that Hispanic votes in his district were collected, delivered, and counted. *Id.*

The LaFaro Video provides even stronger evidence of racial motivation. Maricopa County Republican Chair LaFaro produced a video showing "a man of apparent Hispanic heritage"—a volunteer with a get-out-the-vote organization—apparently dropping off ballots at a polling place. *Id.* at 876. LaFaro's voice-over narration included unfounded statements, *id.* at 877, "that the man was acting to stuff the ballot box" and that LaFaro "knew that he was a thug," *id.* at 876. The video was widely distributed. It was "shown at Republican district meetings," "posted on Facebook and YouTube," and "incorporated into a television advertisement." *Id.* at 877.

The district court used the same rationale to discount the importance of all of the first three *Arlington Heights* factors. It pointed to the "sincere belief," held by some legislators, that fraud in third-party ballot collection was a problem that needed to be addressed. The district court did so even though it recognized that the belief was based on the false and race-based allegations of fraud by Senator Shooter and other proponents of H.B. 2023. The court wrote: "Shooter's allegations and the LaFaro Video were successful in

convincing H.B. 2023's proponents that ballot collection presented opportunities for fraud that did not exist for in-person voting[.]" *Id.* at 880.

We accept the district court's conclusion that some members of the legislature who voted for H.B. 2023 had a sincere, though mistaken, non-race-based belief that there had been fraud in third-party ballot collection, and that the problem needed to be addressed. However, as the district court found, that sincere belief had been fraudulently created by Senator Shooter's false allegations and the "racially-tinged" LaFaro video. Even though some legislators did not themselves have a discriminatory purpose, that purpose may be attributable to their action under the familiar "cat's paw" doctrine. The doctrine is based on the fable, often attributed to Aesop, in which a clever monkey induces a cat to use its paws to take chestnuts off of hot coals for the benefit of the monkey.

For example, we wrote in *Mayes v. Winco Holdings, Inc.*, 846 F.3d 1274 (9th Cir. 2017):

> [T]he animus of a supervisor can affect an employment decision if the supervisor "influenced or participated in the decisionmaking process." *Dominguez-Curry* [*v. Nev. Transp. Dep't*], 424 F.3d [1027,] 1039–40 [(9th Cir. 2017)]. Even if the supervisor does not participate in the ultimate termination decision, a "supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's

100                    DNC v. HOBBS

> recommendation, entirely justified." *Staub v.
> Proctor Hosp.*, 562 U.S. 411, 421 (2011).

*Id.* at 1281; *see also Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) ("[I]f a subordinate . . . sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.").

The good-faith belief of these sincere legislators does not show a lack of discriminatory intent behind H.B. 2023. Rather, it shows that well meaning legislators were used as "cat's paws." Convinced by the false and race-based allegations of fraud, they were used to serve the discriminatory purposes of Senator Shooter, Republican Chair LaFaro, and their allies.

We hold that the district court clearly erred in discounting the importance of the first three *Arlington Heights* factors. We hold that all three factors weigh in favor of showing that discriminatory intent was a motivating factor in enacting H.B. 2023.

### iv. Disparate Impact on a Particular Racial Group

"The impact of the official action[,] whether it 'bears more heavily on one race than another,' may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Arlington Heights*, 429 U.S.

at 266 (internal citation omitted). As described above, uncontested evidence shows that H.B. 2023 has an adverse and disparate impact on American Indian, Hispanic, and African American voters. The district court found that the legislature "was aware" of the impact of H.B. 2023 on what the court called "low-efficacy minority communities." *Reagan*, 329 F. Supp. 3d at 881.

It appears that the district court weighed this factor in favor of showing discriminatory intent as a motivating factor in enacting H.B. 2023. The court did not clearly err in so doing.

### v. Assessment

We hold that the district court clearly erred in holding that Plaintiffs failed to carry their initial burden of proof of showing that racial discrimination was a motivating factor leading to the enactment of H.B. 2023. We hold that all four of the *Arlington Heights* factors weigh in favor of Plaintiffs. Our holding does not mean that the majority of the Arizona state legislature "harbored racial hatred or animosity toward any minority group." *N.C. State Conference of NAACP*, 831 F.3d at 233. "But the totality of the circumstances"— Arizona's long history of race-based voting discrimination; the Arizona legislature's unsuccessful efforts to enact less restrictive versions of the same law when preclearance was a threat; the false, race-based claims of ballot collection fraud used to convince Arizona legislators to pass H.B. 2023; the substantial increase in American Indian and Hispanic voting attributable to ballot collection that was targeted by H.B. 2023; and the degree of racially polarized voting in Arizona—"cumulatively and unmistakably reveal" that

racial discrimination was *a* motivating factor in enacting H.B. 2023. *Id.*

### b. Would H.B. 2023 Otherwise Have Been Enacted

At the second step of the *Arlington Heights* analysis, Arizona has the burden of showing that H.B. 2023 would have been enacted without racial discrimination as a motivating factor. Because the district court held that Plaintiffs had not carried their initial burden, it did not reach the second step of the *Arlington Heights* analysis.

Although there is no holding of the district court directed to *Arlington Heights*' second step, the court made a factual finding that H.B. 2023 would not have been enacted without racial discrimination as a motivating factor. The court specifically found that H.B. 2023 would not have been enacted without Senator Shooter's and LaFaro's false and race-based allegations of voter fraud. The court wrote, "The legislature was motivated by a misinformed belief that ballot collection fraud was occurring, but a sincere belief that mail-in ballots lacked adequate prophylactic safeguards as compared to in-person voting." *Reagan*, 329 F. Supp. 3d at 882. That is, members of the legislature, based on the "misinformed belief" created by Shooter, LaFaro, and their allies and serving as their "cat's paws," voted to enact H.B. 2023. *See Poland*, 494 F.3d at 1182. Based on the court's finding, we hold that Arizona has not carried its burden of showing that H.B. 2023 would have been enacted without the motivating factor of racial discrimination.

DNC v. HOBBS                103

c.  Summary

We hold that the district court clearly erred in holding that Plaintiffs failed to establish that H.B. 2023 violates the intent test of Section 2 of the VRA.  A holding that H.B. 2023 violates the intent test of Section 2 necessarily entails a holding that it also violates the Fifteenth Amendment.

III.  Response to Dissents

We respectfully disagree with our dissenting colleagues. For the most part, our response to their contentions is contained in the body of our opinion and needs no elaboration.  Several contentions, however, merit a specific response.

A.  Response to the First Dissent

Our first dissenting colleague, Judge O'Scannlain, makes several mistakes.

First, our colleague contends that H.B. 2023 does not significantly change Arizona law.  Our colleague writes:

> For years, Arizona has restricted who may handle early ballots.  Since 1992, Arizona has prohibited anyone but the elector himself from possessing "that elector's *unvoted* absentee ballot." 1991 Ariz. Legis. Serv. Ch. 310, § 22 (S.B. 1390) (West).  In 2016, Arizona enacted *a parallel regulation*, H.B.

> 2023 (the "ballot-collection" policy),
> concerning the collection of early ballots.

Diss. Op. at 116–117 (emphases added).

Our colleague appends a footnote to the first sentence in the passage just quoted:

> The majority's effort to deny history can
> easily be dismissed. Maj. Op. 104–105. As
> Judge Bybee's dissent ably recounts, not only
> Arizona but 21 other states have restricted
> early balloting for years. Bybee, J. Diss. Op.
> 157–158.

Our colleague fails to recognize the distinction between "unvoted" and "voted" ballots. Contrary to our colleague's contention, H.B. 2023 is not "a parallel regulation" to already existing Arizona law. Under prior Arizona law, possession of an "unvoted absentee ballot" was forbidden. Arizona law in no way restricted non-fraudulent possession of *voted* absentee ballots (absentee ballots on which the vote had already been indicated). Unlike our colleague, the district court recognized the distinction. It wrote:

> Since 1997, it has been the law in Arizona
> that "[o]nly the elector may be in possession
> of that elector's *unvoted* early ballot." A.R.S.
> § 16-542(D). In 2016, Arizona amended
> A.R.S. § 16-1005 by enacting H.B. 2023,

> which limits who may collect a voter's *voted or unvoted* early ballot.

*Reagan*, 329 F. Supp. 3d at 839 (emphases added). H.B. 2023 for the first time forbade non-fraudulent collection of *voted* ballots. It was not a "parallel regulation." It was a fundamental change in Arizona law.

Second, our colleague repeats the potentially misleading numbers and percentages of OOP voting recounted by the district court. Our colleague writes:

> Only 0.47 percent of all ballots cast in the 2012 general election (10,979 out of 2,323,579) were not counted because they were cast out of the voter's assigned precinct. [*Reagan*, 329 F. Supp. 3d] at 872. In 2016, this fell to 0.15 percent (3,970 out of 2,661,497). *Id.*

Diss. Op. at 122–123. Our colleague, like the district court, *see Reagan*, 329 F. Supp. 3d at 872, fails to mention that, as a percentage of all in-person ballots, OOP ballots increased between 2012 and 2016.

Third, our colleague quotes from a sentence in a footnote in the Supreme Court's opinion in *Gingles*. Based on that sentence, he insists that "substantial difficulty electing representatives of their choice" is the governing standard for the Section 2 results test in the case before us. Our colleague writes:

> [In *Gingles*], the Court observed that "[i]t is obvious that unless minority group members

experience *substantial difficulty* electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability 'to elect.'" *Gingles*, 478 U.S. at 48 n.15 (quoting 52 U.S.C. § 10301(b)) (emphasis added).

Diss. Op. at 124 (emphasis in original). He later writes:

Given the lack of any testimony in the record indicating that the ballot-collection policy would result in minority voters '*experienc[ing] substantial difficulty electing representatives of their choice*,' *Gingles*, 478 U.S. at 48 n.15, the district court did not clearly err[.]

*Id.* at 132 (emphasis added).

Our colleague fails to distinguish between a vote dilution case and a vote denial case. As we noted above, a vote dilution case is one in which multimember electoral districts have been formed, or in which district lines have been drawn, so as to dilute and thereby diminish the effectiveness of minority votes. Vote denial cases are all other cases, including cases in which voters are prevented from voting or in which votes are not counted. *Gingles* was a vote dilution case, and the case before us is a vote denial case. Our colleague fails to quote the immediately preceding sentence in the *Gingles* footnote, which makes clear that the Court was addressing vote dilution cases. The Court wrote, "In recognizing that some Senate Report factors are more important to multimember district *vote dilution claims* than

others, the Court effectuates the intent of Congress." *Gingles*, 478 U.S. at 48 n.15 (emphasis added).

The standard in a vote denial case is different, as recognized by DOJ in its amicus brief in this case, and in *League of Women Voters* where the Fourth Circuit struck down a state statute that would have prevented the counting of OOP ballots in North Carolina without inquiring into whether the number of affected ballots was likely to affect election outcomes. *See* 769 F.3d at 248–49. As we noted above, there may be a de minimis number in vote denial cases challenging facially neutral policies or law, but the 3,709 OOP ballots in our case is above any such de minimis number.

Citing our en banc decision in *Gonzalez*, our colleague contends that our case law does not differentiate between vote denial and vote dilution cases. But the very language from *Gonzalez* that he quotes belies his contention. We wrote in text:

> [A] § 2 challenge "based purely on a showing of some relevant statistical disparity between minorities and whites," without any evidence that the challenged voting qualification causes that disparity, will be rejected.

*Gonzalez*, 677 F.3d at 405. We then appended a footnote, upon which our colleague relies:

> This approach applies both to claims of vote denial and of vote dilution. [*Smith v. Salt River Project Agric. Improvement & Power*

*Dist.*, 109 F.3d 586,] 596 n.8 [(9th Cir. 1997)].

*Id.* at 405 n.32.  The quoted language makes the obvious point that in both vote denial and vote dilution cases, we require evidence of a causal relation between a challenged voting qualification and any claimed statistical disparity between minority and white voters.  However, this language does not tell us that the predicate disparity, and its effect, are the same in vote denial and vote dilution cases.

## B.  Response to the Second Dissent

Our second dissenting colleague, Judge Bybee, writes "to make a simple point:  The Arizona rules challenged here are part of an 'electoral process that is necessarily structured to maintain the integrity of the democratic system.'"  Diss. Op. at 142 (quoting *Burdick v. Takushi*, 504 U.S. 428, 441 (1992)).  We respectfully disagree.  There is nothing in Arizona's policy of discarding OOP votes or about H.B. 2023 that is necessary "to maintain the integrity" of Arizona's democratic system.

Our colleague writes, further, "Parties of all stripes should have an equal interest in rules that are both fair on their face and fairly administered."  *Id.* at 144.  Our colleague misunderstands the purpose of the VRA's results test of Section 2.  The results test looks past the facial fairness of a law to its actual results.

We take these two points in turn.

### 1. Integrity of Arizona's Democratic System

First, our colleague uses his "simple point" to justify Arizona's OOP policy and H.B. 2023 on the ground that they are necessary to protect the integrity of Arizona's system.

Our colleague argues that eliminating Arizona's OOP policy will "lower[] the cost to voters of determining where they are supposed to vote, but only as to presidential, U.S. Senate, and statewide races," and will have "its own consequences." *Id.* at 151, 153. To illustrate those consequences, our colleague imagines a voter from Tuscon who votes in Phoenix. Based on his imagined voter, he posits "two predictable ways" in which future elections in Arizona will be "skew[ed]" if OOP votes are counted for the elections in which the voter is entitled to vote. *Id.* at 152. Because his imagined voter cares only about national elections, that voter "may vote with impunity in the wrong precinct." *Id.* at 152. This will result, first, in "overvalu[ing]" national elections, and, second, in "undervalu[ing]" local elections. *Id.*

Our colleague speculates that Arizona's OOP policy will result in voters either finding the right precinct, or voting by mail. He writes:

> Under Arizona's current OOP rule, a voter, having gone to the trouble of going to a precinct to vote in person and suffering the indignity of having to fill out a provisional ballot, is less likely to make the same mistake next year. A voter who has had a ballot disqualified is more likely to figure out the correct precinct next time—or, better yet, sign up for the convenience of early voting, a

measure that avoids the conundrum of OOP altogether.

*Id.* at 155.

Our colleague's speculation leads him to predict that Arizona's OOP policy will lead to increased in-precinct voting. There is nothing in the record that remotely supports our colleague's predicted consequences. Instead, the record clearly shows the opposite. Arizona's OOP policy has been in place since at least 1970. *Reagan*, 329 F. Supp. 3d at 840. The record shows that, despite its long-standing policy, Arizona has consistently had by far the highest rate of OOP voting of any State—in 2012, eleven times greater than the second-place State. *See* Figure 6, *supra* at 13; *see also* Rodden at 26 (describing OOP voting as a "persistent problem" in Arizona).

Contrary to our colleague's speculation, OOP voters are unlikely ever to discover the "indignity" of having their provisional ballots discarded. Our colleague quotes from an Arizona statute requiring county recorders to establish a "method" by which a voter casting a provisional ballot be notified that his or ballot was not counted, and giving a reason why it was not counted. Diss. Op. at 155 n.9. However, there is nothing in the record showing that county recorders have in fact established, or followed, such a "method." Instead, there was uncontradicted testimony in the district court by OOP voters that they were not directed to their proper polling place and were never told that their vote would not be counted if cast out of precinct. *See Reagan*, 329 F. Supp. 3d at 858 (finding that poll workers neither directed OOP voters to the correct precinct nor told voters that OOP ballots would be discarded).

The persistence of OOP voting is unsurprising given the actions of Arizona. Arizona changes polling places with extraordinary frequency, and often locates them in inconvenient and misleading places. This produces a high rate of OOP voting, particularly in urban areas and particularly for voters with high rates of residential mobility. The uncontested result is that minority voters cast OOP votes twice as often as white voters.

Our colleague further argues that H.B. 2023 is an appropriate measure to protect against voter fraud. He begins by pointing out that many States forbid third-party ballot collection. Diss. Op. at 158–160. But a simple numerical comparison with other states fails to take into account, as the VRA says we must, the particular geography, ethnic patterns, and long history of third-party ballot collection in Arizona. *See Gingles*, 478 U.S. at 78 (a Section 2 analysis requires "a blend of history and an intensely local appraisal"). Evidence in the record shows that third-party ballot collection has long had a unique role in Arizona, given the large numbers of Hispanic and American Indian voters who have unreliable or non-existent in-home mail service, who have unreliable means of transportation, who live long distances from polling places, and who have long-standing cultural traditions of ballot collection. Evidence in the record shows that Arizona has never, in its long history of third-party ballot collection, found a single case of fraud.

Our colleague also argues that Arizona should not ignore the recommendation of the report of the bipartisan commission, *Building Confidence in U.S. Elections* (2005). Diss. Op. at 161–164. This is a reasonable argument, but it has limited force when applied to Arizona. Forbidding third-party ballot collection protects against potential voter fraud.

But such protection is not necessary, or even appropriate, when there is a long history of third-party ballot collection with no evidence, ever, of any fraud and such fraud is already illegal under existing Arizona law. Such protection is undesirable, even illegal, when a statute forbidding third-party ballot collection produces a discriminatory result or is enacted with discriminatory intent. The commission was concerned with maintaining "confidence" in our election system, as indicated by the title of its report. If there is a lack of confidence in third-party ballot collection in Arizona, it is due to the fraudulent, race-based campaign mounted by the proponents of H.B. 2023.

Finally, our colleague points to third-party ballot collection fraud perpetrated by a Republican political operative in North Carolina. *Id.* at 164–166. Our colleague's argument ignores the different histories and political cultures in Arizona and North Carolina, and puts to one side as irrelevant the long and honorable history of third-party ballot collection in Arizona. The argument also ignores the fact that Arizona had long had statutes prohibiting fraudulent handling of both unvoted and voted ballots by third parties, even before the enactment of H.B. 2023. The actions of the North Carolina Republican operative, if performed in Arizona, would have been illegal under those statutes. H.B. 2023 does not forbid fraudulent third-party ballot collection. Such fraud is forbidden by other provisions of Arizona law. H.B. 2023 forbids *non-fraudulent* third-party ballot collection.

## 2. Rules that Are Fair on Their Face

Second, our colleague defends Arizona's OOP policy and H.B. 2023 as "rules that are . . . fair on their face." *Id.* at 144. The results test of Section 2 of the VRA is based on the

understanding that laws that are "fair on their face" can, as in this case, produce discriminatory results. Indeed, Congress added the results test to the VRA precisely to address laws that were fair on their face but whose result was unfair discrimination.

Arizona's OOP policy and H.B. 2023 both fail the results test. The result of Arizona's OOP policy is that twice as many minority ballots as white ballots are thrown away. Prior to the enactment of H.B. 2023, third-party ballot collectors, acting in good faith, collected many thousands of valid ballots cast by minority voters. White voters rarely relied on third-party ballot collection. The result of H.B. 2023 is that many thousands of minority ballots will now not be collected and counted, while white ballots will be largely unaffected.

## IV. Conclusion

We hold that Arizona's OOP policy violates the results test of Section 2. We hold that H.B. 2023 violates both the results test and the intent test of Section 2. We hold that H.B. 2023 also violates the Fifteenth Amendment. We do not reach Plaintiffs' other constitutional challenges.

We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

114                    DNC V. HOBBS

WATFORD, Circuit Judge, concurring:

I join the court's opinion to the extent it invalidates Arizona's out-of-precinct policy and H.B. 2023 under the results test.  I do not join the opinion's discussion of the intent test.

---

O'SCANNLAIN, Circuit Judge, with whom CLIFTON, BYBEE, and CALLAHAN, Circuit Judges, join, dissenting:

We have been asked to decide whether two current Arizona election practices violate the Voting Rights Act or the First, Fourteenth, or Fifteenth Amendments to the United States Constitution.[1]  Based on the record before us and

---

[1] Section 2 of the Voting Rights Act prohibits a State from adopting an election practice that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

The First Amendment to the United States Constitution provides in relevant part: "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble."  U.S. Const. amend. I.

The Fourteenth Amendment guarantees: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.

The Fifteenth Amendment ensures that the right "to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."  U.S. Const. amend. XV.

relevant Supreme Court and Ninth Circuit precedent, the answer to such question is clear: they do not. The majority, however, draws factual inferences that the evidence cannot support and misreads precedent along the way. In so doing, it impermissibly strikes down Arizona's duly enacted policies designed to enforce its precinct-based election system and to regulate third-party collection of early ballots.

I respectfully dissent.

## I

Given the abundant discussion by the district court and the en banc majority, I offer only a brief summary of the policies at issue here and discuss the district court's factual findings as pertinent to the analysis below.

### A

Arizona offers voters several options: early mail ballot, early in-person voting, and in-person Election Day voting. *Democratic Nat'l Comm. v. Reagan ("DNC")*, 329 F. Supp. 3d 824, 838 (D. Ariz. 2018).

#### 1

Since at least 1970, Arizona has required that in-person voters "cast their ballots in their assigned precinct and has enforced this system by counting only those ballots cast in the correct precinct." *Id.* at 840. A voter who arrives at a precinct in which he or she is not listed on the register may cast a provisional ballot, but Arizona will not count such ballot if it determines that the voter does not live in the

precinct in which he or she voted. *Id.* For shorthand, I refer to this rule as Arizona's "out-of-precinct" or "OOP" policy.

Most Arizona voters, however, do not vote in person on Election Day. *Id.* at 845. Arizona law permits all registered voters to vote early by mail or in person at an early voting location in the 27 days before an election. Ariz. Rev. Stat. §§ 16-121(A), 16-541(A), 16-542(D). All Arizona counties operate at least one location for early in person voting. *DNC*, 329 F. Supp. 3d at 839. Rather than voting early in person, any voter may instead request an early ballot to be delivered to his or her mailbox on an election-by-election or permanent basis. *Id.* In 2002, Arizona became the first state to make available an online voter registration option, which also permits voters to enroll in permanent early voting by mail. *Id.* Voters who so enroll will be sent an early ballot no later than the first day of the 27-day early voting period. *Id.* Voters may return early ballots in person at any polling place, vote center, or authorized office without waiting in line or may return their early ballots by mail at no cost. *Id.* To be counted, however, an early ballot must be received by 7:00 p.m. on Election Day. *Id.*

2

For years, Arizona has restricted who may handle early ballots.[2] Since 1992, Arizona has prohibited anyone but the elector himself from possessing "that elector's unvoted absentee ballot." 1991 Ariz. Legis. Serv. Ch. 310, § 22 (S.B.

---

[2] The majority's effort to deny history can easily be dismissed. Maj. Op. 104–105. As Judge Bybee's dissent ably recounts, not only Arizona but 21 other states have restricted early balloting for years. Bybee, J. Diss. Op. 157–158.

1390) (West). In 2016, Arizona enacted a parallel regulation, H.B. 2023 (the "ballot-collection" policy), concerning the collection of early ballots.[3] *DNC*, 329 F. Supp. 3d at 839. Under the ballot-collection policy, only a "family member," "household member," "caregiver," "United States postal service worker" or other person authorized to transmit mail, or "election official" may return another voter's completed early ballot. *Id.* at 839–40 (citing Ariz. Rev. Stat. § 16-1005(H)–(I)).

## B

In April 2016, the Democratic National Committee, the Democratic Senatorial Campaign Committee, and the Arizona Democratic Party (together, "DNC") sued the State of Arizona to challenge the OOP policy and the ballot-collection policy. The district court denied DNC's motions to enjoin preliminarily enforcement of both polices, and DNC asked our court to issue injunctions pending appeal of such denials. After expedited proceedings before three-judge and en banc panels, our court denied the motion for an injunction against the OOP policy but granted the parallel motion against the ballot-collection policy. *Feldman v. Ariz. Sec'y of State's Office*, 840 F.3d 1165 (9th Cir. 2016) (en banc) (mem.) (per curiam); *Feldman v. Ariz. Sec'y of State's Office (Feldman III)*, 843 F.3d 366 (9th Cir. 2016) (en banc). The Supreme Court, however, stayed our injunction against the ballot-collection policy and the OOP and ballot-collection policies functioned in usual fashion. *Ariz. Sec'y of State's Office v. Feldman*, 137 S. Ct. 446 (2016) (mem.).

---

[3] While the majority refers to the legislation as "H.B. 2023," I prefer to call it the ballot-collection policy by which it is commonly known and will do so throughout the dissent.

In 2017, the district court proceeded to the merits of DNC's suit. In May 2018, after a ten-day bench trial, the district court issued a decision supported by thorough findings of fact and conclusions of law. *DNC*, 329 F. Supp. 3d at 832. The district court found that DNC failed to prove any violation of the Voting Rights Act or the United States Constitution and issued judgment in the state's favor. *Id.* at 882–83.

DNC timely appealed, and a three-judge panel of our court affirmed the decision of the district court in its entirety. *Democratic Nat'l Comm. v. Reagan ("DNC")*, 904 F.3d 686 (9th Cir. 2018), *vacated by order granting rehearing en banc*, 911 F.3d 942 (9th Cir. 2019) (mem.). But today, the en banc panel majority reverses the decision of the district court and holds that the OOP and ballot-collection policies violate § 2 of the Voting Rights Act and that the ballot-collection policy was enacted with discriminatory intent in violation of the Fifteenth Amendment.

## II

The first mistake of the en banc majority is disregarding the critical standard of review. Although the majority recites the appropriate standard, it does not actually engage with it.[4] Maj. Op. 8–9. The standard is not complex. We review *de novo* the district court's conclusions of law, but may review

---

[4] As the majority admits, we review the district court's "overall finding of vote dilution" under § 2 of the Voting Rights Act only for clear error. *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (emphasis added); Maj. Op. 8–9. The majority quotes an elaboration of this standard by the Supreme Court in *Gingles*. Maj. Op. 8–9. But the Court in *Gingles* actually held that the district court's ultimate finding was not clearly erroneous. *Gingles*, 478 U.S. at 80.

its findings of fact only for *clear error*. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1067 (9th Cir. 2008) (en banc).

The majority's disregard of such standard and, thus, our appellate role, infects its analysis of each of DNC's claims. The demanding clear error standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). Rather, we may reverse a finding only if, "although there is evidence to support it, [we are] left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. U. S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). To do otherwise "oversteps the bounds of [our] duty under [Federal Rule of Civil Procedure] 52(a)" by "duplicat[ing] the role of the lower court." *Id.* at 573. As explained in Parts III and IV, I fail to see how *on the record before us* one could be "left with a definite and firm conviction" that the district court erred.

III

DNC first contends that Arizona's policies violate § 2 of the Voting Rights Act. A district court's determination of whether a challenged practice violates § 2 of the Voting Rights Act is "intensely fact-based": the court assesses the "totality of the circumstances" and conducts a "'searching practical evaluation of the past and present reality.'" *Smith v. Salt River Project Agric. Improvements & Power Dist. ("Salt River")*, 109 F.3d 586, 591 (9th Cir. 1997) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986)). Thus, "[d]eferring to the district court's superior fact-finding

120                  DNC v. HOBBS

capabilities, we review *only for clear error its ultimate finding of no § 2 violation*." *Id.* at 591 (emphasis added).

In relevant part, § 2 provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color . . . .

> (b) A violation of subsection (a) is established if, *based on the totality of circumstances*, it is shown that the political processes leading to nomination or election in the State . . . *are not equally open to participation by members of a class of citizens protected by subsection (a)* in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301 (emphasis added). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. To determine whether a practice violates § 2, courts employ a two-step analysis. *See Ohio Democratic Party v. Husted*, 834 F.3d 620, 637 (6th Cir. 2016); *Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016); *Frank v. Walker*, 768 F.3d 744, 754–55 (7th Cir. 2014); *League of Women*

*Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014).

The first step is asking whether the practice provides members of a protected class "less 'opportunity' than others 'to participate in the political process *and* to elect representatives of their choice.'" *Chisom v. Roemer*, 501 U.S. 380, 397 (1991) (alteration in original) (quoting 52 U.S.C. § 10301). In other words, the challenged practice "must impose a *discriminatory burden* on members of a protected class." *League of Women Voters*, 769 F.3d at 240 (emphasis added). To prevail at step one, the plaintiff therefore "must show a causal connection between the challenged voting practice and [a] prohibited discriminatory result." *Salt River*, 109 F.3d at 595 (alteration in original) (quoting *Ortiz v. City of Phila. Office of City Comm'rs Voter Registration Div.*, 28 F.3d 306, 312 (3d Cir. 1994)); *see also Ohio Democratic Party*, 834 F.3d at 638. If a discriminatory burden is established, then—and only then—do we consider whether the burden is "caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class." *League of Women Voters*, 769 F.3d at 240 (quoting *Gingles*, 478 U.S. at 47).

The majority agrees that this two-step analysis controls but mistakenly applies it. According to the majority, DNC has shown that the OOP policy and the ballot-collection policy fail at both steps—and, presumably, that the district court clearly erred in finding otherwise. Under an appropriately deferential analysis, however, DNC cannot prevail even at step one: it has simply failed to show that either policy erects a discriminatory burden.

A

As to the facially neutral OOP policy, DNC argues, erroneously, that wholly discarding, rather than partially counting, ballots that are cast out-of-precinct violates § 2 of the Voting Rights Act because such policy imposes a discriminatory burden on minority voters related to Arizona's history of discrimination. The district court, quite properly, found that DNC failed to carry its burden at step one—that the practice imposes a discriminatory burden on minority voters—for two reasons. *DNC*, 329 F. Supp. 3d at 873.

1

First, the district court determined that DNC failed to show "that the racial disparities in OOP voting are practically significant enough to work a meaningful inequality in the opportunities of minority voters as compared to non-minority voters." *Id.* Thus, it ruled that DNC failed to show that the precinct-based system has a "disparate impact on the opportunities of minority voters to elect their preferred representatives." *Id.* at 872. To the contrary, the district court made the factual finding that out-of-precinct "ballots represent . . . a small and ever-decreasing fraction of the overall votes cast in any given election." *Id.*

Furthermore, the district court determined that "the burdens imposed by precinct-based voting . . . are not severe. Precinct-based voting merely requires voters to locate and travel to their assigned precincts, which are ordinary burdens traditionally associated with voting." *Id.* at 858. Indeed, the numbers found by the district court support such conclusion. Only 0.47 percent of all ballots cast in the 2012 general election (10,979 out of 2,323,579) were not counted because

they were cast out of the voter's assigned precinct. *Id.* at 872. In 2016, this fell to 0.15 percent (3,970 out of 2,661,497). *Id.* And of those casting ballots in-person on Election Day, approximately 99 percent of minority voters and 99.5 percent of non-minority voters cast their ballots in their assigned precincts. *Id.* Given that the overwhelming majority of all voters complied with the precinct-based voting system during the 2016 election, it is difficult to see how the district court's finding could be considered clearly erroneous. *See also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (plurality opinion) (discussing "the usual burdens of voting"). And it further ruled that DNC "offered no evidence of a systemic or pervasive history of minority voters being given misinformation regarding the locations of their assigned precincts, while non-minority voters were given correct information" to suggest that the burden of voting in one's assigned precinct is more significant for minority voters than for non-minority voters. *DNC*, 329 F. Supp. 3d at 873.

As Judge Ikuta explained in her now-vacated majority opinion for the three-judge panel:

> If a challenged election practice is not burdensome or the state offers easily accessible alternative means of voting, a court can reasonably conclude that the law does not impair any particular group's opportunity to "influence the outcome of an election," even if the practice has a disproportionate impact on minority voters.

*DNC*, 904 F.3d at 714 (citation omitted) (quoting *Chisom*, 501 U.S. at 397 n.24). The "bare statistic[s]" presented may indeed show a disproportionate impact on minority voters,

124       DNC v. HOBBS

but we have held previously that such showing is not enough. *Salt River*, 109 F.3d at 595 ("[A] bare statistical showing of disproportionate *impact* on a racial minority does not satisfy the § 2 'results' inquiry." (emphasis in original)). A court must evaluate the burden imposed by the challenged voting practice—not merely any statistical disparity that may be shown. The Supreme Court's interpretation of § 2 in *Gingles* suggests the same. There, the Court observed that "[i]t is obvious that unless minority group members experience *substantial difficulty* electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability 'to elect.'" *Gingles*, 478 U.S. at 48 n.15 (emphasis added) (quoting 52 U.S.C. § 10301(b)). Furthermore, because "[n]o state has exactly equal registration rates, exactly equal turnout rates, and so on, at every stage of its voting system," it cannot be the case that pointing to a mere statistical disparity related to a challenged voting practice is sufficient to "dismantle" that practice. *Frank*, 768 F.3d at 754; *see also Salt River*, 109 F.3d at 595.

The majority, however, contends that "the district court discounted the disparate burden on the ground that there were relatively few OOP ballots cast in relation to the total number of ballots." Maj. Op. 43. In the majority's view, the district court should have emphasized that the percentage of in-person ballots that were cast out-of-precinct increased, thus isolating the specific impact of the OOP policy amongst in-person voters bound by the precinct-system requirements.

Contrary to the majority's assertion, however, the legal review at hand does not require that we isolate the specific challenged practice in the manner it suggests. Rather, at step one of the § 2 inquiry, we only consider whether minority voters "experience substantial difficulty electing

representatives of their choice," *Gingles*, 478 U.S. at 48 n.15, "based on the totality of circumstances," 52 U.S.C. § 10301(b).[5] Although the majority would like us to believe that the increasing percentage of in-person ballots cast out-of-precinct demonstrates that minorities are disparately burdened by the challenged policy, the small number of voters who chose to vote in-person and the even smaller number of such voters who fail to do so in the correct precinct demonstrate that any minimal burden imposed by the policy does not deprive minority voters of equal opportunities to elect representatives of their choice. A conclusion otherwise could not be squared with our determination that a mere statistical showing of disproportionate impact on racial minorities does not satisfy the challenger's burden. *See Salt River*, 109 F.3d at 595. If such statistical impact is not sufficient, it must perforce be the case that the crucial test is

---

[5] The majority correctly asserts that *Gingles* was a vote dilution not vote denial case. However, it incorrectly claims the standard in a vote denial case is different and, without stating such standard, it simply concludes that the 3,709 ballots cast out of precinct in the 2016 general election in Arizona is more than any "de minimis number" below which there is no Section 2 violation, without ever revealing what such minimum threshold might be. Maj. Op. 107. The majority cites *League of Women Voters*, a vote denial case, to reach this conclusion. *See* 769 F.3d at 248–49. Yet, in that case, the Fourth Circuit relies on *Gingles* throughout to determine that the same analysis applies to vote denial and vote dilution cases. *Id.* at 238–40. Earlier in its opinion, the majority itself uses *Gingles* as the standard for analyzing a § 2 violation in a vote denial case. Maj. Op. 37. The distinction the majority attempts to draw fails because, contrary to what the majority implies, "a § 2 challenge based purely on a showing of some relevant statistical disparity between minorities and whites, without any evidence that the challenged voting qualification causes that disparity, will be rejected," *Gonzalez v. Arizona*, 677 F.3d 383, 495 (9th Cir. 2012) (internal quotation marks omitted), and "[t]his approach applies both to claims of vote denial and vote dilution." *Id.* at 495 n. 32.

the *extent* to which the practice burdens minority voters as opposed to non-minority voters. But the en banc majority offers no explanation for how or why the burden of voting in one's assigned precinct is severe or beyond that of the burdens traditionally associated with voting.

The majority argues that there may be a "de minimis number" below which no § 2 violation has occurred.[6] Maj. Op. 44. But we know from our own precedent that "a bare statistical showing of disproportionate *impact* on a racial minority does not satisfy the § 2 . . . inquiry." *Salt River*, 109 F.3d at 595 (emphasis in original). And *Chisom* makes clear that § 2 "claims must allege an abridgment of the opportunity to participate in the political process *and* to elect representatives of one's choice." 501 U.S. at 398 (emphasis in original). As such, the inquiry must require consideration of both the scope of the burden imposed by the particular policy—not merely how many voters are impacted by it—and the difficulty of accessing the political process in its entirety.

Thus, it cannot be true, as the majority suggests, that simply showing that some number of minority voters' ballots were not counted as a result of an individual policy satisfies step one of the § 2 analysis for a facially neutral policy.

2

Second, the district court made the factual finding that "Arizona's policy to not count OOP ballots is not the cause

---

[6] As Judge Ikuta explained, "an election rule requiring voters to identify their correct precinct in order to have their ballots counted does not constitute a 'disenfranchisement' of voters." *DNC*, 904 F.3d at 730 n.33; *see also id.* at 724 n.27.

of [any identified] disparities in OOP voting." *DNC*, 329 F. Supp. 3d at 872. According to the OOP policy that is challenged by DNC, a ballot is not counted if it is cast outside of the voter's assigned precinct. And the district court pointed to several factors that result in higher rates of out-of-precinct voting among minorities. For example, the district court found that "high rates of residential mobility are associated with higher rates of OOP voting," and minorities are more likely to move more frequently. *Id.* at 857, 872. Similarly, "rates of OOP voting are higher in neighborhoods where renters make up a larger share of householders." *Id.* at 857. The precinct-system may also pose special challenges for Native American voters, because they may "lack standard addresses" and there may be additional "confusion about the voter's correct polling place" where precinct assignments may differ from assignments for tribal elections. *Id.* at 873. "Additionally", the district court found, Arizona's "changes in polling locations from election to election, inconsistent election regimes used by and within counties, and placement of polling locations all tend to increase OOP voting rates." *Id.* at 858.

But the burden of *complying* with the precinct-based system in the face of any such factors is plainly distinguishable from the *consequence* imposed should a voter fail to comply. Indeed, as the district court found, "there is no evidence that it will be easier for voters to identify their correct precincts if Arizona eliminated its prohibition on counting OOP ballots." *Id.* Although "the consequence of voting OOP might make it more imperative for voters to correctly identify their precincts," *id.*, such consequence does not *cause* voters to cast their ballots out-of-precinct or make it more burdensome for voters to cast their ballots in their assigned precincts.

The majority goes astray by failing to recognize the distinction between the burden of complying and the consequence of failing to do so. In fact, the majority undercuts its own claim by citing the same host of reasons identified by the district court as the reasons why a minority voter is more likely to vote out-of-precinct. Maj Op. 14–19. All the factors the majority seizes upon, however, stem from the general requirement that a voter cast his or her ballot in the assigned precinct—not the policy that enforces such requirement. The importance of such distinction is made clear by the relief that DNC seeks: DNC does not request that Arizona be made to end its precinct-based system or to assign its precincts differently, but instead requests that Arizona be made to count those ballots that are not cast in compliance with the OOP policy.[7] Removing the enforcement policy, however, would do nothing to minimize or to extinguish the disparity that exists in out-of-precinct voting.

Consider another basic voting requirement: in order to cast a ballot, a voter must register. If a person fails to register, his or her vote will not count. Any discriminatory result from such a policy would need to be addressed in a

---

[7] The majority suggests that DNC challenges only "Arizona's policy, within that system, of entirely discarding OOP ballots" as opposed to counting or partially counting them. Maj. Op. 78. But this is not a compromise position: there is no difference between counting and partially counting a ballot cast out-of-precinct. Counting an OOP ballot would entail evaluating the ballot to determine on which issues the person would have been qualified to vote in his or her assigned precinct and discarding the person's votes as to issues on which he or she would not have been qualified to vote. Certainly, the majority isn't suggesting that a person would ever be allowed to vote on issues which he or she would not have been eligible to vote even in the assigned precinct. It is difficult to discern any other possible meaning for what the majority refers to as entirely "counting" out-of-precinct ballots.

DNC v. HOBBS                    129

challenge to *that* policy itself.  For example, if minorities are underrepresented as a segment of registered voters, perhaps they could challenge some discriminatory aspect of the registration system.  But they surely could not prevail by challenging simply the state's *enforcement* of the registration policy by refusing to count unregistered voters' ballots. Minorities in a jurisdiction may very well be underrepresented as members of the registered electorate, but the discrepancy between the protected class as a segment of the general population and as a segment of the registered voting population would not require that a state permit unregistered voters to cast valid ballots on Election Day.

Similarly, the fact that a ballot cast by a voter outside of his or her assigned precinct is discarded does not *cause* minorities to vote out-of-precinct disproportionately.  But DNC does not challenge the general requirement that one vote in his or her precinct or take issue with the assignment of precinct locations—the very requirements that *could* lead to a disproportionate impact.  It may indeed be the case in a precinct-based voting system that a state's poor assignment of districts, distribution of inadequate information about voting requirements, or other factors have some material effect on election practices such that minorities have less opportunity to elect representatives of their choice as a result of the system.  But, in the words of the majority, DNC's challenge "assumes both [the] importance and [the] continued existence" of "Arizona's precinct-based system of voting." Maj. Op. 78.  Instead, DNC challenges only Arizona's *enforcement* of such system.  Thus, even if there were a recognizable disparity in the opportunities of minority voters voting out-of-precinct, it would nonetheless not be the *result* of the policy at issue before us.

### 3

I reject the suggestion implicit in the majority opinion that any facially neutral policy which may result in some statistical disparity is necessarily discriminatory under step one of the § 2 inquiry. We have already held otherwise. *Salt River*, 109 F.3d at 595. And the majority itself concedes that "more than a de minimis number of minority voters must be burdened before a Section 2 violation based on the results test can be found." Maj. Op. 44. Furthermore, I fail to see how DNC—and the majority—can concede the importance and continued existence of a precinct-based system, yet argue that the enforcement mechanism designed to maintain such system is impermissible.

Because DNC has failed to meet its burden under step one of the Voting Rights Act § 2 inquiry—that the district court's findings were clearly erroneous—our analysis of its OOP claim should end here.

### B

As to the facially neutral ballot-collection policy, DNC argues, erroneously, that it violates § 2 because there is "extensive evidence" demonstrating that minority voters are more likely to have used ballot-collection services and that they would therefore be disproportionately burdened by limitations on such services. Specifically, DNC relies on anecdotal evidence that ballot collection has disproportionately occurred in minority communities, that minority voters were more likely to be without home mail delivery or access to transportation, and that ballot-harvesting efforts were disproportionately undertaken by the Democratic Party in minority communities. And, DNC claims, such

burden is caused by or linked to Arizona's history of discrimination.

The district court, quite properly, rejected such argument, making the factual finding that DNC failed to establish at step one that the ballot-collection policy imposed a discriminatory burden on minority voters. *DNC*, 329 F. Supp. 3d at 866, 871. Once again, the question is whether such finding was clearly erroneous. *Salt River*, 109 F.3d at 591.

1

The district court found broadly that the non-quantitative evidence offered by DNC failed to show that the ballot-collection policy denied minority voters of "meaningful access to the political process." *DNC*, 329 F. Supp. 3d at 871. As Judge Ikuta observed, to determine whether the challenged policy provides minority voters "less opportunity to elect representatives of their choice, [we] must necessarily consider the severity and breadth of the law's impacts on the protected class." *DNC*, 904 F.3d at 717.

But no evidence of that impact has been offered. "In fact, *no* individual voter testified that [the ballot-collection policy's] limitations on who may collect an early ballot would make it significantly more difficult to vote." *DNC*, 329 F. Supp. 3d at 871 (emphasis added). Anecdotal evidence of how voters have chosen to vote in the past does not establish that voters are unable to vote in other ways or would be burdened by having to do so. The district court simply found that "prior to the [ballot-collection policy's] enactment minorities generically were more likely than non-minorities to return their early ballots with the assistance of third parties," *id.* at 870, but, once again, the disparate impact

of a challenged policy on minority voters is insufficient to establish a § 2 violation, *see Salt River*, 109 F.3d at 594–95.

The majority simply does not address the lack of evidence as to whether minority voters have less opportunity than non-minority voters now that ballot collection is more limited. Instead, the majority answers the wrong question by pointing to minority voters' use of ballot collection in the past. The majority offers no record-factual support for its conclusion that the anecdotal evidence presented demonstrates that compliance with the ballot-collection policy imposes a disparate burden on minority voters—a conclusion that must be reached in order to satisfy step one of the § 2 inquiry—let alone evidence that the district court's contrary finding was "clearly erroneous."

Given the lack of any testimony in the record indicating that the ballot-collection policy would result in minority voters "experienc[ing] substantial difficulty electing representatives of their choice," *Gingles*, 478 U.S. at 48 n.15, the district court did not clearly err in finding that, "for some voters, ballot collection is a preferred and more convenient method of voting," but a limitation on such practice "does not deny minority voters meaningful access to the political process." *DNC*, 329 F. 3d Supp. at 871.

2

The district court further found that the ballot-collection policy was unlikely to "cause a meaningful inequality in the electoral opportunities of minorities" because only "a relatively small number of voters have used ballot collection services" in the past at all. *DNC*, 329 F. Supp. 3d at 870–71. And, the district court noted, DNC "provided no quantitative

or statistical evidence comparing the proportion that is minority versus non-minority." *Id.* at 866. "Without this information," the district court explained, "it becomes difficult to compare the law's impact on different demographic populations and to determine whether the disparities, if any, are meaningful." *Id.* at 867. Thus, from the record, we do not know either the extent to which voters may be burdened by the ballot-collection policy or how many minority voters may be so burdened.

Nonetheless, the district court considered circumstantial and anecdotal evidence offered by DNC and determined that "the vast majority of Arizonans, minority and non-minority alike, vote without the assistance of third-parties who would not fall within [the ballot-collection policy's] exceptions." *Id.* at 871. DNC—and the majority—argue that such finding is not supported by the record, but, given the lack of quantitative or statistical evidence before us, it is difficult to conclude that such finding is clearly erroneous. The district court itself noted that it could not "speak in more specific or precise terms" given the sparsity of the record. *Id.* at 870. Drawing from anecdotal testimony, the district court estimated that fewer than 10,000 voters used ballot-collection services in any election. *Id.* at 845. Drawing even "the unjustified inference that 100,000 early mail ballots were collected" during the 2012 general election, the district court found that such higher total would nonetheless be "relatively few early voters" as compared to the 1.4 million early mail ballots returned or 2.3 million total votes cast. *Id.* at 845. The majority further argues that the district court erred in "discounting the evidence of third-party ballot collection as merely 'circumstantial and anecdotal'" Maj. Op. 83. But the district court did nothing of the sort. To the contrary, the district court considered whether the ballot-collection policy

violated § 2 by making these estimates—and even generous estimates—from the anecdotal evidence offered.  And the district court's subsequent conclusion that the limitation of third-party ballot collection would impact only a "relatively small number of voters," *id.* at 870, is clearly plausible on this record, *see Bessemer City*, 470 U.S. at 573.

The majority also argues that the total number of votes affected is not the relevant inquiry; the proper test is whether the number of ballots collected by third parties surpasses any de minimis number.  Maj. Op. 84.  But we already know "that a bare statistical showing" that an election practice has a "disproportionate *impact* on a racial minority does not satisfy" step one of the § 2 inquiry.  *Salt River*, 109 F.3d at 595 (emphasis in original).  And, even if such impact were sufficient, the record offers no evidence from which the district court could determine the extent of the discrepancy between minority voters as a proportion of the entire electorate versus minority voters as a proportion of those who have voted using ballot-collection services in the past.  *DNC*, 329 F. Supp. 3d at 866–67.

3

As Judge Bybee keenly observed in a previous iteration of this case (and indeed in his dissent in this case), "[t]here is no constitutional or federal statutory right to vote by absentee ballot."  *Feldman III*, 843 F.3d at 414 (Bybee, J., dissenting) (citing *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807–08 (1969)); *accord* Bybee, J. Diss. Op. 156.  Both today and in the past, Arizona has chosen to provide a wide range of options to voters.  But Arizona's previous decision to permit a particular mechanism of voting does not preclude Arizona from modifying its election system

to limit such mechanism in the future so long as such modification is made in a constitutional manner.  And, in fact, Arizona's modification here was made in compliance with "the recommendation of the bipartisan Commission on Federal Election Reform."  *DNC*, 329 F. Supp. 3d at 855. Without any evidence in the record of the severity and breadth of the burden imposed by this change to the ballot-collection policy, we cannot be "left with the definite and firm conviction" that the district court erred in finding that DNC failed to show that the policy violated § 2.  *See Bessemer City*, 470 U.S. at 573; *see also Salt River*, 109 F.3d at 591.

## C

Because I disagree with the majority's conclusion that DNC has satisfied its burden at step one of the § 2 Voting Rights Act inquiry, I would not reach step two.  I therefore do not address the majority's consideration of the so-called "Senate Factors" in determining whether the burden is "in part caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class."  *League of Women Voters*, 769 F.3d at 240 (quoting *Gingles*, 478 U.S. at 47).  These factors—and the majority's lengthy history lesson on past election abuses in Arizona—simply have no bearing on this case.  Indeed, pages 47 to 81 of the majority's opinion may properly be ignored as irrelevant.

## IV

DNC also contends that the ballot-collection policy violates the Fifteenth Amendment to the United States

Constitution.[8] To succeed on a claim of discriminatory intent under the Fifteenth Amendment, the challenger must demonstrate that the state legislature "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Because discriminatory intent "is a pure question of fact," we again review only for clear error. *Pullman-Standard v. Swint*, 456 U.S. 273, 287–88 (1982). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

The district court concluded that the ballot-collection policy did not violate the Fifteenth Amendment because it made the factual finding that the legislature "was not motivated by a desire to suppress minority voters," although "some individual legislators and proponents of limitations on ballot collection harbored *partisan* motives" that "did not permeate the entire legislative process." *DNC*, 329 F. Supp. 3d at 879, 882 (emphasis added). Instead, "[t]he legislature was motivated by . . . a sincere belief that mail-in ballots lacked adequate prophylactic safeguards as compared to in-person voting." *Id.* at 882. In analyzing DNC's appeal from such finding, the majority, once again, completely ignores our demanding standard of review and instead conducts its own

---

[8] The Fifteenth Amendment authorizes Congress to enforce its guarantee that the right "to vote shall not be denied or abridged . . . by appropriate legislation." U.S. Const. amend. XV. Section 2 of the Voting Rights Act is such legislation. *Shelby Cty. v. Holder*, 570 U.S. 529, 536 (2013).

DNC v. HOBBS                    137

de novo review. Maj. Op. 93. Our duty is only to consider whether the district court clearly erred in *its finding* that the ballot-collection policy was not enacted with discriminatory intent. *See Bessemer City*, 470 U.S. at 573. And "to be clearly erroneous, a decision must . . . strike [a court] as wrong with the force of a five-week old, unrefrigerated dead fish." *Ocean Garden, Inc. v. Marktrade Co., Inc.*, 953 F.2d 500, 502 (9th Cir. 1991) (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)).

The majority therefore fails to offer any basis—let alone a convincing one—for the conclusion that it must reach in order to reverse the decision of the district court: that the district court committed clear error in its factual findings. Given the failure of the majority to conduct its review in the proper manner, I see no reason to engage in a line-by-line debate with its flawed analysis. Rather, it is enough to note two critical errors made by the majority in ignoring the district court's determinations that while some legislators were motivated by partisan concerns, the legislature as a body was motivated by a desire to enact prophylactic measures to prevent voter fraud.

A

First, the majority fails to distinguish between *racial* motives and *partisan* motives. Even when "racial identification is highly correlated with political affiliation," a party challenging a legislative action nonetheless must show that *racial* motives were a motivating factor behind the challenged policy. *Cooper v. Harris*, 137 S. Ct. 1455, 1473 (2017) (quoting *Easley v. Cromartie*, 532 U.S. 234, 243 (2001)). Nonetheless, the majority suggests that a legislator motivated by *partisan* interest to enact a law that

disproportionately impacts minorities must necessarily have acted with racially discriminatory intent as well. For example, the district court noted that Arizona State Senator Don Shooter was, "in part motivated by a desire to eliminate what had become an effective Democratic [Get Out The Vote] strategy." *DNC*, 329 F. Supp. 3d at 879. The majority simply concludes that such finding shows racially discriminatory intent as a motivating factor. But the majority's unsupported inference does not satisfy the required showing. And the majority fails to cite any evidence demonstrating that the district court's finding to the contrary was not "plausible in light of the record viewed in its entirety." *Bessemer City*, 470 U.S. at 574.

B

Second, in defiance of Supreme Court precedent to the contrary, the majority assumes that a legislature's stated desire to prevent voter fraud must be pretextual when there is no direct evidence of voter fraud in the legislative record. In *Crawford*, the Court rejected the argument that *actual* evidence of voter fraud was needed to justify the State's decision to enact prophylactic measures to prevent such fraud. *Crawford*, 553 U.S. at 195–96 . There, the Court upheld an Indiana statute requiring in-person voters to present government-issued photo identification in the face of a constitutional challenge. *Id.* at 185. Although "[t]he record contain[ed] no evidence of [voter] fraud actually occurring in Indiana at any time in its history," the Supreme Court nonetheless determined that the State had a legitimate and important interest "in counting only the votes of eligible voters." *Id.* at 194, 196; *see also id.* at 195 nn.11–13 (citing "fragrant examples of" voter fraud throughout history and in recent years). Given its interest in addressing its valid

DNC v. HOBBS                          139

concerns of voter fraud, Arizona was free to enact prophylactic measures even though no evidence of actual voter fraud was before the legislature. Yet the majority does not even mention *Crawford*, let alone grapple with its consequences on this case.

And because no evidence of actual voter fraud is required to justify an anti-fraud prophylactic measure, the majority's reasoning quickly collapses. The majority cites Senator Shooter's "false and race-based allegations" and the "LaFaro video," which the district court explained "showed surveillance footage of a man of apparent Hispanic heritage appearing to deliver early ballots" and "contained a narration of [i]nnuendos of illegality . . . [and] racially tinged and inaccurate commentary by . . . LaFaro." *DNC*, 329 F. Supp. 3d at 876 (second, third, and fourth alterations in original). The majority contends that although "some members of the legislature who voted for H.B. 2023 had a sincere, though mistaken, non-race-based belief that there had been fraud in third-party ballot collection, and that the problem needed to be addressed," a discriminatory purpose may be attributable to all of them as a matter of law because any sincere belief was "created by Senator Shooter's false allegations and the 'racially tinged' LaFaro video." Maj. Op. 99. The majority claims that these legislators were used as "cat's paws" to "serve the discriminatory purposes of Senator Shooter, Republican Chair LaFaro, and their allies." Maj. Op. 100. Yet, the majority's reliance on such employment discrimination doctrine is misplaced because, unlike employers whose decision may be tainted by the discriminatory motives of a supervisor, each legislator is an independent actor, and bias of some cannot be attributed to all members. The very fact that *some* members had a sincere belief that voter fraud needed to be addressed is enough to

rebut the majority's conclusion.    To the contrary, the
underlying allegations of voter fraud did not need to be true
in order to justify the "legitimacy or importance of the State's
interest in counting only the votes of eligible voters."
*Crawford*, 553 U.S. at 196.   And the majority provides no
support for its inference of pretext where there is a sincere
and legitimate interest in addressing a valid concern.   Maj.
Op. at 97–100.   Instead, the majority *accepts* the district
court's finding that some legislators "had a sincere, non-race-
based belief that there was fraud" that needed to be
addressed. Nevertheless, unable to locate any discriminatory
purpose, it simply attributes one to them using the
inapplicable "cat's paw doctrine."   Maj. Op. 99.   Such
argument demonstrates the extraordinary leap in logic the
majority must make in order to justify its conclusion.

Let me restate the obvious: we may reverse the district
court's intensely factual determination as to discriminatory
intent only if we determine that such finding was *clearly
erroneous*.   Thus, even if the majority disagrees with the
district court's finding, it must demonstrate that the evidence
was not "plausible in light of the record viewed in its
entirety."   *Bessemer City*, 470 U.S. at 574.   Perhaps if the
majority had reminded itself of our appellate standard, it
would not have simply re-weighed the same evidence
considered by the district court to arrive at its own findings
on appeal.

V

The district court properly determined that neither
Arizona's out-of-precinct policy nor its ballot-collection
policy violates § 2 of the Voting Rights Act and the Fifteenth

DNC v. Hobbs                           141

Amendment to the Constitution.[9]  In concluding otherwise, the majority misperceives the inquiry before us and fails to narrow the scope of its review, instead insisting on acting as a de novo trial court.  That, of course, is not our role.

I would therefore affirm the judgment of the district court and must respectfully dissent from the majority opinion.

---

BYBEE, Circuit Judge, with whom O'SCANNLAIN, CLIFTON, and CALLAHAN, Circuit Judges, join, dissenting:

The right to vote is the most fundamental of our political rights and the basis for our representative democracy.  "No right is more precious" because it is a meta-right: it is the means by which we select "those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  "Other rights, even the most basic, are illusory if the right to vote is undermined." *Id.*  Almost as fundamental as the right to vote is the need for the electorate to have confidence in the rules by which elections are conducted.

---

[9] Because the majority concludes that the OOP policy and the ballot-collection policy violate § 2 of the Voting Rights Act and the Fifteenth Amendment to the United States Constitution, it does not reach DNC's claim that such policies also violate the First and Fourteenth Amendments to the United States Constitution.  I will not belabor such claims here; for these purposes, it is sufficient to say that—for many of the reasons and based on much of the evidence cited above—I would also conclude that neither practice violates the First and Fourteenth Amendments.

I write separately to make a simple point: The Arizona rules challenged here are part of an "electoral process that is necessarily structured to maintain the integrity of the democratic system." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992).[1] The Constitution entrusts the "Times, Places and Manner of holding Elections" to state legislatures, subject to laws enacted by Congress to "make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. "'Times, Places, and Manner,' . . . are 'comprehensive words,' which 'embrace authority to provide a complete code for . . . elections.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)); *see Rucho v. Common Cause*, 139 S. Ct. 2484, 2495 (2019).

> "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least in some degree—the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important

---

[1] I join in full Judge O'Scannlain's dissent. I write separately to place the majority's decision today in context of the American democratic tradition.

> regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

*Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (citation omitted) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Time, place, and manner restrictions are fundamentally differently from provisions that affect the "Qualifications requisite for Electors," U.S. Const. art. I, § 2, cl. 1, and state apportionments "according to their respective Numbers," *id.* art. I, § 2, cl. 3. The Constitution restricts with exactness the qualifications states may require of their voters. *See id.* amend. XV, § 1 ("race, color, or previous condition of servitude"); amend. XIX (sex); amend. XXIV ("failure to pay any poll tax or other tax"); amend. XXVI (those "eighteen years of age or older, . . . on account of age"); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621 (1969) (property ownership). Similarly, the constitutional imperative for one person, one vote demands that apportionment be subject to precision approaching "absolute population equality," *Karcher v. Daggett*, 462 U.S. 725, 732 (1983), "as nearly as practicable," *Kirkpatrick v. Preisler*, 394 U.S. 526, 531 (1969).

Time, place, and manner restrictions stand on different footing from status-based restraints on vote qualifications and legislative malapportionment. State requirements respecting when and where we vote and how ballots will be counted are "generally-applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Anderson*, 460 U.S. at 788 n.9. By contrast, for example, "redistricting differs from other kinds of state decisionmaking

in that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religions and political persuasion, and a variety of other demographic factors." *Shaw v. Reno*, 509 U.S. 630, 646 (1993). Time, place, and manner restrictions are the rules of the game, announced in advance, so that all voters will know what they must do. Parties of all stripes should have an equal interest in rules that are both fair on their face and fairly administered.

Two such rules are challenged here: the rule about how Arizona will count out-of-precinct votes (OOP) and the rule about who may file another person's absentee ballot (H.B. 2023). As rules of general applicability, they apply to all voters, without "account of race or color." 52 U.S.C. § 10301(a).[2] Rather than simply recognizing that Arizona has enacted neutral, color-blind rules, the majority has embraced the premise that § 2 of the VRA is violated when any minority voter appears to be adversely affected by Arizona's election laws. Although the majority abjures this premise for now, claiming that it does "not need to go so far" as equating "the case of an individually targeted single minority voter who is denied the right to vote and the case where a facially neutral policy affects a single voter," Maj. Op. at 45, its analysis necessarily rests on that premise. The majority has

---

[2] In relevant part, § 2 of the Voting Rights Act provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 2(a). A violation of § 2(a) may be shown "based on the totality of the circumstances . . . [if] the political processes leading to nomination or election in the State . . . are not equally open to participation by members of a class of citizens [on account of race or color]." *Id.* § 10301(b).

DNC v. Hobbs                    145

no limiting principle for identifying a de minimis effect in a facially neutral time, place, or manner rule. The premise finds its clearest expression in the Fourth Circuit's opinion in *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (emphasis added): "[W]hat matters for purposes of Section 2 is not how many minority voters are being denied equal electoral opportunities *but simply that 'any' minority voter is being denied equal electoral opportunities*." *See* Maj. Op. at 41–42, 45–46, 107 (relying on *League of Women Voters*). Such a premise insists on a precision that we have never demanded before.

By contrast, the Supreme Court explained that following *City of Mobile v. Bolden*, 446 U.S. 55 (1980), "Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test,' applied . . . in *White v. Regester*, 412 U.S. 755 (1973)." *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986). Yet in *White*, the Court made clear that it "did not hold . . . that *any* deviations from absolute equality, however small, must be justified to the satisfaction of the judiciary to avoid invalidation under the Equal Protection Clause." 412 U.S. at 763–64. Rather, the Court recognized that any rule in an election scheme might suffer "relatively minor population deviations . . . . 'based on legitimate considerations incident to the effectuation of a rational state policy.'" *Id.* at 764 (quoting *Reynolds v. Sims*, 377 U.S. 533, 579 (1964)).

A "rational state policy" surely includes the need for a consistent, neutral set of time, place, and manner rules. The majority's reading of the Voting Rights Act turns § 2 into a "one-minority-vote-veto rule" that may undo any number of time, place, and manner rules. It is entirely results-bound, so

much so that under the majority's reading of the Voting Rights Act, the same rules the majority strikes down in Arizona may be perfectly valid in every other state, even states within our circuit. It all depends on the numbers. Indeed, so diaphonous is the majority's holding, that it may be a temporary rule for Arizona. If Arizona were to reenact these provisions again in, say, 2024, the numbers might come out differently and the OOP and ballot collection rules would be lawful once again.

The two Arizona rules at issue here—OOP and H.B. 2023—are rules of general applicability, just like the rules governing voting on the day of the election, registering with the Secretary of State, and bringing identification with you. Such "'evenhanded restrictions that protect the integrity and reliability of the electoral process itself' are not invidious." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189–90 (2008) (plurality opinion) (quoting *Anderson*, 460 U.S. at 788 n.9). Both rules the majority strikes down today have widely-held, well-recognized—even distinguished—pedigrees. As I show in Part I, the OOP is a long-standing rule that remains in place in a majority of American jurisdictions. The rule the majority prefers is a minority rule in the United States and, more importantly, disregards Arizona's interest in encouraging voting in local elections and, in application, may actually disadvantage minority voters. In Part II, I demonstrate that, although H.B. 2023 is of more recent vintage, similar rules are in place in other American jurisdictions, and H.R. 2023 follows carefully the recommendation of a bi-partisan commission on the integrity of American elections.

I

It has long been a feature of American democracy that, on election day, voters must vote in person at an assigned polling venue—an election precinct.

> [I]t is the well established practice in nearly every state to divide the county or city into a number of geographical districts for the purpose of holding elections. Each elector is required to vote at the polling place of his own precinct, which by custom is ordinarily located within the precinct, and, in cities, within a few blocks of his residence.

Joseph P. Harris, *Election Administration in the United States* 206–07 (1934). Like most American jurisdictions, Arizona's election rules require a non-absentee voter's personal presence at the polling place. Ariz. Rev. Stat. § 16-411(A) ("The broad of supervisors of each county . . . shall establish a convenient number of election precincts in the county and define the boundaries of the precincts."). The reasons for such a venue rule are

> significant and numerous: it caps the number of voters attempting to vote in the same place on election day; it allows each precinct ballot to list all of the votes a citizen may cast for all pertinent federal, state, and local elections, referenda, initiatives, and levies; it allows each precinct ballot to list only those votes a citizen may cast, making ballots less confusing; it makes it easier for election officials to monitor votes and prevent election

> fraud; and generally puts polling places in closer proximity to voter residences.

*Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004).[3] Precincts help to secure the orderly administration of elections, which then assures all voters of the integrity of the election.

## A

Arizona's out of precinct rule (OOP) is a standard feature of American democracy. Under Arizona's election code,

---

[3] "One of the major voting innovations in certain states was the increase in the number of polling places." Robert J. Dinkin, *Voting in Revolutionary America: A Study of Elections in the Original Thirteen States, 1776–1789*, at 96 (1982). Among the states, New York led the way, "enacting a law in 1778 which stated that all future elections should be held 'not by counties but by boroughs, towns, manors, districts, and precincts.'" *Id.* at 97 (quoting Laws of New York, sess. 1, chap. 16 (1778)). In early America, polling places were located where the people were:

> voting . . . in barns, private homes, country stores, and churches—almost anything that could separate voters from the election officials and the ballot boxes they tended. On the frontier, where buildings were even harder to find, votes were sometimes cast in sodhouse saloons, sutler stores near army forts, the front porches of adobe houses, and temporary lean-tos thrown together at desolate desert crossroads. In the larger cities, fire stations, warehouses, and livery stables were commonly used. One of the most common venues was liquor establishments. . . . Such an arrangement made an election noisy and, sometimes, violent.

Richard Franklin Bensel, *The American Ballot Box in the Mid-Nineteenth Century* 9 (2004).

"[n]o person shall be permitted to vote unless such person's name appears as a qualified elector in both the general county register and in the precinct register." Ariz. Rev. Stat. § 16-122. The election code provides extensive instructions for electors who have changed their residence or whose name does not appear on the precinct register; if there is any question of the elector's eligibility to vote in that precinct, Arizona authorizes the filing of a provisional ballot. *See, e.g.*, Ariz. Rev. Stat. §§ 16-135, 16-583, 16-584, 16-592.

There is nothing unusual about Arizona's OOP rule.[4] Although there are variations in the way the rule is formulated, by my count, twenty-six states, the District of Columbia, and three U.S. territories disqualify ballots cast in the wrong precinct.[5] These states represent every region of the country: The Northeast (Connecticut, Vermont), the mid-Atlantic (Delaware, District of Columbia, West Virginia), the

---

[4] For many years, a voter was not even permitted to cast a provisional ballot in a precinct other than her own. *See* Harris, *Election Administration in the United States*, at 287–88. The Help America Vote Act (HAVA) now requires states to permit voters to cast a provisional ballot. 52 U.S.C. § 21082(a). HAVA, however, does not affect a state's rules about how to process a provisional ballot. It does provide that states must create a toll-free number that "any individual who casts a provisional ballot may access to discover whether the vote of that individual was counted, and, if the vote was not counted, the reasons that the vote was not counted." 52 U.S.C. § 21082(a)(5)(B); *see Blackwell*, 387 F.3d at 576 ("HAVA is quintessentially about being able to *cast* a provisional ballot. . . . [B]ut the ultimate legality of the vote cast provisionally is generally a matter of state law.").

[5] I have listed all fifty states, the District of Columbia, and U.S. territories, with relevant citations to their treatment of out of precinct votes, in Appendix A. In Appendix B, I have categorized the jurisdictions by rule.

150                    DNC V. HOBBS

South (Alabama, Florida, Kentucky, Mississippi, South Carolina, Tennessee, Virginia, Virgin Islands), the mid-West (Illinois, Indiana, Iowa, Michigan, Missouri, Nebraska, South Dakota, Wisconsin), the Southwest (Arizona, Oklahoma, Texas), the Mountain States (Montana, Wyoming), and the West (American Samoa, Hawaii, Nevada, Northern Mariana Islands).  Twenty states and two territories will count out of precinct ballots, although the states are not uniform in what they will count.[6]  They also represent a broad spectrum of the country:  The Northeast (Maine, Massachusetts, New York, Rhode Island), the mid-Atlantic (Maryland, New Jersey, Pennsylvania), the South (Arkansas, Louisiana, North Carolina, Georgia, Puerto Rico), the mid-West (Ohio, Kansas), the Southwest (New Mexico), the Mountain States (Colorado, Utah), and the West (Alaska, California, Guam, Oregon, Washington).[7]

Nowhere in its discussion of the "totality of the circumstances" has the majority considered that Arizona's OOP provision is a widely held time, place, or manner rule. It is not a redistricting plan, *see Cooper v. Harris*, 137 S. Ct. 1455 (2017); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006); *Shaw v. Reno*, 509 U.S. 630 (1993); a multimember district, *see Chisom v. Roemer*, 501 U.S. 380 (1991); *Gingles*, 478 U.S. 30; or an at-large system, *see*

---

[6] For example, five states will count an out-of-precinct vote, but only if the ballot is filed in the voter's county (Kansas, New Mexico, Pennsylvania, Utah) or town (Massachusetts).  Louisiana and Rhode Island will only count votes for federal office.  Puerto Rico will count only votes for Governor and Resident Commissioner.

[7] Four states (Idaho, Minnesota, New Hampshire, North Dakota) are not accounted for in either list because they allow same-day registration and do not use provisional ballots.

*Rogers v. Lodge*, 458 U.S. 613 (1982). Those "circumstances" are as unique as a fingerprint, subject to manipulation, and require "an intensely local appraisal" of the state's plan. *Gingles*, 478 U.S. at 78 (internal quotation marks and citation omitted). Arizona's OOP applies statewide; it is not a unique rule, but a traditional rule, common to the majority of American states. The OOP rule, as a rule of general applicability, is part of a "political process[] . . . equally open to participation" by all Arizona voters. 52 U.S.C. § 10301(b).

## B

The majority asserts that "counting or partially counting OOP ballots would [not] threaten the integrity of Arizona's precinct-based system." Maj. Op. at 78. Effectively, the majority holds that Arizona must abandon its traditional polling venue rules and accept the ballots of voters who cast their ballot in the wrong precinct, at least for national and state-wide offices. *Id.* at 76–78 (citing the rules of California, Utah, and New Mexico as an example of states partially counting OOP ballots). Under the majority's preferred scheme, Arizona must count all votes for offices that are not precinct dependent. As to the remainder of the ballot, Arizona may—in accordance with its traditional rule—disqualify the ballot for all offices for which the political geography of the precinct matters. The majority has failed to take into account that the rule it prefers has its own consequences, including adverse consequences for minority voters.

Let's review an example to consider the unintended consequences of the majority's haste. Under Arizona's traditional rules, the state would disqualify the ballot of a

voter from Tucson who votes in any precinct other than his assigned precinct. Under the majority's new rule, a voter from Tucson may cross precinct lines and vote in any precinct in Arizona—for instance, in Phoenix. His cross-precinct ballot will be counted for those offices which are common to ballots in his precinct-in-law in Tucson and his new precinct-in-fact in Phoenix—such offices would include the presidency, the U.S. Senate, and any statewide offices. His ballot will be disqualified, however, for all state and local offices defined by geographic boundaries that are not common to the two precincts—for example, the U.S. House of Representatives, the state legislature, and municipal offices such as mayor, city council, and school board.

The majority's rule will skew future elections in Arizona in two predictable ways. First, it *overvalues* national elections. Ballots for the presidency, the U.S. Senate, and any state offices that would otherwise be disqualified must be counted. Voters—whether intentionally or carelessly—may vote with impunity in the wrong precinct, knowing that their vote will count for the national and statewide offices.

Second, it *undervalues* local elections. Those same ballots will not be counted toward those federal, state, and local offices that are defined by geographic boundaries and for which the voters from the outside precinct are not eligible. Non-conscientious voters—voters who care more about a national or a statewide race than the local races—are permitted to vote wherever they please, while conscientious voters—those concerned with all the offices on the ballot—are burdened by the requirement that they find their way to their proper precinct. And if the conscientious voter can't get to the polling place on time, he will have cast no ballot for any office, national, state, or local.

The net result is that the majority has lowered the cost to voters of determining where they are supposed to vote, but only as to presidential, U.S. Senate, and statewide races. As the majority no doubt intends, persons who didn't know or were confused about their polling place will have their vote counted, but only in select races. But as the majority may not have thought through, anyone in Arizona, including people who know where they are supposed to vote in an election (but for one reason or another would not have otherwise voted because it was inconvenient or impossible to vote at their home precinct), will also be able to vote—but again, only in select races. Arizona can thus expect more votes in the presidential, senatorial, and state races than would be cast under its traditional rules. I suppose that in theory that's a good thing. What the majority has not counted on is the effect its order will have on the races that depend on geographic boundaries within Arizona: congressional, state-legislative, and local offices. When voters do not go to their local precincts to vote, they cannot vote in those races. Voters who do not take the time to determine their appropriate precinct—for whatever reason—and vote out of precinct have disenfranchised themselves with respect to the local races. That's a bad thing.

Arizona's longstanding, neutral rule gives voters an incentive to figure out where their polling place is, which, in turn, encourages voters to cast ballots in national, state, and local elections. In effect, Arizona has stapled national and statewide elections to other state and local elections. The opportunity to vote in any one race is the opportunity to vote in all races. It's strong medicine, but Arizona's rule is a self-protective rule; it helps encourage voting and, presumably, interest in local elections. The majority's preferred rule gives voters an incentive to vote wherever it is convenient for them

which increases the likelihood they will vote in certain national and statewide races, but decreases the likelihood they will vote in other state and local races. It places a burden on voters who wish to exercise their right to vote on all matters to which they are entitled, a burden that simply would not exist for the less-engaged voter. The majority's rule contradicts our most basic principles of federalism by deeming elections for national and statewide offices more important than those for lesser offices.

The majority's concern is based on the fact that voters who vote in the wrong precinct are more likely to be minorities. Maj. Op. at 42–44. If that fact holds true in the future—and it may not because, as I have explained, any voter in Arizona (including those who know where to vote) may take advantage of the majority's new rule—then minority ballots will be underrepresented in the local races. Under the majority's preferred scheme, it is thus likely that more minorities will fail to vote in local elections—elections that most directly affect the daily lives of ordinary citizens, and often provide the first platform by which citizen-candidates, not endowed with personal wealth or name recognition, seek on the path to obtaining higher office. In any event, the court has just put a big thumb on the scale of the Arizona elections—national, state, and local—with unclear results.

These concerns are magnified when we consider the relatively small number of OOP ballots. *See Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 873 (D. Ariz. 2018). It is more likely that these ballots would make a difference in a local election than in a national or statewide election. Arizona's rule encourages its OOP voters—white, African-American, Hispanic, or other—to vote in the correct

precinct.  Under Arizona's current OOP rule, a voter, having gone to the trouble of going to a precinct to vote in person and suffering the indignity of having to fill out a provisional ballot, is less likely to make the same mistake the next year.[8] A voter who has had a ballot disqualified is more likely to figure out the correct precinct next time—or, better yet, sign up for the convenience of early voting, a measure that avoids the conundrum of OOP altogether.[9]  The voter who only votes

---

[8] The Majority dismisses this point by highlighting how Arizona has frequently changed polling places in some localities.  Maj. Op. at 111 (referring to Arizona's high rate of OOP voting).  But there is no evidence in the record that the same voters's ballots are excluded as OOP year after year.  My point is that a voter who has had her ballot excluded as OOP is more likely to exercise greater care in finding the right polling location next time.

[9] The Majority worries that OOP voters may never come to know that their votes were in fact rejected and, hence, will never learn from the situation.  Maj. Op. at 110.  Whatever the cause for the Majority's concern, Arizona's statutory law is not to blame.  Arizona law specifically requires county recorders to establish "a method of notifying the provisional ballot voter at no cost to the voter whether the voter's ballot was verified and counted and, if not counted, the reason for not counting the ballot."  Ariz. Rev. Stat. Ann. § 16-584(F) (2019).  Thus, voters should have the opportunity to find out whether their vote was counted.

Further, to the extent that voters inadvertently vote in the wrong precinct, that is not a failing of Arizona law.  Instead, the law requires that voters' names be checked on the precinct register.  If a voter's name does not appear on the register, then the address is checked to confirm that the voter resides within that jurisdiction.  *Id.* § 16-584(B).  Once the address is confirmed to be in the precinct or the voter affirms in writing that the voter is eligible to vote in that jurisdiction, the voter "shall be allowed to vote a provisional ballot."  *Id.*  Accordingly, under Arizona law, no voter should inadvertently vote at the wrong precinct without some indication that something is amiss.

where it is convenient has disenfranchised himself from local elections.

States such as California, Utah, and New Mexico have made the same choice the majority forces on Arizona. Those states may or may not have made the calculus I have set out here and they may or may not have measured the costs and benefits of their new rule; it's theirs to experiment with. They may conclude that the new rule is the right one; they may not. And if any of those states decides that the count-the-ballots-partially rule is not the best rule, those states will be free to adopt a different rule, including the OOP rule the majority strikes down today. After today's decision, Arizona has no such recourse.

## II

H.B. 2023 presents a different set of considerations. There is no constitutional or federal statutory right to vote by absentee ballot. *See McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807–08 (1969) ("It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots. . . . [T]he absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny . . . the exercise of the franchise . . . ."); *see also Crawford*, 553 U.S. at 209 (Scalia, J., concurring in the judgment) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required."); *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (rejecting the claim that there is "a blanket right of registered voters to vote by absentee ballot" because "it is obvious that a federal court is not going to decree

weekend voting, multi-day voting, all-mail voting, or Internet voting").[10]  Nevertheless, if a state is going to offer absentee ballots, it must do so on an equal basis.  Arizona's absentee ballot rule, like its OOP rule, is a neutral time, place, or manner provision to help ensure the integrity of the absentee voting process.  In fact, what is at issue here is not the right of Arizona voters to obtain and return an absentee ballot, but the question of who can physically return the ballot.

### A

H.B. 2023 provides that "[a] person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony."  Ariz. Rev. Stat. Ann. § 16-1005(H) (codifying H.B. 2023).  The law does not apply to three classes of persons:  (1) "[a]n election official," (2) "a United States postal service worker or any other person who is allowed by law to transmit United States mail," and (3) "[a]

---

[10] "The exercise of a public franchise by proxy was illegal at common law."  Cortlandt F. Bishop, *History of Elections in the American Colonies* 129 (1893).  The Colonies experimented with proxy votes, with varying degrees of success.  Proxy voting was not a success in at least one colony.  A 1683 letter to the Governor of South Carolina warned:

> Wee are informed that there are many undue practices in the choyce of members of Parlmt, and that men are admitted to bring papers for others and put in their votes for them, wh is utterly illegal & contrary to the custome of Parliaments & will in time, if suffered, be very mischeevious: you are therefore to take care that such practices be not suffered for the future, but every man must deliver his own vote & noe man suffered to bring the votes of another . . . .

*Id.* at 139 (spelling in original) (citation omitted).

family member, household member or caregiver of the voter."
*Id.* § 16-1005(H)–(I)(2).

The Arizona provision is substantially similar to the laws
in effect in many other states. In Indiana, for example, it is a
felony for anyone to collect a voter's absentee ballot, with
exceptions for members of the voter's household, the voter's
designated attorney in fact, certain election officials, and mail
carriers. Ind. Code § 3-14-2-16(4). Connecticut also restricts
ballot collection, permitting only the voter, a designee of an
ill or disabled voter, or the voter's immediate family
members to mail or return an absentee ballot. Conn. Gen.
Stat. § 9-140b(a). New Mexico likewise permits only the
voter, a member of the voter's immediate family, or the
voter's caregiver to mail or return an absentee ballot. N.M.
Stat. Ann. § 1-6-10.1. At least seven other states (Georgia,
Missouri, Nevada, North Carolina, Oklahoma, Ohio, and
Texas) similarly restrict who can personally deliver an
absentee ballot to a voting location. Ga. Code Ann. § 21-2-
385(a) (limiting who may personally deliver an absentee
ballot to designees of ill or disabled voters or family
members); Mo. Rev. Stat. § 115.291(2) (restricting who can
personally deliver an absentee ballot); Nev. Rev. Stat. Ann.
§ 293.330(4) (making it a felony for anyone other than the
voter or the voter's family member to return an absentee
ballot); Okla. Stat. tit. 26, § 14-108(C) (voter delivering a
ballot must provide proof of identity); Ohio Rev. Code Ann.
§ 3509.05(A) (limiting who may personally deliver an absent
voter's ballot); Tex. Elec. Code Ann. § 86.006(a) (permitting
only the voter to personally deliver the ballot).[11]

---

[11] Until recently, two other states had similar provisions on the books.
California formerly limited who could return mail ballots to the voter's
family or those living in the same household. *Compare* Cal. Elec. Code

DNC v. Hobbs                                159

Other states are somewhat less restrictive than Arizona because they permit a broader range of people to collect early ballots from voters but restrict how many ballots any one person can collect and return. Colorado forbids anyone from collecting more than ten ballots. Colo. Rev. Stat. § 1-7.5-107(4)(b). North Dakota prohibits anyone from collecting more than four ballots, N.D. Cent. Code § 16.1-07-08(1); New Jersey, N.J. Stat. Ann. § 19:63-4(a), and Minnesota, Minn. Stat. Ann. § 203B.08 sbd. 1, three; Arkansas, Ark. Code Ann. § 7-5-403(a)(1), Nebraska, Neb. Rev. Stat. § 32-943(2), and West Virginia, W. Va. Code § 3-3-5(k), two. South Dakota prohibits anyone from collecting more than one ballot without notifying "the person in charge of the election of all voters for whom he is a messenger." S.D. Codified Laws § 12-19-2.2.

Still other states have adopted slightly different restrictions on who may collect early ballots. California, Maine, and North Dakota, for example, make it illegal to collect an absentee ballot for compensation. Cal. Elec. Code § 3017(e)(1); Me. Rev. Stat. Ann. tit. 21-A, § 791(2)(A) (making it a crime to receive compensation for collecting absentee ballots); N.D. Cent. Code § 16.1-07-08(1) (prohibiting a person from receiving compensation for acting as an agent for an elector). Florida and Texas make it a crime to receive compensation for collecting certain numbers of

§ 3017(a)(2) (West 2019), *with* Cal. Elec. Code § 3017(a) (West 2015). It only amended its law in 2016. 2016 Cal. Legis. Serv. ch. 820 (West). Illinois also used to make it a felony for anyone but the voter, his or her family, or certain licensed delivery companies to mail or deliver an absentee ballot. 10 Ill. Comp. Stat. Ann. 5/19-6 (1996); 10 Ill. Comp. Stat. 5/29-20(4). Illinois amended that provision in 2015 to let voters authorize others to mail or deliver their ballots. 10 Ill. Comp. Stat. Ann. 5/19-6 (2015).

ballots. Fla. Stat. Ann. § 104.0616(2) (making it a misdemeanor to receive compensation for collecting more than two vote-by-mail ballots); Tex. Elec. Code Ann. § 86.0052(a)(1) (criminalizing compensation schemes based on the number of ballots collected for mailing).

Some of these laws are stated as a restriction on how the early voter may return a ballot. In those states, the voter risks having his vote disqualified. *See, e.g.*, *Wrinn v. Dunleavy*, 440 A.2d 261, 272 (Conn. 1982) (disqualifying ballots and ordering a new primary election when an unauthorized individual mailed absentee ballots). In other states, as in Arizona, the statute penalizes the person collecting the ballot. *See* Ind. Code Ann. § 3-14-2-16 (making it a felony knowingly to receive a ballot from a voter); Nev. Rev. Stat. Ann. § 293.330(4) (making it a felony for unauthorized persons to return an absentee ballot); Tex. Elec. Code Ann. § 86.006(f)–(g) (making it a crime for an unauthorized person to possess an official ballot); *see also Murphy v. State*, 837 N.E.2d 591, 594–96 (Ind. Ct. App. 2005) (affirming a denial of a motion to dismiss a charge for unauthorized receipt of a ballot from an absentee voter); *People v. Deganutti*, 810 N.E.2d 191, 198 (Ill. App. Ct. 2004) (affirming conviction for absentee ballot violation). In those states, the ballot, even if collected improperly, may be valid. *See In re Election of Member of Rock Hill Bd. of Educ.*, 669 N.E.2d 1116, 1122–23 (Ohio 1996) (holding that a ballot will not be disqualified for a technical error).

DNC v. Hobbs    161

In sum, although states have adopted a variety of rules, Arizona's ballot collection rule is fully consonant with the broad range of rules throughout the United States.[12]

B

Even more striking than the number of other states with similar provision is that H.B. 2023 follows precisely the recommendation of the bi-partisan Carter-Baker Commission on Federal Election Reform.[13] The Carter-Baker Commission found:

> Absentee ballots remain the largest source of potential voter fraud. . . . Absentee balloting is vulnerable to abuse in several ways: . . . Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation. Vote buying schemes are far more difficult to detect when citizens vote by mail. States therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting "third-party" organizations,

---

[12] For context, Appendix C provides the relevant provisions of the laws from all fifty states, the District of Columbia, and the U.S. territories regarding the collection and mailing of absentee ballots.

[13] The Commission on Federal Election Reform was organized by American University's Center for Democracy and Election Management and supported by the Carnegie Corporation of New York, The Ford Foundation, the John S. and James L. Knight Foundation, and the Omidyar Network. It was co-chaired by former President Jimmy Carter and former Secretary of State James Baker.

162                    DNC v. Hobbs

candidates, and political party activists from handling absentee ballots.

Comm'n on Fed. Elections Reform, *Building Confidence in U.S. Elections* 46 (2005) ("*Building Confidence*") (footnote omitted).  The Carter-Baker Commission recommended that "States . . . should reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." *Id.*  It made a formal recommendation:

> State and local jurisdictions should prohibit a person from handling absentee ballots other than the voter, an acknowledged family member, the U.S. Postal Service or other legitimate shipper, or election officials. The practice in some states of allowing candidates or party workers to pick up and deliver absentee ballots should be eliminated.

*Id.* at 47 (Recommendation 5.2.1).

The Carter-Baker Commission recommended that states limit the persons, other than the voter, who handle or collect absentee ballots to three classes of persons: (1) family members, (2) employees of the U.S. Postal Service or another recognized shipper, and (3) election officials.  H.B. 2013 allows two classes of persons to collect absentee ballots: (1) election officials and (2) employees of the U.S. Postal Service "or any other person who is allowed by law to transmit United States mail."  Ariz. Rev. Stat. § 16-1005(H). H.B. 2023 also provides that the prior restriction on collection of ballots does not apply to "[a] family member, household member or caregiver of the voter."  *Id.* § 16-1005(I)(2).  With

respect to election officials and mail delivery workers, Arizona tracks exactly the recommendation from the Commission. With respect to family, however, Arizona's provision is *more generous* than the Carter-Baker Commission's recommendation. Whereas the Commission recommended that only family members be permitted to handled a voter's absentee ballot, Arizona expanded the class of absentee ballot handlers to "household member[s]" and "caregiver[s]."

I don't see how Arizona can be said to have violated the VRA when it followed bipartisan recommendations for election reform in an area the Carter-Baker Commission found to be fraught with the risk of voter fraud. Nothing could be more damaging to confidence in our elections than fraud at the ballot box. And there is evidence that there is voter fraud in the collecting of absentee ballots. As the Seventh Circuit described it: "Voting fraud is a serious problem in U.S. elections generally . . . and it is facilitated by absentee voting. . . . [A]bsentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin*, 385 F.3d at 1130–31; *see also Wrinn*, 440 A.2d at 270 ("[T]here is considerable room for fraud in absentee voting and . . . a failure to comply with the regulatory provision governing absentee voting increases the opportunity for fraud." (citation omitted)); *Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1197 (Ill. App. Ct. 2004) ("[T]he integrity of a vote is even more susceptible to influence and manipulation when done by absentee ballot."); Adam Liptak, *Error and Fraud at Issue as Absentee Voting Rises*, N.Y. Times (Oct. 6, 2012),

http://nyti.ms/QUbcrg (discussing a variety of problems in states).[14]

Organized absentee ballot fraud of sufficient scope to corrupt an election is no doomsday hypothetical: it happened as recently as 2018 in North Carolina. In the state's Ninth Congressional District, over 282,000 voters cast ballots, either in person or absentee. *See* Brief of Dan McCready at 7, *In re Investigation of Election Irregularities Affecting Ctys. Within the 9th Cong. Dist.* (N.C. State Bd. of Elections Feb. 12, 2019) [hereinafter McCready Br.]. North Carolina permits "[a]ny qualified voter" in the state to vote by absentee ballot. N.C. Gen. Stat. § 163A-1295. However, like Arizona, the state adheres to the Commission's recommendations and restricts the categories of persons who may collect a voter's absentee ballot. It is a Class I felony in North Carolina for "any person except the voter's near relative or the voter's verifiable legal guardian to assist the voter to vote an absentee ballot." *Id.* § 163A-1298.

In last year's election in the Ninth Congressional District, evidence suggested that a political activist hired by the Republican nominee paid employees to collect absentee ballots—possibly more than 1,000—from voters in violation of § 163A-1298. *See* Indictment, *State v. Dowless*, No. 19CRS001934 (N.C. Super. Ct. July 30, 2019); McCready Br. at app. 2–3. An employee of the suspected

---

[14] Pressure on absentee voters has long been noted. *See* Harris, *Election Administration in the United States*, at 302 ("The amount of intimidation now exercised by the precinct captain in many sections of large cities is very great; with mail voting it would be enormously increased. The overbearing and dominant precinct captain would insist upon seeing how each voter under obligation to him had marked his ballot, and the voter would have no protection against such tactics.").

activist testified that she personally collected about three dozen ballots. *See* Transcript of Evidentiary Hearing at 150, *In re Investigation of Election Irregularities Affecting Ctys. Within the 9th Cong. Dist.* (N.C. State Bd. of Elections Feb. 18, 2019). She also helped fill in about five or ten incomplete, unsealed ballots in favor of Republican candidates. *Id.* at 67, 99, 152–53. The ballots were kept at the activist's home and office for days or longer before they were turned in. *Id.* at 69. A voter testified that she turned over her blank ballot to the activist's employees in an unsealed envelope, trusting that the activist would make a good decision for her. *Id.* at 207–08, 214–15.

This coordinated ballot fraud led the state Board of Elections to invalidate the results of the election, which had been decided by only 905 votes—fewer than the amount of suspected fraudulent ballots. Order at 10, 44–45, *In re Investigation of Election Irregularities Affecting Ctys. Within the 9th Cong. Dist.* (N.C. State Bd. of Elections Mar. 13, 2019). The residents of the district—some 778,447 Americans—were thus unrepresented in the House of Representatives for the better part of a year. Perhaps the more devastating injury will be the damage this episode does to North Carolinians' confidence in their election system.

The majority acknowledges that the Democratic Party disproportionately benefits from get-out-the-vote efforts by collecting mail-in ballots. *See, e.g.*, Maj. Op. at 83 (quoting *Reagan*, 329 F. Supp. 3d at 870). Further, the majority acknowledges that Democratic activists have often led such collection efforts. *Id.* Yet the experience of North Carolina with Republican activists shows starkly the inherent danger to allowing political operatives to conduct collections of mail-in ballots. Arizona is well within its right to look at the

166                    DNC v. HOBBS

perils endured by its sister states and enact prophylactic measures to curtail any similar schemes. By prohibiting overtly political operatives and activists from playing a role in the ballot-collection process, Arizona mitigates this risk. And the State's well-acknowledged past sins should not prevent it from using every available avenue to keep safe the public's trust in the integrity of electoral outcomes.

Indeed, Arizona does not have to wait until it has proof positive that its elections have been tainted by absentee ballot fraud before it may enact neutral rules. "Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986). In *Crawford*, the Supreme Court quoted with approval the Carter-Baker Commission:

> There is no evidence of extensive fraud in U.S. elections or of multiple voting, but both occur, and it could affect the outcome of a close election. The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.

*Crawford*, 553 U.S. at 194 (quoting *Building Confidence* at 18) (footnote omitted).

The majority today holds that, as a matter of federal law, Arizona may not enforce a neutrally drawn statute recommended by a bi-partisan commission criminalizing the very conduct that produced a fraudulent outcome in a race for Congress less than a year ago. When the Voting Rights Act requires courts to consider the "totality of the circumstances,"

DNC v. HOBBS                                167

it is a poor understanding of the Act that would strike common time, place, and manner restrictions designed to build confidence in the very voting system that it now leaves vulnerable.

### III

As citizens of a democratic republic, we understand intuitively that we have a legal right and a moral duty to cast a ballot in free elections. The states have long had the power to fashion the rules by which its citizens vote for their national, state, and local officials. Once we consider that "totality of the circumstances" must take account of long-held, widely adopted measures, we must conclude that Arizona's time, place, and manner rules are well within our American democratic-republican tradition. Nothing in the Voting Rights Act makes "'evenhanded restrictions that protect the integrity and reliability of the electoral process' . . . invidious." *Crawford*, 553 U.S. at 189–90 (quoting *Anderson*, 460 U.S. at 788 n.9).

I would affirm the judgment of the district court, and I respectfully dissent.

168                    DNC V. HOBBS

*Appendix A*

**State and Territory Laws Regarding Treatment of
Out-of-Precinct Provisional Ballots**

| Jurisdiction | Citation |
| --- | --- |
| Alabama | Ala. Code § 17-9-10 (2019) (providing that voters must vote in their "county and voting place" of domicile); *see also Davis v. Bennett*, 154 So. 3d 114, 131 (Ala. 2014) (affirming that Alabama law requires voters to cast ballots at the correct voting place). |
| Alaska | Alaska Stat. Ann. § 15.20.207(b) (West 2019) (failing to list out-of-precinct voting as grounds for rejecting a ballot); Alaska Stat. Ann. § 15.20.211(a) (West 2019) (providing that a voter may cast a vote in another house district for statewide and federal offices); *see also Hammond v. Hickel*, 588 P.2d 256, 264 (Alaska 1978) ("There is no constitutional requirement of precinct residency, and there is clear statutory authorization for persons claiming to be registered voters to vote a questioned ballot if there is no evidence of registration in the precinct in which the voter seeks to vote."). |
| American Samoa | Am. Samoa Code Ann. § 6.0223(b)–(c) (providing that a voter's right to vote may be challenged if the voter "is not |

| | |
|---|---|
| | entitled to vote in that district" and, if true, the ballot will be rejected). |
| Arizona | Ariz. Rev. Stat. Ann. § 16-584(D)–(E) (2018) (requiring confirmation that the voter resided in the precinct). |
| Arkansas | Ark. Code Ann. § 7-5-308(f) (West 2017) (requiring only that voters be registered to vote in the state). |
| California | Cal. Elec. Code § 14310(c)(3) (West 2019) ("The provisional ballot of a voter who is otherwise entitled to vote shall not be rejected because the voter did not cast his or her ballot in the precinct to which he or she was assigned by the elections official."). |
| Colorado | 8 Colo. Code Regs. § 1505-1:17.2.9 (2019) (providing that if an elector used the wrong ballot, then "only races and issues for which the elector [was] qualified to vote may be counted"). |
| Connecticut | Conn. Gen. Stat. Ann. §§ 9-232, 9-232n (West 2019) (requiring that only provisional ballots by applicants eligible to vote in a given town may be counted). |
| Delaware | Del. Code Ann. tit. 15, § 4948(h)(7)–(8) (West 2015) (explaining that provisional ballots may not be counted if cast by voters outside of their election districts). |

| | |
|---|---|
| District of Columbia | D.C. Code Ann. § 1-1001.09(b)(3) (West 2017) (providing that, aside from those requiring accessible entrances, "[n]o registered qualified elector of the District may cast a vote in a precinct that does not serve his or her current residence"); D.C. Mun. Regs. tit. 3, § 807 (2019) (stating that a provisional ballot may be tabulated if, *inter alia*, "the voter cast the Special Ballot at the precinct in which the voter maintains residence or at an early voting center designated by the Board"). |
| Florida | Fla. Stat. Ann. § 101.048(2)(a) (West 2019) ("The county canvassing board shall examine each Provisional Ballot Voter's Certificate and Affirmation to determine if the person voting that ballot was entitled to vote at the precinct where the person cast a vote in the election . . . ."). |
| Georgia | Ga. Code Ann. § 21-2-419(c)(2) (West 2019) (stating that if a voter voted in the wrong precinct, then races for which the voter was entitled to vote shall be counted). |
| Guam | 3 Guam Code Ann. § 14105(a) (2016) ("When a provisional voter casts a provisional ballot in the incorrect precinct, election officials shall count the votes on that ballot in every race for which the voter would be entitled to |

| | |
|---|---|
| | vote if he or she had been in the correct precinct."). |
| Hawai'i | Haw. Code R. § 3-172-140(c)(3) (2017) ("If [the] county clerk determines the individual is not eligible to vote in the precinct where the provisional ballot was cast, the provisional ballot shall not be counted."). |
| Idaho | Does not use provisional ballots because the state allows for election-day registration. *See* Idaho Code Ann. § 34-408A (West 2019). |
| Illinois | 10 Ill. Comp. Stat. Ann. 5/18A-15(b)(1) (West 2015) (explaining that a provisional ballot is valid if, *inter alia*, "the provisional voter cast the provisional ballot in the correct precinct"). |
| Indiana | Ind. Code Ann. § 3-11.7-5-3(a) (West 2019) (providing that a ballot is invalid and may not be counted if "the provisional voter is not a qualified voter of the precinct"). |
| Iowa | Iowa Code Ann. § 49.9 (West 2019) (explaining that "a person shall not vote in any precinct but that of the person's residence"). |
| Kansas | Kan. Stat. Ann. § 25-3002(b)(3) (West 2019) (explaining that if a voter cast a ballot for the wrong precinct, but was |

|  | still within the same county, then votes for which the voter was eligible will be counted). |
|---|---|
| Kentucky | 31 Ky. Admin. Regs. 6:020(14) (2019) ("If the county board of elections determines the individual is ineligible to vote in the precinct in the election, the vote shall not be counted . . . ."). |
| Louisiana | La. Stat. Ann. § 18:556.2(F)(3)(a)–(b) (2017) (stating that a provisional ballot may be counted if the voter was a registered voter in the parish and was eligible to vote for the federal offices cast). |
| Maine | Me. Stat. tit. 11, § 50 (2019) (providing that all ballots cast in Maine will be counted so long as "challenged ballots are insufficient in number to affect the result of the election"). |
| Maryland | Md. Code Ann., Elec. Law § 11-303(e)(2) (West 2019) (stating that if the voter voted out of precinct, "only the votes cast by the voter for each candidate or question applicable to the precinct in which the voter resides" will get counted). |
| Massachusetts | Mass. Gen. Laws Ann. ch. 54, § 76C(d) (West 2004) ("A provisional ballot cast by a person whose name is not on the voting list for the city or town in which |

DNC v. Hobbs          173

| | |
|---|---|
| | they are claiming the right to vote, but whom the city or town clerk determines to be eligible to vote in another precinct of the same city or town, shall be counted in the precinct in which the person cast the provisional ballot for all offices for which the person is eligible to vote."). |
| Michigan | Mich. Comp. Laws Ann. § 168.813(1) (West 2018) (stating that provisional ballots may only be counted "if the identity and residence of the elector is established"). |
| Minnesota | Does not use provisional ballots because the state allows for election-day registration. *See* Minn. Stat. Ann. § 201.061 subd. 3(a) (West 2017). |
| Mississippi | 1 Miss. Admin. Code Pt. 10, Exh. A (2019) ("Poll managers shall advise an affidavit voter his/her ballot will not count if he/she is voting at the wrong polling place."). |
| Missouri | Mo. Ann. Stat. § 115.430(2)(1) (West 2019) (explaining that ballots voted in a polling place where the voter was not eligible to vote will not be counted). |
| Montana | Mont. Code Ann. § 13-15-107 (West 2019) (stating that a ballot must be rejected if the voter's identity and eligibility cannot be verified). |

174          DNC v. HOBBS

| Nebraska | Neb. Rev. Stat. Ann. § 32-1002(5)(e) (West 2019) (providing that a provisional ballot shall not be counted if "[t]he residence address provided on the registration application completed . . . is in a different county or in a different precinct than the county or precinct in which the voter voted"). |
|----------|---|
| Nevada | Nev. Rev. Stat. Ann. § 293.3085 (West 2019) ("A provisional ballot must not be counted if the county or city clerk determines that the person who cast the provisional ballot cast the wrong ballot for the address at which the person resides."). |
| New Hampshire | Does not use provisional ballots because the state allows for election-day registration. *See* N.H. Rev. Stat. Ann. § 654:7-a (2017). |
| New Jersey | N.J. Stat. Ann. § 19:53C-17 (West 2019) ("If, for any reason, a provisional ballot voter votes a ballot other than the ballot for the district in which the voter is qualified to vote, the votes for those offices and questions for which the voter would be otherwise qualified to vote shall be counted. All other votes shall be void."). |
| New Mexico | N.M. Stat. Ann. § 1-12-25.4(F) (West 2019) ("If the voter is a registered voter in the county but has voted on a |

| | |
|---|---|
| | provisional paper ballot other than the ballot of the voter's correct precinct, the county canvassing board shall ensure that only those votes for the positions or measures for which the voter was eligible to vote are counted."). |
| New York | N.Y. Elec. Law § 9-209(2)(a)(iii) (McKinney 2019) ("If the board of elections determines that a person was entitled to vote at such election, the board shall cast and canvass such ballot if such board finds that the voter appeared at the correct polling place, regardless of the fact that the voter may have appeared in the incorrect election district."). |
| North Carolina | N.C. Gen. Stat. Ann. § 163A-1169(a)(4) (West 2019) ("If the county board of elections finds that an individual voting a provisional official ballot (i) was registered in the county as provided in G.S. 163A-1166, (ii) voted in the proper precinct under G.S. 163A-841 and G.S. 163A-842, and (iii) was otherwise eligible to vote, the provisional official ballots shall be counted by the county board of elections before the canvass. Except as provided in G.S. 163A-1184(e), if the county board finds that an individual voting a provisional official ballot |

| | |
|---|---|
| | (i) did not vote in the proper precinct under G.S. 163A-841 and G.S. 163A-842, (ii) is not registered in the county as provided in G.S. 163A-860, or (iii) is otherwise not eligible to vote, the ballot shall not be counted. If a voter was properly registered to vote in the election by the county board, no mistake of an election official in giving the voter a ballot or in failing to comply with G.S. 163A-1184 or G.S. 163A-1142 shall serve to prevent the counting of the vote on any ballot item the voter was eligible by registration and qualified by residency to vote."). |
| North Dakota | North Dakota does not require voters to be registered and does not utilize provisional ballots. *See* N.D. Cent. Code Ann. § 16.1-01-04 (West 2019). |
| Northern Mariana Islands | 1 N. Mar. I. Code § 6215(b)–(c) (2014) (providing that a voter's right to vote may be challenged if the voter "is not entitled to vote in that election district" and, if true, the ballot will be rejected). |
| Ohio | Ohio Rev. Code Ann. § 3505.183(D) (West 2019) (stating that under certain circumstances, if a voter cast a ballot in the wrong precinct due to poll-worker error, then the votes for which the voter would have been eligible to cast are counted). |

DNC v. HOBBS                    177

| Oklahoma | Okla. Stat. Ann. tit. 26, § 7-116.1(C) (West 2019) ("A provisional ballot shall be counted only if it is cast in the precinct of the voter's residence . . . ."). |
|---|---|
| Oregon | Or. Rev. Stat. Ann. § 254.408(6) (West 2018) (explaining that provisional votes will be counted according to whether "the elector is qualified to vote for the particular office or on the measure"). |
| Pennsylvania | 25 Pa. Stat. and Cons. Stat. Ann. § 3050(a.4)(7) (West 2012) (providing that so long as a ballot is cast within the voter's county, if it is cast in the wrong election district, then only votes which the voter was entitled to make will be counted). |
| Puerto Rico | P.R. Laws Ann. tit. 16, § 4062 (2011) ("If a voter votes in a precinct other than the one where he/she is registered, only the vote cast for the offices of Governor and Resident Commissioner shall be adjudicated during the general canvass."). |
| Rhode Island | 410 R.I. Code R. § 20-00-13.7(C)(1)(b) (2012) (stating that when a voter who cast a provisional ballot lives outside of the precinct, the ballot shall be marked "Federal Offices Only" and only votes for federal officials for whom the voter was eligible to vote shall be counted). |

178                        DNC v. Hobbs

| | |
|---|---|
| South Carolina | S.C. Code Ann. § 7-13-830 (2019) ("If the board certifies the person challenged is not a qualified elector of the precinct, this certification is considered an administrative challenge and is clear and convincing evidence for the meeting authority to disallow the ballot."). |
| South Dakota | S.D. Codified Laws § 12-20-5.1 (2019) ("Prior to the official canvass, the person in charge of the election shall determine if the person voting by provisional ballot was legally qualified to vote in the precinct in which the provisional ballot was cast."). |
| Tennessee | Tenn. Code Ann. § 2-7-112(a)(3)(B)(v) (West 2018) (explaining that a ballot shall be rejected if it is determined that the voter should not have cast the ballot in the precinct). |
| Texas | Tex. Elec. Code Ann. § 65.054(b)(1) (West 2012) (stating that a provisional ballot shall be accepted only if the voter was qualified to cast it); *see also Morales v. Segura*, No. 04-15-365, 2015 WL 8985802, at *4 (Tex. App. Dec. 16, 2015) (upholding the rejection of a ballot voted in the wrong precinct). |
| Utah | Utah Code Ann. § 20A-4-107(a)–(c) (West 2019) (explaining that a ballot voted in the wrong precinct but the |

DNC v. HOBBS 179

|  | right county is able to have any votes counted for which the voter was eligible to vote). |
|---|---|
| Vermont | Vt. Stat. Ann. tit. 17, § 2121(a) (West 2019) (explaining that a voter is qualified to "register to vote in the town of his or her residence"); *see also id.* § 2557(a) (stating that a provisional ballot may be accepted once the town clerk "determine[s] whether the applicant meets all of the registration eligibility requirements"). |
| Virgin Islands | V.I. Code Ann. tit. 18, §§ 581(a), 587 (2019) (providing that voters must reside in their election districts and that poll workers must challenge an individual that they believe does not reside within the district). |
| Virginia | Va. Code Ann. § 24.2-653(B) (West 2015) ("The electoral board shall . . . determine whether each person having submitted such a provisional vote was entitled to do so as a qualified voter in the precinct in which he offered the provisional vote."). |
| Washington | Wash. Admin. Code § 434-262-032 (2019) (listing situations where a ballot must be struck and failing to provide out-of-precinct voting as reason for disqualifying a ballot). |

| West Virginia | W. Va. Code Ann. § 3-1-41(d) (West 2016) (stating that poll clerks must warn "that if the voter is casting a ballot in the incorrect precinct, the ballot cast may not be counted for that election"). |
|---|---|
| Wisconsin | Wis. Stat. Ann. § 6.97(4) (West 2018) (providing that there must be a determination of whether the "individual who has voted under this section is qualified to vote in the ward or election district where the individual's ballot is cast"). |
| Wyoming | Wyo. Stat. Ann. § 22-15-105(b) (West 2019) (requiring voters to swear that they are entitled to vote in the given precinct). |

DNC v. HOBBS                    181

## *Appendix B*

### State and Territory Treatment of Out-of-Precinct Provisional Ballots[15]

| Do Not Tabulate Out-of-Precinct Ballots | Tabulate Out-of-Precinct Ballots |
|---|---|
| Alabama | Alaska |
| American Samoa | Arkansas |
| Arizona | California |
| Connecticut | Colorado |
| Delaware | Georgia |
| District of Columbia | Guam |
| Florida | Kansas[*] |
| Hawai'i | Louisiana[†] |
| Illinois | Maine |
| Indiana | Maryland |
| Iowa | Massachusetts[*] |
| Kentucky | New Jersey |
| Michigan | New Mexico[*] |

---

**[15]** Idaho, Minnesota, New Hampshire, and North Dakota are not included because they do not use provisional ballots. *See supra* Appendix A.

DNC V. HOBBS

| Mississippi | New York |
|---|---|
| Missouri | North Carolina[‡] |
| Montana | Ohio[††] |
| Nebraska | Oregon |
| Nevada | Pennsylvania[*] |
| Northern Mariana Islands | Puerto Rico[**] |
| Oklahoma | Rhode Island[†] |
| South Carolina | Utah[*] |
| South Dakota | Washington |
| Tennessee | |
| Texas | |
| Vermont | |
| Virgin Islands | |
| Virginia | |
| West Virginia | |
| Wisconsin | |
| Wyoming | |

    * Requires the voter to be in the correct county, city, or town.

    † Tabulates votes for federal offices only.

‡ There is some divergence among secondary sources regarding whether North Carolina counts OOP ballots. *Compare Provisional Ballots*, Nat'l Conf. of St. Legislatures (Oct. 15, 2018), http://www.ncsl.org/research/elections-and-campaigns/provisional-ballots.aspx, *with What Is Provisional Voting? Explained*, democracy N.C., https://democracync.org/resources/what-is-provisional-voting-explained (last visited Oct. 15, 2019). North Carolina law generally disfavors counting only provisional ballots cast within the correct precinct. *See* N.C. Gen. Stat. Ann. § 163A-1169(a)(4) (West 2019) ("[I]f the county board finds that an individual voting a provisional official ballot (i) did not vote in the proper precinct . . . the ballot shall not be counted."); *see also James v. Bartlett*, 607 S.E.2d 638, 642 (N.C. 2005) ("[V]oters must cast ballots on election day in their precincts of residence."). Nevertheless, North Carolina law appears to allow an OOP vote to be tabulated in very narrow exceptions—such as election-official error. *See* N.C. Gen. Stat. Ann. § 163A-1169(a)(4) ("If a voter was properly registered to vote in the election by the county board, no mistake of an election official in giving the voter a ballot or in failing to comply with G.S. 163A-1184 or G.S. 163A-1142 shall serve to prevent the counting of the vote on any ballot item the voter was eligible by registration and qualified by residency to vote."). This dissent resolves doubt in favor of listing North Carolina as a state that counts OOP ballots—even though its current law and practice are not entirely clear.

†† The ballot may be counted if, among other things, the casting of the wrong ballot was a result of poll-worker error. Only offices for which the voter would have been eligible to vote will be counted.

184                    DNC v. HOBBS

**\*\*** Only the votes for Governor and Resident Commissioner will be canvassed.

DNC v. Hobbs     185

## *Appendix C*

## State and Territory Laws Regarding the
## Collection of Absentee Ballots

| Jurisdiction | Citation |
|---|---|
| Alabama | Ala. Code § 17-11-4 (2019):<br><br>An application for a voter who requires emergency treatment by a licensed physician within five days before an election pursuant to Section 17-11-3 may be forwarded to the absentee election manager by the applicant or his or her designee. |
| Alaska | Alaska Stat. Ann. § 15.20.072 (West 2019) (providing a method a personal representative to handle and deliver ballots for a special needs voter). |
| American Samoa | Am. Samoa Code Ann. 6.1104(a):<br><br>The reply envelope shall bear upon the face thereof the name, official title, and post office address of the Chief Election Officer and the words "Absentee Ballot Enclosed". The back of the reply envelope shall contain a statement to be subscribed to by the qualified elector which affirms the fact that he is the person voting. |

186                         DNC v. HOBBS

| Arizona | Ariz. Rev. Stat. Ann. § 16-1005(H)–(I) (2016): |
|---------|-----------------------------------------------|
|         | H. A person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony. An election official, a United States postal service worker or any other person who is allowed by law to transmit United States mail is deemed not to have collected an early ballot if the official, worker or other person is engaged in official duties. |
|         | I. Subsection H of this section does not apply to: |
|         | 1. An election held by a special taxing district formed pursuant to title 481 for the purpose of protecting or providing services to agricultural lands or crops and that is authorized to conduct elections pursuant to title 48. |
|         | 2. A family member, household member or caregiver of the voter. For the purposes of this paragraph: |
|         | (a) "Caregiver" means a person who provides medical or health care assistance to the voter in a residence, nursing care institution, hospice facility, assisted living center, assisted |

|  |  |
|---|---|
|  | living facility, assisted living home, residential care institution, adult day health care facility or adult foster care home.<br><br>(b) "Collects" means to gain possession or control of an early ballot.<br><br>(c) "Family member" means a person who is related to the voter by blood, marriage, adoption or legal guardianship.<br><br>(d) "Household member" means a person who resides at the same residence as the voter. |
| Arkansas | Ark. Code Ann. § 7-5-403(a) (West 2019):<br><br>(1) A designated bearer may obtain absentee ballots for no more than two (2) voters per election.<br><br>(2)(A) A designated bearer shall not have more than two (2) absentee ballots in his or her possession at any time.<br><br>(B) If the county clerk knows or reasonably suspects that a designated bearer has more than two (2) absentee ballots in his or her possession, the county clerk shall notify the prosecuting attorney. |

| | |
|---|---|
| | (3)(A) A designated bearer receiving an absentee ballot from the county clerk for a voter shall obtain the absentee ballot directly from the county clerk and deliver the absentee ballot directly to the voter.<br><br>(B) A designated bearer receiving an absentee ballot from a voter shall obtain the absentee ballot directly from the voter and deliver the absentee ballot directly to the county clerk.<br><br>(4)(A) A designated bearer may deliver to the county clerk the absentee ballots for not more than two (2) voters.<br><br>(B) The designated bearer shall be named on the voter statement accompanying the absentee ballot. |
| California | Cal. Elec. Code § 3017(a)(2) (West 2019):<br><br>A vote by mail voter who is unable to return the ballot may designate another person to return the ballot to the elections official who issued the ballot, to the precinct board at a polling place or vote center within the state, or to a vote by mail ballot dropoff location within the state that is provided pursuant to Section 3025 or 4005. The person designated shall return the ballot |

| | |
|---|---|
| | in person, or put the ballot in the mail, no later than three days after receiving it from the voter or before the close of the polls on election day, whichever time period is shorter. Notwithstanding subdivision (d), a ballot shall not be disqualified from being counted solely because it was returned or mailed more than three days after the designated person received it from the voter, provided that the ballot is returned by the designated person before the close of polls on election day. |
| Colorado | Colo. Rev. Stat. Ann. § 1-7.5-107(4)(b)(I) (West 2019)<br><br>The eligible elector may:<br><br>(A) Return the marked ballot to the county clerk and recorder or designated election official by United States mail or by depositing the ballot at the office of the county clerk and recorder or designated election official or at any voter service and polling center, drop box, or drop-off location designated by the county clerk and recorder or designated election official as specified in the election plan filed with the secretary of state. The ballot must be returned in the return envelope. |

| | |
|---|---|
| | (B) Deliver the ballot to any person of the elector's own choice or to any duly authorized agent of the county clerk and recorder or designated election official for mailing or personal delivery; except that no person other than a duly authorized agent of the county clerk and recorder or designated election official may receive more than ten mail ballots in any election for mailing or delivery; or<br><br>(C) Cast his or her vote in person at the voter service and polling center. |
| Connecticut | Conn. Gen. Stat. Ann. § 9-140b(a) (West 2019):<br><br>An absentee ballot shall be cast at a primary, election or referendum only if: (1) It is mailed by (A) the ballot applicant, (B) a designee of a person who applies for an absentee ballot because of illness or physical disability, or (C) a member of the immediate family of an applicant who is a student, so that it is received by the clerk of the municipality in which the applicant is qualified to vote not later than the close of the polls; (2) it is returned by the applicant in person to the clerk by the day before a regular election, special election or primary or prior to the opening of the polls on the day of a |

referendum; (3) it is returned by a designee of an ill or physically disabled ballot applicant, in person, to said clerk not later than the close of the polls on the day of the election, primary or referendum; (4) it is returned by a member of the immediate family of the absentee voter, in person, to said clerk not later than the close of the polls on the day of the election, primary or referendum; (5) in the case of a presidential or overseas ballot, it is mailed or otherwise returned pursuant to the provisions of section 9-158g; or (6) it is returned with the proper identification as required by the Help America Vote Act, P.L. 107-252,1 as amended from time to time, if applicable, inserted in the outer envelope so such identification can be viewed without opening the inner envelope. A person returning an absentee ballot to the municipal clerk pursuant to subdivision (3) or (4) of this subsection shall present identification and, on the outer envelope of the absentee ballot, sign his name in the presence of the municipal clerk, and indicate his address, his relationship to the voter or his position, and the date and time of such return. As used in this section, "immediate family" means a dependent relative who resides in the

| | |
|---|---|
| | individual's household or any spouse, child or parent of the individual. |
| Delaware | Del. Code Ann. tit. 15, § 5507(4) (West 2018): <br><br> The elector shall return the sealed ballot envelope to the Department by: <br><br> a. Depositing it in a United States postal mailbox, thereby mailing it to the Department; or <br><br> b. Delivering it, or causing it to be delivered, to the Department before the polls close on the day of the election. |
| District of Columbia | D.C. Mun. Regs. tit. 3, § 722.2 (2019): <br><br> A duly registered voter shall apply to vote by emergency absentee ballot according to the following procedure: <br><br> (a) The registered voter shall, by signed affidavit on a form provided by the Board, set forth: <br><br> (1) The reason why he or she is unable to be present at the polls on the day of the election; and <br><br> (2) Designate a duly registered voter to serve as agent for the purpose of delivering the absentee ballot to the |

voter, except than an officer of the court in charge of a jury sequestered on election day may act as agent for any registered voter sequestered regardless of whether the officer is a registered voter in the District.

(b) Upon receipt of the application, the Executive Director, or his or her designee, if satisfied that the person cannot, in fact, be present at the polling place on the day of the election shall issue to the voter, through the voter's duly authorized agent, an absentee ballot which shall be marked by the voter, placed in a sealed envelope and returned to the Board before the close of the polls on election day.

(c) The person designated as agent shall, by signed affidavit on a form prescribed by the Board, state the following:

(1) That the ballot will be delivered by the voter who submitted the application for the ballot; and

(2) That the ballot shall be marked by the voter and placed in a sealed envelope in the agent's presence, and returned, under seal to the Board by the agent.

194 DNC v. HOBBS

| Florida | Fla. Stat. Ann. § 104.0616 (West 2016):<br><br>(1) For purposes of this section, the term "immediate family" means a person's spouse or the parent, child, grandparent, or sibling of the person or the person's spouse.<br><br>(2) Any person who provides or offers to provide, and any person who accepts, a pecuniary or other benefit in exchange for distributing, ordering, requesting, collecting, delivering, or otherwise physically possessing more than two vote-by-mail ballots per election in addition to his or her own ballot or a ballot belonging to an immediate family member, except as provided in ss. 101.6105–101.694, commits a misdemeanor of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. |
|---------|------------------------------|
| Georgia | Ga. Code Ann. § 21-2-385 (West 2019):<br><br>(a) . . . Such envelope shall then be securely sealed and the elector shall then personally mail or personally deliver same to the board of registrars or absentee ballot clerk, provided that mailing or delivery may be made by the elector's mother, father, grandparent, aunt, uncle, brother, sister, spouse, son, |

DNC v. Hobbs 195

daughter, niece, nephew, grandchild, son-in-law, daughter-in-law, mother-in-law, father-in-law, brother-in-law, sister-in-law, or an individual residing in the household of such elector. The absentee ballot of a disabled elector may be mailed or delivered by the caregiver of such disabled elector, regardless of whether such caregiver resides in such disabled elector's household. The absentee ballot of an elector who is in custody in a jail or other detention facility may be mailed or delivered by any employee of such jail or facility having custody of such elector. An elector who is confined to a hospital on a primary or election day to whom an absentee ballot is delivered by the registrar or absentee ballot clerk shall then and there vote the ballot, seal it properly, and return it to the registrar or absentee ballot clerk. . . .

(b) A physically disabled or illiterate elector may receive assistance in preparing his or her ballot from any person of the elector's choice other than such elector's employer or the agent of such employer or an officer or agent of such elector's union; provided, however, that no person whose name appears on the ballot as a candidate at a particular primary, election, or runoff

| | |
|---|---|
| | nor [specified relatives of a candidate] to any elector who is not related to such candidate. . . . The person rendering assistance to the elector in preparing the ballot shall sign the oath printed on the same envelope as the oath to be signed by the elector. Any person who willfully violates this subsection shall be guilty of a felony and, upon conviction thereof, shall be sentenced to imprisonment for not less than one nor more than ten years or to pay a fine not to exceed $100,000.00, or both, for each such violation. |
| Guam | 3 Guam Code Ann. § 10107 (2016): The Commission shall deliver a ballot to any qualified elector applying in person at the office of said Commission; provided, however, that such applicant shall complete and subscribe the application heretofore prescribed by this Chapter; provided further, that said application shall be made not more than thirty (30) days nor less than one (1) day before the date of the election for which the vote is being cast. It is provided further, that said ballot shall be immediately marked, enclosed in the ballot envelope, placed in the return envelope with the proper affidavit enclosed, and immediately returned to the Commission. |

| Hawai'i | Haw. Rev. Stat. Ann. § 15-9 (West 2019): |
|---------|------------------------------------------|
|         | (a) The return envelope shall be: |
|         | (1) Mailed and must be received by the clerk issuing the absentee ballot no later than the closing hour on election day in accordance with section 11-131; or |
|         | (2) Delivered other than by mail to the clerk issuing the absentee ballot, or to a voter service center no later than the closing hour on election day in accordance with section 11-131. |
|         | (b) Upon receipt of the return envelope from any person voting under this chapter, the clerk may prepare the ballots for counting pursuant to this section and section 15-10. |
|         | (c) Before opening the return and ballot envelopes and counting the ballots, the return envelopes shall be checked for the following: |
|         | (1) Signature on the affirmation statement; |

198 DNC v. HOBBS

| | |
|---|---|
| | (2) Whether the signature corresponds with the absentee request or register as prescribed in the rules adopted by the chief election officer; and<br><br>(3) Whether the person is a registered voter and has complied with the requirements of sections 11-15 and 11-16.<br><br>(d) If any requirement listed in subsection (c) is not met or if the return or ballot envelope appears to be tampered with, the clerk or the absentee ballot team official shall mark across the face of the envelope "invalid" and it shall be kept in the custody of the clerk and disposed of as prescribed for ballots in section 11-154. |
| Idaho | Idaho Code Ann. § 34-1005 (West 2019):<br><br>The return envelope shall be mailed or delivered to the officer who issued the same; provided, that an absentee ballot must be received by the issuing officer by 8:00 p.m. on the day of election before such ballot may be counted. |

DNC v. Hobbs                    199

| Illinois | 10 Ill. Comp. Stat. Ann. § 5/19-6 (West 2015):<br><br>It shall be unlawful for any person not the voter or a person authorized by the voter to take the ballot and ballot envelope of a voter for deposit into the mail unless the ballot has been issued pursuant to application by a physically incapacitated elector under Section 3-3 or a hospitalized voter under Section 19-13, in which case any employee or person under the direction of the facility in which the elector or voter is located may deposit the ballot and ballot envelope into the mail. If the voter authorized a person to deliver the ballot to the election authority, the voter and the person authorized to deliver the ballot shall complete the authorization printed on the exterior envelope supplied by an election authority for the return of the vote by mail ballot. |
|---|---|
| Indiana | Ind. Code Ann. § 3-14-2-16(4) (West 2019):<br><br>A person who knowingly does any of the following commits a Level 6 felony: . . . |

| | |
|---|---|
| | (4) Receives from a voter a ballot prepared by the voter for voting, except:<br><br>(A) the inspector;<br><br>(B) a member of the precinct election board temporarily acting for the inspector;<br><br>(C) a member or an employee of a county election board (acting under the authority of the board and state law) or an absentee voter board member acting under IC 3-11-10; or<br><br>(D) a member of the voter's household, an individual designated as attorney in fact for the voter, or an employee of:<br><br>(i) the United States Postal Service; or<br><br>(ii) a bonded courier company;<br><br>(acting in the individual's capacity as an employee of the United States Postal Service or a bonded courier company) when delivering an envelope containing an absentee ballot under IC 3-11-10-1. |
| Iowa | Iowa Code Ann. § 53.17(1) (West 2019): |

| | |
|---|---|
| | a. The sealed return envelope may be delivered by the registered voter, by the voter's designee, or by the special precinct election officials designated pursuant to section 53.22, subsection 2, to the commissioner's office no later than the time the polls are closed on election day. However, if delivered by the voter's designee, the envelope shall be delivered within seventy-two hours of retrieving it from the voter or before the closing of the polls on election day, whichever is earlier.<br><br>b. The sealed return envelope may be mailed to the commissioner by the registered voter or by the voter's designee. If mailed by the voter's designee, the envelope must be mailed within seventy-two hours of retrieving it from the voter or within time to be postmarked or, if applicable, to have the postal service barcode traced to a date of entry into the federal mail system not later than the day before the election, as provided in section 53.17A, whichever is earlier. |
| Kansas | Kan. Stat. Ann. § 25-1221 (West 2019):<br><br>After such voter has marked the official federal services absentee ballot, he or she shall place it in the official ballot envelope and secretly seal the same. |

| | |
|---|---|
| | Such voter shall then fill out in full the form printed upon the official ballot envelope and sign the same. Such ballot envelope shall then be placed in the envelope provided for such purpose and mailed by the voter to the county election officer of the county of the voter's residence.<br><br>Kan. Stat. Ann. § 25-1124(d) (West 2019):<br><br>Any voted ballot may be transmitted to the county election officer by the voter or by another person designated in writing by the voter, except if the voter has a disability preventing the voter from writing and signing a statement, the written and signed statement required by subsection (e) shall be sufficient. |
| Kentucky | Ky. Rev. Stat. Ann. § 117.086(1) (West 2019):<br><br>The voter returning his absentee ballot by mail shall mark his ballot, seal it in the inner envelope and then in the outer envelope, and mail it to the county clerk as shall be provided by this chapter. The voter shall sign the detachable flap and the outer envelope in order to validate the ballot. A person having power of attorney for the voter |

| | |
|---|---|
| | and who signs the detachable flap and outer envelope for the voter shall complete the voter assistance form as required by KRS 117.255. The signatures of two (2) witnesses are required if the voter signs the form with the use of a mark instead of the voter's signature. A resident of Kentucky who is a covered voter as defined in KRS 117A.010 who has received an absentee ballot transmitted by facsimile machine or by means of the electronic transmission system established under KRS 117A.030(4) shall transmit the voted ballot to the county clerk by mail only, conforming with ballot security requirements that may be promulgated by the state board by administrative regulation. In order to be counted, the ballots shall be received by the clerk by at least the time established by the election laws generally for the closing of the polls, which time shall not include the extra hour during which those voters may vote who were waiting in line to vote at the scheduled poll closing time. |
| Louisiana | La. Stat. Ann. § 18:1308(B) (2017):<br><br>The ballot shall be marked as provided in R.S. 18:1310 and returned to the registrar by the United States Postal Service, a commercial courier, or hand |

204                          DNC v. Hobbs

|  | delivery. If delivered by other than the voter, a commercial courier, or the United States Postal Service, the registrar shall require that the person making such delivery sign a statement, prepared by the secretary of state, certifying that he has the authorization and consent of the voter to hand deliver the marked ballot. For purposes of this Subsection, "commercial courier" shall have the same meaning as provided in R.S. 13:3204(D). No person except the immediate family of the voter, as defined in this Code, shall hand deliver more than one marked ballot to the registrar. |
| --- | --- |
| Maine | Me. Rev. Stat. Ann. tit. 21-A, § 791(2)(A) (2009): <br><br> A person commits a Class D crime if that person [d]elivers, receives, accepts, notarizes or witnesses an absentee ballot for any compensation. This paragraph does not apply to a governmental employee handling ballots in the course of that employee's official duties or a person who handles absentee ballots before the unvoted ballots are delivered to the municipality or after the voted ballots are returned to the clerk. |

| Maryland | Md. Code Ann., Elec. Law § 9-307 (West 2019): |
|----------|-----------------------------------------------|
| | (a) A qualified applicant may designate a duly authorized agent to pick up and deliver an absentee ballot under this subtitle. |
| | (b) An agent of the voter under this section: |
| | (1) must be at least 18 years old; |
| | (2) may not be a candidate on that ballot; |
| | (3) shall be designated in a writing signed by the voter under penalty of perjury; and |
| | (4) shall execute an affidavit under penalty of perjury that the ballot was: |
| | (i) delivered to the voter who submitted the application; |
| | (ii) marked and placed in an envelope by the voter, or with assistance as allowed by regulation, in the agent's presence; and |
| | (iii) returned to the local board by the agent. |

| Massachusetts | Mass. Gen. Laws Ann. ch. 54, § 92(a) (West 2019):<br><br>A voter who receives the ballot by mail, as provided in subsection (a) of section ninety-one B, may return it by mail to the city or town clerk in the envelope provided pursuant to subsection (d) of section eighty-seven, or such voter or a family member may deliver it in person to the office of the city or town clerk. A voter to whom a ballot was delivered in person at the office of the clerk as provided in said subsection (a) of said section ninety-one B shall return it without removing the ballot from such office. |
|---|---|
| Michigan | Mich. Comp. Laws Ann. § 168.764a (West 2019):<br><br>Step 5. Deliver the return envelope by 1 of the following methods:<br><br>(a) Place the necessary postage upon the return envelope and deposit it in the United States mail or with another public postal service, express mail service, parcel post service, or common carrier.<br><br>(b) Deliver the envelope personally to the office of the clerk, to the clerk, or to an authorized assistant of the clerk. |

(c) In either (a) or (b), a member of the immediate family of the voter including a father-in-law, mother-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, grandparent, or grandchild or a person residing in the voter's household may mail or deliver a ballot to the clerk for the voter.

(d) You may request by telephone that the clerk who issued the ballot provide assistance in returning the ballot. The clerk is required to provide assistance if you are unable to return your absent voter ballot as specified in (a), (b), or (c) above, if it is before 5 p.m. on the Friday immediately preceding the election, and if you are asking the clerk to pickup the absent voter ballot within the jurisdictional limits of the city, township, or village in which you are registered. Your absent voter ballot will then be picked up by the clerk or an election assistant sent by the clerk. All persons authorized to pick up absent voter ballots are required to carry credentials issued by the clerk. If using this absent voter ballot return method, do not give your ballot to anyone until you have checked their credentials. . . .

208              DNC v. HOBBS

| | All of the following actions are violations of the Michigan election law and are illegal in this state: . . . . |
| | |
| | (4) For a person other than those listed in these instructions to return, offer to return, agree to return, or solicit to return an absent voter ballot to the clerk. |
| Minnesota | Minn. Stat. Ann. § 203B.08 subd. 1 (West 2015): |
| | |
| | The voter may designate an agent to deliver in person the sealed absentee ballot return envelope to the county auditor or municipal clerk or to deposit the return envelope in the mail. An agent may deliver or mail the return envelopes of not more than three voters in any election. Any person designated as an agent who tampers with either the return envelope or the voted ballots or does not immediately mail or deliver the return envelope to the county auditor or municipal clerk is guilty of a misdemeanor. |
| Mississippi | Miss. Code Ann. § 23-15-631(f) (West 2019): |
| | |
| | Any voter casting an absentee ballot who declares that he or she requires assistance to vote by reason of |

| | |
|---|---|
| | blindness, temporary or permanent physical disability or inability to read or write, shall be entitled to receive assistance in the marking of his or her absentee ballot and in completing the affidavit on the absentee ballot envelope. The voter may be given assistance by anyone of the voter's choice other than a candidate whose name appears on the absentee ballot being marked, the spouse, parent or child of a candidate whose name appears on the absentee ballot being marked or the voter's employer, an agent of that employer or a union representative; however, a candidate whose name is on the ballot or the spouse, parent or child of such candidate may provide assistance upon request to any voter who is related within the first degree. In order to ensure the integrity of the ballot, any person who provides assistance to an absentee voter shall be required to sign and complete the "Certificate of Person Providing Voter Assistance" on the absentee ballot envelope. |
| Missouri | Mo. Ann. Stat. § 115.291(2) (West 2018): |
| | Except as provided in subsection 4 of this section, each absentee ballot that is not cast by the voter in person in the |

| | office of the election authority shall be returned to the election authority in the ballot envelope and shall only be returned by the voter in person, or in person by a relative of the voter who is within the second degree of consanguinity or affinity, by mail or registered carrier or by a team of deputy election authorities; except that covered voters, when sent from a location determined by the secretary of state to be inaccessible on election day, shall be allowed to return their absentee ballots cast by use of facsimile transmission or under a program approved by the Department of Defense for electronic transmission of election materials. |
|---|---|
| Montana | Mont. Code Ann. § 13-13-201 (West 2019): <br><br> (1) A legally registered elector or provisionally registered elector is entitled to vote by absentee ballot as provided for in this part. <br><br> (2) The elector may vote absentee by: <br><br> (a) marking the ballot in the manner specified; |

(b) placing the marked ballot in the secrecy envelope, free of any identifying marks;

(c) placing the secrecy envelope containing one ballot for each election being held in the signature envelope;

(d) executing the affirmation printed on the signature envelope; and

(e) returning the signature envelope with all appropriate enclosures by regular mail, postage paid, or by delivering it to:

(i) the election office;

(ii) a polling place within the elector's county;

(iii) pursuant to 13-13-229, the absentee election board or an authorized election official; or

(iv) in a mail ballot election held pursuant to Title 13, chapter 19, a designated place of deposit within the elector's county.

(3) Except as provided in 13-21-206 and 13-21-226, in order for the ballot to be counted, each elector shall return it

| | |
|---|---|
| | in a manner that ensures the ballot is received prior to 8 p.m. on election day. |
| Nebraska | Neb. Rev. Stat. § 32-943(2) (West 2019): <br><br> A candidate for office at such election and any person serving on a campaign committee for such a candidate shall not act as an agent for any registered voter requesting a ballot pursuant to this section unless such person is a member of the registered voter's family. No person shall act as agent for more than two registered voters in any election. |
| Nevada | Nev. Rev. Stat. Ann. § 293.330(4) (West 2017): <br><br> [I]t is unlawful for any person to return an absent ballot other than the voter who requested the absent ballot or, at the request of the voter, a member of the voter's family. A person who returns an absent ballot and who is a member of the family of the voter who requested the absent ballot shall, under penalty of perjury, indicate on a form prescribed by the county clerk that the person is a member of the family of the voter who requested the absent ballot and that the voter requested that the person return the absent ballot. A |

DNC v. Hobbs    213

| | |
|---|---|
| | person who violates the provisions of this subsection is guilty of a category E felony . . . . |
| New Hampshire | New Hampshire recently enacted legislation adding greater specificity to is provision governing the delivery of absentee ballots—N.H. Rev. Stat. Ann. § 657:17. The new statute will read:<br><br>I. . . . . The voter or the person assisting a blind voter or voter with a disability shall then endorse on the outer envelope the voter's name, address, and voting place. The absentee ballot shall be delivered to the city or town clerk from whom it was received in one of the following ways:<br><br>(a) The voter or the voter's delivery agent may personally deliver the envelope; or<br><br>(b) The voter or the person assisting the blind voter or voter with a disability may mail the envelope to the city or town clerk, with postage affixed.<br><br>II. As used in this section, "delivery agent" means: |

(a) The voter's spouse, parent, sibling, child, grandchild, father-in-law, mother-in-law, son-in-law, daughter-in-law, stepparent, stepchild; or

(b) If the voter is a resident of a nursing home as defined in RSA 151–A:1, IV, the nursing home administrator, licensed pursuant to RSA 151–A:2, or a nursing home staff member designated in writing by the administrator to deliver ballots; or

(c) If the voter is a resident of a residential care facility licensed pursuant to RSA 151:2, I(e) and described in RSA 151:9, VII(a)(1) and (2), the residential care facility administrator, or a residential care facility staff member designated in writing by the administrator to deliver ballots; or

(d) A person assisting a blind voter or a voter with a disability who has signed a statement on the affidavit envelope acknowledging the assistance.

III. The city or town clerk, or ward clerk on election day at the polls, shall not accept an absentee ballot from a delivery agent unless the delivery agent completes a form provided by the

DNC v. HOBBS                    215

| | |
|---|---|
| | secretary of state, which shall be maintained by the city or town clerk, and the delivery agent presents a government-issued photo identification or has his or her identity verified by the city or town clerk. Absentee ballots delivered through the mail or by the voter's delivery agent shall be received by the town, city, or ward clerk no later than 5:00 p.m. on the day of the election. A delivery agent who is assisting a voter who is blind or who has a disability pursuant to this section may not personally deliver more than 4 absentee ballots in any election, unless the delivery agent is a nursing home or residential care facility administrator, an administrator designee, or a family member, each as authorized by this section. |
| New Jersey | N.J. Stat. Ann. § 19:63-4(a) (West 2015): A qualified voter is entitled to apply for and obtain a mail-in ballot by authorized messenger, who shall be so designated over the signature of the voter and whose printed name and address shall appear on the application in the space provided. The authorized messenger shall be a family member or a registered voter of the county in which the application is made and shall |

place his or her signature on the application in the space so provided in the presence of the county clerk or the designee thereof. No person shall serve as an authorized messenger or as a bearer for more than three qualified voters in an election. No person who is a candidate in the election for which the voter requests a mail-in ballot shall be permitted to serve as an authorized messenger or bearer. The authorized messenger shall show a photo identification card to the county clerk, or the designee thereof, at the time the messenger submits the application form. The county clerk or the designee thereof shall authenticate the signature of the authorized messenger in the event such a person is other than a family member, by comparing it with the signature of the person appearing on a State of New Jersey driver's license, or other identification issued or recognized as official by the federal government, the State, or any of its political subdivisions, providing the identification carries the full address and signature of the person. After the authentication of the signature on the application, the county clerk or the designee thereof is authorized to deliver to the authorized messenger a ballot to be delivered to the qualified voter.

DNC v. HOBBS                    217

| New Mexico | N.M. Stat. Ann. § 1-6-10.1 (West 2019): <br><br> A. A voter, caregiver to that voter or member of that voter's immediate family may deliver that voter's absentee ballot to the county clerk in person or by mail; provided that the voter has subscribed the official mailing envelope of the absentee ballot. <br><br> B. As used in this section, "immediate family" means the spouse, children, parents or siblings of a voter. |
|------------|----------|
| New York | N.Y. Elec. Law § 8-410 (McKinney 2019): <br><br> The absentee voter shall mark an absentee ballot as provided for paper ballots or ballots prepared for counting by ballot counting machines. He shall make no mark or writing whatsoever upon the ballot, except as above prescribed, and shall see that it bears no such mark or writing. He shall make no mark or writing whatsoever on the outside of the ballot. After marking the ballot or ballots he shall fold each such ballot and enclose them in the envelope and seal the envelope. He shall then take and subscribe the oath on the envelope, with blanks properly filled in. The envelope, containing the ballot or |

| | |
|---|---|
| | ballots, shall then be mailed or delivered to the board of elections of the county or city of his residence. |
| North Carolina | N.C. Gen. Stat. Ann. § 163A-1310(b)(1) (West 2018):<br><br>All ballots issued under the provisions of this Part and Part 2 of Article 21 of this Chapter shall be transmitted by mail or by commercial courier service, at the voter's expense, or delivered in person, or by the voter's near relative or verifiable legal guardian and received by the county board not later than 5:00 p.m. on the day of the statewide primary or general election or county bond election. Ballots issued under the provisions of Part 2 of Article 21 of this Chapter may also be electronically transmitted. |
| North Dakota | N.D. Cent. Code Ann. § 16.1-07-08(1) (West 2019):<br><br>Upon receipt of an application for an official ballot properly filled out and duly signed, or as soon thereafter as the official ballot for the precinct in which the applicant resides has been prepared, the county auditor, city auditor, or business manager of the school district, as the case may be, shall send to the absent voter by mail, at the expense of |

DNC v. Hobbs                    219

the political subdivision conducting the election, one official ballot, or personally deliver the ballot to the applicant or the applicant's agent, which agent may not, at that time, be a candidate for any office to be voted upon by the absent voter. The agent shall sign the agent's name before receiving the ballot and deposit with the auditor or business manager of the school district, as the case may be, authorization in writing from the applicant to receive the ballot or according to requirements set forth for signature by mark. The auditor or business manager of the school district, as the case may be, may not provide an absent voter's ballot to a person acting as an agent who cannot provide a signed, written authorization from an applicant. No person may receive compensation, including money, goods, or services, for acting as an agent for an elector, nor may a person act as an agent for more than four electors in any one election. A voter voting by absentee ballot may not require the political subdivision providing the ballot to bear the expense of the return postage for an absentee ballot.

| | |
|---|---|
| Northern Mariana Islands | 1 N. Mar. I. Code § 6212(a) (2010):<br><br>The Commission shall provide to any registered voter entitled to vote by absentee ballot and who applied for one, an official ballot, a ballot envelope, an affidavit prescribed by the Commission, and a reply envelope. The absentee voter shall mark the ballot in the usual manner provided by law and in a manner such that no other person can know how the ballot is marked. The absentee voter shall then deposit the ballot in the ballot envelope and securely seal it. The absentee voter shall then complete and execute the affidavit. The ballot envelope and the affidavit shall then be enclosed and sealed in the covering reply envelope and mailed via standard U.S. First Class Mail only or sent by commercial courier service to the commission at the expense of the voter. Such ballots and affidavits will not be counted by the Commission unless mailed. For the purpose of this part, the word "mailed" includes ballots and affidavits sent through the postal or courier services. |
| Ohio | Ohio Rev. Code Ann. § 3509.05(A) (West 2016):<br><br>The elector shall mail the identification envelope to the director from whom it |

| | |
|---|---|
| | was received in the return envelope, postage prepaid, or the elector may personally deliver it to the director, or the spouse of the elector, the father, mother, father-in-law, mother-in-law, grandfather, grandmother, brother, or sister of the whole or half blood, or the son, daughter, adopting parent, adopted child, stepparent, stepchild, uncle, aunt, nephew, or niece of the elector may deliver it to the director. |
| Oklahoma | Okla. Stat. Ann. tit. 26, § 14-108(C) (West 2019):<br><br>Any voter who hand delivers his or her ballot as provided in subsection A of this section shall provide proof of identity to the county election board and shall hand deliver the ballot no later than the end of regular business hours on the day prior to the date of the election. For purposes of this section, "proof of identity" shall have the same meaning as used in subsection A of Section 7-114 of this title. |
| Oregon | Or. Rev. Stat. Ann. § 254.470(6) (West 2018):<br><br>(6)(a) Upon receipt of any ballot described in this section, the elector shall mark the ballot, sign the return identification envelope supplied with |

222                        DNC V. HOBBS

| | |
|---|---|
| | the ballot and comply with the instructions provided with the ballot.<br><br>(b) The elector may return the marked ballot to the county clerk by United States mail or by depositing the ballot at the office of the county clerk, at any place of deposit designated by the county clerk or at any location described in ORS 254.472 or 254.474.<br><br>(c) The ballot must be returned in the return identification envelope. If the elector returns the ballot by mail, the elector must provide the postage.<br><br>(d) Subject to paragraph (e) of this subsection, if a person returns a ballot for an elector, the person shall deposit the ballot in a manner described in paragraph (b) of this subsection not later than two days after receiving the ballot. |
| Pennsylvania | 25 Pa. Stat. and Cons. Stat. Ann. § 3146.6(a)(1) (West 2019) (footnote omitted):<br><br>Any elector who submits an Emergency Application and receives an absentee ballot in accordance with section 1302.1(a.2) or (c) shall mark the ballot on or before eight o'clock P.M. on the day of the primary or election. This |

| | |
|---|---|
| | envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope. Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election. |
| Puerto Rico | P. R. Laws Ann. tit. 16, § 4177 (2010): <br><br> Any voter entitled to vote as an absentee voter in a specific election, as established in § 4176 of this title, shall cast his/her vote in accordance with the procedure provided by the Commission through regulations. Only those absentee ballots sent on or before an election, and received on or before the last day of general canvass for that election, shall be considered validly cast pursuant to this Section. The Commission shall establish through regulations the manner in which the mailing date of absentee ballots shall be validated. |
| Rhode Island | 17 R.I. Gen. Laws Ann. § 17-20-2.1(d) (West 2019): |

In addition to those requirements set forth elsewhere in this chapter, a mail ballot, in order to be valid, must have been cast in conformance with the following procedures:

(1) All mail ballots issued pursuant to subdivision 17-20-2(1) shall be mailed to the elector at the Rhode Island address provided by the elector on the application. In order to be valid, the signature on all certifying envelopes containing a voted ballot must be made before a notary public or before two (2) witnesses who shall set forth their addresses on the form.

(2) All applications for mail ballots pursuant to § 17-20-2(2) must state under oath the name and location of the hospital, convalescent home, nursing home, or similar institution where the elector is confined. All mail ballots issued pursuant to subdivision 17-20-2(2) shall be delivered to the elector at the hospital, convalescent home, nursing home, or similar institution where the elector is confined; and the ballots shall be voted and witnessed in conformance with the provisions of § 17-20-14.

(3) All mail ballots issued pursuant to subdivision 17-20-2(3) shall be mailed to the address provided by the elector on the application or sent to the board of canvassers in the city or town where the elector maintains his or her voting residence. In order to be valid, the signature of the elector on the certifying envelope containing voted ballots does not need to be notarized or witnessed. Any voter qualified to receive a mail ballot pursuant to subdivision 17-20-2(3) shall also be entitled to cast a ballot pursuant to the provisions of United States Public Law 99-410 ("UOCAVA Act").

(4) All mail ballots issued pursuant to subdivision 17-20-2(4) may be mailed to the elector at the address within the United States provided by the elector on the application or sent to the board of canvassers in the city or town where the elector maintains his or her voting residence. In order to be valid, the signature on all certifying envelopes containing a voted ballot must be made before a notary public, or other person authorized by law to administer oaths where signed, or where the elector voted, or before two (2) witnesses who shall set forth their addresses on the form. In order to be valid, all ballots

| | |
|---|---|
| | sent to the elector at the board of canvassers must be voted in conformance with the provisions of § 17-20-14.2. |
| South Carolina | S.C. Code Ann. § 7-15-385 (2019):<br><br>Upon receipt of the ballot or ballots, the absentee ballot applicant must mark each ballot on which he wishes to vote and place each ballot in the single envelope marked "Ballot Herein" which in turn must be placed in the return-addressed envelope. The applicant must then return the return-addressed envelope to the board of voter registration and elections by mail, by personal delivery, or by authorizing another person to return the envelope for him. The authorization must be given in writing on a form prescribed by the State Election Commission and must be turned in to the board of voter registration and elections at the time the envelope is returned. The voter must sign the form, or in the event the voter cannot write because of a physical handicap or illiteracy, the voter must make his mark and have the mark witnessed by someone designated by the voter. The authorization must be preserved as part of the record of the election, and the board of voter registration and elections must note the |

DNC v. HOBBS                                    227

| | |
|---|---|
| | authorization and the name of the authorized returnee in the record book required by Section 7-15-330. A candidate or a member of a candidate's paid campaign staff including volunteers reimbursed for time expended on campaign activity is not permitted to serve as an authorized returnee for any person unless the person is a member of the voter's immediate family as defined in Section 7-15-310. The oath set forth in Section 7-15-380 must be signed and witnessed on each returned envelope. The board of voter registration and elections must record in the record book required by Section 7-15-330 the date the return-addressed envelope with witnessed oath and enclosed ballot or ballots is received by the board. The board must securely store the envelopes in a locked box within the office of the board of voter registration and elections. |
| South Dakota | S.D. Codified Laws § 12-19-2.2 (2019):<br><br>If a person is an authorized messenger for more than one voter, he must notify the person in charge of the election of all voters for whom he is a messenger. |
| Tennessee | Tenn. Code Ann. § 2-6-202(e) (West 2017): |

228                         DNC V. HOBBS

| | |
|---|---|
| | After receiving the absentee voting supplies and completing the ballot, the voter shall sign the appropriate affidavit under penalty of perjury. The effect of the signature is to verify the information as true and correct and that the voter is eligible to vote in the election. The voter shall then mail the ballot. |
| Texas | Tex. Elec. Code Ann. § 86.006(f) (West 2017) (footnote omitted):<br><br>A person commits an offense if the person knowingly possesses an official ballot or official carrier envelope provided under this code to another. Unless the person possessed the ballot or carrier envelope with intent to defraud the voter or the election authority, this subsection does not apply to a person who, on the date of the offense, was:<br><br>(1) related to the voter within the second degree by affinity or the third degree by consanguinity, as determined under Subchapter B, Chapter 573, Government Code;<br><br>(2) physically living in the same dwelling as the voter; |

|  | (3) an early voting clerk or a deputy early voting clerk; |
|--|--|
|  | (4) a person who possesses a ballot or carrier envelope solely for the purpose of lawfully assisting a voter who was eligible for assistance under Section 86.010 and complied fully with: |
|  | (A) Section 86.010; and |
|  | (B) Section 86.0051, if assistance was provided in order to deposit the envelope in the mail or with a common or contract carrier; |
|  | (5) an employee of the United States Postal Service working in the normal course of the employee's authorized duties; or |
|  | (6) a common or contract carrier working in the normal course of the carrier's authorized duties if the official ballot is sealed in an official carrier envelope that is accompanied by an individual delivery receipt for that particular carrier envelope. |
| Texas | Tex. Elec. Code Ann. § 86.0052(a)(1) (West 2013) (making it a crime if a person "compensates another person for depositing the carrier envelope in the mail or with a common or contract |

| | |
|---|---|
| | carrier as provided by Section 86.0051(b), as part of any performance-based compensation scheme based on the number of ballots deposited or in which another person is presented with a quota of ballots to deposit"). |
| Utah | Utah Code Ann. § 20A-3-306 (West 2019): <br><br> (1)(a) Except as provided by Section 20A-1-308, to vote a mail-in absentee ballot, the absentee voter shall: <br><br> (i) complete and sign the affidavit on the envelope; <br><br> (ii) mark the votes on the absentee ballot; <br><br> (iii) place the voted absentee ballot in the envelope; <br><br> (iv) securely seal the envelope; and <br><br> (v) attach postage, unless voting in accordance with Section 20A-3-302, and deposit the envelope in the mail or deliver it in person to the election officer from whom the ballot was obtained. <br><br> (b) Except as provided by Section 20A-1-308, to vote an absentee ballot in |

|  | person at the office of the election officer, the absent voter shall: |
|--|--|
|  | (i) complete and sign the affidavit on the envelope; |
|  | (ii) mark the votes on the absent-voter ballot; |
|  | (iii) place the voted absent-voter ballot in the envelope; |
|  | (iv) securely seal the envelope; and |
|  | (v) give the ballot and envelope to the election officer. |
|  | (2) Except as provided by Section 20A-1-308, an absentee ballot is not valid unless: |
|  | (a) in the case of an absentee ballot that is voted in person, the ballot is: |
|  | (i) applied for and cast in person at the office of the appropriate election officer before 5 p.m. no later than the Tuesday before election day; or |
|  | (ii) submitted on election day at a polling location in the political subdivision where the absentee voter resides; |

232                          DNC v. HOBBS

| | |
|---|---|
| | (b) in the case of an absentee ballot that is submitted by mail, the ballot is:<br><br>(i) clearly postmarked before election day, or otherwise clearly marked by the post office as received by the post office before election day; and<br><br>(ii) received in the office of the election officer before noon on the day of the official canvass following the election; or<br><br>(c) in the case of a military-overseas ballot, the ballot is submitted in accordance with Section 20A-16-404.<br><br>(3) An absentee voter may submit a completed absentee ballot at a polling location in a political subdivision holding the election, if the absentee voter resides in the political subdivision.<br><br>(4) An absentee voter may submit an incomplete absentee ballot at a polling location for the voting precinct where the voter resides, request that the ballot be declared spoiled, and vote in person. |
| Vermont | Vt. Stat. Ann. tit. 17, § 2543 (West 2019): |

DNC v. HOBBS                                      233

(a) After marking the ballots and signing the certificate on the envelope, the early or absentee voter to whom the same are addressed shall return the ballots to the clerk of the town in which he or she is a voter, in the manner prescribed, except that in the case of a voter to whom ballots are delivered by justices, the ballots shall be returned to the justices calling upon him or her, and they shall deliver them to the town clerk.

(b) Once an early voter absentee ballot has been returned to the clerk in the envelope with the signed certificate, it shall be stored in a secure place and shall not be returned to the voter for any reason.

(c) If a ballot includes more than one page, the early or absentee voter need only return the page upon which the voter has marked his or her vote.

(d)(1) All early voter absentee ballots returned as follows shall be counted:

(A) by any means, to the town clerk's office before the close of business on the day preceding the election;

| | |
|---|---|
| | (B) by mail, to the town clerk's office before the close of the polls on the day of the election; and

(C) by hand delivery to the presiding officer at the voter's polling place.

(2) An early voter absentee ballot returned in a manner other than those set forth in subdivision (1) of this subsection shall not be counted. |
| Virgin Islands | V.I. Code Ann. tit. 18, § 665 (2018):

(a) An absentee who has received an absentee ballot may vote by mailing or causing to be delivered to the board of elections for the proper election district such ballot marked and sworn to, as follows:

After marking the ballot, the voter shall enclose and seal it in the envelope provided for that purpose. He shall then swear and subscribe to a self-administered oath which shall be provided to the absentee on a printed form along with the absentee ballot and he shall further execute the affidavit on such envelope and shall enclose and seal the envelope containing the ballot in the return mailing envelope printed, as provided in paragraph 3 of subsection (a) of section 663 of this |

title, with the name and address of the board of elections for the election district in which he desires to vote, endorse thereon his name and return address, and shall then mail the envelope, or cause it to be delivered, to the board of elections; provided that such envelope must be received by the board no later than ten days after the day of election for the absentee vote to be counted. Absentee ballots received from overseas in franked envelopes, or from persons who are members of the Uniformed Services of the United States or a spouse of any member of the Uniformed Services of the United States, shall be counted if they are received by the board no later than ten (10) days after the day of the election. In the case of a recount authorized by the board, any ballot received by the board no later than 5 p.m. the day before the recount shall be counted.

(b) Any envelope containing an absentee ballot mistakenly mailed by the absentee voter to the Supervisor of Elections contrary to the provisions of this section shall be mailed or delivered by the Supervisor of Elections to the proper board of elections if it can be so mailed or delivered by him before the time for the closing of the polls on the

| | |
|---|---|
| | day of election, and if the proper board can be determined without breaking open the inner envelope containing the ballot.<br><br>(c) All mailing envelopes containing absentee ballots received by a board of elections under this section, whether received in sufficient time for the ballots to be counted as provided in this chapter, or not, shall be stamped or endorsed by a member of the board or the clerk with the date of their receipt in the board's office, and, if received on the day of election, with the actual time of day received, and such record shall be signed or initialed by the board member or clerk making it. |
| Virginia | Va. Code Ann. § 24.2-707(A) (West 2019):<br><br>After the voter has marked his absentee ballot, he shall (a) enclose the ballot in the envelope provided for that purpose, (b) seal the envelope, (c) fill in and sign the statement printed on the back of the envelope in the presence of a witness, who shall sign the same envelope, (d) enclose the ballot envelope and any required assistance form within the envelope directed to the general registrar, and (e) seal that envelope and mail it to the office of the general |

| | |
|---|---|
| | registrar or deliver it personally to the general registrar. A voter's failure to provide in the statement on the back of the envelope his full middle name or his middle initial shall not be a material omission, rendering his ballot void, unless the voter failed to provide in the statement on the back of the envelope his full first and last name. A voter's failure to provide the date, or any part of the date, including the year, on which he signed the statement printed on the back of the envelope shall not be considered a material omission and shall not render his ballot void. For purposes of this chapter, "mail" shall include delivery by a commercial delivery service, but shall not include delivery by a personal courier service or another individual except as provided by §§ 24.2-703.2 and 24.2-705. |
| Washington | Wash. Rev. Code Ann. § 29A.40.091(4) (West 2019):<br><br>The voter must be instructed to either return the ballot to the county auditor no later than 8:00 p.m. the day of the election or primary, or mail the ballot to the county auditor with a postmark no later than the day of the election or primary. Return envelopes for all election ballots must include prepaid |

238                    DNC v. HOBBS

| | |
|---|---|
| | postage. Service and overseas voters must be provided with instructions and a privacy sheet for returning the ballot and signed declaration by fax or email. A voted ballot and signed declaration returned by fax or email must be received by 8:00 p.m. on the day of the election or primary. |
| West Virginia | W. Va. Code Ann. § 3-3-5(k) (West 2010):<br><br>Absentee ballots which are hand delivered are to be accepted if they are received by the official designated to supervise and conduct absentee voting no later than the day preceding the election: Provided, That no person may hand deliver more than two absentee ballots in any election and any person hand delivering an absentee ballot is required to certify that he or she has not examined or altered the ballot. Any person who makes a false certification violates the provisions of article nine of this chapter and is subject to those provisions. |
| Wisconsin | Wis. Stat. Ann. § 6.87(4)(b) (West 2019):<br><br>The envelope shall be mailed by the elector, or delivered in person, to the |

DNC v. HOBBS                            239

| | |
|---|---|
| | municipal clerk issuing the ballot or ballots. |
| Wyoming | Wyo. Stat. Ann. § 22-9-113 (West 2019): <br><br> Upon receipt, a qualified elector shall mark the ballot and sign the affidavit. The ballot shall then be sealed in the inner ballot envelope and mailed or delivered to the clerk. |

REFERENCE TITLE: early voting; revisions

State of Arizona
Senate
Fiftieth Legislature
First Regular Session
2011

# SB 1412

**Introduced by**
**Senator Shooter**

## AN ACT

AMENDING SECTIONS 16-542, 16-545, 16-547 AND 16-1005, ARIZONA REVISED STATUTES; RELATING TO EARLY VOTING.

(TEXT OF BILL BEGINS ON NEXT PAGE)

Be it enacted by the Legislature of the State of Arizona:

Section 1.  Section 16-542, Arizona Revised Statutes, is amended to read:

**16-542.  Request for ballot**

A.  Within ninety-three days before any election called pursuant to the laws of this state, an elector may make a verbal or signed request to the county recorder, or other officer in charge of elections for the applicable political subdivision of this state in whose jurisdiction the elector is registered to vote, for an official early ballot. In addition to name and address, the requesting elector shall provide the date of birth and state or country of birth or other information that if compared to the voter registration information on file would confirm the identity of the elector.  If the request indicates that the elector needs a primary election ballot and a general election ballot, the county recorder or other officer in charge of elections shall honor the request.  For any partisan primary election, if the elector is not registered as a member of a political party that is entitled to continued representation on the ballot pursuant to section 16-804, the elector shall designate the ballot of only one of the political parties that is entitled to continued representation on the ballot and the elector may receive and vote the ballot of only that one political party.  The county recorder may establish on-site early voting locations at the recorder's office, which shall be open and available for use beginning the same day that a county begins to send out the early ballots.  The county recorder may also establish any other early voting locations in the county the recorder deems necessary.

B.  Notwithstanding subsection A of this section, a request for an official early ballot from an absent uniformed services voter or overseas voter as defined in the uniformed and overseas citizens absentee voting act of 1986 (P.L. 99-410; 42 United States Code section 1973ff-6) or a voter whose information is protected pursuant to section 16-153 that is received by the county recorder or other officer in charge of elections more than ninety-three days before the election is valid.  If requested by the absent uniformed services or overseas voter, or a voter whose information is protected pursuant to section 16-153, the county recorder or other officer in charge of elections shall provide to the requesting voter early ballot materials through the next two regularly scheduled general elections for federal office immediately following receipt of the request.

C.  The county recorder or other officer in charge of elections shall mail the early ballot and the envelope for its return postage prepaid to the address provided by the requesting elector within five days after receipt of the official early ballots from the officer charged by law with the duty of preparing ballots pursuant to section 16-545, except that early ballot distribution shall not begin more than twenty-six days before the election.  If an early ballot request is received on or before the thirtieth day before the election, the early ballot shall be distributed on the twenty-sixth day before the election.

D.  EXCEPT FOR THE SPOUSE, PARENT OR CHILD OF THE ELECTOR, only the elector may be in possession of that elector's VOTED OR unvoted early ballot. If a complete and correct request is made by the elector within twenty-six days before the election, the mailing must be made within forty-eight hours after receipt of the request.  Saturdays, Sundays and other legal holidays are

Cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

excluded from the computation of the forty-eight hour period prescribed by this subsection. If a complete and correct request is made by an absent uniformed services voter or an overseas voter before the election, the regular early ballot shall be transmitted by mail, by fax or by other electronic format approved by the secretary of state within twenty-four hours after the early ballots are delivered pursuant to section 16-545, subsection B, excluding Sundays.

E. In order to be complete and correct and to receive an early ballot by mail, an elector's request that an early ballot be mailed to the elector's residence or temporary address must include all of the information prescribed by subsection A of this section and must be received by the county recorder or other officer in charge of elections no later than 5:00 p.m. on the eleventh day preceding the election. An elector who appears personally no later than 5:00 p.m. on the Friday preceding the election at an on-site early voting location that is established by the county recorder or other officer in charge of elections shall be given a ballot and permitted to vote at the on-site location. If an elector's request to receive an early ballot is not complete and correct but complies with all other requirements of this section, the county recorder or other officer in charge of elections shall attempt to notify the elector of the deficiency of the request.

F. Unless an elector specifies that the address to which an early ballot is to be sent is a temporary address, the recorder may use the information from an early ballot request form to update voter registration records.

G. The county recorder or other officer in charge of early balloting shall provide an alphabetized list of all voters in the precinct who have requested and have been sent an early ballot to the election board of the precinct in which the voter is registered not later than the day prior to the election.

H. As a result of an emergency occurring between 5:00 p.m. on the second Friday preceding the election and 5:00 p.m. on the Monday preceding the election, qualified electors may request to vote early in the manner prescribed by the county recorder of their respective county. For the purposes of this subsection, "emergency" means any unforeseen circumstances that would prevent the elector from voting at the polls.

I. A candidate or political committee may distribute early ballot request forms to voters. If the early ballot request forms include a printed address for return to an addressee other than a political subdivision, the addressee shall be the candidate or political committee that paid for the printing and distribution of the request forms. All early ballot request forms that are received by a candidate or political committee shall be transmitted as soon as practicable to the political subdivision that will conduct the election.

Sec. 2. Section 16-545, Arizona Revised Statutes, is amended to read:

**16-545. Early ballot**

A. The early ballot shall be one prepared for use in the precinct in which the applicant resides and, if a partisan primary election, of the political party with which the applicant is affiliated as shown by the affidavit of registration. The ballot shall be identical with the regular official ballots, except that it shall have printed or stamped on it "early".

B. The officer charged by law with the duty of preparing ballots at any election shall:

1. Prepare the official early ballot and deliver a sufficient number to the recorder or other officer in charge of elections not later than the thirty-third day before the election. Except as provided in section 16-542, subsection D, regular early ballots shall not be distributed to the general public before the beginning of early voting.

2. ENSURE THAT THE BALLOT RETURN ENVELOPES ARE OF A TYPE THAT ARE TAMPER EVIDENT AND TAMPER RESISTANT WHEN PROPERLY SEALED.

Sec. 3. Section 16-547, Arizona Revised Statutes, is amended to read:

**16-547. Ballot affidavit; form**

A. The early ballot shall be accompanied by an envelope bearing ~~upon~~ ON the front the name, official title and post office address of the recorder or other officer in charge of elections and ~~upon~~ ON the other side a printed affidavit in substantially the following form:

State of Arizona

County of _____

I, _____, do solemnly swear that I am the identical person whose name is signed to this affidavit and that this name and signature are my true name and signature, or if I did not personally sign, it was because of physical disability and that I requested _____ (name of person signing affidavit) to sign for me, that I have not voted and will not vote in this election in any other state during the calendar year of this affidavit and that I personally voted the enclosed ballot or that it was marked according to my instructions because I was unable to do so. I understand that knowingly voting more than once in any election is a class 5 felony. I declare that I am more than eighteen years of age, that I am a qualified elector of the state of Arizona and the county of _____ and that I reside at _____. If a challenge is filed against my early ballot, I understand that a copy of the challenge will be sent to me by first class mail and that I may have as little as forty-eight hours' notice of an opportunity to appear. For purposes of notifying me of a ballot challenge between the time I return my ballot and seven days after election day, please use the following address: _____. (If no address is provided, notice will be mailed to the mailing address listed on the registration rolls.)

_____
Elector

B. The face of each envelope in which a ballot is sent to a federal postcard applicant or in which a ballot is returned by such applicant to the recorder or other officer in charge of elections shall be in the form prescribed in accordance with the uniformed and

overseas citizens absentee voting act of 1986 (P.L. 99-410; 42 United States Code section 1973ff). Otherwise, the envelopes shall be the same as those used to send ballots to, or receive ballots from, other early voters.

C.  The county recorder or other officer in charge of elections shall supply printed instructions to early voters that direct them to sign the affidavit, mark the ballot and return both in the enclosed self-addressed envelope THAT COMPLIES WITH SECTION 16-545. The instructions shall include the following statement:

In order to be valid and counted, the ballot and affidavit must be delivered to the office of the county recorder or other officer in charge of elections or may be deposited at any polling place in the county no later than 7:00 p.m. on election day.

Sec. 4.  Section 16-1005, Arizona Revised Statutes, is amended to read:

16-1005.  Ballot abuse; exception; classification

A.  Any person who ~~knowingly~~ marks or ~~punches an early~~ TAMPERS WITH A VOTED OR UNVOTED ballot OR BALLOT ENVELOPE ~~with the intent to fix an election for his own benefit or for that of another person~~ is guilty of a class 5 felony.

B.  ANY PERSON WHO POSSESSES ANOTHER PERSON'S VOTED OR UNVOTED BALLOT IS GUILTY OF A CLASS 6 FELONY.  THIS SUBSECTION DOES NOT APPLY TO A PERSON WHO POSSESSES THE VOTED OR UNVOTED BALLOT OF THE SPOUSE, PARENT OR CHILD OF THAT PERSON.

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020



**Register**   **About**   **Features**   **Datasets**   **LegiScan API**   **Bill Tracking**   **Search**   **VOTE!**   **Login**



**LegiScan Search**

View Top 50 Searches

**State:**

Arizona

Select area of search.

**Bill Number:**

Find an exact bill number.

**Full Text Search:**

Search bill text and data. [**help**]

Search    Reset

**LegiScan Info**

- Voter Registration
- 2020 Schedules
- Governor Deadlines
- Effective Dates
- LegiScan API
- Weekly Datasets
- Documentation
- Search Help
- Legislation 101
- On Bill Numbers
- State Support

**LegiScan Trends**

View Top 50 National

CO HB1084 Requirements For Dog And Cat Breeders And Sellers

VA HB1039 Felony homicide; repeals the crime.

MO HB2159 Changes the law regarding tobacco products by raising the required age…

NY S00298 Provides for the immunization of all children born after January 1, 2009…

OK HB3296 Airports; setback requirements for wind turbines; providing for a status…

# Bill Text: AZ SB1412 | 2011 | Fiftieth Legislature 1st Regular | Engrossed



**Arizona** Senate Bill 1412 *(Prior Session Legislation)*

AZ State Legislature page for SB1412

| Summary | Sponsors | Texts | Votes | Research | Comments | Track |

| Introduced | Engrossed | **Engrossed** |

**Bill Title:** Early voting; revisions

**Spectrum:** Partisan Bill (Republican 1-0)

**Status:** *(Passed)* 2011-04-13 - Governor Signed [SB1412 Detail]

**Download:** Arizona-2011-SB1412-Engrossed.html



House Engrossed Senate Bill

State of Arizona
Senate
Fiftieth Legislature
First Regular Session
2011

# SENATE BILL 1412

### AN ACT

AMENDING SECTIONS 16-545, 16-547 AND 16-1005, ARIZONA REVISED STATUTES; RELATING TO BALLOTS.

**(TEXT OF BILL BEGINS ON NEXT PAGE)**

Be it enacted by the Legislature of the State of Arizona:

Section 1. Section 16-545, Arizona Revised Statutes, is amended to read:

16-545. Early ballot

VA SB652 Fairfax County; policemen's retirement system.

TN SB1636 As introduced, prohibits a public institution of higher education from…

MD HB36 Juvenile Proceedings - Fines, Fees, and Costs

OK HB3975 Renewable energy; Oklahoma Renewable Energy Policy Act of 2020; effective…

OK HB3373 Motor vehicles; creating the Shelby Johnson and Logan Deardorf Act of 2020;…

A.  The early ballot shall be one prepared for use in the precinct in which the applicant resides and, if a partisan primary election, of the political party with which the applicant is affiliated as shown by the affidavit of registration.  The ballot shall be identical with the regular official ballots, except that it shall have printed or stamped on it "early".

B.  The officer charged by law with the duty of preparing ballots at any election shall:

1.  Prepare the official early ballot and deliver a sufficient number to the recorder or other officer in charge of elections not later than the thirty-third day before the election.◆ Except as provided in section 16-542, subsection D, regular early ballots shall not be distributed to the general public before the beginning of early voting.

2.  ENSURE THAT THE BALLOT RETURN ENVELOPES ARE OF A TYPE THAT ARE TAMPER EVIDENT WHEN PROPERLY SEALED.

Sec. 2.  Section 16-547, Arizona Revised Statutes, is amended to read:

16-547.  Ballot affidavit; form

A.  The early ballot shall be accompanied by an envelope bearing ~~upon~~ ON the front the name, official title and post office address of the recorder or other officer in charge of elections and ~~upon~~ ON the other side a printed affidavit in substantially the following form:

State of Arizona

County of _____

I, _____, do solemnly swear that I am the identical person whose name is signed to this affidavit and that this name and signature are my true name and signature, or if I did not personally sign, it was because of physical disability and that I requested _____ (name of person signing affidavit) to sign for me, that I have not voted and will not vote in this election in any other state during the calendar year of this affidavit and that I personally voted the enclosed ballot or that it was marked according to my instructions because I was unable to do so.◆ I understand that knowingly voting more than once in an election is a class 5 felony.◆ I declare that I am more than eighteen years of age, that I am a qualified elector of the state of Arizona and the county of _____ and that I reside at _____.◆ If a challenge is filed against my early ballot, I understand that a copy of the challenge will be sent to me by first class mail and that I may have as little as forty-eight hours' notice of an opportunity to appear.◆ For purposes of notifying me of a ballot challenge between the time I return my ballot and seven days after election day, please use the following address: _____.◆ (If no address is provided, notice will be mailed to the mailing address listed on the registration rolls.)

_____

Elector

B.  The face of each envelope in which a ballot is sent to a federal postcard applicant or in which a ballot is returned by such applicant to the recorder or other officer in charge of elections shall be in the form prescribed in accordance with the uniformed and overseas citizens absentee voting act of 1986 (P.L. 99-410; 42 United States Code section 1973ff).  Otherwise, the envelopes shall be the same as those used to send ballots to, or receive ballots from, other early voters.

C.  The county recorder or other officer in charge of elections shall supply printed instructions to early voters that direct them to sign the affidavit, mark the ballot and return both in the enclosed self-addressed envelope THAT COMPLIES WITH SECTION 16-545.◆ The instructions shall include the following statement:

In order to be valid and counted, the ballot and affidavit must be delivered to the office of the county recorder or other officer in charge of elections or may be deposited at any polling place in the county no later than 7:00 p.m. on election day.

WARNING-IT IS A FELONY TO OFFER OR RECEIVE ANY COMPENSATION FOR A BALLOT.

Sec. 3.  Section 16-1005, Arizona Revised Statutes, is amended to read:

16-1005.  Ballot abuse; classification

A.  Any person who knowingly marks ~~or punches an early~~ A VOTED OR UNVOTED ballot OR BALLOT ENVELOPE with the intent to fix an election for his own benefit or for that of another person is guilty of a class 5 felony.

B.  IT IS UNLAWFUL TO OFFER OR PROVIDE ANY CONSIDERATION TO ACQUIRE A VOTED OR UNVOTED EARLY BALLOT.  A PERSON WHO VIOLATES THIS SUBSECTION IS GUILTY OF A CLASS 5 FELONY.

C.  IT IS UNLAWFUL TO RECEIVE OR AGREE TO RECEIVE ANY CONSIDERATION IN EXCHANGE FOR A VOTED OR UNVOTED BALLOT.◆ A PERSON WHO VIOLATES THIS SUBSECTION IS GUILTY OF A CLASS 5 FELONY.

D.  ANY PERSON WHO DELIVERS MORE THAN TEN EARLY BALLOTS TO AN ELECTION OFFICIAL FOR TALLYING SHALL ALSO PROVIDE TO THE ELECTION OFFICIAL A COPY OF THE PERSON'S PHOTO IDENTIFICATION.◆ IF THE PERSON DELIVERING THE BALLOTS DOES NOT PROVIDE A COPY OF THE PERSON'S PHOTO IDENTIFICATION, THE ELECTION OFFICIAL SHALL RECORD THE INFORMATION FROM THE PERSON'S PHOTO IDENTIFICATION AND RETAIN THE INFORMATION AS A PART OF THE RECORDS OF THE VOTING LOCATION AS PRESCRIBED IN PROCEDURES ESTABLISHED BY THE SECRETARY OF STATE IN THE INSTRUCTIONS AND PROCEDURES MANUAL ADOPTED PURSUANT TO SECTION 16-452.◆ WITHIN SIXTY DAYS AFTER THE ELECTION, THE OFFICER IN CHARGE OF THAT ELECTION SHALL SUBMIT TO THE SECRETARY OF STATE THE PHOTOCOPIES OR OTHER ELECTRONIC FACSIMILES OR OTHER INFORMATION SUBMITTED BY THE PERSONS DELIVERING THE EARLY BALLOTS.  THE SECRETARY OF STATE SHALL COMPILE A STATEWIDE REPORT ON THE SUBMITTALS AND SHALL MAKE THAT INFORMATION AVAILABLE

MUDOCV. Holder No. 18-15845 archived on January 22, 2020

TO THE PUBLIC ON THE SECRETARY OF STATE'S WEBSITE.� THE SECRETARY OF STATE MAY MAKE ANY REFERRALS TO THE APPROPRIATE PROSECUTING AGENCY FOR PURPOSES OF ENFORCING THIS CHAPTER.

E.  IT IS UNLAWFUL TO POSSESS A VOTED OR UNVOTED BALLOT WITH THE INTENT TO SELL THE VOTED OR UNVOTED BALLOT OF ANOTHER PERSON.� A PERSON WHO VIOLATES THIS SUBSECTION IS GUILTY OF A CLASS 5 FELONY.

F.  A PERSON OR ENTITY WHO KNOWINGLY SOLICITS THE COLLECTION OF VOTED OR UNVOTED BALLOTS BY MISREPRESENTING ITSELF AS AN ELECTION OFFICIAL OR AS AN OFFICIAL BALLOT REPOSITORY OR IS FOUND TO BE SERVING AS A BALLOT DROP OFF SITE, OTHER THAN THOSE ESTABLISHED AND STAFFED BY ELECTION OFFICIALS, IS GUILTY OF A CLASS 5 FELONY.

G.  A PERSON WHO KNOWINGLY COLLECTS VOTED OR UNVOTED BALLOTS AND DOES NOT TURN THOSE BALLOTS IN TO AN ELECTION OFFICIAL, THE UNITED STATES POSTAL SERVICE OR OTHER ENTITY PERMITTED BY LAW TO TRANSMIT POST IS GUILTY OF A CLASS 5 FELONY.

H.  A PERSON WHO ENGAGES OR PARTICIPATES IN A PATTERN OF BALLOT FRAUD IS GUILTY OF A CLASS 4 FELONY.� FOR THE PURPOSES OF THIS SUBSECTION, "PATTERN OF BALLOT FRAUD" MEANS THE PERSON HAS OFFERED OR PROVIDED ANY CONSIDERATION TO THREE OR MORE PERSONS TO ACQUIRE THE VOTED OR UNVOTED BALLOT OF A PERSON.

LegiScan is an impartial and nonpartisan legislative tracking and reporting service utilizing GAITS and LegiScan API

Contact Us · Terms · Privacy · 800-618-2750

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020



# Arizona Attorney General
# Mark Brnovich

Español

Search  **Search**

| OFFICE ▾ | COMPLAINTS ▾ | OUTREACH ▾ | SENIORS ▾ | CONSUMER ▾ |
| CRIMINAL ▾ | CIVIL RIGHTS ▾ | MEDIA ▾ | FINTECH ▾ |

Attorney General Opinions / Effect of Shelby County on Withdrawn Preclearance Submissions

# Effect of Shelby County on Withdrawn Preclearance Submissions

**Attorney General:** Thomas C. Horne
**Date Posted:** Thursday, August 29, 2013
**Opinion Number:** I13-008 (R13-013)
**Regarding:** Effect of Shelby County on Withdrawn Preclearance Submissions

cited in Leaf Gov. Hobbs, No. 18-15845 archived on January 22, 2020

| | 733.04 |
| **I13-008.pdf** | **KB** |

## To:

Ken Bennett
Arizona Secretary of State

## Questions Presented

You have asked for an opinion on the following questions:

1. Since the United States Supreme Court declared the coverage formula triggering preclearance obligations to be unconstitutional, are previously enacted, but not precleared statutes, valid and enforceable?

2. If the answer to the first question is yes, what are the effective dates of any such statutes that were enacted, but not precleared, and remain in the statute books?

AG OPINIONS ARCHIVE

» 2019 (5)
» 2018 (12)
» 2017 (7)
» 2016 (12)
» 2015 (14)
» 2014 (8)
» 2013 (12)
» 2012 (3)
» 2011 (8)
» 2010 (8)
» 2009 (11)
» 2008 (13)
» 2007 (13)
» 2006 (8)
» 2005 (9)
» 2004 (11)
» 2003 (11)
» 2002 (10)

» 2001 (24)
» 2000 (31)
» 1999 (30)

3. What statutes are affected by this scenario?

## Summary Answers

1. Yes. The statutes that were duly enacted by the Legislature are valid and enforceable.
2. The effective date for these statutes is June 25, 2013, at the earliest.
3. Six policies and statutes are affected by the preclearance withdrawals and subsequent *Shelby County* decision: (1) 2002 Citizens Clean Election Substantive Policy Statement; (2) Laws 2009 Ch. 134 (H.B. 2101); (3) Laws 2010 Ch. 48 (H.B. 2261); (4) Laws 2010 Ch. 314 (H.B. 2113); (5) Laws 2011 Ch. 105 (S.B. 1412); and (6) Laws 2011 Ch. 166 (S.B. 1471).

## Background

The Voting Rights Act of 1965 ("VRA") and its subsequent reauthorizations created a system by which certain jurisdictions were required to submit any statutory or procedural change that affected voting for preclearance prior to implementing it. The preclearance obligation, set forth in Section 5 of the VRA, shifted the burden of proof to the covered jurisdictions to demonstrate before implementing any statutory or procedural change that affected voting that such change would not have a discriminatory effect. 42 U.S.C. § 1973c. The covered jurisdictions could seek preclearance by either submitting a letter containing the requisite information to the Department of Justice ("DOJ") or by filing a declaratory judgment action in the District Court for the District of Columbia. *See* 42 U.S.C. § 1973b; 28 C.F.R. § 51.10. Arizona and its sub-jurisdictions[1] were covered jurisdictions by the coverage formula contained within section 4(b) of the VRA.

The procedure for seeking preclearance from the DOJ is set forth in 28 C.F.R. § 51.20, *et seq.* For each voting change affecting a statewide election policy, procedure or statute, the State submitted a letter with the following information:

- (a) A copy of the ordinance, enactment, order, or regulation embodying the change affecting voting for which preclearance is sought;
- (b) A copy of the current voting standard, practice, or procedure that is being amended;
- (c) A statement identifying each change between the submitted regulation and the previous practice;
- (d) A statement identifying the authority under which the jurisdiction undertook the change;
- (e) The date the change was adopted;
- (f) The date on which the change takes effect;
- (g) A statement regarding whether the change has already been implemented;
- (h) A statement regarding whether the change affects less than the entire jurisdiction and an explanation, if so;
- (i) A statement of the reasons for the change;

Hobbs, 18-15845, archived on January 22, 2020
read in DNDCITctions

(j) A statement of the anticipated effect of the change on members of racial or language minority groups;

- (k) A statement identifying any past or pending litigation concerning the change or related voting practices; and
- (l) History of preclearance for the prior practice.

28 C.F.R. § 51.27. The DOJ then had sixty calendar days from the date it received the submission to interpose an objection. 28 C.F.R. § 51.9. The DOJ was also authorized to ask for additional information within that sixty-day period. 28 C.F.R. § 51.37.  When the DOJ asked for additional information, a new sixty-day period would begin from the DOJ's receipt of that additional information. *Id.* A jurisdiction could withdraw a submission at any time prior to a final decision by the DOJ. 28 C.F.R. § 51.25.

Since 1967, the State has submitted approximately 773 statutes, policies, forms, and procedures affecting voting to the DOJ for preclearance. According to the Attorney General's records, the State did not seek preclearance through court action in the D.C. district court for any proposed changes. Of those 773 submissions, only six were partially or fully withdrawn:

1. 2002 Citizens Clean Election Substantive Policy Statement
2. Laws 2009 Ch. 134 (H.B. 2101)
3. Laws 2010 Ch. 48 (H.B. 2261)
4. Laws 2010 Ch. 314 (H.B. 2113)
5. Laws 2011 Ch. 105 (S.B. 1412)
6. Laws 2011 Ch. 166 (S.B. 1471)

Those withdrawals, and the current status of the underlying laws, are discussed below.

In *Shelby County, Alabama v. Holder*, the United States Supreme Court held that Section 4(b)'s coverage formula was unconstitutional.  133 S. Ct. 2612, 2631 (2013). The Court stated that the formula "can no longer be used as a basis for subjecting jurisdictions to preclearance." *Id.*

## Analysis

1. Because Shelby County Eliminated the Coverage Formula and Therefore Arizona's Preclearance Obligation, Duly Enacted Statutes that Were Submitted for Preclearance but Later Withdrawn Are Enforceable.

Section 5 of the Voting Rights Act prohibits the enforcement in any covered jurisdiction of any "change affecting voting" absent preclearance by a declaratory judgment or from the DOJ.  28 C.F.R. §§ 51.1, 51.10, 51.12. As set forth above, this requirement shifted the burden of proof to the State to demonstrate as a prerequisite for implementing a new statute, procedure, rule, or form, that the change did not have the purpose or effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. §§ 51.1; 51.10.

The preclearance obligation applied only to jurisdictions covered by the coverage formula set forth in Section 4(b) of the VRA. The United States

Supreme Court held that the coverage formula is unconstitutional because current circumstances do not justify it. 133 S. Ct. at 2629 (stating that in the 2006 reauthorization of the VRA, Congress kept the focus on decades-old data relevant to decades-old problems, rather than current data reflecting current needs). The Court declared Section 4(b) unconstitutional, but issued no holding on Section 5. *Id.* at 2631. The "formula in [Section 4(b)] can no longer be used as a basis for subjecting jurisdictions to preclearance," but "Congress may draft another formula based on current conditions." *Id.* Consequently, Arizona is presently not a covered jurisdiction subject to the preclearance obligation.

Until the *Shelby County* decision, Arizona statutes that had not been precleared were unenforceable. Other than preclearance, there was no barrier to implementing those few duly enacted statutes that had been withdrawn from preclearance consideration. Now, under *Shelby County*, the preclearance barrier is removed and such statutes are enforceable.

      2. The Effective Date for the Statutes Previously Withdrawn from Preclearance Consideration Is June 25, 2013.

The general effective date for new statutes is the ninety-first day after the Legislature adjourns *sine die.* *Bland v. Jordan*, 79 Ariz. 384, 386, 291 P.2d 205, 206 (1955). Generally, the effective date for Arizona statutes subject to preclearance has been the date of preclearance or the general effective date, whichever comes later.

Under federal jurisprudence, when a court announces a rule of federal law but does not expressly state whether the decision applies prospectively only, the opinion "is properly understood to have followed the normal rule of retroactive application." *Harper v. Virginia Dept. of Taxation*, 409 U.S. 86, 97 (1993). Retroactivity means that when a court decides a case and applies a new legal rule to the parties before it, then the new rule must be applied "to all pending cases." *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752 (1995).

In *Shelby County*, the Court announced a new rule of law that Section 4(b)'s coverage formula is unconstitutional, but did not expressly limit that ruling to apply prospectively. 133 S.Ct. at 2631. Therefore, under *Harper*, *Shelby County* must have retroactive application.

This interpretation draws additional support from the DOJ's own statement that it would not make preclearance determinations on any matters awaiting ruling at the time the *Shelby County* decision was issued:

> *With respect to administrative submissions under Section 5 of the Voting Rights Act, that were pending as of June 25, 2013, or received after that date, the Attorney General is providing a written response to jurisdictions that advises:*
>
> *On June 25, 2013, the United States Supreme Court held that the coverage formula in Section 4(b) of the Voting Rights Act, 42 U.S.C. 1973b(b), as reauthorized by the Voting Rights Act Reauthorization and Amendments Act of 2006, is unconstitutional and can no longer*

Hobbs, ﬁled 18-130 prospectively on January 22, 2020

ared in DktEntry 18-...

> be used as a basis for subjecting jurisdictions to preclearance under
> Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. Shelby County v.
> Holder, 570 U.S. ____, 2013 WL 3184629 (U.S. June 25, 2013) (No.
> 12-96). Accordingly, no determination will be made under Section 5
> by the Attorney General on the specified change. Procedures for the
> Administration of Section 5 of the Voting Rights Act, 28 C.F.R. 51.35.
> We further note that this is not a determination on the merits and,
> therefore, should not be construed as a finding regarding whether
> the specified change complies with any federal voting rights law.

U.S. DOJ: Civil Rights Division: Voting Section,
http://www.justice.gov/crt/about/vot/. Therefore, anything that was pending
evaluation by the DOJ on June 25, 2013 must be deemed effective as of that
date.

But the *Reynoldsville Casket* case instructs that the retroactivity only applies to
pending cases. None of the withdrawn submissions were under review at the
time *Shelby County* was issued, and therefore cannot be considered to have
been pending. As such, their effective date cannot be earlier than June 25,
2013.

   3. Current Status of Previously Withdrawn Preclearance Submissions

Based on a comprehensive review of the Attorney General's records, the
Attorney General had withdrawn six preclearance submissions of statewide
policies and statutes. The following discussion sets forth their status as of June
25, 2013.

   a)      2002 Citizens Clean Election Substantive Policy Statement

The Arizona Citizens Clean Election Commission ("CCEC") adopted the policy
"Candidates Denied Approval for Funding" during its December 11, 2001 public
meeting. The Attorney General's Office submitted the policy change to the DOJ
for preclearance on January 11, 2002. Under this policy, a candidate who failed
to submit a sufficient number of valid contribution slips was not permitted to
provide a supplemental submission of additional slips. On February 28, 2002,
the Attorney General submitted a letter to the DOJ withdrawing the submission
because CCEC had effectively superseded the policy by promulgating a new
proposed rule addressing the same subject matter. Because this policy
statement has been superseded by subsequent rules embodied in the Arizona
Administrative Code, the *Shelby County* decision is irrelevant to the policy's
effective date.

   b)      *Laws 2009 Ch. 134 (H.B. 2101)*

H.B. 2101 made several amendments to the laws governing county supervisor
board members. Section 1 of the bill lowered the population threshold (from
200,000 to 175,000) at which counties must have five board members and
clarified the number of signatures needed for calling a special election. Section
2 provided that a county with a population exceeding 175,000 based on 2000
census data must begin the process of electing two additional supervisors at

DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

the next election and required the current applicable board(s) of supervisors to form five supervisorial districts by adopting the boundaries of five precinct boundaries. According to comments made in the minutes of the House of Representatives Committee on Government, H.B. 2101 was needed to increase county leadership in Pinal County, which had undergone significant population growth. This Attorney General submitted the law to the DOJ for preclearance on August 11, 2009.

On September 24, 2009, a group of registered voters in Pinal County sued the Pinal County Board of Supervisors, the Pinal County Recorder, the Pinal County Election Director, and Pinal County itself in a special action seeking to declare Section 2 of H.B. 2101 unconstitutional. *Robison v. Pinal County Bd. of Supervisors*, Pinal County Superior Court Cause No. S-1100-CV-200903971.

On October 13, 2009, the Attorney General received a request for more information from the DOJ with respect to Section 2 of the bill, but the DOJ precleared Section 1. On October 29, 2009, the Pinal County Superior Court indicated by minute entry that it would enter the form of judgment lodged by Plaintiffs, which stated that Section 2 of H.B. 2101 was unconstitutional and may not be implemented. Specifically, the court held the following:

> *Section 2 of the Legislation is void and of no effect because it is based on electoral districts that have never been precleared under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973*
>
> *Section 2 of the Legislation is void and of no effect because it is an unconstitutional special law in violation of Article 4, Part 2, § 19 of the Arizona Constitution;*
>
> *Section 2 of the Legislation is void and of no effect because it requires Defendants to establish supervisorial districts grossly disproportionate in population in violation of Article 2, §§ 13 and 21 of the Arizona Constitution.*

In light of the disposition of that litigation, the Attorney General withdrew the submission for preclearance with regard to Section 2 of H.B. 2101. Under the superior court's decision, Section 2 of H.B. 2101 is void and *Shelby County* does not revive it.

        c)    *Laws 2010 Ch. 48 (H.B. 2261) 2010 Ch. 314 (H.B. 2113)*

Both Laws 2010 Ch. 48 (H.B. 2261) and Laws 2010 Ch. 314 (H.B. 2113) amended statutes related to governance of community college districts. The Attorney General submitted the two laws separately, but simultaneously, to the DOJ for preclearance, but the subsequent letter from DOJ requesting additional information and the partial withdrawal letter addressed the two bills together.

H.B. 2261 amended A.R.S. § 15-1441 regarding the term of office for board members for community college districts. Preexisting law provided for a staggering of board members from the first general election for board members

citation DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

was held and provided that each member's term is six years. Section 1 of H.B. 2261 changed the term of board members to four years for a county with a population of at least three million, which presently applies only to Maricopa County. This amendment was to take effect in the next election after the statute's effective date, but the effective date was amended subsequently in H.B. 2113 (*see* below). Section 1 also provided for two additional board members, to be elected at-large, in counties with a population of at least three million. At the first general election held to elect the new at-large members, the two candidates having the most votes would be declared elected. The elected member receiving the highest number of votes would serve a four-year term and the elected member receiving the next highest number of votes would serve a two-year term. Thereafter, each member's term would be four years. Sections 2 and 3 of the bill were not subject to preclearance. Section 4 provided that current board members shall continue to serve until the expiration of their normal terms.

The Attorney General submitted Sections 1 and 4 of H.B. 2261 to the DOJ for preclearance on May 28, 2010.

As noted, the DOJ responded with a request for more information that was intertwined with a request for more information on H.B. 2113, and parts of H.B. 2113 superseded parts of H.B. 2261. H.B. 2113 also made changes to the terms of office and number of members for community college district boards. Sections 1 and 6 of H.B. 2113 did not include changes affecting voting and were not submitted for preclearance. Section 2 amended A.R.S. § 15-1441(C) to provide that the change from six year terms to four-year terms would not become effective until June 30, 2012. Section 2 also provided that the addition of two at-large board members would not be effective until July 1, 2012. Sections 3 and 4 repealed A.R.S. § 16-322, which provided for the number of signatures needed for nomination petitions and replaced that statute with identical language except for A.R.S. § 16-322(a)(5), which changed the number of signatures a candidate for community college district must gather. Section 5 amended Section 4 of H.B. 2261 to clarify the effective date.

The Attorney General submitted Sections 2 through 5 of H.B. 2113 to the DOJ on May 28, 2010 for preclearance. On July 27, 2010, the DOJ responded. The DOJ did not make a determination as to H.B. 2261, Sections 1 and 4, because they were superseded by H.B. 2113, Sections 2 and 5. The DOJ also did not make a determination as to the implementation schedule set forth in H.B. 2261, Section 1 and H.B. 2113, Section 2, because they were directly related to the adoption of the two additional proposed at-large board members for which they sought additional information. The information sought included a detailed explanation of the governmental interest to be served by the addition of two members to the college district board and the basis for the state's decision that this interest is better served by electing them on an at-large basis, as opposed to from single-member districts; a description of alternative proposals; and election returns by voting precinct within Maricopa County for each federal, state, county, and county school board election since 1999 in which minorities have participated as candidates.

Cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

On October 27, 2010, the Attorney General wrote to the DOJ summarizing its understanding of what had been precleared as follows:

- H.B. 2261, § 1, to the extent that section changed the terms of office for community college district board members from six years to four years, in a county with a population of at least three million persons;
- H.B. 2113, § 2, to the extent that section amends A.R.S. § 15-1441(C) to provide that the change in the terms of office provided for in H.B. 2261 will become effective on June 30, 2012; and
- H.B. 2113, §§ 3-5.

The Attorney General then withdrew from consideration the following:

- H.B. 2261, § 1, regarding the effective date of that amendment and regarding that section's amendment to A.R.S. § 15-1441(I).
- H.B. 2261, § 4
- H.B. 2113, § 2, except to the extent that section amended A.R.S. § 15-1441(C) to provide that the change in the terms of office provided for in H.B. 2261 would become effective on June 30, 2012.

The Legislature made no further changes to A.R.S. § 15-1441 or 16-322 relevant to this discussion.

The current version of A.R.S. § 15-1441(I) provides:

> Beginning in July 1, 2012, in addition to the governing board members who are elected from each of the five precincts in a community college district, a county with a population of at least three million persons shall elect two additional governing members from the district at large. At the first general election held to elect at-large governing board members, the two candidates having the most votes shall be declared elected, if each candidate is a qualified elector who resides in that county. The elected member who receives the highest number of votes of the at-large candidates shall serve a four year term and the elected member who receives the next highest number of votes shall serve a two year term. Thereafter each member's term is four years.

Because *Shelby County* removed the preclearance obligation and this law has not been changed since its original passage, the effective date must be June 25, 2013 at the earliest. Therefore, the next applicable election at which time two at-large board members shall be elected is 2014. Candidates seeking to run for that office must therefore comply with A.R.S. § 16-322(A)(5)(b) and all other applicable election statutes. The current members of the applicable community college district boards will continue to serve the remainders of their respective terms.

   d)   *Laws 2011 Ch. 105 (S.B. 1412)*

Senate Bill 1412 created new security requirements for early ballots and

required photo identification from persons who deliver more than ten early ballots to an election official. Section 1 amended A.R.S. § 16-545 by requiring election officers to ensure that return envelopes for early ballots are tamper evident when properly sealed. Section 2 amended A.R.S. § 16-547 by requiring election officials to provide instructions to voters that early ballots should be returned in the tamper evident envelope enclosed with the ballot and to include a warning that it is a felony to receive or offer compensation for a ballot. Section 3 amended A.R.S. § 16-1005 by including new language to make it a felony to mark a voted or unvoted ballot or ballot envelope with intent to fix an election. Section 3 also added new subsections B through H to A.R.S. § 16-1005 regarding additional forms of ballot abuse and classification for those violations as felonies. Subsection D required a person who delivers more than ten early ballots to provide a copy of his or her photo identification to the election official.

The Attorney General submitted the bill for preclearance on May 18, 2011. On June 27, 2011, the DOJ precleared all of the sections except Subsection D, which created A.R.S. § 16-1005(D) regarding the requirement to provide a photo identification when delivering more than ten early ballots. As to that section, the DOJ asked for more information, including how that proposed provision was expected to serve the state interest and whether any alternative measures had been considered; a list of the acceptable photographic identification; and a detailed description of the statewide report that would be posted on the secretary of state's website regarding such individuals who deliver more than ten early ballots. The Attorney General withdrew the submission regarding Subsection D on August 4, 2011. In 2012, the Legislature amended A.R.S. § 1005 by repealing that subsection. 2012 Ariz. Session Laws Ch. 361, § 22. Therefore, *Shelby County* has no effect on the validity of this provision.

   *e) Laws 2011 Ch. 166 (S.B. 1471)*

In 2011, S.B. 1471 made changes to a number of election-related statutes. Section 1 amended A.R.S. § 16-248 to increase the minimum number of active registered voters needed to allow precincts to conduct the presidential preference primary by mail from two hundred to three hundred. Section 2 amended A.R.S. § 16-531 regarding the number of clerks of election a board of supervisors may appoint. Section 3 repealed the language set forth in A.R.S. § 16-547(A) for the affidavit contained on an early ballot envelope and added new language. The new language provided that the declaration is provided under penalty of perjury, that the voter is a registered voter in the county, and that the voter has not voted in any other county or state. The new language also indicates whether the voter was assisted and provides blanks for the signature and address of the assistant. Section 4 amended A.R.S. § 16-580(G), prohibiting candidates and persons who have been employed by or volunteered for a candidate, campaign, political organization or political party from assisting voters in voting. Section 5 of the bill added a requirement that a new political party seeking recognition must obtain signatures from voters in at least five different counties, and at least ten percent of the required total shall be registered in counties with populations under 5,000. Section 6 amended the

cited in TNIC v. Hobbs, No. 18-15845 attached on January 22, 2020

signature requirements of A.R.S. § 16-803 regarding recognition of a new political party.

The Attorney General submitted the bill to the DOJ for preclearance on June 15, 2011. The DOJ sent a letter on August 15, 2011 that precleared all but Section 4 (A.R.S. § 16-580(G)) of the bill. As to that section, the DOJ requested additional information, including the following:

> A detailed description of the manner in which the prohibition will be implemented including,

>> a. the minimum amount of time, if any, that an individual may be employed by or volunteer for one of the prohibited entities that will preclude them from providing any assistance to a voter;

>> b. whether for those individuals whose ineligibility is based on volunteering for an entity that exists for more than a single election cycle, such as a political party, that the resulting ineligibility for the individual similarly extends beyond the date of the election;

>> c. whether the proposed prohibition on providing assistance will be applicable to those individuals who also serve as employees in county offices or as poll workers on election day; and

>> d. any guidance that the state has issued concerning the manner in which it will implement this prohibition, including enforcement at the polling places or in county offices.

On October 4, 2011, the Attorney General withdrew the preclearance submission regarding Section 4 of S.B. 1471 regarding amendments to A.R.S. § 16-580(G). The Legislature amended A.R.S. § 16-580 in 2012 to remove the language at issue. 2012 Ariz. Session Laws Ch. 361, § 13. That version was precleared on July 19, 2012.

# Conclusion

The *Shelby County* decision removed the preclearance obligation by holding the coverage formula unconstitutional. Therefore, any duly enacted state statutes that had not been precleared or repealed are deemed valid and enforceable. The effective date of such statutes is the date of the *Shelby County* decision, June 25, 2013. This Opinion does not address the effect of *Shelby County* on the enforceability of any laws, policies, or procedures enacted by the counties, cities, towns, or other jurisdictions subject to the preclearance obligation.

Of the preclearance submissions withdrawn by the Attorney General, only the amendments to A.R.S. §§ 15-1441 and 16-322 are affected by the *Shelby County* decision. Those sections provide for two new at-large members of community college districts in counties with a population of at least three million people. Those two new at-large board members must be elected during the 2014 election.

Thomas C. Horne

cited in GNC v. HO471, No. 16-45845 archived on January 22, 2020

Attorney General

1. This Opinion does not address *Shelby County's* effect on preclearance
   submissions made by Arizona's counties, cities, towns, or other sub-
   jurisdictions subject to preclearance. Those jurisdictions independently
   sought preclearance for changes in their codes, ordinances, policies,
   procedures, etc. that affected voting. The Arizona Attorney General did not
   track or monitor those preclearance submissions.

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020



**Register**  **About**  **Features**  **Datasets**  **LegiScan API**  **Bill Tracking**  **Search**  **VOTE!**  **Login**



**LegiScan Search**

View Top 50 Searches

**State:**

Arizona

Select area of search.

**Bill Number:**

Find an exact bill number.

**Full Text Search:**

Search bill text and data. **[help]**

Search   Reset

**LegiScan Info**

- Voter Registration

- 2020 Schedules

- Governor Deadlines
- Effective Dates

- LegiScan API
- Weekly Datasets

- Documentation
- Search Help

- Legislation 101
- On Bill Numbers
- State Support

**LegiScan Trends**

View Top 50 National

CO HB1084 Requirements For Dog And Cat Breeders And Sellers

VA HB1039 Felony homicide; repeals the crime.

MO HB2159 Changes the law regarding tobacco products by raising the required age…

NY S00298 Provides for the immunization of all children born after January 1, 2009…

OK HB3296 Airports; setback requirements for wind turbines; providing for a status…

# Bill Text: AZ HB2305 | 2013 | Fifty-first Legislature 1st Regular | Engrossed



## Arizona House Bill 2305 *(Prior Session Legislation)*

AZ State Legislature page for HB2305

| Summary | Sponsors | **Texts** | Votes | Research | Comments | **Track** |

| Introduced | Engrossed | Engrossed | **Engrossed** | Chaptered |

**NOTE:** There are more recent revisions of this legislation. Read Latest Draft

**Bill Title:** Initiatives; filings; circulators

**Spectrum:** Partisan Bill (Republican 1-0)

**Status:** *(Passed)* 2013-06-19 - Governor Signed [HB2305 Detail]

**Download:** Arizona-2013-HB2305-Engrossed.html



cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

Conference Engrossed

State of Arizona
House of Representatives
Fifty-first Legislature
First Regular Session
2013

# HOUSE BILL 2305

### AN ACT

AMENDING SECTIONS 16-322, 16-544, 16-547, 16-924 AND 16-1005, ARIZONA REVISED STATUTES; AMENDING TITLE 19, CHAPTER 1, ARTICLE 1, ARIZONA REVISED STATUTES, BY ADDING SECTION 19-103; AMENDING SECTIONS 19-111, 19-112, 19-121, 19-121.01, 19-121.02 AND 19-121.04, ARIZONA REVISED STATUTES; AMENDING TITLE 19, CHAPTER 2, ARTICLE 1, ARIZONA REVISED STATUTES, BY ADDING SECTION 19-201.01; AMENDING SECTIONS 19-202.01 AND 19-203, ARIZONA REVISED STATUTES; RELATING TO ELECTIONS.

**(TEXT OF BILL BEGINS ON NEXT PAGE)**

VA SB652 Fairfax County: policemen's retirement system.

TN SB1636 As introduced, prohibits a public institution of higher education from…

MD HB36 Juvenile Proceedings - Fines, Fees, and Costs

OK HB3975 Renewable energy: Oklahoma Renewable Energy Policy Act of 2020; effective…

OK HB3373 Motor vehicles; creating the Shelby Johnson and Logan Deardorf Act of 2020;…

Be it enacted by the Legislature of the State of Arizona:

Section 1. Section 16-322, Arizona Revised Statutes, is amended to read:

16-322. Number of signatures required on nomination petitions

A. Nomination petitions shall be signed:

1. If for a candidate for the office of United States senator or for a state office, excepting members of the legislature and superior court judges, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least one-half ONE-SIXTH of one per cent of the voter registration of the party of the candidate in at least three counties in the state, but not less than one-half AND AT LEAST ONE-SIXTH of one per cent nor BUT NOT more than ten per cent of the total voter registration of the candidate's party in the state.

2. If for a candidate for the office of representative in Congress, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least ONE-THIRD OF one per cent but not more than ten per cent of the total voter registration of the party designated in the district from which such THE representative shall be elected except that if for a candidate for a special election to fill a vacancy in the office of representative in congress, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least one-half ONE-SIXTH of one per cent but not more than ten per cent of the total voter registration of the party designated in the district from which such THE representative shall be elected.

3. If for a candidate for the office of member of the legislature, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least ONE-THIRD OF one per cent but not more than three per cent of the total voter registration of the party designated in the district from which the member of the legislature may be elected.

4. If for a candidate for a county office or superior court judge, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least two per cent but not more than ten per cent of the total voter registration of the party designated in the county or district, provided that in counties with a population of two hundred thousand persons or more, a candidate for a county office shall have nomination petitions signed by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least one-half of one per cent but not more than ten per cent of the total voter registration of the party designated in the county or district.◻

5. If for a candidate for a community college district, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least:

(a) Through June 30, 2012, one-half of one per cent but not more than ten per cent of the total voter registration in the precinct as established pursuant to section 15-1441.

(b) Beginning July 1, 2012, one-quarter of one per cent but not more than ten per cent of the total voter registration in the precinct as established pursuant to section 15-1441. Notwithstanding the total voter registration in the community college district, the maximum number of signatures required by this subdivision is one thousand.

6. If for a candidate for county precinct committeeman, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least two per cent but not more than ten per cent of the party voter registration in the precinct or ten signatures, whichever is less.

7. If for a candidate for justice of the peace or constable, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least two per cent but not more than ten per cent of the party voter registration in the precinct.

8. If for a candidate for mayor or other office nominated by a city at large, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least five per cent and not more than ten per cent of the designated party vote in the city, except that a city that chooses to hold nonpartisan elections may by ordinance provide that the minimum number of signatures required for the candidate be one thousand signatures or five per cent of the vote in the city, whichever is less, but not more than ten per cent of the vote in the city.

9. If for an office nominated by ward, precinct or other district of a city, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least five per cent and not more than ten per cent of the designated party vote in the ward, precinct or other district, except that a city that chooses to hold nonpartisan elections may provide by ordinance that the minimum number of signatures required for the candidate be two hundred fifty signatures or five per cent of the vote in the district, whichever is less, but not more than ten per cent of the vote in the district.

10. If for a candidate for an office nominated by a town at large, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least five per cent and not more than ten per cent of the vote in the town, except that a town that chooses to hold nonpartisan elections may provide by ordinance that the minimum number of signatures required for the candidate be one thousand signatures or five per cent of the vote in the town, whichever is less, but not more than ten per cent of the vote in the town.

11. If for a candidate for a governing board of a school district, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least one-half of one per cent of the total voter registration in the school district if the governing board members are elected at large or one per cent of the total voter registration in the single member district if governing board members or joint technical education district board members are elected from single member districts. Notwithstanding the total voter registration in the school district or single member district, the maximum number of signatures required by this paragraph is four hundred.

no. 15-BAb archived on January 22, 2020
cited by UNC Dubbib,

**12.** If for a candidate for a governing body of a special district as described in title 48, by a number of qualified electors who are qualified to vote for the candidate whose nomination petition they are signing equal to at least one-half of one per cent of the vote in the special district but not more than two hundred fifty and not fewer than five signatures.

**B.** The basis of percentage in each instance referred to in subsection A of this section, except in cities, towns and school districts, shall be the number of voters registered in the designated party of the candidate OR THE TOTAL NUMBER OF REGISTERED VOTERS, AS PRESCRIBED IN EACH PARAGRAPH IN SUBSECTION A OF THIS SECTION AND as reported pursuant to section 16-168, subsection G on March 1 of the year in which the general election is held. In cities, the basis of percentage shall be the vote of the party for mayor at the last preceding election at which a mayor was elected. In towns, the basis of percentage shall be the highest vote cast for an elected official of the town at the last preceding election at which an official of the town was elected. In school districts, the basis of percentage shall be the total number of voters registered in the school district or single member district, whichever applies. The total number of voters registered for school districts shall be calculated using the periodic reports prepared by the county recorder pursuant to section 16-168, subsection G. The count that is reported on March 1 of the year in which the general election is held shall be the basis for the calculation of total voter registration for school districts.

**C.** In primary elections the signature requirement for party nominees, other than nominees of the parties entitled to continued representation pursuant to section 16-804, is at least one-tenth of one per cent of the total vote for the winning candidate or candidates for governor or presidential electors at the last general election within the district.� Signatures must be obtained from qualified electors who are qualified to vote for the candidate whose nomination petition they are signing.

**D.** If new boundaries for congressional districts, legislative districts, supervisorial districts, justice precincts or election precincts are established and effective subsequent to March 1 of the year of a general election and prior to the date for filing of nomination petitions, the basis for determining the required number of nomination petition signatures is the number of registered voters in the designated party of the candidate in the elective office, district or precinct on the day the new districts or precincts are effective.

Sec. 2. Section 16-544, Arizona Revised Statutes, is amended to read:

**16-544.** Permanent early voting list; civil penalty; violation; classification

**A.** Any voter may request to be included on a permanent list of voters to receive an early ballot for any election for which the county voter registration roll is used to prepare the election register. The county recorder of each county shall maintain the permanent early voting list as part of the voter registration roll.

**B.** In order to be included on the permanent early voting list, the voter shall make a written request specifically requesting that the voter's name be added to the permanent early voting list for all elections in which the applicant is eligible to vote. A permanent early voter request form shall conform to requirements prescribed in the instructions and procedures manual issued pursuant to section 16-452.� The application shall allow for the voter to provide the voter's name, residence address, mailing address in the voter's county of residence, date of birth and signature and shall state that the voter is attesting that the voter is a registered voter who is eligible to vote in the county of residence. The voter shall not list a mailing address that is outside of this state for the purpose of the permanent early voting list unless the voter is an absent uniformed services voter or overseas voter as defined in the uniformed and overseas citizens absentee voting act of 1986 (P.L. 99-410; 42 United States Code section 1973ff-6). In lieu of the application, the applicant may submit a written request that contains the required information.

**C.** On receipt of a request to be included on the permanent early voting list, the county recorder or other officer in charge of elections shall compare the signature on the request form with the voter's signature on the voter's registration form and, if the request is from the voter, shall mark the voter's registration file as a permanent early ballot request.

**D.** Not less than ninety days before any polling place election scheduled in March or August, the county recorder or other officer in charge of elections shall mail to all voters who are eligible for the election and who are included on the permanent early voting list an election notice by nonforwardable mail that is marked with the statement required by the postmaster to receive an address correction notification. If an election is not formally called by a jurisdiction by the one hundred twentieth day before the election, the recorder or other officer in charge of elections is not required to send the election notice.� The notice shall include the dates of the elections that are the subject of the notice, the dates that the voter's ballot is expected to be mailed and the address where the ballot will be mailed.� If the upcoming election is a partisan open primary election and the voter is not registered as a member of one of the political parties that is recognized for purposes of that primary, the notice shall include information on the procedure for the voter to designate a political party ballot. The notice shall be delivered with return postage prepaid and shall also include a means for the voter to do any of the following:

1. Change the mailing address for the voter's ballot to another location in the voter's county of residence.

2. Update the voter's residence address in the voter's county of residence.

3. Request that the voter not be sent a ballot for the upcoming election or elections indicated on the notice.

**E.** If the notice that is mailed to the voter is returned undeliverable by the postal service, the county recorder or other officer in charge of elections shall take the necessary steps to contact the voter at the voter's new residence address in order to update that voter's address or to move the voter to inactive status as prescribed in section 16-166, subsection A.� If a voter is moved to inactive status, the voter shall be removed from the permanent early voting list. If the voter is removed from the permanent early voting list, the voter shall only be added to the permanent early voting list again if the voter submits a new request pursuant to this section.

**F.** Not later than the first day of early voting, the county recorder or other officer in charge of elections shall mail an early ballot to all eligible voters included on the permanent early voting list in the same manner prescribed in section 16-542, subsection C. If the voter has not returned the notice or otherwise notified the election officer within forty-five days before the election that the voter does not wish to receive an early ballot by mail for the election or elections indicated, the ballot shall automatically be scheduled for mailing.

G.  If a voter who is on the permanent early voting list is not registered as a member of a recognized political party and fails to notify the county recorder of the voter's choice for political party ballot within forty-five days before a partisan open primary election, the following apply:

1.  The voter shall not automatically be sent a ballot for that partisan open primary election only and the voter's name shall remain on the permanent early voting list for future elections.

2.  To receive an early ballot for the primary election, the voter shall submit the voter's choice for political party ballot to the county recorder.

H.  After a voter has requested to be included on the permanent early voting list, the voter shall be sent an early ballot by mail automatically for any election at which a voter at that residence address is eligible to vote until any of the following occurs:

1.  The voter requests in writing to be removed from the permanent early voting list.

2.  The voter's registration or eligibility for registration is moved to inactive status or canceled as otherwise provided by law.

3.  The notice sent by the county recorder or other officer in charge of elections is returned undeliverable and the county recorder or officer in charge of elections is unable to contact the voter to determine the voter's continued desire to remain on the list.

I.  A voter may make a written request at any time to be removed from the permanent early voting list.  The request shall include the voter's name, residence address, date of birth and signature.�  On receipt of a completed request to remove a voter from the permanent early voting list, the county recorder or other officer in charge of elections shall remove the voter's name from the list as soon as practicable.

J.  An absent uniformed services voter or overseas voter as defined in the uniformed and overseas citizens absentee voting act of 1986 (P.L. 99-410; 42 United States Code section 1973ff-6) is eligible to be placed on the permanent early voting list pursuant to this section.

K.  A voter's failure to vote an early ballot once received does not constitute grounds to remove the voter from the permanent early voting list.

L.  NOTWITHSTANDING SUBSECTION K OF THIS SECTION, BY DECEMBER 1 OF EACH EVEN-NUMBERED YEAR, THE COUNTY RECORDER OR OTHER OFFICER IN CHARGE OF ELECTIONS MAY SEND A NOTICE TO EACH VOTER WHO IS ON THE PERMANENT EARLY VOTING LIST AND WHO DID NOT VOTE AN EARLY BALLOT IN BOTH THE PRIMARY ELECTION AND THE GENERAL ELECTION FOR THE TWO MOST RECENT GENERAL ELECTIONS FOR FEDERAL OFFICE, UNLESS THE VOTER HAD CONTACTED THE COUNTY RECORDER IN THE IMMEDIATELY PRECEDING TWENTY-FOUR MONTHS TO REAFFIRM THE VOTER'S INTENT TO REMAIN ON THE PERMANENT EARLY VOTING LIST.  THE NOTICE PRESCRIBED BY THIS SUBSECTION DOES NOT APPLY TO PERSONS WHOSE VOTER REGISTRATION RECORDS ARE SEALED AS PRESCRIBED IN SECTION 16-153.�  THE NOTICE SHALL INFORM THE VOTER THAT IF THE VOTER WISHES TO REMAIN ON THE PERMANENT EARLY VOTING LIST, THE VOTER SHALL DO BOTH OF THE FOLLOWING WITH THE NOTICE RECEIVED:

1.  CONFIRM IN WRITING THE VOTER'S DESIRE TO REMAIN ON THE PERMANENT EARLY VOTING LIST.

2.  RETURN THE COMPLETED NOTICE TO THE COUNTY OFFICER IN CHARGE OF ELECTIONS WITHIN THIRTY DAYS AFTER RECEIPT BY THE VOTER.�  THE NOTICE SHALL BE SIGNED BY THE VOTER AND SHALL CONTAIN THE VOTER'S ADDRESS AND DATE OF BIRTH.

M.  IF A VOTER RECEIVES A NOTICE AS PRESCRIBED BY SUBSECTION L OF THIS SECTION AND THE VOTER FAILS TO RESPOND WITHIN THE THIRTY-DAY PERIOD, THE COUNTY OFFICER IN CHARGE OF ELECTIONS SHALL REMOVE THE VOTER'S NAME FROM THE PERMANENT EARLY VOTING LIST.�  THIS SUBSECTION DOES NOT APPLY TO VOTERS WHO FAILED TO VOTE AN EARLY BALLOT AND WHO MODIFIED THEIR VOTER REGISTRATION INFORMATION DURING THE PERIOD FOR EARLY VOTING FOR EITHER THE IMMEDIATELY PRECEDING PRIMARY OR GENERAL ELECTION.

L.  N.  A candidate, A political committee or other ANOTHER organization may distribute permanent early voting list request forms to voters.  BEGINNING JANUARY 1, 2015, PERMANENT EARLY VOTING LIST REQUEST FORMS THAT ARE DISTRIBUTED BY A CANDIDATE, A POLITICAL COMMITTEE OR ANOTHER ORGANIZATION SHALL INCLUDE THE FOLLOWING STATEMENT:

NOTICE:  BY SIGNING THIS FORM YOU ARE AGREEING TO RECEIVE AN EARLY BALLOT FOR EVERY ELECTION IN WHICH YOU ARE ELIGIBLE TO VOTE.�  YOU ARE INFORMING THE RECORDER THAT YOU DO NOT WISH TO VOTE AT YOUR ASSIGNED POLLING LOCATION FOR ALL ELECTIONS.�  IF YOU WOULD LIKE TO VOTE AT YOUR ASSIGNED POLLING LOCATION, DO NOT SIGN THIS FORM.

PERMANENT EARLY VOTING LIST REQUEST FORMS THAT ARE SUBMITTED ON OR AFTER JANUARY 1, 2015 WITHOUT THE STATEMENT PRESCRIBED BY THIS SUBSECTION ARE VALID FOR PURPOSES OF REQUIRING THAT THE VOTER BE SENT AN EARLY BALLOT FOR THE IMMEDIATELY SUCCEEDING ELECTION, BUT THAT VOTER'S NAME SHALL NOT BE PLACED ON THE PERMANENT EARLY VOTING LIST.�  If the permanent early voting list request forms include a printed address for return, that address shall be the political subdivision that will conduct the election.�  Failure to use the political subdivision as the return addressee is punishable by a civil penalty of up to three times the cost of the production and distribution of the permanent early voting list request.

M.  O.  All original and completed permanent early voting list request forms that are received by a candidate, political committee or other organization shall be submitted within six business days after receipt by a candidate or political committee

or eleven days before the election day, whichever is earlier, to the political subdivision that will conduct the election. Any person, political committee or other organization that fails to submit a completed permanent early voting list request form within the prescribed time is subject to a civil penalty of up to twenty-five dollars per day for each completed form withheld from submittal.� Any person who knowingly fails to submit a completed permanent early voting list request form before the submission deadline for the election immediately following the completion of the form is guilty of a class 6 felony.

Sec. 3.  Section 16-547, Arizona Revised Statutes, is amended to read:

**16-547.  Ballot affidavit; form**

A.  The early ballot shall be accompanied by an envelope bearing on the front the name, official title and post office address of the recorder or other officer in charge of elections and on the other side a printed affidavit in substantially the following form:

I declare the following under penalty of perjury:  I am a registered voter in _____ county Arizona, I have not voted and will not vote in this election in any other county or state, I understand that knowingly voting more than once in any election is a class 5 felony and I voted the enclosed ballot and signed this affidavit personally unless noted below.

If the voter was assisted by another person in marking **OR RETURNING** the ballot, complete the following:

I declare the following under penalty of perjury:  At the registered voter's request I assisted the voter identified in this affidavit with marking **OR RETURNING** the voter's ballot, I marked **OR RETURNED** the ballot as directly instructed by the voter, I provided the assistance because the voter was physically unable to mark the ballot solely due to illness, injury or physical limitation **OR WAS OTHERWISE UNABLE TO RETURN THE BALLOT** and I understand that there is no power of attorney for voting and that the voter must be able to make ~~their~~ **THE VOTER'S** selection even if ~~they~~ **THE VOTER** cannot physically mark the ballot.

Name of voter assistant: _____

Address of voter assistant: _____

B.  The face of each envelope in which a ballot is sent to a federal postcard applicant or in which a ballot is returned by ~~such~~ **THE** applicant to the recorder or other officer in charge of elections shall be in the form prescribed in accordance with the uniformed and overseas citizens absentee voting act of 1986 (P.L. 99-410; 42 United States Code section 1973ff).� Otherwise, the envelopes shall be the same as those used to send ballots to, or receive ballots from, other early voters.

C.  The county recorder or other officer in charge of elections shall supply printed instructions to early voters that direct them to sign the affidavit, mark the ballot and return both in the enclosed self-addressed envelope that complies with section 16-545.  The instructions shall include the following statement:

In order to be valid and counted, the ballot and affidavit must be delivered to the office of the county recorder or other officer in charge of elections or may be deposited at any polling place in the county no later than 7:00 p.m. on election day.

WARNING �  It is a felony to offer or receive any compensation for a ballot.

Sec. 4.  Section 16-924, Arizona Revised Statutes, is amended to read:

**16-924.  Civil penalties; attorney general; county, city or town attorney**

A.  Unless another penalty is specifically prescribed in this title, if the filing officer for campaign finance reports designated pursuant to section 16-916, subsection A has reasonable cause to believe that a person is violating any provision of this title, except for violations of chapter 6, article 2, the secretary of state shall notify the attorney general for a violation regarding a statewide office or the legislature, the county officer in charge of elections shall notify the county attorney for that county for a violation regarding a county office or the city or town clerk shall notify the city or town attorney for a violation regarding a city or town office.� The attorney general, county attorney or city or town attorney, as appropriate, may serve on the person an order requiring compliance with that provision.  The order shall state with reasonable particularity the nature of the violation and shall require compliance within twenty days from the date of issuance of the order.  The alleged violator has twenty days from the date of issuance of the order to request a hearing pursuant to title 41, chapter 6.

B.  If a person fails to take corrective action within the time specified in the compliance order issued pursuant to subsection A **OF THIS SECTION**, the attorney general, county attorney or city or town attorney, as appropriate, shall issue an order assessing a civil penalty of not more than one thousand dollars.� The person alleged to have violated the compliance order has thirty days from the date of issuance of the order assessing the civil penalty to request a hearing pursuant to title 41, chapter 6.

C.  Any party aggrieved by an order or decision of the attorney general, county attorney or city or town attorney, as appropriate, may appeal to the superior court as provided in title 12, chapter 7, article 6.

D.  For the purposes of this section, failure to comply with a compliance order issued by the attorney general, county attorney or city or town attorney, as appropriate, as prescribed in subsection A **OF THIS SECTION** is deemed an intentional act.

**E.  NOTWITHSTANDING SUBSECTION A OF THIS SECTION:**

**1.  IF THE SECRETARY OF STATE HAS MADE A REASONABLE CAUSE FINDING PURSUANT TO THIS SECTION REGARDING A VIOLATION BY THE ATTORNEY GENERAL, THE SECRETARY OF STATE SHALL NOTIFY THE COUNTY ATTORNEY OF THE COUNTY IN WHICH THE VIOLATION OCCURRED, AND THE COUNTY ATTORNEY MAY SERVE ON THE ATTORNEY GENERAL AN ORDER REQUIRING COMPLIANCE WITH THAT PROVISION AS PRESCRIBED BY THIS SECTION.**

**2.  IF A COUNTY ELECTIONS OFFICER HAS MADE A REASONABLE CAUSE FINDING PURSUANT TO THIS SECTION REGARDING A VIOLATION BY THE COUNTY ATTORNEY OF THAT COUNTY, THE COUNTY**

ELECTIONS OFFICER SHALL NOTIFY THE ATTORNEY GENERAL AND THE ATTORNEY GENERAL MAY SERVE ON THE COUNTY ATTORNEY AN ORDER REQUIRING COMPLIANCE WITH THAT PROVISION AS PRESCRIBED BY THIS SECTION.

3. IF A CITY OR TOWN CLERK HAS MADE A REASONABLE CAUSE FINDING PURSUANT TO THIS SECTION REGARDING A VIOLATION BY THE CITY OR TOWN ATTORNEY, THE CITY OR TOWN CLERK SHALL NOTIFY THE COUNTY ATTORNEY OF THE COUNTY IN WHICH THE VIOLATION OCCURRED, AND THE COUNTY ATTORNEY MAY SERVE ON THE CITY OR TOWN ATTORNEY AN ORDER REQUIRING COMPLIANCE WITH THAT PROVISION AS PRESCRIBED BY THIS SECTION.

Sec. 5. Section 16-1005, Arizona Revised Statutes, is amended to read:

**16-1005.** Ballot abuse; ballot return; violation; classification

A. Any person who knowingly marks a voted or unvoted ballot or ballot envelope with the intent to fix an election for his own benefit or for that of another person is guilty of a class 5 felony.

B. It is unlawful to offer or provide any consideration to acquire a voted or unvoted early ballot. A person who violates this subsection is guilty of a class 5 felony.

C. It is unlawful to receive or agree to receive any consideration in exchange for a voted or unvoted ballot. A person who violates this subsection is guilty of a class 5 felony.

D. It is unlawful to possess a voted or unvoted ballot with the intent to sell the voted or unvoted ballot of another person.� A person who violates this subsection is guilty of a class 5 felony.

E. A person or entity that knowingly solicits the collection of voted or unvoted ballots by misrepresenting itself as an election official or as an official ballot repository or is found to be serving as a ballot drop off site, other than those established and staffed by election officials, is guilty of a class 5 felony.

F. A person who knowingly collects voted or unvoted ballots and WHO does not turn those ballots in to an election official, the United States postal service or any other entity permitted by law to transmit post is guilty of a class 5 felony.

G. A VOTER MAY DESIGNATE ANY PERSON TO RETURN THE BALLOT TO THE ELECTIONS OFFICIAL FROM WHOM IT CAME OR TO THE PRECINCT BOARD AT A POLLING PLACE WITHIN THE COUNTY EXCEPT THAT NO EARLY BALLOT SHALL BE COLLECTED OR RETURNED BY EITHER OF THE FOLLOWING:

1. ANY PAID OR VOLUNTEER WORKER OF ANY POLITICAL COMMITTEE AS DEFINED IN SECTION 16-901.� A PRECINCT COMMITTEEMAN IS NOT PRESUMED TO BE ACTING ON BEHALF OF A POLITICAL COMMITTEE UNLESS AN AGENT OF THE POLITICAL COMMITTEE OR PARTY HAS DIRECTED PRECINCT COMMITTEEMEN TO COLLECT OR RETURN EARLY BALLOTS.

2. ANY OTHER GROUP OR ORGANIZATION ON WHOSE BEHALF AN INDIVIDUAL IS DIRECTED TO COLLECT OR RETURN THE BALLOT.

H. ANY PERSON WHO KNOWINGLY VIOLATES SUBSECTION G OF THIS SECTION IS GUILTY OF A CLASS 1 MISDEMEANOR. SUBSECTION G OF THIS SECTION DOES NOT APPLY TO AN INDIVIDUAL WHO IS COLLECTING OR RETURNING A BALLOT AND WHO IS ACTING WITHOUT DIRECTION FROM A POLITICAL COMMITTEE, GROUP OR ORGANIZATION.

I. A person who engages or participates in a pattern of ballot fraud is guilty of a class 4 felony.� For the purposes of this subsection, "pattern of ballot fraud" means the person has offered or provided any consideration to three or more persons to acquire the voted or unvoted ballot of a person.

Sec. 6. Title 19, chapter 1, article 1, Arizona Revised Statutes, is amended by adding section 19-103, to read:

**19-103.** Legislative findings and intent; strict compliance

THE LEGISLATURE FINDS AND DETERMINES THAT STRICT COMPLIANCE WITH THE APPLICATION AND ENFORCEMENT OF THE CONSTITUTIONAL AND STATUTORY REQUIREMENTS FOR BOTH THE INITIATIVE AND THE REFERENDUM PROCESS PROVIDE THE SUREST METHOD FOR SAFEGUARDING THE INTEGRITY AND ACCURACY OF THE INITIATIVE AND REFERENDUM PROCESS. THEREFORE, THE LEGISLATURE DECLARES THAT THE CONSTITUTIONAL AND STATUTORY REQUIREMENTS FOR THE INITIATIVE AND REFERENDUM BE STRICTLY CONSTRUED AND THAT PERSONS USING EITHER THE INITIATIVE OR REFERENDUM PROCESS STRICTLY COMPLY WITH THOSE CONSTITUTIONAL AND STATUTORY REQUIREMENTS.

Sec. 7. Section 19-111, Arizona Revised Statutes, is amended to read:

**19-111.** Number for petition

A. A person or organization intending to propose a law or constitutional amendment by initiative petition or to file a referendum petition against a measure, item, section or part of a measure, before causing the petition to be printed and circulated, shall file with the secretary of state an application, on a form to be provided by the secretary of state, setting forth his THE PERSON'S name or, if an organization, its name and the names and titles of its officers, THE PERSON'S OR ORGANIZATION'S address, his THE PERSON'S OR ORGANIZATION'S intention to circulate and file a petition, a description of no more than one hundred words of the principal provisions of the proposed law, constitutional amendment or measure and the text of the proposed law, constitutional amendment or measure to be initiated or referred in no less than eight point type, and applying for issuance of an official serial number. At the same time as the person or organization files its application, the person or organization shall file with the secretary of state its statement of organization or its signed exemption statement as prescribed by section 16-902.01.� The secretary of state shall not accept an application for initiative or referendum without an accompanying statement of organization or signed exemption statement as prescribed by this subsection.

B. On receipt of the application, the secretary of state shall assign an official serial number to the petition, which number shall appear in the lower right-hand corner of each side of each copy thereof, and issue that number to the

cited in DNC v. Reagan, HB2305 archived on January 22, 2020

applicant. THE SECRETARY OF STATE SHALL ASSIGN numbers ~~shall be assigned~~ to petitions ~~by the secretary of state~~ in numerical sequence, and a record shall be maintained in ~~his~~ THE SECRETARY OF STATE'S office of each application received and of the numbers assigned and issued to the applicant. WHEN THE APPLICATION IS RECEIVED BY THE SECRETARY OF STATE AND MARKED BY THE SECRETARY OF STATE WITH AN OFFICIAL TIME AND DATE OF RECEIPT, THE TIME-AND-DATE-MARKED TEXT THAT ACCOMPANIED THE APPLICATION CONSTITUTES THE OFFICIAL COPY OF THE TEXT OF THE MEASURE OR CONSTITUTIONAL AMENDMENT AND SHALL BE USED IN ALL INSTANCES AS THE TEXT OF THE MEASURE OR CONSTITUTIONAL AMENDMENT. FOR ANY SUBSEQUENT CHANGE IN THE TEXT OF THE MEASURE OR CONSTITUTIONAL AMENDMENT BY THE APPLICANT, THE APPLICANT SHALL FILE A NEW APPLICATION AND TEXT, SHALL BE ASSIGNED A NEW OFFICIAL SERIAL NUMBER AND SHALL USE AS THE TEXT OF THE MEASURE OR CONSTITUTIONAL AMENDMENT THE TIME-AND-DATE-MARKED TEXT THAT ACCOMPANIED THE NEW APPLICATION.

C. The secretary of state shall make available to each applicant by electronic means a copy of the text of this article governing the initiative and referendum and all rules adopted by the secretary of state pursuant to this title. In addition, the secretary of state shall provide the applicant by electronic means the ability to file a statement of organization or five hundred dollar threshold exemption statement and a notice stating: "This statement must be filed before valid signatures can be collected." The secretary of state shall make available by electronic means a copy of the text of this article governing the initiative and referendum and all rules adopted by the secretary of state pursuant to this title to the county, city and town clerks who shall similarly furnish a copy to each applicant by electronic means.� If a member of the public so requests, the secretary of state and the county, city and town clerks shall provide a copy in pamphlet form.

D. The eight point type required by subsection A of this section shall not apply to maps, charts or other graphics.

Sec. 8. Section 19-112, Arizona Revised Statutes, is amended to read:

**19-112.** Signatures and verification; attachment; registration of circulators

A. Every qualified elector signing a petition shall do so in the presence of the person who is circulating the petition and who is to execute the affidavit of verification. At the time of signing, the qualified elector shall sign his first and last names in the spaces provided and the elector so signing shall print his first and last names and write, in the appropriate spaces following the signature, the signer's residence address, giving street and number, and if he has no street address, a description of his residence location. The elector so signing shall write, in the appropriate spaces following the elector's address, the date on which the elector signed the petition.

B. The signature sheets shall be attached at all times during circulation to a full and correct copy of the title and text of the measure or constitutional amendment proposed or referred by the petition. The title and text shall be in at least eight point type and shall include both the original and the amended text. The text shall indicate material deleted, if any, by printing the material with a line drawn through the center of the letters of the material and shall indicate material added or new material by printing the letters of the material in capital letters.� A THE SECRETARY OF STATE'S TIME-AND-DATE-MARKED COPY OF THE MEASURE OR CONSTITUTIONAL AMENDMENT WITH ITS PROPOSED TEXT SET OUT IN FULL WITH THE ORIGINAL AND THE AMENDED TEXT CONSTITUTES THE FULL AND CORRECT COPY AND IS THE ONLY VALID COPY OF THE TITLE AND TEXT OF THE MEASURE OR CONSTITUTIONAL AMENDMENT FOR SIGNATURES. SIGNATURES THAT ARE COLLECTED WITH ANY COPY OF THE MEASURE OR CONSTITUTIONAL AMENDMENT THAT IS NOT A FACSIMILE OF THE TIME-AND-DATE-MARKED COPY WITH TITLE AND TEXT THAT IS IDENTICAL TO THE TIME-AND-DATE-MARKED COPY ARE INVALID.

C. The person before whom the signatures, names and addresses were written on the signature sheet ~~shall~~, on the affidavit form pursuant to this section, SHALL subscribe and swear before a notary public that each of the names on the sheet was signed and the name and address were printed by the elector and the circulator on the date indicated, ~~and~~ that in his belief each signer was a qualified elector of a certain county of the state, or, in the case of a city, town or county measure, of the city, town or county affected by the measure on the date indicated, and that at all times during circulation of the signature sheet a copy of the title and text was attached to the signature sheet. Circulators who are not residents of this state must be registered as circulators with the secretary of state before circulating petitions. The secretary of state shall provide for a method of receiving service of process for those petition circulators who register pursuant to this subsection. The secretary of state shall establish in the instructions and procedures manual issued pursuant to section 16-452 a procedure for registering circulators and receiving service of process. All signatures of petitioners on a signature sheet shall be those of qualified electors who are registered to vote in the same county.� However, if signatures from more than one county appear on the same signature sheet, only the valid signatures from the same county that are most numerous on the signature sheet shall be counted. Signature and handwriting comparisons may be made.

D. The affidavit shall be in the following form printed on the reverse side of each signature sheet:

**Affidavit of Circulator**

State of Arizona   )
          ) ss.:
County of _____)
(Where notarized)

I,   (print name)  , a person who is not required to be a resident of this state but who is otherwise qualified to register to vote ~~in the county of _____~~, in the state of Arizona at all times during my circulation of this petition sheet, and under the penalty of a class 1 misdemeanor, depose and say that subject to section 19-115, Arizona Revised Statutes, each individual personally printed the individual's own name and address and signed this sheet of the foregoing petition in my presence on the date indicated and I believe that each signer's name and residence address or post office address are correctly stated and that each signer is a qualified elector of the state of Arizona (or in the case of a city, town or county measure, of the city, town or county affected by the

measure proposed to be initiated or referred to the people) and that at all times during circulation of this signature sheet a copy of the title and text was attached to the signature sheet.

(Signature of affiant) _____

(Residence address, street
and number of affiant,
or if no street address, a
description of residence
location) _____

_____

Subscribed and sworn to before me on _____ ◆◆◆◆

(date)

_____

Notary Public

_____, Arizona.

My commission expires on _____.

(date)

(FORM SHALL INCLUDE A DESIGNATED LOCATION FOR NOTARY STAMP)

E.   The eight point type required by subsection B **OF THIS SECTION** shall not apply to maps, charts or other graphics.

Sec. 9.  Section 19-121, Arizona Revised Statutes, is amended to read:

**19-121.  Signature sheets; petitions; form; procedure for filing; evidence in challenge; definitions**

A.  Signature sheets filed shall:

1.  Be in the form prescribed by law.

2.  Have printed in its **THEIR** lower right-hand corner, on each side of such sheet **SHEETS**, the official serial number assigned to the petition by the secretary of state.

3.  Be attached to a full and correct copy of the title and text of the measure, or amendment to the constitution, proposed or referred by the petition.◆ **THE SECRETARY OF STATE'S TIME-AND-DATE-MARKED COPY OF THE MEASURE OR CONSTITUTIONAL AMENDMENT CONSTITUTES THE FULL AND CORRECT COPY AND IS THE ONLY VALID COPY OF THE TITLE AND TEXT OF THE MEASURE FOR CIRCULATION FOR SIGNATURES.**

4.  Be printed in at least eight point type.

5.  Be printed in black ink on white or recycled white pages fourteen inches in width by eight and one-half inches in length, with a margin of at least one-half inch at the top and one-fourth inch at the bottom of each page.

B.  For **THE** purposes of this chapter, a petition is filed when the petition sheets are tendered to the secretary of state, at which time **WHO SHALL ISSUE** a receipt is immediately issued by the secretary of state based on an estimate made to the secretary of state of the purported number of sheets and signatures filed.  After the issuance of the receipt, no additional petition sheets may be accepted for filing.

C.  Petitions may be filed with the secretary of state in numbered sections for convenience in handling.  Not more than fifteen signatures on one sheet shall be counted.  ◆**THE POLITICAL COMMITTEE THAT FILES THE PETITIONS SHALL ORGANIZE THE SIGNATURE SHEETS AND GROUP THEM BY THE COUNTY OF RESIDENCE OF THE MAJORITY OF THE PERSONS SIGNING THAT SIGNATURE SHEET, BY CIRCULATOR ON THAT SIGNATURE SHEET AND BY THE NOTARY PUBLIC WHO NOTARIZED THE CIRCULATOR'S SIGNATURE ON THAT SHEET.◆ THE SECRETARY OF STATE MAY RETURN AS UNFILED ANY SIGNATURE SHEETS THAT ARE NOT SO ORGANIZED AND GROUPED.◆ BEFORE MAKING THE DETERMINATION THAT THE PETITIONS WERE IMPROPERLY ORGANIZED AND THEREFORE NOT FILED, THE SECRETARY OF STATE SHALL MAKE A REASONABLE CAUSE FINDING PURSUANT TO SECTION 16-924 THAT THE COMMITTEE FAILED TO COMPLY WITH THIS SECTION AND SHALL REFER THE MATTER TO THE ATTORNEY GENERAL PURSUANT TO SECTION 16-924.◆ THE ATTORNEY GENERAL MAY THEN ISSUE A COMPLIANCE ORDER DIRECTING THE COMMITTEE TO REORGANIZE THE PETITIONS IN THE PROPER ORGANIZATION OR GROUPING.  ANY REORGANIZATION REQUIRED UNDER THIS SECTION DOES NOT EXTEND THE TIME FOR FILING.◆ THE POLITICAL COMMITTEE THAT IS THE PROPONENT OF THE PETITION IS SOLELY RESPONSIBLE FOR COMPLIANCE WITH THIS SUBSECTION.**

D.  Initiative petitions which **THAT** have not been filed with the secretary of state as of 5:00 p.m. on the day required by the constitution prior to **BEFORE** the ensuing general election after their issuance shall be null and void, but in no event shall the secretary of state accept an initiative petition which **THAT** was issued for circulation more than twenty-four months prior to **BEFORE** the general election at which the measure is to be included on the ballot.

E.  For **THE** purposes of this article and article 4 **OF THIS CHAPTER**, the measure to be attached to the petition as enacted by the legislative body of an incorporated city, **OR** town or **A** county means the adopted ordinance or resolution or, in the absence of a written ordinance or resolution, that portion of the minutes of the legislative body that reflects the action taken by that body when adopting the measure.  In the case of zoning measures the measure shall also include a legal description of the property and any amendments made to the ordinance by the legislative body.

F.  **ANY POLITICAL COMMITTEE MAY SUBMIT TO THE SECRETARY OF STATE FORTY-FIVE DAYS BEFORE THE DEADLINE FOR FILING ITS PETITION A LIST OF ALL PETITION CIRCULATORS WHO CIRCULATED THAT PETITION AND A COPY OF A CRIMINAL RECORDS CHECK VERIFIED THROUGH SOURCE DOCUMENTS PERFORMED ON EACH PETITION CIRCULATOR BY AN ENTITY LICENSED TO DO SO UNDER TITLE 32, CHAPTER 24 OR SIMILARLY LICENSED IN ANOTHER STATE.◆ IF THE BACKGROUND CHECK WAS**

PERFORMED AND PROVIDED BY A PERSON OR ENTITY WHO WAS ENGAGED IN AN ARM'S LENGTH TRANSACTION WITH THE COMMITTEE, INCLUDING ANY OF ITS EMPLOYEES, VENDORS, CONTRACTORS OR SUBCONTRACTORS, A REBUTTABLE PRESUMPTION ARISES AND IN ANY CHALLENGE TO THOSE PETITION CIRCULATORS, THE PRESUMPTION MUST BE OVERCOME BY A SHOWING OF A PREPONDERANCE OF THE EVIDENCE THAT THE CIRCULATOR WAS NOT ELIGIBLE TO REGISTER TO VOTE IN THIS STATE.◆ THE SECRETARY OF STATE MAY ADOPT BY RULE APPROPRIATE STANDARDS FOR DETERMINING WHETHER A TRANSACTION BETWEEN A POLITICAL COMMITTEE, ITS EMPLOYEES, VENDORS, CONTRACTORS AND SUBCONTRACTORS AND THE PERSON OR ENTITY PROVIDING THE CIRCULATORS' BACKGROUND CHECKS CONSTITUTES AN ARM'S LENGTH TRANSACTION.◆ FOR THE PURPOSES OF THIS SUBSECTION:

1. "AFFILIATE" MEANS PARTIES THAT ARE RELATED BY BLOOD OR MARRIAGE, EMPLOYMENT OR AGENCY, OR, IN THE CASE OF ENTITIES, THAT ARE UNDER DIRECT OR INDIRECT COMMON CONTROL OR ONE OF WHICH CONTROLS THE OTHER.

2. "ARMS LENGTH TRANSACTION" MEANS AN AGREEMENT TO PROVIDE A CRIMINAL RECORDS CHECK NEGOTIATED BETWEEN A WILLING COMMITTEE, INCLUDING ANY OF ITS EMPLOYEES, VENDORS, CONTRACTORS OR SUBCONTRACTORS AND A WILLING ENTITY LICENSED UNDER TITLE 32, CHAPTER 24 OR SIMILARLY LICENSED IN ANOTHER STATE WHERE THE PARTIES ARE NOT AFFILIATES.

Sec. 10.  Section 19-121.01, Arizona Revised Statutes, is amended to read:

**19-121.01.**  Secretary of state; removal of petition and ineligible signatures; facsimile sheets; random sample

A.  Within twenty days, excluding Saturdays, Sundays and other legal holidays, of the date of filing of an initiative or referendum petition and issuance of the receipt, the secretary of state shall:

1.  Remove the following:

(a)  Those sheets not attached to a copy of the COMPLETE title and text of the measure THAT IS MARKED BY THE OFFICIAL DATE AND TIME OF RECEIPT BY THE SECRETARY OF STATE.

(b)  The copy of the title and text from the remaining petition sheets.

(c)  Those sheets not bearing the CORRECT petition serial number in the lower right-hand corner of each side.

(d)  Those sheets containing a circulator's affidavit that is not completed or signed.

(e)  Those sheets on which the affidavit of the circulator is not notarized, the notary's signature is missing, the notary's commission has expired or the notary's seal is not affixed.

(f)  Those sheets on which the signatures of the circulator or the notary are dated earlier than the dates on which the electors signed the face of the petition sheet.

(g)  ~~Beginning after November 2, 2010,~~ Those sheets that are circulated by a circulator who is prohibited from participating in any election, initiative, referendum or recall campaign pursuant to section 19-119.01.

2.  After completing the steps in paragraph 1 of this subsection, review each sheet to determine the county of the majority of the signers and shall:

(a)  Place a three or four letter abbreviation designating that county in the upper right-hand corner of the face of the petition.

(b)  Remove all signatures of those not in the county of the majority on each sheet by marking an "SS" in red ink in the margin to the right of the signature line.

(c)  Cause all signature sheets to be grouped together by county of registration of the majority of those signing and attach them to one or more copies of the title and text of the measure.  If the sheets are too bulky for convenient grouping by the secretary of state in one volume by county, they may be bound in two or more volumes with those in each volume attached to a single printed copy of the measure.  The remaining detached copies of the title and text of the measure shall be delivered to the applicant.

3.  After completing the steps in paragraph 2 of this subsection, remove the following signatures that are not eligible for verification by marking an "SS" in red ink in the margin to the right of the signature line:

(a)  If the signature of the qualified elector is missing.

(b)  If the residence address or the description of residence location is missing.

(c)  If the date on which the petitioner signed is missing.

(d)  Signatures in excess of the fifteen signatures permitted per petition.

(e)  Signatures withdrawn pursuant to section 19-113.

(f)  ~~Beginning after November 2, 2010,~~ Signatures for which the secretary of state determines that the petition circulator has printed the elector's first and last names or other information in violation of section 19-112.

4.  After the removal of petition sheets and signatures, count the number of signatures for verification on the remaining petition sheets and note that number in the upper right-hand corner of the face of each petition sheet immediately above the county designation.

5.  Number the remaining petition sheets that were not previously removed and that contain signatures eligible for verification in consecutive order on the front side of each petition sheet in the upper left-hand corner.

6.  Count all remaining petition sheets and signatures not previously removed and issue a receipt to the applicant of this total number eligible for verification.

B.  If the total number of signatures for verification as determined pursuant to subsection A, paragraph 6 of this section equals or exceeds the constitutional minimum, the secretary of state, during the same twenty day period provided in subsection A of this section, shall select, at random, five per cent of the total signatures eligible for verification by the county recorders of the counties in which the persons signing the petition claim to be qualified electors.  The random sample of signatures to be verified shall be drawn in such a manner that every signature eligible for verification has an equal chance of being included in the sample.  The random sample produced shall identify each signature selected by petition page and line number.  The

signatures selected shall be marked according to the following procedure:

1.  Using red ink, mark the selected signature by circling the line number and drawing a line from the base of the circle extending into the left margin.

2.  If a signature line selected for the random sample is found to be blank or was removed from the verification process pursuant to subsection A of this section and is marked with an "SS", then the next line down, even if that requires going to the next petition sheet in sequence, on which an eligible signature appears shall be selected as a substitute if that line has not already been selected for the random sample.  If the next eligible line is already being used in the random sample, the secretary of state shall proceed back up the page from the signature line originally selected for the random sample to the next previous signature line eligible for verification. If that line is already being used in the random sample, the secretary of state shall continue moving down the page or to the next page from the line originally selected for the random sample and shall select the next eligible signature as its substitute for the random sample.  The secretary of state shall use this process of alternately moving forward and backward until a signature eligible for verification and not already included in the random sample can be selected and substituted.

C.  After the selection of the random sample and the marking of the signatures selected on the original petition sheets pursuant to subsection B of this section, the secretary of state shall reproduce a facsimile of the front of each signature sheet on which a signature included in the random sample appears.  The secretary of state shall clearly identify those signatures marked for verification by color highlighting or other similar method and shall transmit by personal delivery or certified mail to each county recorder a facsimile sheet of each signature sheet on which a signature appears of any individual who claims to be a qualified elector of that county and whose signature was selected for verification as part of the random sample.

D.  The secretary of state shall retain in custody all signature sheets removed pursuant to this section except as otherwise prescribed in this title.

Sec. 11.  Section 19-121.02, Arizona Revised Statutes, is amended to read:

**19-121.02.  <u>Certification by county recorder</u>**

A.  Within fifteen days, excluding Saturdays, Sundays and other legal holidays, after receiving the facsimile signature sheets from the secretary of state pursuant to section 19-121.01, the county recorder shall determine which signatures of individuals whose names were transmitted shall be disqualified for any of the following reasons:

1.  No residence address or description of residence location is provided.

2.  No date of signing is provided.

3.  The signature is illegible and the signer is otherwise unidentifiable.

4.  The address provided is illegible or nonexistent.

5.  The individual was not a qualified elector on the date of signing the petition.

6.  The individual was a registered voter but was not at least eighteen years of age on the date of signing the petition or affidavit.

7.  The signature was disqualified after comparison with the signature on the affidavit of registration.

8.  If a petitioner signed more than once, all but one otherwise valid signature shall be disqualified.

9.  For the same reasons any signatures or entire petition sheets could have been removed by the secretary of state pursuant to section 19-121.01, subsection A, paragraph 1 OR 3.

B.  Within the same time period provided in subsection A of this section, the county recorder shall certify to the secretary of state the following:

1.  The name of any individual whose signature was included in the random sample and disqualified by the county recorder together with the petition page and line number of the disqualified signature.

2.  The total number of signatures selected for the random sample and transmitted to the county recorder for verification and the total number of random sample signatures disqualified.

C.  The secretary of state shall prescribe the form of the county recorder's certification.

D.  At the time of the certification, the county recorder shall:

1.  Return the facsimile signature sheets to the secretary of state.

2.  Send notice of the results of the certification by mail to the person or organization that submitted the initiative or referendum petitions and to the secretary of state.

Sec. 12.  Section 19-121.04, Arizona Revised Statutes, is amended to read:

**19-121.04.  <u>Disposition of petitions by secretary of state</u>**

A.  Within seventy-two hours, excluding Saturdays, Sundays and other legal holidays, after receipt of the facsimile signature sheets and the certification of each county recorder, the secretary of state shall determine the total number of valid signatures by subtracting from the total number of eligible signatures determined pursuant to section 19-121.01, subsection A, paragraph 6 ~~in the following order:~~

~~1.  All signatures on petitions containing a defective circulator's affidavit.~~

~~2.  All signatures that were found ineligible by the county recorders and that were not subtracted pursuant to paragraph 1 of this subsection.~~

~~3.  After determining~~ the percentage of all signatures found to be invalid in the random sample~~, a like percentage from those signatures remaining after the subtractions performed pursuant to paragraphs 1 and 2 of this subsection.~~

B.  If the ~~actual~~ number of signatures on the remaining sheets after any such subtraction equals or exceeds the minimum number required by the constitution or if the number of valid signatures as projected from the random sample pursuant to subsection A of this section is at least one hundred per cent of the minimum number required by the constitution, the secretary of state shall issue the following receipt to the person or organization that submitted the following:

_____ signature pages bearing _____ signatures for initiative (referendum)

petition serial number _____ have been refused for filing in this office ~~because the person circulating them was~~

a county recorder or justice of the peace at the time of circulating the petition or due to defects in the circulator's affidavit AS PROVIDED BY LAW.  A total of _____ signatures included on the remaining petition sheets were found to be ineligible.  Of the total random sample of _____ signatures, a total of _____ signatures were invalidated by the county recorders resulting in a failure rate of _____ per cent.  The actual number of remaining signatures for such initiative (referendum) petition number _____ are equal to or in excess of the minimum required by the constitution to place a measure on the general election ballot.  The number of valid signatures filed with this petition, based on the random sample, appears to be at least one hundred five per cent of the minimum required or through examination of each signature has been certified to be greater than the minimum required by the constitution.

Date:_____   _____

Secretary of State

&#9723; (Seal)

The secretary of state shall then forthwith notify the governor that a sufficient number of signatures has been filed and that the initiative or referendum shall be placed on the ballot in the manner provided by law.

C.  If the number of valid signatures as projected from the random sample is less than one hundred per cent of the minimum number required by the constitution or if the actual number of signatures on the remaining sheets after any such subtraction from the random sample or after certification fails to equal or exceed the minimum required by the constitution, the secretary of state shall immediately return RETAIN the original signature sheets, in the form filed by him under section 19-121, to UNTIL AFTER THE CONCLUSION OF ANY LITIGATION REGARDING THE MEASURE OR UNTIL THE TIME HAS EXPIRED FOR ANY LITIGATION.&#9723; THE SECRETARY OF STATE SHALL PROVIDE TO the person or organization that submitted them, together with a certified statement that, for the following reasons, the petition lacks the minimum number of signatures to place it on the general election ballot:

1.  Signature sheets bearing secretary of state page numbers _____ and bearing signatures of _____ persons appeared on petitions containing a defective circulator's affidavit SIGNATURE PAGES THAT WERE REQUIRED TO BE REMOVED.

2.  A total of _____ signatures on the remaining petition sheets were found to be ineligible.

3.  A total of _____ signatures included in the random sample have been certified by the county recorders as ineligible at the time such petition was signed and a projection from such random sample has indicated that _____ more signatures are ineligible to appear on the petition.

A facsimile of the certifications of the county recorders under section 19-121.02 shall accompany the signature sheets returned to the person or organization that submitted them.

Sec. 13.  Title 19, chapter 2, article 1, Arizona Revised Statutes, is amended by adding section 19-201.01, to read:

19-201.01.  Legislative findings and intent; strict compliance

THE LEGISLATURE FINDS AND DETERMINES THAT STRICT COMPLIANCE WITH THE APPLICATION AND ENFORCEMENT OF THE CONSTITUTIONAL AND STATUTORY REQUIREMENTS FOR RECALL PROVIDE THE SUREST METHOD FOR SAFEGUARDING THE INTEGRITY AND ACCURACY OF THE RECALL PROCESS.&#9723; THEREFORE, THE LEGISLATURE DECLARES THAT THE CONSTITUTIONAL AND STATUTORY REQUIREMENTS FOR RECALL BE STRICTLY CONSTRUED AND THAT PERSONS USING THE RECALL PROCESS STRICTLY COMPLY WITH THOSE CONSTITUTIONAL AND STATUTORY REQUIREMENTS.

Sec. 14.  Section 19-202.01, Arizona Revised Statutes, is amended to read:

19-202.01.  Application for recall petition

A.  A person or organization intending to file a recall petition shall, before causing the petition to be printed and circulated, submit an application setting forth his THE FOLLOWING:

1.  THE PERSON'S name AND ADDRESS or, if an organization, its name AND ADDRESS and the names and titles of its officers. , address, his

2.  THE PERSON OR ORGANIZATION'S intention to circulate and submit such A RECALL petition. ,

3.  The text of the general statement required by section 19-203 and a request for issuance of an official number to be printed on the signature sheets of the petition.

B.  Such THE application AND PETITION shall be submitted AS A SINGLE DOCUMENT to the office of secretary of state if for recall of a state officer, including a member of the state legislature, or a member of Congress, with the county officer in charge of elections if for a county or district officer or superior court judge, with the city or town clerk if for a city or town officer and with the county school superintendent if for a governing board member of a school district.

B.  C.  On receipt of the application AND PETITION, the receiving officer shall forthwith assign a number to the petition, which number shall appear in the lower right-hand corner on each side of each signature sheet, and issue that number to the applicant.  A record shall be maintained by the receiving officer of each application received, of the date of its receipt and of the number assigned and issued to the applicant.

D.  WHEN THE APPLICATION IS RECEIVED BY THE FILING OFFICER AND MARKED BY THE FILING OFFICER WITH AN OFFICIAL DATE AND TIME OF RECEIPT, THE TIME-AND-DATE-MARKED APPLICATION, INCLUDING THE GENERAL STATEMENT REQUIRED BY SECTION 19-203, CONSTITUTES THE OFFICIAL COPY OF THE TEXT OF THE RECALL AND SHALL BE USED IN ALL INSTANCES AS THE TEXT OF THE RECALL.&#9723; FOR ANY SUBSEQUENT CHANGE IN THE TEXT OF THE RECALL BY THE APPLICANT, INCLUDING ANY CHANGE IN THE GENERAL STATEMENT REQUIRED BY SECTION 19-203, THE APPLICANT SHALL FILE A NEW APPLICATION, SHALL RECEIVE A NEW OFFICIAL SERIAL NUMBER AND SHALL USE AS THE TEXT OF THE RECALL THE TIME-AND-DATE-MARKED TEXT THAT ACCOMPANIED THE NEW APPLICATION.

Sec. 15.  Section 19-203, Arizona Revised Statutes, is amended to read:

19-203.  Recall petition; contents; submission for verification; nonacceptance

Case: 18-15845, 01/27/2020, ID: 11574519, DktEntry: 123-2, Page 29 of 189

A. A recall petition shall contain a general statement of not more than two hundred words stating the grounds of the demand for the recall. The petition shall be submitted for verification of signatures to ONE OF THE FOLLOWING:

1. The office of the secretary of state if for a state officer, including a member of the legislature or a member of Congress. , with

2. The county officer in charge of elections if for a county or district officer or superior court judge. , with

3. The city or town clerk if for a city or town officer and with the county school superintendent if for a governing board member of a school district.

B. No recall petition is considered filed for purposes of this chapter until the verification process is complete and the petition is filed pursuant to section 19-208.03, subsection A, paragraph 1.

B. C. A recall petition shall not be accepted for such verification if more than one hundred twenty days have passed since the date of submission of the application for recall petition, as prescribed by section 19-202.01.

D. THE FILING OFFICER'S TIME-AND-DATE-MARKED COPY OF THE APPLICATION, INCLUDING THE GENERAL STATEMENT OF THE GROUNDS FOR RECALL, CONSTITUTES THE FULL AND CORRECT COPY OF THE RECALL TEXT AND IS THE ONLY VALID COPY FOR CIRCULATION FOR SIGNATURES.� SIGNATURES THAT ARE COLLECTED WITH ANY COPY OF THE RECALL TEXT THAT IS NOT A FACSIMILE OF THE TIME-AND-DATE-MARKED COPY WITH THE COMPLETE TEXT THAT IS IDENTICAL TO THE TIME-AND-DATE-MARKED COPY ARE INVALID.

Sec. 16. Applicability; permanent early voting list; early ballots; 2012 and 2014 primary and general elections; secretary of state voter outreach campaign

A. Notwithstanding section 16-544, Arizona Revised Statutes, as amended by this act, for voters on the permanent early voting list who did not vote an early ballot in the 2012 primary and general elections and the 2014 primary and general elections, county officers in charge of elections may send the notices prescribed by section 16-544, subsection L, Arizona Revised Statutes, as amended by this act, and modify their permanent early voting lists.

B. In 2013 and 2014, the secretary of state, in conjunction with county and local elections officials, shall implement a statewide public information and voter outreach program to educate and inform voters regarding the possible removal of voters from the permanent early voting list, including the basis for that removal and methods for a voter to avoid removal or to be added to the permanent early voting list, if desired. The statewide public information and voter outreach program shall include print and radio advertisements, including advertisements directed at persons who reside in locations with limited services and persons who receive official elections materials in languages other than English.

Sec. 17. Candidate petition signature collection; date of collection; validity; number

Candidate nomination petition signatures that are properly collected and filed as otherwise provided by law are valid without regard to whether those signatures are collected before the effective date of this act but the number of signatures required for a candidate after the effective date of this act shall be as prescribed by section 16-322, Arizona Revised Statutes, as amended by this act.

Sec. 18. Retroactive applicability

Section 16-924, Arizona Revised Statutes, as amended by this act, is applicable to reasonable cause findings made from and after July 31, 2012.

Sec. 19. Severability

If a provision of this act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act that can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.

LegiScan is an impartial and nonpartisan legislative tracking and reporting service utilizing GAITS and LegiScan API

Contact Us · Terms · Privacy · 800-618-2750



# 2000 OFFICIAL PRESIDENTIAL GENERAL ELECTION RESULTS

**General Election Date: 11/7/00**

**Updated: December 2001**  **Source: State Elections Offices**

CHART 1 OF 3

| STATE | BROWN | BROWNE | BUCHANAN | BUSH | DODGE | GORE | HAGELIN | HARRIS |
|---|---|---|---|---|---|---|---|---|
| AL | | 5,893 | 6,351 | 941,173 | | 692,611 | 447 | |
| AK | | 2,636 | 5,192 | 167,398 | | 79,004 | 919 | |
| AZ | | | 12,373 | 781,652 | | 685,341 | 1,120 | |
| AR | | 2,781 | 7,358 | 472,940 | | 422,768 | 1,098 | |
| CA | | 45,520 | 44,987 | 4,567,429 | | 5,861,203 | 10,934 | |
| CO | | 12,799 | 10,465 | 883,748 | 208 | 738,227 | 2,240 | 216 |
| CT | | 3,484 | 4,731 | 561,094 | | 816,015 | *40 | *4 |
| DE | | 774 | 777 | 137,288 | | 180,068 | 107 | |
| DC | | 669 | | 18,073 | | 171,923 | | 114 |
| FL | | 16,415 | 17,484 | 2,912,790 | | 2,912,253 | 2,281 | 562 |
| GA | | 36,332 | 10,926 | 1,419,720 | | 1,116,230 | | *11 |
| HI | | 1,477 | 1,071 | 137,845 | | 205,286 | 306 | |
| ID | | 3,488 | 7,615 | 336,937 | | 138,637 | 1,177 | |
| IL | | 11,623 | 16,106 | 2,019,421 | | 2,589,026 | 2,127 | |
| IN | | 15,530 | 16,959 | 1,245,836 | | 901,980 | *167 | |
| IA | | 3,209 | 5,731 | 634,373 | | 638,517 | 2,281 | 190 |
| KS | | 4,525 | 7,370 | 622,332 | | 399,276 | 1,375 | |
| KY | | 2,896 | 4,173 | 872,492 | | 638,898 | 1,533 | |
| LA | | 2,951 | 14,356 | 927,871 | | 792,344 | 1,075 | 1,103 |
| ME | | 3,074 | 4,443 | 286,616 | | 319,951 | | |
| MD | | 5,310 | 4,248 | 813,797 | | 1,145,782 | *176 | |
| MA | | 16,366 | 11,149 | 878,502 | | 1,616,487 | 2,884 | |
| MI | | 16,711 | 2,061 | 1,953,139 | | 2,170,418 | 2,426 | |
| MN | | | 22,166 | 1,109,659 | | 1,168,266 | 2,294 | 1,022 |
| MS | | 2,009 | 2,265 | 572,844 | | 404,614 | 450 | 613 |
| MO | | 7,436 | 9,818 | 1,189,924 | | 1,111,138 | 1,104 | |
| MT | | 1,718 | 5,697 | 240,178 | | 137,126 | 675 | |
| NE | | 2,245 | 3,646 | 433,862 | | 231,780 | 478 | |
| NV | | 3,311 | 4,747 | 301,575 | | 279,978 | 415 | |
| NH | | 2,757 | 2,615 | 273,559 | | 266,348 | *55 | |
| NJ | | 6,312 | 6,989 | 1,284,173 | | 1,788,850 | 2,215 | 844 |
| NM | | 2,058 | 1,392 | 286,417 | | 286,783 | 361 | |
| NY | | 7,649 | 31,599 | 2,403,374 | | 4,107,697 | 24,361 | 1,789 |
| NC | | 12,307 | 8,874 | 1,631,163 | | 1,257,692 | | |
| ND | | 660 | 7,288 | 174,852 | | 95,284 | 313 | |
| OH | | 13,475 | 26,724 | 2,351,209 | | 2,186,190 | 6,169 | *10 |
| OK | | 6,602 | 9,014 | 744,337 | | 474,276 | | |
| OR | | 7,447 | 7,063 | 713,577 | | 720,342 | 2,574 | |
| PA | | 11,248 | 16,023 | 2,281,127 | | 2,485,967 | | |
| RI | | 742 | 2,273 | 130,555 | | 249,508 | 271 | 34 |
| SC | | 4,876 | 3,519 | 785,937 | | 565,561 | 942 | |
| SD | | 1,662 | 3,322 | 190,700 | | 118,804 | | |
| TN | 1,606 | 4,284 | 4,250 | 1,061,949 | | 981,720 | 613 | |
| TX | | 23,160 | 12,394 | 3,799,639 | | 2,433,746 | | |
| UT | | 3,616 | 9,319 | 515,096 | | 203,053 | 763 | 186 |
| VT | | 784 | 2,192 | 119,775 | | 149,022 | 219 | 70 |
| VA | | 15,198 | 5,455 | 1,437,490 | | 1,217,290 | *171 | |
| WA | | 13,135 | 7,171 | 1,108,864 | | 1,247,652 | 2,927 | 304 |

cited in RNC v. Hobbs, No. 18-15845, archived on January 22, 2020

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| WV | | 1,912 | 3,169 | 336,475 | | 295,497 | 367 | |
| WI | | 6,640 | 11,471 | 1,237,279 | | 1,242,987 | 853 | 306 |
| WY | | 1,443 | 2,724 | 147,947 | | 60,481 | 411 | |
| **Total:** | **1,606 .00%** | **384,431 .36%** | **448,895 .42%** | **50,456,002 47.87%** | **208 .00%** | **50,999,897 48.38%** | **83,714 .08%** | **7,378 .01%** |

Back to Top of Page

CHART 2 OF 3

| STATE | LANE | MCREYNOLDS | MOOREHEAD | NADER | PHILLIPS | SMITH | VENSON | YOUNGKEIT |
|---|---|---|---|---|---|---|---|---|
| AL | | | | 18,323 | 775 | | | |
| AK | | | | 28,747 | 596 | | | |
| AZ | | | | 45,645 | *110 | 5,775 | | |
| AR | | | | 13,421 | 1,415 | | | |
| CA | | *28 | | 418,707 | 17,042 | | | |
| CO | 712 | | | 91,434 | 1,319 | | | |
| CT | | | | 64,452 | 9,695 | | | |
| DE | | | | 8,307 | 208 | | | |
| DC | | | | 10,576 | | | | |
| FL | 622 | | 1,804 | 97,488 | 1,371 | | | |
| GA | | | | *13,432 | *140 | | | |
| HI | | | | 21,623 | 343 | | | |
| ID | | | | *12,292 | 1,469 | | | |
| IL | | *4 | | 103,759 | *57 | | | |
| IN | | *43 | | *18,531 | *200 | | | |
| IA | 107 | | | 29,374 | 613 | | | |
| KS | | | | 36,086 | 1,254 | | | |
| KY | | | | 23,192 | 923 | | | |
| LA | | | | 20,473 | 5,483 | | | |
| ME | | | | 37,127 | 579 | | | |
| MD | | | | 53,768 | 919 | | | |
| MA | | *42 | | 173,564 | | | | |
| MI | | | | 84,165 | 3,791 | | | |
| MN | | | | 126,696 | 3,272 | | | |
| MS | | | | 8,122 | 3,267 | | | |
| MO | | | | 38,515 | 1,957 | | | |
| MT | | | | 24,437 | 1,155 | | | |
| NE | | | | 24,540 | 468 | | | |
| NV | | | | 15,008 | 621 | | | |
| NH | | | | 22,198 | 328 | | | |
| NJ | | 1,880 | | 94,554 | 1,409 | | | |
| NM | | | | 21,251 | 343 | | | |
| NY | | *2 | | 244,030 | 1,498 | | | |
| NC | | *1,226 | | | | | | |
| ND | | | | 9,486 | 373 | | | |
| OH | | | | 117,857 | 3,823 | | | |
| OK | | | | | | | | |
| OR | | | | 77,357 | 2,189 | | | |
| PA | | | | 103,392 | 14,428 | | | |
| RI | 52 | | 199 | 25,052 | 97 | | | |
| SC | | | | 20,200 | 1,682 | | | |
| SD | | | | | 1,781 | | | |
| TN | | | | 19,781 | 1,015 | | 535 | |
| TX | | *63 | | 137,994 | *567 | | | |

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| UT | | | | 35,850 | 2,709 | | | 161 |
| VT | 1,044 | 161 | | 20,374 | 153 | | | |
| VA | | | | 59,398 | 1,809 | | | |
| WA | | 660 | 1,729 | 103,002 | 1,989 | | | |
| WV | | | | 10,680 | *23 | | | |
| WI | | | 1,063 | 94,070 | 2,042 | | | |
| WY | | | | *4,625 | 720 | | | |
| **Total:** | **1,044** **.00%** | **5,602** **.00%** | **4,795** **.00%** | **2,882,955** **2.74%** | **98,020** **.09%** | **5,775** **.00%** | **535** **.00%** | **161** **.00%** |

Back to Top of Page

CHART 3 OF 3

| STATE | WRITE-IN (MISCELLANEOUS) | NONE OF THESE CANDIDATES | TOTAL VOTES CAST | | ELECTORAL VOTE BUSH | ELECTORAL VOTE GORE |
|---|---|---|---|---|---|---|
| AL | 699 | | 1,666,272 | | 9 | |
| AK | 1,068 | | 285,560 | | 3 | |
| AZ | | | 1,532,016 | | 8 | |
| AR | | | 921,781 | | 6 | |
| CA | 6 | | 10,965,856 | | | 54 |
| CO | | | 1,741,368 | | 8 | |
| CT | 10 | | 1,459,525 | | | 8 |
| DE | 93 | | 327,622 | | | 3 |
| DC | 539 | | 201,894 | | | 2## |
| FL | 40 | | 5,963,110 | | 25 | |
| GA | 13 | | 2,596,804 | | 13 | |
| HI | # | | 367,951 | | | 4 |
| ID | 6 | | 501,621 | | 4 | |
| IL | | | 4,742,123 | | | 22 |
| IN | 56 | | 2,199,302 | | 12 | |
| IA | 1,168 | | 1,315,563 | | | 7 |
| KS | | | 1,072,218 | | 6 | |
| KY | 80 | | 1,544,187 | | 8 | |
| LA | # | | 1,765,656 | | 9 | |
| ME | 27 | | 651,817 | | | 4 |
| MD | 1,480 | | 2,025,480 | | | 10 |
| MA | 3,990 | | 2,702,984 | | | 12 |
| MI | | | 4,232,501 | | | 18 |
| MN | 28 | | 2,438,685 | | | 10 |
| MS | | | 994,184 | | 7 | |
| MO | | | 2,359,892 | | 11 | |
| MT | 11 | | 410,997 | | 3 | |
| NE | # | | 697,019 | | 5 | |
| NV | # | 3,315 | 608,970 | | 4 | |
| NH | 1,221 | | 569,081 | | 4 | |
| NJ | | | 3,187,226 | | | 15 |
| NM | # | | 598,605 | | | 5 |
| NY | ** | | 6,821,999 | | | 33 |
| NC | | | 2,911,262 | | 14 | |
| ND | | | 288,256 | | 3 | |
| OH | | | 4,705,457 | | 21 | |
| OK | # | | 1,234,229 | | 8 | |
| OR | 3,419 | | 1,533,968 | | | 7 |
| PA | 934 | | 4,913,119 | | | 23 |
| RI | 329 | | 409,112 | | | 4 |

cited in DNC v. Hobbs, No. 18-15845, archived on January 22, 2020

| | | | | |
|---|---|---|---|---|
| SC | # | 1,382,717 | 8 | |
| SD | # | 316,269 | 3 | |
| TN | 428 | 2,076,181 | 11 | |
| TX | 74 | 6,407,637 | 32 | |
| UT | 1 | 770,754 | 5 | |
| VT | 514 | 294,308 | | 3 |
| VA | 2,636 | 2,739,447 | 13 | |
| WA | | 2,487,433 | | 11 |
| WV | 1 | 648,124 | 5 | |
| WI | 1,896 | 2,598,607 | | 11 |
| WY | | 218,351 | 3 | |
| **Total:** | **20,767 .02%** | **3,315 .00%** | **105,405,100** | 271 | 266 |

## NOTES

\*  **Write-in Votes.**
\*\*  **138,216 Miscellaneous write-in, blank and void votes were compiled as one total. This figure is not included in Total Votes Cast.**
\#  **Write-in votes for Presidential candidates not permitted.**
\#\#  **The District of Columbia has 3 electoral votes. There was 1 abstention.**

**Total Electoral Vote = 538**
**Total Electoral Vote Needed to Elect = 270**

Back to Top of Page

---

**ADDRESSES AND PARTY DESIGNATIONS OF 2000 PRESIDENTIAL CANDIDATES ON THE GENERAL ELECTION BALLOTS**

*(Note:  Links are provided to an index of campaign finance reports filed by a candidate's principal campaign committee.  The candidate may have additional authorized committees, whose reports can be found by searching the Commission's Imaging system.)*

**Cathy Gordon Brown (I)**
**2206 Dabbs Avenue**
**Old Hickory, TN 37138**

**Harry Browne (LBT, LBT-IA, LBF, I)**
**Harry Browne for President, Inc.**
**PMB 212, 4740 East Sunrise Drive**
**Tucson, AZ 85718**
**http://www.harrybrowne.org/**
**800/777-2000, 202/521-1200**

**Patrick J. Buchanan (REF, RFM, FRE, BP, BR, CF, IDP, RTL, I)**
**Committee to Elect Patrick J. Buchanan**
**8233 Old Courthouse Road, Suite 200**
**Vienna, VA 22182**
**http://www.buchananreform.com**
**703/734-2700**

**George W. Bush (R, C)**
**Bush-Cheney 2000, Inc**
**301 Congress Avenue, Suite 200**
**Austin, TX 78701**
**http://www.georgewbush.com**
**512/637-2000**

**Earl F. Dodge (P)**
**P.O. Box 2635**
**Denver, CO 80201**
**303/237-4947**

**Al Gore (D, DFL, DNL, L, WF)**

cited in DNC v. Trump No. 18-15845 archived on January 22, 2020

**Gore/Lieberman, Inc.**
**601 Mainstream Drive**
**Nashville, TN 37228**
**http://www.algore.com/**
**615/340-2000**

**John S. Hagelin (NL, NLF, N, IDP, REF, I, U)**
**Hagelin/Goldhaber**
**402 North B Street, P.O. Box 1900**
**Fairfield, IA 52556**
**http://www.hagelin.org/**
**877/424-3546, 515/472-2040**

**James E. Harris, Jr. (SWC, SWP, FSW, I)**
**520 Park Avenue, S.E., #2**
**Atlanta, GA 30312**

**Denny Lane (GRT-VT)**
**P.O. Box 537**
**Waitsfield, VT 05673**
**http://members.aol.com/rootsparty/lane.html**

**David McReynolds (SOC, SFL, LU, I)**
**McReynolds 2000 Committee**
**339 Lafayette Street, #303**
**New York, NY 10012**
**http://www.votesocialist.org/**
**212/780-9405**

**Monica Moorehead (WW, I)**
**Workers World Party Presidential Campaign Committee (Moorehead)**
**55 West 17th Street, 5th Floor**
**New York, NY 10011**
**http://www.vote4workers.org/**
**212/ 255-0352**

**Ralph Nader (GRN, GRA, DCG, CPF, GRM, GI, HGR, IG, PG, UC, PRO, WG, I)**
**Nader 2000 General Committee, Inc.**
**P.O. Box 18002**
**Washington, D.C. 20036**
**http://www.votenader.com/**
**202/265-4000**

**Howard Phillips (CON, CST, AIP, AMC, BP, CNC, CPF, IAP, UST, I)**
**Phillips 2000, Inc.**
**450 Maple Avenue East**
**Vienna, VA 22180**
**http://www.phillips2000.com/**
**703/242-0613**

**L. Neil Smith (LBT)**
**3415 South McClintock, #111-913**
**Tempe, AZ 85282**

**Randall Venson (I)**
**Randall Venson for President Committee**
**P.O. Box 330668**
**Nashville, TN 37203**

**Louie G. Youngkeit (UN)**
**1979 West Center**
**Provo, UT 84601**

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

Back to Top of Page

## KEY TO ABBREVIATIONS OF PARTY NAMES AND IDENTIFYING LABELS

| | | |
|---|---|---|
| AIP | = | AMERICAN INDEPENDENT |
| AMC | = | AMERICAN CONSTITUTION PARTY |
| BP | = | BY PETITION |
| BR | = | BUCHANAN REFORM |

| | | |
|---|---|---|
| C | = | CONSERVATIVE |
| CF | = | CITIZENS FIRST |
| CNC | = | CONCERNED CITIZENS |
| CON | = | CONSTITUTION |
| CPF | = | CONSTITUTION PARTY OF FLORIDA |
| CST | = | CONSTITUTIONAL |
| D | = | DEMOCRATIC |
| DCG | = | D.C. STATEHOOD GREEN |
| DFL | = | DEMOCRATIC-FARMER LABOR |
| DNL | = | DEMOCRATIC-NONPARTISAN LEAGUE |
| FRE | = | FREEDOM |
| FSW | = | FLORIDA SOCIALIST WORKERS |
| GI | = | GREEN INDEPENDENT |
| GPF | = | GREEN PARTY OF FLORIDA |
| GRA | = | GREEN PARTY OF ARKANSAS |
| GRM | = | MASSACHUSETTS GREEN PARTY |
| GRN | = | GREEN |
| GRT-VT | = | VERMONT GRASSROOTS |
| HGR | = | HAWAII GREEN |
| I | = | INDEPENDENT |
| IAP | = | INDEPENDENT AMERICAN |
| IDP | = | INDEPENDENCE |
| IG | = | IOWA GREEN PARTY |
| L | = | LIBERAL |
| LBF | = | LIBERTARIAN PARTY OF FLORIDA |
| LBT-IA | = | LIBERTARIAN PARTY OF IOWA |
| LBT | = | LIBERTARIAN |
| LU | = | LIBERTY UNION |
| N | = | NONPARTISAN |
| NL | = | NATURAL LAW |
| NLF | = | NATURAL LAW PARTY OF FLORIDA |
| P | = | PROHIBITION PARTY |
| PG | = | PACIFIC GREEN |
| PRO | = | PROGRESSIVE |
| R | = | REPUBLICAN |
| REF | = | REFORM |
| RFM | = | REFORM PARTY MINNESOTA |
| RTL | = | RIGHT TO LIFE |
| SFL | = | SOCIALIST PARTY OF FLORIDA |
| SOC | = | SOCIALIST PARTY USA |
| SWC | = | SOCIALIST WORKERS CAMPAIGN |
| SWP | = | SOCIALIST WORKERS PARTY |
| U | = | UNENROLLED |
| UC | = | UNITED CITIZENS |
| UN | = | UNAFFILIATED |
| UST | = | U.S. TAXPAYERS |
| WF | = | WORKING FAMILIES |
| WI | = | WISCONSIN GREEN |
| WW | = | WORKERS WORLD |

cited in DNC v. Hobbs 18-15845 archived on January 22, 2020

Compiled by:
**Public Disclosure Division**
**Federal Election Commission**
**800/424-9530 (press 3) or 202/694-1120**

---

**Back to:**

**Elections and Voting - Campaign Finance Reports and Data**

**FEC Home Page**



**United States Government Accountability Office**
**Washington, DC 20548**

September 14, 2004

The Honorable Joseph I. Lieberman
Ranking Minority Member
Committee on Governmental Affairs
United States Senate

The Honorable Henry A. Waxman
Ranking Minority Member
Committee on Government Reform
House of Representatives

The Honorable John Conyers, Jr.
Ranking Minority Member
Committee on the Judiciary
House of Representatives

Subject: *Department of Justice's Activities to Address Past Election-Related Voting Irregularities*

Election-day problems in Florida and elsewhere in November 2000 raised concerns about voting systems that included, among other things, alleged voting irregularities that may have affected voter access to the polls. The term voting irregularities generally refers to a broad array of complaints relating to voting and/or elections that may involve violations of federal voting rights and/or federal criminal law for which the Department of Justice (DOJ) has enforcement responsibilities.

You requested that we review activities at DOJ to help ensure voter access to the polls and actions to address allegations of voting irregularities. This report (1) identifies and describes changes DOJ has made since November 2000 to help ensure voter access to the polls; (2) identifies and describes actions that the Voting Section in DOJ's Civil Rights Division has taken to track, address, and assess allegations of election-related[1] voting irregularities received between November 2000 and December 2003; and (3) assesses the Voting Section's internal control[2] activities

---

[1]Election-related refers to a preliminary investigation, matter, or case that the Voting Section initiated based on allegations about a specific election. A matter is an activity that has been assigned an identification number but has not resulted in a court filing of a complaint, indictment, or information. A case is an activity that has been assigned the same identification number that it had as a matter and has resulted in the court filing of a complaint, indictment, or information.

[2]Internal controls are integral components of an organization's management that provide reasonable assurances of objectives that include, among other things, efficient operations. They comprise the plans, methods, and procedures used to meet missions, goals, and objectives and, in doing so, support performance-based management. For additional information on internal controls, see GAO *Internal Control: Standards for Internal Control in the Federal Government*, AIMD-00-21.3.1 (Washington, D.C.:November 1, 1999).

to help ensure relevant, accurate, and reliable recording and documentation of allegations of voting irregularities to accurately track actions taken in response to allegations and provide accurate and complete information to the public and congressional committees.

We primarily performed our work at DOJ's Civil Rights Division, Voting Section. We obtained relevant documentation and interviewed responsible officials regarding DOJ's activities to help ensure voter access to the polls. To identify and describe changes made since November 2000, we reviewed documentation on DOJ's efforts to monitor and observe elections, increase emphasis on enforcement of minority language and overseas voters' rights, disseminate election-related guidance, and increase its resources to address voting issues. To identify and describe actions that the Voting Section took to track, address, and assess allegations of voting irregularities, we reviewed telephone logs and 34 files with information on a preliminary investigation, matters, and cases that the Voting Section considered to be election-related voting irregularities initiated from November 2000 to December 2003. To assess the Voting Section's internal controls, we obtained available documentation of policies, procedures, and techniques the Voting Section has to manage allegations of voting irregularities and considered them in relation to GAO's internal control standards. We also interviewed officials and obtained documentation from DOJ's Criminal Division, Public Integrity Section (PIN), in relation to the coordination between the Voting Section and PIN to address voter access to the polls.

On August 31, 2004, we provided your staffs a briefing document on the results of our work. Enclosure I contains the materials we presented at that time. Our audit work was performed in Washington, D.C., from May 2003 through August 2004 in accordance with generally accepted government auditing standards.

**Background**

The Voting Section in the Civil Rights Division is charged with the responsibility of enforcing federal voting rights statutes that are designed to safeguard the right to vote of racial and language minorities; disabled, elderly, and illiterate persons; and military and overseas voters, among others. The Voting Section is also charged with the responsibility of enforcing federal statutes that, among other things, address issues such as voter registration, provisional voting, and voter information. Provisional voting permits eligible persons to vote on election day if their names are not on voter registration lists, with the understanding that each person's eligibility will be verified after the election and their votes counted, if eligible. (See enc. I, and attach. I, for more information on statutes that the Voting Section enforces.)

The Voting Section, among other things, monitors election-day activities to ensure voting rights are protected and initiates investigations and opens matters—an activity that has not resulted in a court filing of a complaint, indictment, or information—to examine allegations of voting irregularities that fall within the jurisdiction of the Civil Rights Division. If warranted, a matter may culminate in a case—an activity that has resulted in the filing of a complaint, indictment, or information with a federal court.

The Voting Section also may initiate matters to monitor private lawsuits. Voting Section attorneys are generally responsible for conducting investigations and prosecuting cases.

The Voting Section also coordinates with PIN to refer allegations the Voting Section receives that involve violations of criminal statutes related to voting fraud. For example, in relation to the 2002 federal election, the Voting Section referred three matters deemed to be potential violations of criminal laws to PIN, which assumed responsibility for the investigations. In addition, the Voting Section and PIN have provided joint training to Assistant U.S. Attorneys, with the Voting Section presenting information about civil rights statutes that are to protect the right to vote and PIN presenting information about criminal statutes that are to prevent election fraud.

**Results**

Since November 2000, DOJ has implemented changes to help ensure voter access to the polls. The Voting Section emphasized the importance of its monitoring of election-day activities and increased its monitoring of these activities. In 2000, DOJ attorneys and professional staff monitored elections in 5 counties in 5 states. By 2002, the number of election jurisdictions monitored by DOJ attorneys and professional staff increased to 19 counties in 10 states, with monitoring of elections in counties in Florida accounting for the bulk of the increase. The Voting Section also (1) placed a greater priority on protecting the voting rights of language minority voters by helping to ensure that certain covered jurisdictions provided bilingual voting materials for elections; (2) placed a priority on enforcing and preparing for compliance with the federal statute to help ensure voting rights of overseas voters; (3) provided additional training to Assistant U.S. Attorneys on civil rights statutes to educate them about voters' rights; and (4) provided guidance to states regarding the implementation of sections of the Help America Vote Act of 2002 (HAVA) that DOJ enforces.[3] For example, the Voting Section provided guidance to states by issuing a press release that outlined provisions of HAVA that took effect on January 1, 2004, such as provisional voting and identification requirements for new voters who register by mail.

The Attorney General directed the Civil Rights Division to work with civil rights leaders, state and local election officials, and U.S. Attorney Offices prior to election day in an effort to help ensure that citizens' voting rights are protected. The Attorney General also directed the Criminal Division to work with these same groups in helping to preserve ballot integrity and prevent election offenses. Almost all of the U.S. Attorney Offices reported that they had contacted various state or local officials prior to the November 2002 election. Voting Section officials reported that the Assistant Attorney General for the Civil Rights Division and staff from that division met with various civil rights organizations.

---

[3] 42 U.S.C. §§ 15301 to 15545.

According to Voting Section officials, DOJ plans to help ensure voter access for the upcoming November 2004 election include increasing its monitoring of elections, coordinating with civil rights organizations, and establishing procedures for bringing the concerns of civil rights organizations about specific issues or jurisdictions to DOJ on or before election day in November 2004. Voting Section officials also said that final decisions as to where monitoring will be conducted are not made public until shortly before an election. (See enc. I for more information.)

The Voting Section has used several means of tracking allegations of voting irregularities and the Section's actions with regard to those allegations. First, the Voting Section used telephone logs to track telephone calls regarding allegations of voting irregularities it received related to the November 2000 and 2002 elections. According to the Voting Section, contractors were hired to help handle the unprecedented number of calls that were received concerning the November 2000 election situation to help ensure that the public would be able to voice opinions and concerns. Second, DOJ tracks matters and cases through its Interactive Case Management (ICM) system—its formal process for tracking and managing work activities. Prior to opening a matter, the Voting Section may make a determination that an allegation does not fall within DOJ's jurisdiction or may initiate a preliminary investigation about an allegation. Third, the Voting Section tracked monitoring of elections using logs and for some election-monitoring activities they opened matters; thus, it has not routinely tracked election-monitoring activities through the ICM system. (See enc. I for more information.)

Actions that Voting Section attorneys took to address allegations of voting irregularities initiated from November 2000 to December 2003 included contacting cognizant election officials at the state and local levels; obtaining data as appropriate; interviewing voters affected by alleged voting irregularities; meeting with minority groups; and assessing the merits of the allegations to determine what, if any, further action was needed. Attorneys in the Voting Section addressed allegations of voting irregularities by first determining whether the allegations were related to violations of federal civil rights statutes and then, if warranted, initiating a preliminary investigation or matter to determine whether an allegation had merit. If warranted, a matter may culminate in a case that is filed with a federal court. We reviewed files for 1 closed preliminary investigation, 25 closed matters, and 8 open and closed cases that the Voting Section considered election-related. The preliminary investigation and 13 matters were closed because they lacked merit. The remaining 12 matters were closed because the state or voting jurisdiction took action to remedy an issue, a state court issued an order addressing the issue, the voting jurisdiction implemented changes for future elections, or Voting Section attorneys provided election officials feedback following the on-site monitoring of elections. Six cases remain open pending fulfillment of consent decrees entered into on behalf of DOJ and the jurisdiction in alleged violation of federal statute, and two cases were closed because states had taken action in response to consent decrees. Enclosure I and attachment IV provide detailed information on actions taken regarding selected matters and cases that the Voting Section considered as involving election-related voting irregularities initiated from November 2000 to December 2003.

Regarding internal controls, we found that the Voting Section did not have a reliable method to consistently record and document telephone calls received alleging voting irregularities. According to Voting Section officials, the number of calls received following the November 2000 election far exceeded the number received in past elections. As a result, the Voting Section used a contractor to assist in handling the telephone calls. To track some of the telephone calls related to the November 2000 election, Voting Section and contractor staff used telephone logs that had several broad categories to capture the subject of the allegation, rows for states from which the calls originated and, for the most part, tabulated the numbers of calls using tick marks. Voting Section staff also kept two other types of logs to record some telephone calls, which included columns to record a caller's name, state, telephone number, and description of the call. Our analysis of the contractor telephone logs found, among other things, that these logs did not include a way to record calls from 4 states—Arkansas, Kansas, Montana, and North Dakota. According to Voting Section officials, these 4 states were left off the contractor logs inadvertently, although these officials noted that they were unaware of any calls received from these states. Our analysis of logs that Voting Section staff completed found that Voting Section staff recorded having received calls from some of these states. The Voting Section improved upon the telephone log for the November 2002 election by having one log that consistently provided for documenting the caller's name, telephone number, and action taken. Compared with the telephone log that contractor staff maintained and one of the three types of logs that Voting Section staff maintained after the November 2000 election, which had several columns to broadly categorize the subject of the telephone calls, the November 2002 log included one column to capture the subject of the telephone calls. The Voting Section plans to take several actions to address voting irregularities for the November 2004 election, including, among other things, using a telephone log similar to the one used for the November 2002 election. The Voting Section did not provide written instructions to contractors for completing the telephone logs related to the 2000 election. However, for the November 2002 federal election, the Voting Section provided instructions to DOJ staff for how to handle calls from citizens, the press, members of Congress, and others. In addition to its method for recording and documenting telephone calls received regarding voting irregularities, we found that the Voting Section did not routinely track its election-monitoring activities through its ICM system. The Voting Section said that it has plans to assign one identification number to track these activities in the future. (See enc. I for more information.)

In conclusion, lack of specifics about allegations and actions limits DOJ's ability to have accurate and clear information to share with the public or Congress about the types of allegations received and actions taken. Predictions of another close presidential election in November 2004 combined with possible voter confusion over new requirements in the Help America Vote Act—such as the implementation of provisional voting in states that had not previously used provisional voting—and possible questions regarding voting equipment could result in the Voting Section again receiving a very large number of telephone calls. This could result in the need to use contractors to record voter allegations because much of the Voting Section staff will be monitoring election sites on election day. It is important that the

information collected be as complete, accurate, and specific as possible regarding specific allegations. If the Voting Section collects more precise information about voter allegations, it is in a better position to assure the public that it has addressed allegations of voting irregularities. Moreover, if it documents actions taken more precisely, it is better able to reassure the public and Congress of its commitment to enforce federal voting rights statutes.

The Voting Section emphasized the importance of its monitoring of election-day activities, but the monitoring program has not been routinely tracked in the Voting Section's ICM system. We believe the significance of this program warrants a more formal tracking of monitoring efforts and resources dedicated to the program to allow for reliable, relevant, and timely information for management decision making and for external reporting purposes.

**Recommendations for Executive Action**

Confidence in our election processes is of utmost importance. To help ensure confidence in the integrity of voting processes, the Voting Section plays an important role in addressing voting irregularities. By accurately recording and documenting its activities in as clear a manner as possible, the Voting Section contributes to assuring the public and Congress of the integrity of our voting processes and that allegations of voting irregularities have been addressed.

To reassure citizens of the integrity of our election processes and to reassure the public and Congress of DOJ's commitment to its responsibility to enforce federal voting rights statutes, we recommend that the Attorney General direct the Chief of the Voting Section to take the following two actions

- develop and implement procedures for the November 2004 election to help ensure that the Voting Section has a reliable method of tracking and documenting allegations of voting irregularities and actions taken to address them. Procedures could include more precise categories to record types of allegations and actions taken; development of instructions on completing the telephone logs; and development and implementation of training for contractors, should they be needed; and

- implement a method to track and report on election-monitoring activities in the ICM system.

**Agency Comments**

We provided a draft of this report to DOJ for review and comment. The draft report sent to DOJ for comment reflected changes made as a result of DOJ's prior detailed review of attachment IV in enclosure I and changes DOJ requested in writing following our exit conference with them. In commenting on the draft, DOJ generally agreed with the report and recommendations. The Deputy Assistant Attorney General for the Civil Rights Division accepted both recommendations and said that the

Assistant Attorney General for the Civil Rights Division has directed their implementation.

In commenting on our recommendation for the Civil Rights Division to track and report on election-monitoring activities in the ICM system, DOJ noted that it currently has procedures that effectively track election-monitoring activities. Our report acknowledges that the Division had information on election monitoring. However, the Voting Section told us that they did not routinely track election-monitoring activities in the ICM system—its formal process for tracking and managing work activities. Because we had asked for clarification of the confusing and unclear information previously provided on election monitoring and tracking, the Civil Rights Division, in a May 25, 2004, written response provided clarifying information that explained the different databases and data from logs that were used to capture information on election monitoring. In this written response, the Civil Rights Division included four charts on election monitoring that had been recently created, one for each calendar year from 2000 through 2003 (but not for 2004, as the Division states it did). In addition, the Civil Rights Division said that it had asked for a program that would provide the types of reports and data that the Division is routinely asked to provide regarding the election-monitoring program. Our recommendation is directed toward improving the Voting Section's tracking of election-monitoring activities, which the Voting Section has emphasized as being a very important part of its efforts to help ensure voter access to the polls. Tracking election-monitoring activities in the ICM system would ensure that this important component of the Voting Section's work is incorporated into the Division's formal process for tracking and managing work activities.

After we provided DOJ with a copy of the draft report that included this correspondence and its enclosure for review and comment, Civil Rights Division officials realized they had not provided us with information on all of the telephone logs used following the November 2000 election. The Civil Rights Division subsequently provided that additional information, which showed that Voting Section staff used two additional types of logs for the November 2000 election. These logs included columns to record callers' names, telephone numbers, states, and descriptions of the calls. This new information was incorporated into our report to accurately reflect the Voting Section's activities to track telephone calls following the November 2000 election. (See p. 5 in this letter and p. 42 in enc. I.) According to the Civil Rights Division, the November 2002 log, which it proposes as the basis for documenting telephone calls related to the upcoming November 2004 elections, was the only one used by Voting Section staff for the November 2002 election.

DOJ noted that the draft report discussion of the Civil Rights Division's use of telephone logs focused almost exclusively on the logs maintained by contractors, that the draft report failed to note that these logs were only a small portion of all the records of telephone calls received by the Division, and that any shortcomings in these logs were extremely unlikely to have changed the course of subsequent investigations. As we note in our report, it was difficult to obtain precise information on the number of calls or the specific nature of alleged irregularities from the

telephone logs on the November 2000 election. The information that the Voting Section collected on its telephone logs was not precise enough to support the Division's statements that upwards of 95 percent of the calls received regarding the November 2000 election reflected citizen frustration or anger over the election, that the vast majority of the calls that contractors received came from New York and California, or that the vast majority of the calls from those two states expressed frustration over the situation in Florida. Moreover, it is important to note that our recommendation with regard to recording complaints about voting irregularities for the November 2004 election is based on the limitations of the log used in November 2002 and the lack of a clear plan for accurately recording a potentially large volume of complaints that may arise from the November 2004 election. For example, November 2004 will be the first national election in which all states will be implementing HAVA's new voter identification and provisional voting requirements with which many voters may be unfamiliar.

In its comments, DOJ said that the Civil Rights Division invited us to meet with Voting Section staff who worked during the time of the November 2000 election and that we declined this invitation. We did not receive an invitation from officials in the Civil Rights Division, who arranged our meetings with Voting Section staff, to meet to discuss the November 2000 election logs. Throughout this review, we requested meetings with Voting Section and Civil Rights Division officials. It is always our preference, as part of our work, to meet with agency officials to discuss issues and questions we may have about agency processes, procedures, and documentation. However, Civil Rights Division officials preferred that we provide questions in writing and to respond to those questions in writing. The Civil Rights Division sometimes took weeks to respond in writing, which contributed significantly to the length of time it took us to complete our review. Had Civil Rights Division officials been more willing to meet with us to explain the Voting Section's processes and discuss the documentation provided to us, rather than rely on written questions and responses, the time required for this review could have been significantly reduced.

DOJ's written comments are in attachment V. DOJ also provided technical comments from the Criminal Division's Public Integrity Section and from the Civil Rights Division, which we incorporated as appropriate. The Civil Rights Division provided additional information on cases initiated for calendar years 2002, 2003, and 2004. The 2002 and 2003 cases involved enforcement under Sections 2 and 208 of the Voting Rights Act and were not clearly identifiable in the ICM system as also involving language minority issues under Section 203 of the Voting Rights Act. The Civil Rights Division subsequently identified these cases as including enforcement of language minority violations, and we have included them in our report. Information on cases initiated in calendar year 2004 had not been included because our review covered complete calendar years, but we have added information on cases initiated in 2004 as of August 2004 as a courtesy to the Division.

— — — — —

As agreed with your offices, unless you publicly release its contents earlier, we plan no further distribution of this report until 30 days from its issue date. At that time, we

will send copies of this report to the Attorney General, Department of Justice; Chairman, Senate Committee on Governmental Affairs; Chairman, House Committee on Government Reform; Chairman, House Committee on the Judiciary; Chairman and Ranking Minority Member, House Committee on House Administration; and Chairman and Ranking Minority Member, Senate Committee on Rules and Administration. Copies of this report will be made available to other interested parties upon request. This report will also be available on GAO's Web site at http://www.gao.gov. If you have any questions, please contact me at (202) 512-8777 or by e-mail at jenkinswo@gao.gov or Linda Watson, Assistant Director, at (202) 512-8685 or by e-mail at watsonl@gao.gov. Key contributors to this report were Katherine Davis, Gina Flacco, Evan Gilman, Geoffrey Hamilton, Mary Martin, Maria Santos, and Daniele Schiffman.

William O. Jenkins, Jr.
Director, Homeland Security and Justice Issues

Enclosures

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

**GAO-04-1041R DOJ Activities to Address Past Voting Irregularities**

**Enclosure I**



**Enclosure I**

# DOJ Activities to Address Past Election-Related Voting Irregularities

Results of work completed for the
Ranking Minority Member of the
House Committee on Government Reform,
Ranking Minority Member of the
House Committee on the Judiciary, and
Ranking Member of the
Senate Committee on Governmental Affairs

August 31, 2004

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

1

**Enclosure I**

 **Contents**

- Objectives
- Results in Brief
- Scope and Methodology
- Background
- Changes to Ensure Voter Access
- Actions to Track, Address, and Assess Allegations
- Assessment of Internal Controls
- Conclusions
- Recommendations
- Attachment I—Federal Voting Rights Statutes
- Attachment II—Role of the Criminal Division's Public Integrity Section
- Attachment III—Election Jurisdictions Monitored during 2000-2003
- Attachment IV—Election-Related Preliminary Investigation, Matters, and Cases Initiated from November 2000 to December 2003
- Attachment V—Agency Comments

2

Enclosure I

 **Objectives**

This briefing addresses the following objectives:

1.  Identify and describe any changes the Department of Justice (DOJ) has made since November 2000 to help ensure voter access to the polls.

2.  Identify and describe any actions that the Voting Section in DOJ's Civil Rights Division has taken to track (monitoring work initiated and actions taken), address, and assess allegations of election-related voting irregularities received between November 2000 and December 2003.

    •   Election-related refers to a preliminary investigation, matter, or case that the Voting Section initiated pursuant to an allegation about a specific election.

3

**Enclosure I**



**Objectives**

- A **preliminary investigation** is an investigation into an allegation that has not been assigned an identification number. A **matter** is an activity that has been assigned an identification number but has not resulted in a court filing of a complaint, indictment, or information. A **case** is an activity that has been assigned the same identification number that it had as a matter and has resulted in the court filing of a complaint, indictment, or information.

- Voting irregularities, for purposes of this review, generally refer to a broad array of complaints relating to voting and/or elections that may involve violations of federal voting rights and/or federal criminal law for which DOJ has enforcement responsibilities.

3. Assess the Voting Section's internal control activities to help ensure relevant, accurate, and reliable recording and documentation of allegations of voting irregularities for management decision-making and external reporting purposes.

- Internal controls are integral components of an organization's management that provide reasonable assurance of objectives that include, among other things, efficient operations. They comprise the plans, methods, and procedures used to meet missions, goals, and objectives and, in doing so, support performance-based management.

4

Enclosure I

 **G A O**
Accountability * Integrity * Reliability

**Results in Brief**

1. Since November 2000, DOJ has increased its monitoring of election activities on election day, provided additional training to Assistant U.S. Attorneys on civil rights laws, placed a greater priority on protecting the voting rights of language minorities and overseas voters, and provided guidance to states regarding implementation of the Help America Vote Act (HAVA).

2. The Civil Rights Division tracks matters and cases through a case management system. Telephone calls related to the 2000 and 2002 federal elections were tracked using telephone logs. The Voting Section addressed allegations of voting irregularities by contacting cognizant officials, obtaining data if deemed appropriate, and assessing the merits of the allegation to determine what, if any, further action was needed.

3. The Voting Section tracked the unprecedented volume of telephone calls related to the November 2000 election by using logs. Some logs had several broad categories to capture the subject of the calls and rows for states from which the calls originated, while other logs contained callers' names, contact information, and description of the calls. The Voting Section improved upon the telephone log for the November 2002 election by including categories to capture the action taken on each call and to record the caller's name, telephone number, and subject of the call. The Voting Section tracked some monitoring of elections by assigning matter identification numbers.

5

**Enclosure I**



# Scope and Methodology

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

6

**Enclosure I**

 **Scope**

To address our objectives, we performed work at DOJ's:

- Civil Rights Division's Voting Section,

- Criminal Division's Public Integrity Section (PIN),

- Federal Bureau of Investigation's (FBI) Public Corruption Unit, and

- Executive Office for U.S. Attorneys (EOUSA).

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

7

Enclosure I

 **GAO**
Accountability • Integrity • Reliability

**Methodology**
**Objective 1**

To identify changes in DOJ's efforts to help ensure voter access to the polls, we

- gathered documentation on DOJ's efforts to
  - monitor and observe elections,
  - increase emphasis on enforcement of minority language and overseas voters' rights,
  - disseminate election-related guidance, and
  - increase its resources to address voting issues, and

- interviewed responsible officials primarily in DOJ's Voting Section and PIN.

8

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

Enclosure I


**GAO**
Accountability * Integrity * Reliability

**Methodology**
**Objective 2**

To identify DOJ's actions to track, address, and assess allegations of voting
irregularities, we

- interviewed officials in the Voting Section about procedures for tracking,
  addressing, and assessing allegations of voting irregularities;

- analyzed information on the approximately 11,000 reported telephone calls
  made to the Voting Section about the November 2000 election; and

- reviewed all files that the Voting Section identified as those it considered to
  be election-related voting irregularities that were initiated from November
  2000 to December 2003. This included 1 closed preliminary investigation,
  25 closed matters, and 8 closed and open cases. The Voting Section tracks
  its matters and cases based on statutes it enforces and not on whether an
  allegation relates to a specific election. Consequently, the Voting Section
  had to identify for us the preliminary investigation, matters, and cases that it
  considered to be election-related voting irregularities.

9

**Enclosure I**



# Background

## Voting Section

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

10

Enclosure I

 **GAO**
Accountability * Integrity * Reliability

**Background
Voting Section**

Voting Section responsibilities include:

- enforcing the Voting Rights Act, which is designed to safeguard the right to vote of racial and language minorities and illiterate persons, among other provisions;

- enforcing federal statutes designed to safeguard the right to vote of disabled, elderly, military, and overseas voters; and

- enforcing provisions of the National Voter Registration Act, and the Help America Vote Act (HAVA) which address issues such as voter registration, provisional voting, and voter information.

Attachment I provides more information on statutes that the Voting Section enforces.

11

Enclosure I



**Background
Voting Section**

The Voting Section, among other things, monitors election-day activities to ensure voting rights are protected and initiates investigations and opens matters to examine allegations of voting irregularities that fall within the jurisdiction of the Civil Rights Division. If warranted, a matter may culminate in a case that is filed with a federal court.

Voting Section attorneys are generally responsible for conducting investigations and prosecuting civil cases. The Voting Section also may initiate matters to monitor private lawsuits.

The Voting Section coordinates with the Criminal Division's Public Integrity Section (PIN) to help ensure voters' rights are protected, such as referring three allegations to PIN about possible election crimes related to the 2002 election. (See attach. II for more information about PIN's election-related responsibilities.)

12

Enclosure I



**Background
Voting Section**

The following table provides information on all matters and cases initiated by the Voting Section in calendar years 2000 through 2003.

| Year initiated | Matters | Cases | Total |
|---|---|---|---|
| 2000 | 70 | 18 | 88 |
| 2001 | 53 | 6 | 59 |
| 2002 | 127 | 18 | 145 |
| 2003 | 99 | 4 | 103 |
| **Total** | **349** | **46** | **395** |

Source: GAO analysis of data from DOJ's Civil Rights Division's Voting Section.

According to Voting Section officials, the number of matters was higher in 2002 because the Voting Section initiated new matters for each of the over 80 newly covered jurisdictions required by the Voting Rights Act to provide bilingual election materials and assistance to language minority citizens. Following the 2000 Census, DOJ, in conjunction with the U.S. Census Bureau, identified these 80 jurisdictions. The Voting Rights Act requires jurisdictions to provide language minority assistance when certain criteria are met, such as when more than 5 percent of the citizens of voting age, or more than 10,000 of the citizens of voting age, are members of a single language minority group, and are unable to speak or understand English adequately enough to participate in the electoral process.

13

Enclosure I



**Background
Voting Section**

As shown in the following table, the Voting Section's positions for attorneys (authorized and on-board) increased since the beginning of fiscal year 2000.

| Time period | Authorized attorney positions | Attorneys on-board |
|---|---|---|
| Start FY 2000 | 34 | 31 |
| End FY 2000 | 36 | 35 |
| End FY 2001 | 47 | 40 |
| End FY 2002 | 47 | 42 |
| End FY 2003 | 41 | 38 |
| As of April 16, 2004 | 41 | 39 |

Source: DOJ's Civil Rights Division's Voting Section.

The number of authorized and on-board attorneys declined at the end of fiscal year 2003 because the number of submissions to the Voting Section for redistricting changes following the 2000 Census began to decline that year, according to Voting Section officials. Every 10 years, after the federal census, states redraw their legislative election districts to make these districts equal in population. The process of drawing new election district boundaries is called redistricting.

14

**Enclosure I**



# Changes to Help Ensure Voter Access

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

15

Enclosure I

 **Changes to Help Ensure Voter Access**
**Results in Brief**

Since November 2000, DOJ focused on ensuring voter access to the polls by

- placing more emphasis on its election-monitoring program,
- providing additional training for certain Assistant U.S. Attorneys who handle election-related issues that included placing more emphasis on handling civil rights issues,
- directing U.S. Attorney Offices to contact election and other officials at the state and local level to offer assistance prior to election day,
- placing greater priority on enforcing the voting rights of language minorities and overseas voters, and
- providing guidance to states regarding HAVA implementation.



16

Enclosure I

 **GAO**
Accountability * Integrity * Reliability

**Changes to Help Ensure Voter Access
Emphasis Placed on Election Monitoring**

In March 2001, the Attorney General announced that DOJ was placing more emphasis on its election-monitoring program.  The Attorney General is authorized by law to notify the Office of Personnel Management (OPM) of the need to assign federal observers to monitor polling place activities on election day in counties that the Attorney General has certified under the Voting Rights Act and in counties authorized by federal court orders.  The Attorney General delegates the authority with respect to federal observers to the Voting Section. The Voting Section's decision to request federal observers is based on past experience or investigations that indicated observers may be needed to protect voting rights.  (See attach. I for information on the law authorizing federal observers.)

In addition to OPM federal observers, the Voting Section assigns DOJ attorneys and professional staff to monitor election day activities in local jurisdictions throughout the United States, whether or not the locations have been certified under the Voting Rights Act.  This additional monitoring is part of the Voting Section's investigations of possible voting rights violations.  Unlike OPM observers, DOJ attorneys and professional staff do not have specific statutory right of access to polling places and must get authority from the appropriate state and/or local officials for them to enter polling places.

17

Enclosure I



**Changes to Help Ensure Voter Access**
**Emphasis Placed on Election Monitoring**

DOJ attorneys and professional staff are assigned to these jurisdictions
    when there may be insufficient time to arrange for federal observers in
    covered jurisdictions, or when the results of Voting Section staff's pre-
    election investigations indicate the need for some limited federal
    presence.

The Attorney General directed the Voting Section to increase resources
    devoted to the election-monitoring program through the use of OPM
    federal observers and DOJ attorneys and professional staff.

The level of resources used and number of elections monitored were
    greater in federal election years (even-numbered years) than other
    years, as shown in the next figure.

*cited in DNC v. Hobbs, 18-15845 archived on January 22, 2020*

18

Enclosure I



**Changes to Help Ensure Voter Access
Emphasis Placed on Election Monitoring**

The number of OPM federal observers and DOJ attorneys and professional staff were greater in the 2002 elections than in the 2000 elections. Similarly, more elections were monitored in 2002 than in 2000.



Note: DOJ monitors are attorneys and professional staff.

19

Enclosure I

 **GAO**
Accountability * Integrity * Reliability

**Changes to Help Ensure Voter Access
Emphasis Placed on Election Monitoring**

OPM federal observers are always accompanied by DOJ attorneys and professional staff when monitoring elections and were present for elections held during calendar years 2000 through 2003 in Attorney General-certified and court-ordered counties and jurisdictions in several states.  In a few instances, DOJ attorneys and professional staff independently monitored elections in these Attorney General-certified and court-ordered counties and jurisdictions.

DOJ attorneys and professional staff also independently monitored elections in counties and jurisdictions that were not Attorney General-certified or under court order during this 4-year period.  In 2000, DOJ attorneys and professional staff monitored elections in 5 counties in 5 states.  By 2002, the number of election jurisdictions monitored by DOJ attorneys and professional staff increased to 19 counties in 10 states, with monitoring of elections in counties in Florida accounting for the bulk of the increase.

According to the Voting Section, election monitoring is a high-priority program of DOJ and a very important part of the Section's efforts to address voting irregularities.

See attachment III for more information on election monitoring in Attorney General-certified and court-ordered election jurisdictions and election jurisdictions that DOJ monitored independently.

20

Enclosure I

 **G A O**
Accountability * Integrity * Reliability

**Changes to Help Ensure Voter Access Training**

Officials in the Voting Section and PIN said that Assistant U.S. Attorneys can attend annual public corruption conferences, where they receive (1) training on handling election crime investigations and prosecutions and (2) periodic updates to DOJ's manual on prosecuting election crimes. Starting in October 2002, additional annual training, referred to as the Ballot Access and Voting Integrity Conference, was provided to Assistant U.S. Attorneys who, in coordination with DOJ headquarters, handle election-related matters for the 93 U.S. Attorneys.

The Ballot Access and Voting Integrity Conference training, according to Civil Rights Division officials, included civil rights issues that had not been covered in the training offered to Assistant U.S. Attorneys prior to October 2002 and was designed to provide them a better understanding of what the Voting Section does to enforce federal voting rights statutes. Also, according to the Civil Rights Division, the presentations that the Voting Section made at this annual training conference placed special emphasis on the election-monitoring program and solicited the Assistant U.S. Attorneys' involvement in helping to enforce federal voting rights laws, ballot access, and the election-monitoring program. According to PIN, this training, which was mandatory for the Assistant U.S. Attorneys designated as district election officers, also covers voting integrity issues important to election crime matters.

21

**GAO-04-1041R DOJ Activities to Address Past Voting Irregularities**

Enclosure I


**Accountability ∗ Integrity ∗ Reliability**

**Changes to Help Ensure Voter Access Training**

The Ballot Access and Voting Integrity Conference training was provided to Assistant U.S. Attorneys in October 2002, September 2003, and July 2004.

The training materials for 2002 included topics related to federal voter registration and election-day statutes that the Voting Section enforces, which include the Voting Rights Act, National Voter Registration Act, and the Uniformed and Overseas Citizens Absentee Voting Act, and topics related to handling election crime investigations, trials, and the statutes and theories used to address election crimes.

The 2003 training materials included, in addition to the same topics covered in 2002, information on HAVA and election monitoring by federal observers. According to PIN and the Voting Section, the content of the 2004 training was similar to that provided in previous years.

22

**Enclosure I**

 **G A O**
Accountability ∗ Integrity ∗ Reliability

**Changes to Help Ensure Voter Access**
**Contacts with State and Local Election Officials**

In October 2002, the Attorney General directed each U.S. Attorney to
coordinate with state and local election and law enforcement officials
prior to the November 2002 elections to, in part, explore ways that they
could work more closely together to deter and detect discrimination and
to deter and prosecute election crimes.

According to PIN officials, the Attorney General's October 2002 directive
(1) formalized an ad-hoc practice that had existed in DOJ for many
years of coordinating elections and election-related matters with state
officials and (2) led to a systematic effort to coordinate election issues
and matters with these officials.

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

23

Enclosure I



**Changes to Help Ensure Voter Access**
**Contacts with State and Local Election Officials**

Prior to the November 2002 federal elections, almost all of the U.S.
Attorney Offices reported to PIN that they had contacted various state or
local officials either by telephone, in writing, or in person.

The state and local officials contacted varied by each U.S. Attorney Office.
For example, according to PIN,

- the three U.S. Attorneys in the state of Florida reported having
met with the Florida Secretary of State and

- the U.S. Attorney for the Southern District of California reported
having met with the San Diego County Registrar of Voters,
Election Administrator, and Deputy District Attorney, and the
Imperial County Registrar of Voters and District Attorney.

24

Enclosure I

 **GAO**
Accountability · Integrity · Reliability

**Changes to Help Ensure Voter Access**
**Contacts with Civil Rights and Other Organizations**

The Attorney General directed the Civil Rights Division was to work with civil rights leaders, state and local election officials, and U.S. Attorney Offices prior to election day in an effort to help ensure that citizens' voting rights are protected. The Attorney General also directed the Criminal Division to work with these same groups in helping to preserve ballot integrity and prevent election offenses.

According to the Voting Section, the Assistant Attorney General for the Civil Rights Division has met with representatives of civil rights organizations to discuss the Voting Section's election-monitoring program and its plans for monitoring the November 2004 election and has made other presentations concerning voting rights issues at many of these organizations' meetings and conferences. The Voting Section also said that as this election approaches, it plans to ask civil rights organizations what election jurisdictions they believe the Voting Section should consider monitoring.

The Voting Section also said that since October 2002, staff from the Civil Rights Division have made presentations to, met with, or received presentations from various civil rights and other organizations, such as the NAACP, Lawyers' Committee for Civil Rights Under Law, League of United Latin American Citizens, Leadership Conference on Civil Rights, AARP, National Association of Secretaries of State, and National Association of State Election Directors.

25

Enclosure I



**Changes to Help Ensure Voter Access
Language Minority Voting Rights**

In 2002, the Civil Rights Division made enforcement of voting rights laws that address access to voting for language minority groups one of the Voting Section's highest priorities. DOJ reported in a civil rights accomplishments fact sheet that the Civil Rights Division conducted an outreach campaign with state and local election officials and local language minority groups to help ensure access to bilingual voting materials for language minority groups. This was begun in July 2002 following the certification of covered jurisdictions based on the results of the 2000 census.

- The fact sheet states that the outreach included a July 2002 letter from the then- Assistant Attorney General for the Civil Rights Division to each of the 296 political jurisdictions covered by Section 203 of the Voting Rights Act notifying them of their bilingual access obligations in the upcoming and future elections. According to the Civil Rights Division, attorneys from the Division visited many of the 296 counties covered by Section 203.

- In addition, the fact sheet reported that Civil Rights Division attorneys conducted in-person meetings with state and local election officials and local language minority groups in almost all of the more than 80 newly covered jurisdictions.

26

**GAO-04-1041R DOJ Activities to Address Past Voting Irregularities**

**Enclosure I**

 **GAO**
Accountability * Integrity * Reliability

**Changes to Help Ensure Voter Access**
**Language Minority Voting Rights**

We analyzed data as of March 15, 2004, on matters and cases related to Section
203 language minority issues recorded in DOJ's Interactive Case Management
(ICM) system, which is used to track and manage these data. We found that the
Voting Section initiated 7 matters and no cases in 2000, 13 matters and 2 cases
in 2001, 94 matters and 1 case in 2002, and 28 matters and no cases in 2003.
According to the Civil Rights Division, the Division also initiated the following
cases: (1) two language assistance cases in 2002 under Section 2 and Section
208 of the Voting Rights Act; (2) two cases in 2003 under Section 2, Section
203, and Section 208 of the Voting Rights Act; and (3) five cases in 2004 under
Section 203 of the Voting Rights Act. Sections 2, 203, and 208 of the Voting
Rights Act are described in attachment I.



27

Enclosure I

 **GAO**
Accountability • Integrity • Reliability

**Changes to Help Ensure Voter Access
Uniformed and Overseas Citizens**

Given the large number of troops deployed overseas and an increase in concerns about late mailing of absentee ballots, Voting Section officials said that the Voting Section placed increased priority in 2004 on enforcing and preparing to ensure compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), which only applies to federal elections. These officials cited the following enforcement and preparation activities during 2004.

- Obtained a court order in April for emergency relief to remedy an UOCAVA violation committed during the Pennsylvania primary election.
- Negotiated with the state of Alabama in May to obtain a similar emergency relief order from a state court for a county's failure to provide enough time for the mailing to and return of ballots from overseas voters for its primary election.
- Obtained a court order in an UOCAVA lawsuit in July against the state of Georgia for similar emergency relief for its primary election.
- Established a working group of Voting Section attorneys to facilitate communications with the Department of Defense's Federal Voting Assistance Program, which is charged with administering UOCAVA, and to plan for the possibility of more UOCAVA litigation during 2004.

Our analysis of matters and cases in DOJ's ICM system as of March 15, 2004, showed that the Voting Section initiated 3 matters and 2 cases during calendar years 2000 through 2003 involving the issue of absentee voting by uniformed and overseas citizens. All 5 of the matters and cases were initiated in 2002.

28

Enclosure I

 **GAO**
Accountability * Integrity * Reliability

**Changes to Help Ensure Voter Access Guidance to States on HAVA**

In October 2002, HAVA established the Election Assistance Commission to, in part, serve as a national clearinghouse and resource to compile information and review procedures related to federal election administration and provide guidance on implementing certain HAVA requirements. Because the Election Assistance Commission was not established until December 2003, the Voting Section provided informal, nonbinding guidance to states on implementing the requirements of HAVA.

The Voting Section's guidance to states on HAVA's requirements included
- interpreting requirements of the law and advising states on how to comply with them based on DOJ's enforcement role under HAVA;
- responding to inquiries from state and local officials;
- making presentations at various meetings and conferences;
- writing letters to the chief state election official, governor, and attorney general in each of the 50 states, the District of Columbia, and the U.S. territories offering to assist the jurisdictions in their efforts to ensure compliance with HAVA and summarizing HAVA provisions;
- creating a HAVA information page on its Web site; and
- issuing a press release that outlined provisions of HAVA that took effect on January 1, 2004, such as provisional voting and identification requirements for new voters who register by mail.

According to the Civil Rights Division, the Voting Section also filed its first enforcement action in California in 2004 against a county for violating the voter information provisions of HAVA.

29

Enclosure I

 **G A O**
Accountability • Integrity • Reliability

**Changes to Help Ensure Voter Access
Plans for November 2004 Election**

According to Voting Section officials, DOJ's plans for helping to ensure voter
access for the November 2004 election include

- increasing its on-site monitoring of elections considerably over prior years
  through greater use of staff from other sections in the Civil Rights Division.
  Voting Section officials also said that final decisions as to where monitoring
  will be conducted are not made public until shortly before an election, but
  they told us that the Voting Section has prepared a list of jurisdictions for
  consideration based on consent decrees and will update the list with other
  jurisdictions being considered for coverage as the election approaches.
  According to these officials, the Voting Section has not established a
  specific goal for achieving an increase in staff or elections to be covered,
  and

- coordinating with civil rights organizations that will be monitoring the
  election and establishing procedures for bringing their concerns about
  specific issues or jurisdictions to DOJ on or before election day in
  November 2004.

cited in DNC v. Hobbs, No. 18-15845, archived on January 22, 2020

30

**Enclosure I**



# Actions to Track, Address, and Assess Allegations

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

31

Enclosure I



**Actions to Track, Address, and Assess Allegations**
**Results in Brief**

In our review, we found that the Civil Rights Division had formal procedures to track matters and cases to address voting irregularities. Specifically, the Voting Section tracks investigative matters and cases through the Division's ICM system using unique identification numbers. In addition, the Voting Section tracked telephone calls alleging voting irregularities for the November 2000 and November 2002 elections using telephone logs.

Voting Section attorneys addressed and assessed allegations of election-related voting irregularities initiated from November 2000 to December 2003 in various ways, depending on the allegation. Our review of files related to 1 preliminary close investigation, 25 closed matters, and 8 open and closed cases generally found that attorneys contacted cognizant officials and assessed the legal merits of evidence of alleged violations of civil rights laws.

In our review of files, we found that Voting Section attorneys generally addressed allegations of voting irregularities initiated from November 2000 to December 2003 through a preliminary investigation or investigative matters and took actions such as interviewing election officials at state and local levels, interviewing voters affected by alleged voting irregularities, and meeting with civil rights groups.

Our review of Voting Section files also found that Voting Section attorneys, in conjunction with supervisory attorneys, assessed information collected and determined whether (1) federal voting rights laws were violated; (2) an investigation should be closed; or (3) further action was needed by the Voting Section, such as filing a complaint with a federal court or continued monitoring.

32

Enclosure I

 **G A O**
Accountability * Integrity * Reliability

**Actions to Track, Address, and Assess Allegations
Tracking Allegations of Voting Irregularities**

The ICM is a database system that the Voting Section uses to track and manage matter and case data for the Section and can be used to generate reports.

Each matter and case is assigned a DJ number, which is an unique identification number.  Information on matters and cases can be searched  by the identification numbers, statutes, and other information maintained in the system.

The system is set up to automatically enter certain data and has required fields for which data must be entered.  Voting Section staff can enter other data into the system, as appropriate.

cited in DNC v. Hobbs, No. 18-15845, archived on January 22, 2020

33

Enclosure I



**Actions to Track, Address, and Assess Allegations
Tracking Allegations of Voting Irregularities**

Officials told us that the Voting Section

- receives numerous citizen calls, comments, and questions daily;

- receives telephone calls, e-mails, faxes, letters, and packages. Most of the calls and written allegations from citizens do not concern issues within the jurisdiction of the Civil Rights Division and, in such instances, the caller is often notified of this determination over the telephone and referred to other state or federal agencies with possible jurisdiction;

- documented telephone calls received at the Section's toll free telephone number using telephone logs for the 2000 and 2002 elections;

- found that only a small percentage of allegations that it received following the November 2000 election fell within its jurisdiction or presented substantive issues that merited further review. Notations on logs documenting telephone calls related to the November 2000 election indicated that some of the calls– we were unable to quantify the number of calls because of the way calls were recorded– were related to dissatisfaction with the outcome of the election or other issues such as general complaints about the election process that contained no specific allegations of violations of federal laws;

- in addition to following up with people who called the Voting Section after the November 2000 election, Voting Section staff pursued other avenues of complaints, such as complaint logs generated by the NAACP Voter Fund, hearings conducted by the U.S. Commission on Civil Rights and the NAACP, and incidents receiving a large amount of publicity, to determine if federal laws had been violated; and

- expects attorneys to find new matters for investigation in addition to assignments made by Section management.

34

Enclosure I



**Actions to Track, Address, and Assess Allegations**
**Tracking Allegations of Voting Irregularities**

Voting Section officials told us that on election day

- in addition to calls received by the Section at its toll-free number, an OPM federal examiner maintains a toll-free telephone number to receive calls. An examiner is a federal employee assigned by OPM to receive complaints of racial or minority language discriminatory voting practices. (See attach. I for the statute related to federal examiners.) Any allegations taken by the examiner that are deemed to require immediate attention are routed to the Civil Rights Division when received, while other allegations are transmitted after the election and reviewed to determine if further action is needed. According to the Chief of the Voting Section, they received few, if any, allegations from examiners in relation to the November 2000 election, and

- a small number of Civil Rights Division staff remain available at the Voting Section on major election days to take citizen calls, with the vast majority of Section staff at various locations around the country for monitoring purposes. Major problems that arise from these calls are routed to attorney supervisors to determine what actions are needed.

Our review of files included five matters that were initiated to monitor elections. According to Voting Section officials, this activity is not routinely tracked through the ICM, but they plan to designate a single identification number to track this activity.

35

Enclosure I

 **G A O**
Accountability ∗ Integrity ∗ Reliability

**Actions to Track, Address, and Assess Allegations**
**Actions to Address Allegations**

The following presents information on the Voting Section's process for addressing allegations related to voting irregularities.

- If the Voting Section deems that a voting allegation falls within its jurisdiction and appears to have merit, an attorney is assigned to make inquiries about the allegation. The attorney performs some investigative work to determine whether the allegation should be pursued.
- If an attorney believes a matter should be investigated, the attorney discusses this with the Deputy Chief responsible for the state in which the matter rises. The Section Chief and Deputies decide whether or not to formally open a matter. The Voting Section assigns a number to the matter for tracking purposes.
- When Voting Section staff monitor elections and receive allegations of or information about voting irregularities while on site, they make efforts to resolve allegations by contacting local election officials immediately. Further investigation of such irregularities is conducted after an election if the allegation was not resolved on election day or if it is deemed otherwise necessary to prevent such problems from arising in the future.

36

Enclosure I



**Actions to Track, Address, and Assess Allegations**
**Actions to Address Allegations**

Our file review found that the Voting Section generally took the following
actions during its investigations initiated from November 2000 to
December 2003:

- Interviewed state and county election officials, other state and
county officials who may provide insight into the investigation, state
Attorneys General, voters raising the allegations, and
representatives from the NAACP and other minority groups.
- Requested documentation detailing certain election procedures.
- Facilitated the resolution of allegations and issues that arose during
elections, when monitoring elections. If Voting Section staff
monitoring elections received allegations about voting irregularities,
they immediately took steps to resolve the allegations by contacting
local election officials.
- Where deemed appropriate, filed enforcement actions in federal
court against jurisdictions that allegedly violated federal voting rights
laws by either obtaining judgments against them or entering into
consent decrees with jurisdictions that agree to remedy their alleged
violations of federal voting statutes.

37

Enclosure I



**Actions to Track, Address, and Assess Allegations**
**Actions to Assess Allegations**

Following the investigation of a preliminary investigation or matter, a Voting Section attorney, in conjunction with a supervisor, determines whether the allegation has merit, whether the preliminary investigation or matter should be pursued further, or whether the preliminary investigation or matter should be closed. The determination to close a matter or pursue it as a case is a legal judgment and is often based on whether there is deemed to be a sufficient evidence of violations of voting rights laws and whether the state or local election officials have taken action to correct problems.

The Voting Section identified a total of 34 closed investigations and open and closed cases initiated between November 2000 and December 2003 that it considered to involve election-related voting irregularities: 1 closed preliminary investigation, 25 closed matters, and 8 open and closed cases.

The preliminary investigation was closed because the Voting Section concluded that the allegation lacked merit.

38

Enclosure I



**Actions to Track, Address, and Assess Allegations**
**Actions to Assess Allegations**

For the 25 closed matters:

- 13 were closed because the Voting Section concluded that the allegations lacked merit;
- 5 were closed because the state or voting jurisdictions took actions to resolve the issues (e.g., one state passed an election law, and the Voting Section approved changes to election procedures that one city had proposed);
- 4 were closed following the completion of elections, and the Voting Section provided feedback or observations related to election procedures while monitoring elections;
- 2 were closed because voting jurisdictions implemented changes for future elections; and
- 1 was closed because a state court issued an order addressing the issue.

For the 8 cases:

- 6 are open pending fulfillment of consent decrees entered into on behalf of DOJ and the jurisdiction in alleged violation of statute, and
- 2 are closed because consent decrees entered into on behalf of DOJ and the jurisdictions in alleged violation of statutes required states to take corrective actions and states did so by passing legislation, among other actions.

Attachment IV provides detailed information on the results of our file review of the 34 closed preliminary investigation and matters and open and closed cases initiated from November 2000 to December 2003 that the Voting Section considered as involving election-related voting irregularities.

39

**Enclosure I**



# Assessment of Internal Controls

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

40

Enclosure I



**Assessment of Internal Controls**
**Results in Brief**

In our review, we found that

- the Voting Section tracked telephone calls related to the November 2000 election by using telephone logs. Some logs had several broad categories to capture the subject of the calls, rows for states from which the calls originated and, for the most part, tabulated the numbers of calls using tick marks. Other logs that the Voting Section used contained information such as callers' names, telephone numbers, and descriptions of the calls. The Voting Section improved upon the telephone log for the November 2002 election by including columns to record the action taken on each call in addition to recording the caller's name and telephone number, but has one column to capture the subject of the call, and

- as mentioned previously, the Voting Section tracked some monitoring of elections by opening matters and assigning each matter an identification number. According to Voting Section officials, it has not routinely tracked election-monitoring activities through the case management system but is considering assigning one identification number to track election-monitoring activities.

41

Enclosure I



**Assessment of Internal Controls**
**November 2000 Election Telephone Logs**

The Voting Section received an unprecedented volume of telephone calls in November and December 2000 related to the unusual events surrounding the November 2000 presidential election.

- The Voting Section reported to the Senate Committee on the Judiciary that it received approximately 11,000 calls related to the November 2000 election. In comparison, the Voting Section told us it received several hundred calls related to the November 2002 election. The Voting Section told us it does not have records of telephone calls related to other elections except to the extent that such telephone calls generated investigations that became matters or cases.

- According to the Voting Section, contractors were hired in November 2000 to help handle the unprecedented number of incoming telephone calls received concerning the November 2000 election to help ensure that the public would be able to voice opinions and concerns. Hiring contractors was not intended as a mechanism to gather specific allegations.

- Voting Section staff and contractors kept telephone logs that consisted of tables with columns identifying broad categories of allegations or comments and rows with the state from which a call originated. Voting Section staff also kept two other types of logs, which included the caller's name, state, telephone number and description of the call. Calls were recorded on most logs as tick marks, while some logs included limited narrative on the nature of the call.

42

Enclosure I

 **GAO**
Accountability • Integrity • Reliability

**Assessment of Internal Controls**
**November 2000 Election Telephone Logs**

Our analysis of the telephone call logs completed by contractors found the following:

- It was difficult to count how many calls were received because, for example, one caller could have made multiple complaints and some logs appeared to be duplicates.
- The call logs did not include a way to record calls from 4 states—Arkansas, Kansas, Montana, and North Dakota. According to Voting Section officials, these 4 states were left off the contractor logs inadvertently, although these officials noted that they were unaware of any calls received from these states. Our analysis found that Voting Section staff recorded having received calls from some of these states.
- Columns that were used to record callers were labeled voter fraud, irregularities, request investigation, re-vote, and general comments. In some of the logs, the columns were re-labeled manually to tally additional types of comments. The broad nature of these column labels to record information about the nature of the calls and the limited narrative sometimes included on logs did not always provide sufficient information to determine whether the Voting Section should initiate an investigation.
- The telephone logs did not include information on callers' contact information such as telephone numbers.

43

Enclosure I



**Assessment of Internal Controls**
**November 2000 Election Telephone Logs**

Some of the telephone logs that Voting Section and contractor staff completed included comments indicating allegations that people may have been prevented from voting. According to the Voting Section, Voting Section personnel reviewed logs on an ongoing basis and efforts were made to contact callers who provided telephone numbers and whose messages indicated possible violations of federal civil rights statutes. The Voting Section does not have records indicating how many such return calls were made and noted that return telephone contact information was not always provided or asked for.

According to Voting Section officials, an assessment of the calls led them to determine that most of the calls focused on concerns about the election situation in Florida, often from citizens in states other than Florida, and that few allegations included substantive information about possible violations of federal law. However, the information on the November 2000 telephone logs is not precise enough to document this assessment.

*cited in DNC v. Hobbs, No. 18-15845 archived on September 22, 2019*

44

Enclosure I



**Assessment of Internal Controls
November 2002 Election Telephone Logs**

For the November 2002 federal election, the Voting Section assigned staff to receive calls; provided instructions for how to handle calls from citizens, the press, members of Congress, and others; and provided state contact information to refer callers to state officials, when appropriate.

According to Voting Section officials, a telephone log was used to record calls received.  The telephone log included columns to record time of call; caller information for name, city, state, and telephone number; subject; and action.  No instructions were provided with the telephone log about how to complete it regarding the type of information to be included in the subject or action columns.

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

45

Enclosure I



**GAO**
Accountability * Integrity * Reliability

**Assessment of Internal Controls**
**Plans for the November 2004 Election**

According to the Civil Rights Division, the Voting Section plans to ensure that it has full capability to receive and respond, as appropriate, to all calls related to the November 2004 general election in the most expeditious way possible. Division officials further stated that the Voting Section has procedures in place to track and respond to telephone calls that it might receive in relation to the November 2004 general election.

- Specifically, the Civil Rights Division told us that the Voting Section plans to use a telephone log such as the one used for the November 2002 election to record information on the caller's name, time of call, city and state, telephone number, subject of the call, and action taken on the call. The Division noted that the November 2002 log or any log that the Voting Section might use for the November 2004 election is a tool to ensure that the Voting Section does not miss calls raising important concerns over which it has jurisdiction and is not intended to definitively track all election-related allegations received.

46

**Enclosure I**

 **G A O**
Accountability * Integrity * Reliability

**Assessment of Internal Controls**
**Plans for the November 2004 Election**

The Civil Rights Division also cited other procedures that the Voting Section plans to use to track and respond to possible telephone calls related to the November 2004 general election. These procedures will include the Voting Section

- continuing its practice of assigning its staff to specific states for the purpose of reviewing citizen calls and letters;

- keeping a sufficient number of staff and supervisory attorneys in headquarters on election day to handle calls and to respond to allegations referred from Voting Section staff monitoring elections in the field on that day; and

- using contractors, if needed, to take telephone calls. The Division plans to determine the need to use contractors on a case-by-case basis.

47

**Enclosure I**



# Conclusions and Recommendations

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

48

Enclosure I

  **Internal Controls
Conclusions**

- The Voting Section received an unprecedented number of calls related to the November 2000 election and took steps to document telephone calls. According to the Voting Section, it also documented calls for the November 2002 election for which far fewer calls were received. The 2000 and 2002 election telephone logs differed somewhat in format, and improvements were made regarding how information was collected on the 2002 election telephone log. The Voting Section did not provide written instructions to contractors in November 2000 about how to complete the logs, but did provide written instructions to DOJ staff on completing some of the information for the 2002 logs. However, both logs lack precision for documenting the nature of the call and actions taken because broad categories were used to capture information on the call.

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

49

Enclosure I



**Internal Controls**
**Conclusions**

- Predictions of another close presidential election in November 2004, possible voter confusion over new requirements in the Help America Vote Act, and possible questions regarding voting equipment could result in the Voting Section again receiving a large number of telephone calls and possibly result in the use of contractors to handle calls since most of the Voting Section staff are monitoring election sites on election day. If the Voting Section collects more precise information about such calls, it is in a better position to assure the public that it addressed allegations of voting irregularities; if it documents actions taken more precisely, it is better able to reassure the public and Congress of its commitment to enforce federal voting rights statutes.

- The Voting Section has emphasized the importance of its monitoring of election day activities, yet the monitoring program has not been routinely tracked in the ICM system, its formal process for tracking and managing work activities. Voting Section officials told us they were considering tracking this program in the future, and we believe the significance of this program warrants a more formal tracking of monitoring efforts and resources dedicated to the program.

50

Enclosure I

 **G A O**
Accountability * Integrity * Reliability

# Recommendations

Confidence in election processes is of utmost importance. To help ensure confidence in the integrity of our voting processes, the Voting Section plays an important role in addressing voting irregularities. By accurately recording and documenting its activities in as clear a manner as possible, the Voting Section contributes to assuring the public and Congress of the integrity of our voting processes.

To reassure citizens of the integrity of our election processes and to reassure the public and Congress of DOJ's commitment to its responsibility to enforce federal voting rights statutes, we recommend that the Assistant Attorney General for the Civil Rights Division direct the Chief of the Voting Section to

- develop and implement procedures for the November 2004 election to ensure that the Voting Section has a reliable method of tracking and documenting allegations of voting irregularities and actions taken to address them. Procedures could include more precise categories for recording types of allegations, more precise categories to record actions taken, development of instructions on completing the telephone logs, and development and implementation of training for contractors, should they be needed, and

- implement a method to track and report on election monitoring program activities in the Interactive Case Management system.



51

**Attachment I**

**Voting Laws Enforced by the Voting Section Relevant to Contents of Briefing and Its Attachments**

According to the Voting Section, to carry out its mission, the Voting Section brings lawsuits against states, counties, cities, and other jurisdictions to remedy denials and abridgements of the right to vote; defends lawsuits that the Voting Rights Act authorizes to be brought against the Attorney General; reviews changes in voting laws and procedures administratively under Section 5 of the Voting Rights Act; and monitors election day activities through the assignment of federal observers under Section 8 of the Voting Rights Act. Provided below are short descriptions of some of the primary voting laws enforced by the Voting Section.

**Voting Rights Act Provisions**

- <u>Section 2 of the Voting Rights Act</u> (42 U.S.C. § 1973)

  Section 2 of the Voting Rights Act establishes a nationwide ban against any state or local election practices or procedures that deny or abridge a citizen's right to vote on account of race, color, or membership in a language minority group.[4] The Voting Rights Act provides that plaintiffs may establish a violation of Section 2 by demonstrating that "the political processes leading to nomination or election" deny members of the protected classes an equal opportunity to participate in the political process and to elect representatives of their choice. A court, under the Voting Rights Act, may also consider the extent to which members of the protected class have been elected to office in the jurisdiction, though Congress made clear that Section 2 does not confer upon protected classes a right to proportional representation.

- <u>Sections 203 and 4(f)(4) of the Voting Rights Act</u> (42 U.S.C. §§ 1973aa-1a, 1973b(f)(4))

  Sections 203 and 4(f)(4) are the language minority provisions of the Voting Rights Act and require certain covered jurisdictions to provide bilingual election materials and assistance based on census data pertaining to the population of citizens of voting age with limited English proficiency and their rate of illiteracy. With respect to Section 203, the Voting Rights Act requires jurisdictions to provide language minority assistance when certain criteria are met, such as when more than 5 percent of the citizens of voting age or more than 10,000 of the citizens of voting age are members of a single language minority group, and are unable to speak or understand English adequately enough to participate in the electoral process.

---

[4] 42 U.S.C. §§ 1973, 1973b(f)(2).

**Attachment I**

- <u>Section 208 of the Voting Rights Act</u> (42 U.S.C. § 1973aa-6)

  Section 208 of the Voting Rights Act authorizes voting assistance for blind, disabled, or illiterate persons. A voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

- <u>Section 5 of the Voting Rights Act</u> (42 U.S.C. § 1973c)

  Under Section 5 of the Act, "covered"[5] jurisdictions may not change their election practices or procedures until they obtain federal "preclearance" for the change. The act provides for either judicial or administrative preclearance. Under the judicial mechanism, covered jurisdictions may seek declaratory judgment from the United States District Court for the District of Columbia that the change has neither the purpose nor the effect of discriminating against protected minorities in exercising their voting rights. Under the administrative mechanism, covered jurisdictions may seek the same determination from the Attorney General. The Attorney General may deny preclearance by interposing and objection to the proposed change within 60 days of its submission.

- <u>Section 6 of the Voting Rights Act</u> (42 U.S.C. § 1973d)

  Section 6 of the Voting Rights Act provides for the appointment of federal examiners by order of a federal court or, with respect to certain covered jurisdictions, upon certification by the Attorney General. Federal examiners help to register voters by determining whether a citizen meets state eligibility requirements and must therefore be included in the registration rolls. A federal court, under the Voting Rights Act, may order the appointment of federal examiners to any jurisdiction sued under any statute to enforce certain constitutional voting guarantees.[6] In covered jurisdictions, the Attorney General may appoint examiners upon certification that the Attorney General has received at least 20 meritorious written complaints of voting discrimination or that the Attorney General otherwise believes that the appointment of examiners is necessary to protect voting rights.

---

[5] The jurisdictions targeted for "coverage" are those evidencing discriminatory voting practices, based upon a triggering formula, as defined in Section 4 of the Voting Rights Act (42 U.S.C. 1973b). The Attorney General and the Director of the Census have responsibility for determining which jurisdictions are covered by the triggering formula, and their determinations are not reviewable in any court and are effective upon publication in the *Federal Register*.

[6] <u>See also</u>, section 3 of the Voting Rights Act (42 U.S.C. § 1973a).

**Attachment I**

- Section 8 of the Voting Rights Act (42 U.S.C. § 1973f)

    Under Section 8 of the Voting Rights Act, federal observers may be appointed, upon request of the Attorney General, in any jurisdiction where an examiner is serving. Federal observers are to monitor elections and report whether persons entitled to vote were allowed to vote and whether their votes were properly counted.

- Section 11(b) of the Voting Rights Act (42 U.S.C. § 1973i(b)

    Section 11(b) of the Voting Rights Act prohibits persons, whether acting under color of law or not, from intimidating, threatening, or coercing, or attempting to intimidate, threaten or coerce, any person for voting or attempting to vote. Section 11(b) further prohibits intimidation, threats, or coercion of those persons aiding other persons in voting or exercising certain powers or duties under the Act.

**Uniformed and Overseas Citizens Absentee Voting Act of 1986** (42 U.S.C. §§ 1973ff to 1973ff-6)

The Uniformed and Overseas Citizens Absentee Voting Act of 1986 (UOCAVA), in general, requires states and territories to allow absent uniformed service voters, their spouses and dependents, and certain other overseas voters to register and vote absentee in elections for federal office. UOCAVA requires, for example, that a presidential designee prescribe a federal write-in absentee ballot for all overseas voters in federal elections. The ballot is to be used if the overseas voter applies for, but does not receive, a state absentee ballot.[7] While state law, in general, governs the processing of these federal write-in ballots, UOCAVA requires that states permit their use in federal elections.[8]

**National Voter Registration Act** (42 U.S.C. §§ 1973gg to 1973gg-10)

The National Voter Registration Act of 1993 (NVRA) established procedures designed to "increase the number of eligible citizens who register to vote in elections Federal office," while protecting "the integrity of the electoral process" and ensuring the maintenance of "accurate and current voter registration rolls."[9] NVRA requires all states to adopt certain federal voter registration procedures, except for those states that have no registration requirements or that permit election-day registration with respect to federal elections.[10] NVRA, for example, requires states to allow applicants for driver's licenses to register to vote on the same form.[11] NVRA also requires states

---

[7] 42 U.S.C. § 1973ff-2(a).
[8] Id. § 1973ff-1(3).
[9] 42 U.S.C. § 1973gg.
[10] 42 U.S.C. § 1973gg-2.
[11] Id. § 1973gg-3(a).

**Attachment I**

to provide voter registration forms and accept completed applications at various state agencies, including any office in the state providing public assistance, any office in the state that provides state-funded disability programs, and other agencies chosen by the state, such as state licensing bureaus, county clerks' offices, public schools and public libraries.[12] NVRA also contains detailed requirements regarding state removal of names from federal registration rolls.[13]

**Voting Accessibility for the Elderly and Handicapped Act of 1984** (42 U.S.C. §§ 1973ee to 1973ee-6)

Congress has passed legislation intended to improve access for elderly and handicapped individuals to registration facilities and polling places for federal elections. The Voting Accessibility for the Elderly and Handicapped Act of 1984 requires, with some exceptions, that political subdivisions within each state that are responsible for conducting elections assure that polling places and registration sits are accessible to handicapped and elderly voters.[14] If the political subdivision is unable to provide an accessible polling place, it must provide an alternative means for casting a ballot on election day upon advance request by the voter.[15] The act's requirements also include, for example, that each state or political subdivision provide a reasonable number of accessible permanent registration facilities, and that each state make available certain types of voting and registration aids such as large-type instructions and information by telecommunication devices for the deaf.[16]

**Title II of the Americans with Disabilities Act** (42 U.S.C. §§ 12131 to 12134) (enforced by the Disability Rights Section of the Civil Rights Division)

Title II of the Americans with Disabilities Act prohibits discrimination against qualified individuals with disabilities in all programs, activities, and services of public entities. It applies to all state and local governments, their departments and agencies, and any other instrumentalities or special purpose districts of State and local governments. According to the Voting Section, as construed by the courts, Title II requires that polling places be accessible to persons with disabilities with certain exceptions.

**Help America Vote Act** (42 U.S.C. §§ 15301 to 15545)

The Help America Vote Act of 2002 (HAVA), among other things, established a program to provide funds to states to replace punch care voting systems, established the Election Assistance Commission to assist in the administration of federal elections and to otherwise provide assistance with the administration of certain

---

[12] Id. §§ 1973gg-5(a)(2), (a)(3), (a)(4), (a)(6)(A)(i).

[13] Id. § 1973gg-6(b).

[14] 42 U.S.C. §§ 1973ee to 1973ee-6.

[15] Id. § 1973ee-1(b)(2)(ii).

[16] Id. § 1973ee-2, 1973ee-3.

**Attachment I**

federal election laws and programs, and established minimum election administration standards for States and units of local government with responsibility for the administration of federal elections. Certain HAVA provisions including those relating to voting system standards, provisional voting and voting information requirements, and computerized statewide voter registration lists are to be enforced by the Attorney General.[17]

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

---

[17] 42 U.S.C. § 15511.

**Attachment II**

**Role of the Criminal Division's Public Integrity Section in Federal Elections**

The Public Integrity Section (PIN), in conjunction with the 93 U. S. Attorneys and the FBI, is responsible for enforcing federal criminal laws applicable to federal election fraud offenses, among other things. Election fraud is conduct that corrupts the electoral processes for: (1) obtaining, marking, or tabulating ballots; (2) canvassing and certifying election results; or (3) registering voters. Election fraud can be committed with or without the participation of voters. Examples of election fraud that does not involve voter participation are ballot box stuffing, ghost voting, and "nursing home" frauds. Examples of election fraud that involves, at least to some extent, voter participation are vote buying schemes, absentee ballot fraud, voter intimidation schemes, migratory-voting or floating-voter schemes, and voter "assistance" fraud in which the voters' wishes are ignored or not sought. According to a PIN official, its attorneys spend about 10 percent of their time on election fraud investigations and trials.

PIN is also responsible for overseeing the U.S. Attorneys' and the FBI's investigation and prosecution of federal election fraud, one of the most common types of alleged federal election crimes. PIN's oversight entails (1) advising investigators and prosecutors on the application of federal criminal laws to election crimes, (2) reviewing all major election crime investigations and all proposed election crime charges, and (3) assisting with implementing DOJ's District Election Officer (DEO) program. Under the DEO program, PIN asks each of the 93 U.S. Attorneys to appoint an Assistant U.S. Attorney to serve a 2-year term as a DEO and provides training and guidance to DEOs on carrying out their responsibilities. DEOs, whose responsibilities are performed in conjunction with their other responsibilities, are to

- screen and conduct preliminary investigations of complaints, in conjunction with the FBI and PIN, to determine whether they constitute potential election crimes and should become matters for investigation;
- oversee the investigation and prosecution of election fraud and other election crimes in their districts;
- coordinate their district's (investigative and prosecutorial) efforts with DOJ headquarters prosecutors;
- coordinate election matters with state and local election and law enforcement officials and make them aware of their availability to assist with election-related matters;
- issue press releases to the public announcing the names and telephone numbers of DOJ and FBI officials to contact on election day with complaints about voting or election irregularities and answer telephones on election day to receive these complaints; and
- supervise a team of Assistant U.S. Attorneys and FBI special agents who are appointed to handle election-related allegations while the polls are open on election day.

**Attachment II**

Our analysis of information from PIN on election fraud matters showed that U.S. Attorneys and PIN attorneys initiated a total of 61 election fraud matters, or investigations, related to election years 2000 through 2003. Most of the 61 matters related to elections held in 2002. Matters were initiated in 28 states and 1 U.S. territory (the U.S. Virgin Islands) and ranged from 1 to 7 matters per state/territory over the 4-year period. The most frequent allegations of election fraud were for absentee ballot fraud and vote buying. According to PIN, many of these matters resulted in indictments and subsequent convictions.

According to the Criminal Division, the information provided by PIN does not include all election fraud investigations that the U.S. Attorneys have initiated because (1) U. S. Attorneys are not required to consult with PIN for preliminary investigations as opposed to grand jury investigations, which require consultation; (2) PIN did not track election fraud investigations prior to October 2002; and (3) election fraud investigations are sometimes initiated under non-election statutes.

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

## Attachment III

### Election Jurisdictions Monitored during Calendar Years 2000 through 2003

**Table 1: Attorney General-Certified Election Jurisdictions Monitored during Calendar Years 2000 through 2003**

| State | Election jurisdictions monitored during | | | |
|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 |
| | Hale County | | Hale County | |
| | Selma (Dallas County)[a] | | Chambers County | |
| | Lowndes County | | | |
| Arizona | Apache County | | Apache County | |
| | Navajo County | | Navajo County | |
| Georgia | Randolph County [a] | | Randolph County | |
| | Brooks County | | | |
| | Sumter County | | | |
| | Twiggs County | | | |
| Louisiana | Tensas Parish | | | |
| Mississippi | Aberdeen (Monroe County)[a] | Clarksdale (Coahoma County)[b] | Adams County | Greenville (Washington County) |
| | Bolivar County | Isola (Humphreys County) | Amite County | Humphreys County |
| | Grenada County | Macon (Noxubee County) | Centreville (Wilkinson County) | Noxubee County [a] |
| | Neshoba County | Sunflower (Sunflower County) | Drew (Sunflower County) | Neshoba County |
| | Newton County | | | Newton County |
| | | | | Kemper County |
| | | Vicksburg (Warren County)[a] | | Leake County |
| | | Webb (Tallahatchie County) | | Jones County |
| | | | | Winston County |
| New York | Kings County | Kings County | Kings County | |
| | New York County | New York County | New York County | |
| | | Bronx County | | |
| South Carolina | Marion County [a] | Ridgeville (Dorchester County) | Ridgeville (Dorchester County)[a] | |
| Texas | Irving (Dallas County) | Irving (Dallas County) | Titus County | |
| **Total jurisdictions** | **19** | **11** | **13** | **9** |

Source: GAO's analysis of election monitoring data provided by DOJ's Voting Section.

[a]Elections were monitored by DOJ attorneys and professional staff only, not OPM federal observers.
[b]Three elections were held in Clarksdale (Coahoma County), Mississippi, in calendar year 2001. Only DOJ attorneys and professional staff monitored one of the three elections, held on June 5, 2001. For the remaining two elections held that year, DOJ attorneys and professional staff accompanied OPM observers in monitoring the elections.

**GAO-04-1041R DOJ Activities to Address Past Voting Irregularities**

cited in DNC v. Hobbs, No. 18-15845 (9th Cir.), January 2020

## Attachment III

**Table 2: Court-Ordered Election Jurisdictions Monitored during Calendar Years 2000 through 2003**

| State | Election jurisdictions monitored during | | | |
| | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| California | Alameda County[a] | | | |
| Illinois | | Cicero (Cook County) | | Cicero (Cook County)[b] |
| Louisiana | [c] | [c] | [c] | [c] |
| Michigan | City of Hamtramck | City of Hamtramck | City of Hamtramck | City of Hamtramck |
| New Jersey | Passaic County | Passaic County | Passaic County | Passaic County[d] |
| New Mexico | Bernalillo County | | Bernalillo County | |
| | Cibola County | | Cibola County | |
| | Sandoval County | | Sandoval County | |
| | Socorro County | | Socorro County | |
| Pennsylvania | | Reading (Berks County)[b] | Reading (Berks County)[b] | Reading (Berks County) |
| Utah | San Juan County[e] | | San Juan County[e] | |
| **Total jurisdictions** | **8** | **4** | **8** | **4** |

Source: GAO's analysis of election monitoring data provided by DOJ's Voting Section.

[a]The court order for Alameda County, California, was in effect until January 22, 2001.
[b]Elections were monitored by DOJ attorneys and professional staff only, not OPM federal observers.
[c]A court order for St. Landry Parish was entered into on December 5, 1979. Data from the Voting Section shows that as of August 26, 2003, the court order was still in effect and that no elections were monitored at this parish during calendar years 2000 through 2003.
[d]Four elections were held in Passaic County, New Jersey, in calendar year 2003. Only DOJ attorneys and professional staff monitored one of the four elections, held on May 13, 2003. For the remaining three elections held that year, DOJ attorneys and professional staff accompanied OPM observers in monitoring the elections.
[e]The court order for San Juan County, Utah, was in effect until December 31, 2002.

## Attachment III

**Table 3: Other Election Jurisdictions Monitored during Calendar Years 2000 through 2003**

| State | Election jurisdictions monitored during | | | |
| | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| California | | | San Francisco County | San Francisco County |
| Connecticut | | | Waterbury (New Haven County) | |
| Florida | | Osceola County | Osceola County | |
| | | | Duval County | Duval County |
| | | | Miami-Dade County | Miami-Dade County |
| | | | Century (Escambia County) | |
| | | | Orange County | |
| | | | Broward County | |
| Georgia | Putnam County | | Atlanta (Fulton County) | |
| Hawaii | | | | Honolulu County |
| Kentucky | | | | Jefferson County |
| Louisiana | | | St. Martinville (St. Martin Parish) | Baker (East Baton Rouge Parish) |
| | | | Winnsboro (Franklin Parish) | Tangipahoa Parish |
| Massachusetts | | Lawrence (Essex County) | | Lawrence (Essex County) |
| Michigan | Flint (Genesee County) | | | |
| Missouri | | St. Louis | St. Louis | St. Louis |
| New Jersey | | | Hudson County | |
| | | | Middlesex County | |
| New Mexico | McKinley County[a] | | San Juan County | |
| New York | | Queens County[a] | Queens County | New York City (Queens County) |
| | | Suffolk County | Suffolk County | Brentwood Union Free School District (Suffolk County) |
| Ohio | | Maple Heights (Cuyahoga County) | | |
| South Carolina | Marion County | | | |
| Texas | Forth Worth (Tarrant County) | Bexar County | Kenedy ISD (Karnes County) | Harris County |
| | | Comal County | Seagraves (Gaines County) | Moore County |
| | | Guadalupe County | | |
| **Total jurisdictions** | **5** | **9** | **19** | **13** |

Source: GAO's analysis of election monitoring data provided by DOJ's Voting Section.

Note: DOJ attorneys and professional staff monitored the election jurisdictions shown in this table unless otherwise noted.

[a]OPM federal observers also monitored elections in these counties even though the counties are not under Attorney General-certification or court order.

Attachment IV

## Summaries of Election-Related Preliminary Investigation, Matters, and Cases Initiated from November 2000 to December 2003

### Election-Related Closed Matters and Open Case Initiated during November or December 2000

| No. | Matter/Case | Jurisdiction | Date matter initiated | DJ No. |
|-----|-------------|--------------|-----------------------|--------|
| 1 | Matter | Florida | December 2000 | No[a] |
| 2 | Matter | Hillsborough County, Florida | November 2000 | No[a] |
| 3 | Matter | Palm Beach County, Florida | November 2000 | Yes |
| 4 | Matter | Several counties in Florida | November 2000 | Yes |
| 5 | Matter | DeKalb County, Georgia | December 2000 | Yes |
| 6 | Matter | Gwinnett County, Georgia | November 2000 | Yes |
| 7 | Case | St. Louis, Missouri | November 2000 (case filed in August 2002) | Yes |

Source: DOJ Civil Rights Division.

[a] For the matters that the Voting Section initiated in Florida after the 2000 election, the Voting Section initially used a general DJ number for all work on investigations and inquiries related to the Florida election. This number was opened in November 2000. Subsequently, the Voting Section assigned separate DJ numbers for individual matters. The 2000 matters in Florida and Hillsborough County, Florida, were inadvertently not given an individual DJ number.

**Summary of Election-Related Closed Matters and Open Case Initiated during November or December 2000**

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| 1. The Voting Section received a large number of complaints alleging that Florida voters arrived at the polls expecting to be properly registered to vote, but were told that their names were not on the voter rolls. Some people who tried to vote but whose names were not on the voter rolls were often told to stand in another line so election officials could be called to verify their registrations, but many voters alleged that office phones were busy all day and registrations could not be verified. Some voters apparently left and some remained at the polls until they closed, at which time they were apparently told they could not vote because the polls were closed. | Voting Section staff contacted individuals mentioned in complaints that the NAACP had forwarded to determine the nature of their alleged registration problems. Voting Section staff monitored election-related hearings and lawsuits in Florida to see what steps the state was going to take. The Voting Section reviewed election reform legislation that Florida enacted in 2001. | Interviews by Voting Section staff with individuals mentioned in the complaints did not reveal a distinct pattern of registration problems in any one Florida county sufficient to warrant litigation, but taken as a whole the registration complaints seemed to indicate general problems with the state of compliance with NVRA provisions for clarity and processing of voter registration forms, transmission of the forms to election officials, education of registration personnel, adherence to NVRA registration deadlines, maintenance of registration lists, ability to verify registration at the polls, and education of voters, state registration personnel, election officials, and poll workers. | Florida enacted election reform legislation in 2001 requiring, among other things, that the state implement a statewide voter registration database, permit provisional voting, and provide funds to counties for voter education and poll worker training. The Voting Section reviewed this law under Section 5 of the Voting Rights Act and precleared it on March 28, 2002. With respect to this investigation, the Voting Section noted that these reforms should help address the problems alleged to have occurred in 2000. While the Voting Section further noted that the |

Attachment IV

| | | | |
|---|---|---|---|
| | | *cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020* | new state legislation did not appear specifically to address all the NVRA-related issues, such as the voter registration process and education of motor vehicle agency and other state agency employees regarding state registration procedures and requirements in federal law, such issues could be addressed through design and implementation of the forthcoming election procedures to carry out the requirements of the new law. Therefore, the Voting Section determined that it would monitor Florida's NVRA actions in the future in light of the new state legislation and ongoing federal legislative efforts in election reform which might also impact Florida's election procedures.<br><br>The Voting Section closed the matter because, based on its monitoring of the situation and the provisions in the state law pertinent to registration that had been precleared, it concluded that the problems which occurred in the 2000 election were being adequately addressed. |
| 2. The NAACP National Voter Fund alleged (1) that on Election Day 2000, sheriff's deputies in marked cars in Hillsborough County, Florida, blocked access to a polling place, (2) that their presence | Voting Section staff met with, among others, officials from the county sheriff's office and several local residents, and spoke with a poll watcher to gather additional | The sheriff's office reported that the presence of sheriff's deputies near the polling place was related to a burglary nearby. One of the sheriff's deputies | The Voting Section closed the matter because the complaint lacked merit since there was no evidence on any of the |

**Attachment IV**

| | | | |
|---|---|---|---|
| had an intimidating effect on voters, and (3) that at least on one occasion they harassed a voter. An African-American man approached sheriff's deputies after they left the scene of a burglary complaining that he was not allowed to vote. | observations. | learned two days after the election that the same man who had approached the deputies on Election Day returned to the polling place and successfully voted. A poll worker observed the presence of the sheriff's cars around the same time they were responding to the burglary, and observed that no voter had been deterred from voting due to the police activity. | allegations raised. |
| 3. It was alleged that the design of the butterfly ballot in Palm Beach County, Florida, violated federal voting rights laws. | The Voting Section opened a matter related to this issue and reviewed federal law for which the Section had enforcement authority to determine if any action was appropriate. | The Voting Section determined that there was no basis for asserting federal jurisdiction. | The Voting Section concluded that because it had no jurisdiction concerning this matter, no further action was warranted. In addition, according to the Voting Section, the new Florida election reform law should help to alleviate faulty ballot design by providing for greater oversight of ballot design. |
| 4. Four state troopers with the Florida Department of Highway Safety and Motor Vehicles ran a driver's license checkpoint on Election Day 2000 in Leon County, Florida. This checkpoint was located near (about a mile from) a voting precinct. Another checkpoint was held in Bay and Escambia Counties. According to a highway patrol official, this checkpoint was not located near a voting precinct. | The Voting Section opened a matter to investigate this issue and asked the Florida State Office of the Attorney General about the checkpoint in Leon County. A Voting Section attorney also spoke with an African-American voter who was stopped at one of the driver's license checkpoints. | The Voting Section's investigation revealed that the Florida Highway Patrol had set up a traffic check stop close to a polling place (about a mile away) located in a predominantly African-American neighborhood. The Voting Section investigation also indicated that the troopers' traffic stop plan had not been pre-approved by their commander, as is the standard procedure. Further investigation revealed that the traffic checkpoint was in effect for about 3 hours, and a higher number of white drivers were stopped than African-American drivers. According the Voting Section, an African-American voter who was | The Voting Section closed the matter because there was no evidence of intimidation or racial intent to affect or intimidate voters. |

Cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

**Attachment IV**

| | | stopped was treated courteously and proceeded to vote without incident. | |
|---|---|---|---|
| 5. A U.S. Representative raised regarding long voting delays in predominantly African-American precincts in DeKalb County, Georgia during the November 2000 election. It was alleged that there were no corresponding delays in majority white precincts. In one predominantly African-American precinct, several hundred voters apparently left the precinct without voting after waiting in line for several hours. In districts with a majority of white residents, voting lines apparently moved quickly with some people being able to vote in less than 15 minutes. In addition, two people complained about possible voting irregularities during a March 2001 election. | A Voting Section attorney met with the following in Georgia to address these concerns: (1) the DeKalb County Elections Supervisor, (2) the Chairman of the DeKalb County Elections Board, (3) the Gwinnett County Elections Supervisor, (4) the president of the DeKalb County NAACP, (5) the Assistant DeKalb County Attorney, and (6) one of the representative's staff members. The Voting Section attorney received and reviewed documents from both counties' elections departments regarding the November 2000 election.

The Voting Section attorney requested additional documents from the Assistant DeKalb County Attorney and DeKalb County Elections Supervisor to determine if there was an unequal division of resources among African-American and white districts. These documents outlined the budget for expenses related to the elections from 1998 through 2000. The Voting Section attorney also spoke with the president of the DeKalb County NAACP and the U.S. Attorney for the Northern District of Georgia.

The Voting Section attorney spoke with the two persons alleging fraud during the March 2001 election. | The Voting Section attorney's analysis of the documents that DeKalb County provided revealed that most of the county's polling places that stayed open past closing time were located in majority African-American precincts. The polls' extended hours almost uniformly resulted from there being large numbers of people in line as well as insufficient numbers of poll workers and voting machines. The attorney also determined that there had been no unequal division of electoral resources between majority white and majority African-American precincts. According to investigations of the November 2000 election by the county's elections department, the area manager and his assistants at the main precinct of concern failed to contact the precinct office about the long lines and insufficient voting machines. The former area manager also denied the poll workers' requests for additional voting machines, stating none were available. The president of the DeKalb County NAACP, staff in the office of the U.S. Attorney for the Northern District of Georgia, and the DeKalb County Elections Supervisor did not receive complaints related to Election Day in DeKalb County.

With respect to the March 2001 allegations, the Voting Section attorney noted that the two | The county implemented the following changes for the March 2001 election: (1) increased the number of voting machines, (2) assigned additional poll workers and managers, (3) assigned at least 10 additional staff members to answer telephones at the Elections Department and installed 10 more telephone lines, and (4) gave the Elections Department and area managers cell phones in case regular telephone lines were busy. The Voting Section determined that a dramatic improvement resulted from these remedial actions and, as a result, closed the matter. |

**GAO-04-1041R DOJ Activities to Address Past Voting Irregularities**

**Attachment IV**

| | | | |
|---|---|---|---|
| | | persons could not identify the precincts where alleged irregularities occurred, and that they did not have allegations of racial intimidation or vote suppression. The Voting Section attorney determined that their complaints seemed to concern Georgia state law, suggested that they explore their state law remedies, suggested that they contact the county elections department and the office of Georgia's Secretary of State, and asked them to keep the Voting Section attorney informed of developments. | |
| 6. The Voting Section received information that people in Gwinnett County, Georgia who had registered to vote via the Georgia Department of Public Safety (DPS) were not on the voter registration rolls and were not allowed to vote. DPS operated vehicle registration sites in Georgia. Subsequently, DPS began the process of transitioning National Voter Registration Act (NVRA) responsibilities to the state's newly created Department of Motor Vehicles (DMV). It was alleged that voters were turned away from the polls and were not offered provisional ballots. Some voters were told to go to the county registration office, but officials there told them they were not allowed to vote. | The Voting Section spoke with staff in the Georgia Attorney General's office and the Georgia DPS and DMV, a voter who raised the allegations, and the Deputy Director of Elections in the Secretary of State's Office. The Voting Section monitored the transition of NVRA responsibilities from DPS to the new DMV from April 2001 to April 2002. | The Voting Section's investigation revealed that the problem likely arose from the DPS paperless system to obtain and renew a driver's license. The process seemed to result in people believing they had been registered to vote when they had not. A person who indicated the intention to register to vote did not receive any confirmation at the time of the transaction.

The Voting Section's investigation revealed that since DPS implemented a paperless system in 1996, the percentage of those who registered to vote at DPS sites when they applied or renewed their licenses had dropped almost every year. There was also evidence that DPS officials knew of concerns regarding the agency's paperless registration system from its implementation. | The Voting Section closed the matter in April 2002 mostly because the state had created a new agency, the Department of Motor Vehicle Safety, to which responsibility for voter registration was in the process of being transitioned. The Voting Section determined this system would remedy the problem. |
| 7. DOJ, on behalf of the United States, alleged that the St. Louis Board of Election Commissioners' (referred to hereafter as the Board) placement of eligible voters on | Following an investigation, DOJ filed a complaint with the U.S. District Court in the Eastern District of Missouri on August 14, 2002. On the same date, | The Voting Section alleged that the state was in violation of NVRA and filed a complaint. | The consent order gives court jurisdiction over the proceeding until January 31, 2005. The consent order |

Attachment IV

| | | | |
|---|---|---|---|
| inactive status, when combined with election-day procedures that inactive voters were required to follow to restore their active voter status and vote during the November 2000 and March 2001 elections, constituted a removal of those voters from the voter registration rolls in violation of Section 8 of NVRA. As of the November 2000 general election, more than 54,000 registered voters in St. Louis had been designated as inactive and excluded from the lists of eligible voters following a series of mail canvasses that the Board conducted of its voter registration rolls. These mail canvasses did not include the notices required by Section 8(d)(2) of NVRA. The Board did not make an effort to notify inactive voters that their registration status had changed, that their names would not appear on the voter registration lists, or that they would face more administrative efforts on election day before being permitted to vote.

As a result, certain eligible, but inactive voters, were not able to vote in the November 2000 general election and March 2001 municipal primary election due to the lack of an adequate infrastructure (i.e., insufficient phone lines, working telephones, and staff) in place to enable voters to complete the verification procedures required by the Board on election day. For the November 2000 election, over 300 eligible inactive voters were able to obtain authorization to vote after going to the Board's headquarters as instructed by the election judges. | DOJ entered into a consent order with the city of St. Louis. | | requires the Board to initiate procedures to remedy the problems that occurred during the November 2000 election, such as improved methods of notifying voters who are moved to an inactive status, improved methods of canvassing, and improved resources to process eligible voters not included on the rolls on Election Day. This relief included requiring that every polling place have a complete list of registered voters, including inactive voters, and a polling place locator to assist voters in finding their correct precincts.

The consent decree is valid until January 31, 2005. The case remains open to monitor implementation of the consent order. |

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

GAO-04-1041R DOJ Activities to Address Past Voting Irregularities

**Attachment IV**

**Election-Related Closed Matters and Open Cases Initiated during Calendar Year 2001**

| No. | Matter/Case | Jurisdiction | Date matter initiated | DJ No. |
|---|---|---|---|---|
| 1 | Matter | Florida | March 2001[b] | Yes |
| 2 | Matter | Florida | June 2001[b] | Yes |
| 3 | Matter | Florida | June 2001[b] | Yes |
| 4 | Matter | Florida | August 2001[b] | No [c] |
| 5 | Matter | Broward County, Florida | October 2001[b] | Yes |
| 6 | Matter | Miami-Dade County, Florida | June 2001[b] | Yes |
| 7 | Matter | Miami-Dade County, Florida | June 2001[b] | Yes |
| 8 | Matter (election monitoring) | New York, New York | July 2001 | Yes |
| 9 | Matter | Georgetown County, South Carolina | April 2001 | Yes |
| 10 | Matter | Seagraves, Texas | July 2001 | Yes |
| 11 | Case | Miami-Dade County, Florida | March 2001 (case filed in June 2002)[b] | Yes |
| 12 | Case | Orange County, Florida | June 2001 (case filed in June 2002)[b] | Yes |
| 13 | Case | Osceola County, Florida | June 2001 (case filed in June 2002)[b] | Yes |
| 14 | Case | Berks County, Pennsylvania | March 2001 (case filed in February 2003) | Yes |
| 15 | Case | Tennessee | April 2001 (case filed in September 2002) | Yes |

Source: DOJ Civil Rights Division.

[b] Each of these Florida matters was initiated in the period shortly after the November 2000 election—i.e., in November or December 2000—and was reported under the general DJ number for Florida discussed previously (see note a under the summary table for November and December 2000 and note c below). The above dates are the dates they received individual DJ numbers.

[c] For the matters that the Voting Section initiated in Florida after the 2000 election, the Voting Section initially used a general DJ number for all work on investigations and inquiries related to the Florida election. This number was opened in November 2000. Subsequently, the Voting Section assigned separate DJ numbers for individual matters. The 2000 matters in Florida and Hillsborough County, Florida, were inadvertently not given an individual DJ number.

## Attachment IV

**Summary of Election-Related Closed Matters and Open Cases Initiated during Calendar Year 2001**

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| 1. There were allegations made by students at Florida A&M University (FAMU) in Tallahassee (Leon County), Florida, and Bethune-Cookman College in Daytona Beach, Florida, regarding discriminatory treatment of African-American students in the registration process or at the polls. First-time voters, apparently unfamiliar with the registration process, had greater difficulty registering to vote. Older students did not seem to have such difficulty. | The Voting Section's investigation consisted of phone interviews with Bethune-Cookman students, on-campus interviews of FAMU students and student government leaders, and a review of statements taken by a representative of the Service Employees International Union legal department working in association with the NAACP.

A Voting Section attorney interviewed three students on FAMU's campus who claimed to experience difficulty voting, but were able to vote. The Voting Section attorney left his contact information with FAMU's student government association for any individuals who wanted to give statements regarding voting problems but could not meet with the attorney.

The Voting Section attorney attempted to contact all ten students from Bethune-Cookman, but was only able to speak with three. The attorney sent letters to the remaining students but never received responses to the letters.

The Voting Section attorney followed up with his contacts at FAMU, but the Voting Section did not receive any response from students to its efforts to conduct further inquiries. The student government association | The Voting Section determined that the problems were likely attributable to voter confusion, not racial animosity. The Voting Section noted that the incidents of the three FAMU students who successfully voted were isolated incidents, and since each student ultimately voted, the problems they suggested did not suggest a pattern of intimidation or attempted vote denial.

The Voting Section concluded that most of the allegations were likely to have been the result of students not being familiar with the voting process. Many students had registered at their permanent home addresses and did not understand they had to re-register in Leon County. The Voting Section found that voter inexperience and confusion were to blame at Bethune-Cookman, not any pattern of discriminatory treatment. | The Voting Section closed the matter because it lacked merit based on the evidence gathered during the investigation. |

**GAO-04-1041R DOJ Activities to Address Past Voting Irregularities**

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| | also posted and distributed flyers and sent out internet notices with the attorney's contact information. Neither the attorney nor the student association at FAMU received additional allegations of voting irregularities. | | |
| 2. Beginning in 1999, under Florida state law, the state contracted with a firm to compare names of registered voters with names of convicted felons who under Florida law were disqualified from voting. The state elections division sent lists of felon names for each of Florida's 67 counties to election officials in those counties for investigation and purging. The Voting Section was concerned that county and state actions with regards to the purging process may have been flawed and impermissible under NVRA. The Voting Section questioned whether eligible voters had been inadvertently removed from the voter rolls. | The Voting Section reviewed testimony from Florida election officials and representatives of the company that compiled the database and obtained information on how the lists of felons' names were matched to voter registration lists. The Voting Section also did extensive additional investigation to determine whether the method in which Florida compiled a list of felons and how they purged these felons violated any of the statutes enforced by the Voting Section.

In addition, the Voting Section reviewed Florida's 2001 election reform law pursuant to Section 5 of the Voting Rights Act. This review included provisions of the new law related to the voter purge procedures that were the subject of the investigation. | The evidence gathered by the Voting Section showed that the matching at the state level was set up in a way that it captured names that were less than definite matches. The Voting Section also learned that after receiving the state-generated list, counties' actions varied. For example, some counties refused to use the list because they perceived it to contain many errors. Other counties sent letters to all the people on the state's list telling them that their names were matched to those of disqualified felons, and they would be required to show their eligibility to vote or be removed from the rolls. The Voting Section determined that evidence gathered for this matter was inconclusive, but showed there was a possibility that voters could have been removed in violation of federal law.

With respect to the Section 5 review of the 2001 election reform law, this law was precleared on March 28, 2002 after careful review. Preclearance was granted only after receiving explicit assurances from the Attorney General of Florida describing how the law would be implemented with respect to voter purge lists | The Voting Section closed the matter in April 2002. The closing memo noted that the new statute appears to require no additional procedures for accurate name matching compared to the old law. It also noted that the new statute appeared to codify a procedure used by many counties under prior law where voters whose names are matched by the state must affirmatively prove their eligibility to avoid removal.

However, the Voting Section closing memo also noted that the new voter purge procedures (which included the assurances made by the Attorney General of Florida to protect voters from erroneous purging) had been precleared on March 28, 2002. It further stated that the Florida felon purge statute in effect at the time of the 2000 election no longer existed and that any litigation against it based on how that law was implemented would be moot. Based on these two factors, the matter was closed. The memo also stated that the Voting Section may open a new investigation depending on any information received regarding the operation of the new statute and related regulations.

Finally, the closing memo |

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| | | generated by the state pursuant to the new state law. These assurances included (1) a statement that there would not be a presumption in favor of the accuracy of the statewide database, and any presumption would be in favor of the voter and (2) the appearance of a voter's name on any voter purge list of potentially ineligible voters generated by the state would not by itself confirm a voter's ineligibility, and that the burden of determining ineligibility was on county supervisors of elections, a burden which must meet the highest degree of proof. These assurances were specifically noted when preclearance was issued by the Voting Section. | also made note of pending litigation in the case of *NAACP* v. *Harris*, which included allegations that the voter purge list used in 2000 violated the NVRA. Subsequent to the April 2002 closing of this matter, a settlement was reached in this case which required new procedures for how the state was to complete its voter purge lists in the future. This change in voter purging procedures was precleared under Section 5 of the Voting Rights Act in 2003. |
| 3. A newspaper article provided to DOJ by a member of the U.S. Senate provided information that officials in several Florida counties disabled a feature in optical scan voting machines used during the November 2000 election to detect ballots spoiled by over-voting and allow voters to correct the error. | A Voting Section attorney analyzed rates of ballot spoilage in counties that had disabled the spoilage detection function in their optical scan machines and compared those rates to those of ballot spoilage in counties that had disabled this function. | The investigation found that Florida counties with optical scan machines that activated the spoilage detection technology had lower rates of ballot spoilage than counties that did not have or did not use the technology. Some counties that had this detection feature disabled it on their voting machines. There were also isolated instances where the technology was either disabled or failed to function properly. The Voting Section determined that there was no evidence that the disabling of this feature was done with a discriminatory effect or purpose. | The Voting Section closed this matter because it found no evidence indicating a violation of federal law. Moreover, election reform legislation enacted in Florida in May of 2001 requires all counties to acquire voting machines with precinct-based spoilage detection technology by September 2002. The election reform law also requires counties to activate this technology during voting. The Attorney General, under Section 5 of the VRA, precleared election procedures provided for in this legislation. |
| 4. The U.S. Commission on Civil Rights issued a report that posed questions regarding | The Voting Section reviewed the findings of the Commission's report regarding ballot | Several analyses suggested patterns of racial disparity in the ballot rejection practices | The Voting Section concluded that there was no basis for bringing a Section 2 lawsuit against |

Filed with DNC v. Hobbs, No. 18-15845 and 18-15857 on Jan. 22, 2020

**Attachment IV**

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| spoiled ballots in Florida during the November 2000 election. The Commission questioned whether the racial disparity in spoiled ballots that occurred in Florida in 2000 was a violation of Section 2 of the Voting Rights Act. The Commission stated that the U.S. Department of Justice (DOJ) should specifically investigate whether the racial disparity in spoiled ballots violated Section 2. | rejection disparity and several newspaper studies of the spoilage issue. It then prepared a factual and legal analysis of issues raised in the Commission's report to determine if a Section 2 violation had occurred. | of a few Florida counties during one election. However, the Voting Section determined that the disparity alone did not meet the standards for a Section 2 lawsuit. The Voting Section noted that more investigation, analysis, and careful thought would have to be given to the causes of ballot rejection problems in Florida, the actual level of racial disparities, and the role played by state and county officials before a decision could be made concerning a Section 2 violation. | Florida on the basis of the evidence of racial disparities found in spoilage rates. Furthermore, it was determined that because Florida's 2001 election reform law required new election machines, significant steps had been taken by Florida towards remedying the election problems with respect to voting machines. The Voting Section also concluded that it would make sense to monitor the actions of Florida and its counties over the subsequent few years to see whether they would follow through in acquiring new voting machines with error detection technologies and educating voters to see what impact such actions would have on ballot rejection rates. |
| 5. DOJ received allegations of inaccessible polling places and voting booths in Broward County, Florida. | The Voting Section opened a matter and looked into the county's compliance with the Voting Accessibility for the Elderly and Handicapped Act (VAEHA). The Voting Section sent a letter to the Broward County Supervisor of Elections requesting specific information regarding procedures in place to ensure the physical accessibility of polling places for federal elections pursuant to VAEHA.

Attorneys from the Voting Section and the Civil Rights Division's Disability Rights Section met with the county supervisor of elections and the supervisor's attorney to discuss physical accessibility of polling places and | Based on information that the county provided, the Voting Section found that the county conducted polling place surveys in 1999 and conducted another survey devised to address the problem of disabled voters' access to the polls. The investigation revealed that the people conducting the surveys had no training in accessibility standards. The county provided the Voting Section attorney with a memo and a plan stating that Florida intended to purchase new touch-screen voting machines with an audio component for the blind or visually impaired, with one such voting machine available per precinct. | As a result of the problems experienced in the 2000 election, the Florida legislature enacted changes to its accessibility requirements for polling places and voting machines. In light of this and the Voting Section's determination that the new Florida law went further than the requirements in VAEHA, the investigation was closed. |

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| | purchase of new voting machines. The Voting Section and Disability Rights Section's attorneys requested documentation such as copies of county surveys covering accessibility procedures, a list of polling place changes spurred by accessibility concerns; a list of disability community contacts with whom officials from the office of the county supervisor of elections met, and procedures for reassignment or curbside voting. The county provided both attorneys with a demonstration of the new touch-screen voting machines with an audio component for the blind or visually impaired. The Voting Section attorney also contacted the county supervisor of election's attorney requesting information on VAEHA compliance. | | |
| 6. It was alleged that a crowd of persons attempted to intimidate election officials on the canvassing board of Miami-Dade County, Florida, during the presidential vote recount after the November 2000 election. It was alleged that this group's activities at the county courthouse during the recount intimidated the canvassing board into abandoning the recount. | The Voting Section attorney reviewed the allegations along with numerous accounts of events that transpired that day. | Based on the information gathered, the Voting Section determined that no cause of action existed under the civil enforcement provisions of the federal voting laws that the Voting Section is charged with enforcing. | The Voting Section concluded that no further investigation was warranted and closed the matter. |
| 7. There were allegations made after the November 2000 election that ballot boxes in two predominantly minority precincts in Miami-Dade County, Florida, had not been picked up on | The Voting Section attorney examined voter turnout data for the two precincts in question. The Voting Section attorney also held discussions with the First Assistant County | The discussions that the Voting Section conducted with counsel for Miami-Dade County indicated that all of the county's ballot boxes had been accounted for on that day. According to the county | The Voting Section closed the matter because it lacked merit. According to the Voting Section, the evidence that the Voting Section collected made it seem doubtful that there were any missing ballot |

**Attachment IV**

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| Election Day, and that they were allegedly later found in the polling places. | Attorney in Miami-Dade County, who in turn contacted the county supervisor of elections. | supervisor of elections, the boxes that were later located in the two precincts contained election supplies, not ballots. Analysis of data from the two precincts indicated that both precincts reported voter turnout rates in the expected range given the county's overall turnout rate. | boxes. |
| 8. The Voting Section opened this matter in August 2001 to initiate the monitoring of an election in New York City in November 2001 on the basis of observations made during the November 2000 election. Thirty federal observers and seven DOJ staff members monitored polling place procedures during municipal general elections in 2001 in Kings County (also known as Brooklyn) and in Bronx County. The Attorney General had previously certified both counties for federal observers pursuant to Section 6 of the Voting Rights Act. Also, 17 federal observers and 5 Voting Section attorneys monitored polling place procedures during the general election in 2002 in Brooklyn. | In pre-election activities, two Civil Rights Division attorneys met with officials from the New York City Board of Elections to discuss concerns about preparations for the election, including the need for poll worker training for the election, the need for voting machines to accommodate the number of registered voters, the need for Spanish-language voter registration materials for poll workers to distribute minority language assistance, and consolidation of polling places. A Voting Section attorney also attended four poll-worker training classes. After the election, the Voting Section attorneys met with several Board of Elections officials to debrief them. | Thirty federal observers monitored activities at 31 polling places in Bronx County and 12 polling places in Brooklyn County during the municipal general elections. Three staff members from DOJ's Civil Rights Division and one AUSA for the Southern District of New York traveled with the observers to provide additional monitoring. Two Voting Section staff members visited six polling places in both counties. During the election, observers found that materials to be displayed to inform Spanish-speaking voters of assistance to interpret the ballot were not always clear or in public view at nearly half of the polling places in both counties. The Board of Election officials were informed of this and took action. These officials noted that it was up to each polling place inspector to display the materials they are given. Poll workers were observed asking voters for identification, which was in violation of New York State law; Board of Election officials were notified of this and went to the polling place to address the issue. DOJ monitors did not witness any Spanish-speaking poll workers at the 12 | The Voting Section closed the matter because the monitoring of the election was completed. Voting Section staff could not comprehensively identify failure by individual poll workers to post or provide all materials to Spanish-speaking voters because of the large number of election districts—nearly 2,000—and the small number of observers. However, the Voting Section found that the Board of Elections was very responsive to all of the Voting Section's concerns and sent Board officials to places where problems arose, usually within 30 minutes. |

**Attachment IV**

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| | | polling locations visited in Brooklyn; this was discussed with Board of Election officials; however, DOJ officials found that appropriate language assistance was available in both counties.<br><br>Seventeen federal observers and five attorneys from the Civil Rights Division monitored polling place procedures during the general election in Kings County.<br><br>The Voting Section attorney who attended four poll-worker training classes found that the classes appropriately addressed minority language issues and assistance. | |
| 9. The Voting Section received an allegation from an African-American voter that a supervisor at a voting precinct in Georgetown County, South Carolina discriminated against African-American voters during the 2000 presidential election. The voter alleged that the supervisor treated African-American voters in a rude and discriminating manner. In talking to the complainant and others, it was learned that there were also alleged voter registration problems during the 2000 election related to precinct changes and the local DMV. | The Voting Section attorney interviewed officials with the Georgetown County Board of Registration and Elections, representatives of the Republican and Democratic parties, voters, and an attorney representing the county. The Voting Section attorney also interviewed an official who managed the Georgetown County DMV office regarding the second-hand allegations from a Democratic party representative regarding possible registration problems at the local DMV.<br><br>After interviewing the DMV official and examining the forms that the DMV provides to drivers applying for new licenses to simultaneously allow them to register to vote, the Voting Section | Voting Section staff wrote to the Voter Registration and Election Commission for Georgetown County outlining the allegations concerning the rude treatment by the poll worker and the Voting Section's findings and asked the commission how it planned to respond.<br>The county's Voter Registration and Election Commission responded in writing that the election supervisor was informed by letter that she would be reassigned to another precinct and not permitted to serve in a supervisory capacity for the June 11, 2002, election. She decided not to work the June 2002 election.<br><br>Other issues examined in this investigation were not raised with the county in this letter. With respect to the precinct change allegations, the Voting Section learned that confusion as to proper | The Voting Section closed the matter on March 9, 2004. As of that date, the Voting Section had not received additional complaints concerning the treatment of African-American voters in Georgetown County or about voting registration issues previously investigated. According to the complainant, the election held on June 11, 2002, went smoothly. |

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| | attorney noted that the form on the DMV driver's license application did not contain a box for people to check if they wanted to register to vote and that this might not adhere to the NVRA provision for a simultaneous process to apply for a driver's license and register to vote. In addition, in the interview with the employee in the local DMV office, the Voting Section attorney learned that they may have been only asking people applying for new drivers' licenses, not people renewing their licenses, if they wanted to register to vote. However, this employee further informed the Voting Section attorney that in October 2000 she received instructions from the head of the state DMV to ask every person who was applying for a driver's license whether he or she wished to register to vote, and she followed that instruction through the election. | voting precincts was likely the result of a change in the method of identifying addresses of voters. With respect to allegations about the DMV procedures, the Voting Section received no complaints from voters who indicated that the alleged problems at the DMV existed or resulted in denying them the right to vote. In addition, after the examination of the DMV forms and interview with the local DMV employee, it was concluded that there did not appear to be a violation of the NVRA. | |
| 10. The Voting Section received a complaint alleging that the Seagraves Independent School District and the City of Seagraves, both in Texas, held elections without bilingual judges or bilingual training. | A Voting Section attorney visited Seagraves and the Seagraves Independent School Board. The Voting Section also contacted a newspaper to review published articles regarding the school board election. | Information in a newspaper article indicated that the allegations were untrue, and that all election material was produced in English and Spanish. The Voting Section attorney was told that confusion existed for all voters because of the present districting system.<br><br>The Seagraves City Secretary wrote a letter to the Voting Section attorney stating that each year the city names a Hispanic judge who is also bilingual. The City | The Voting Section attorney suggested that the town should make an effort to educate voters of district boundaries by methods other than newspaper advertising. Subsequent to the election, the city of Seagraves sent a map of district boundaries and candidates running in each district to each city household. The Voting Section closed the matter. |

cited in DNC v. Hobbs

2020.06 archived on January 22, 2020

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| | | Secretary also provided the Voting Section attorney with minutes of prior city council meetings highlighting the nomination and approval of the election judges, and a sample ballot printed in both English and Spanish. | |
| 11. During the November 2000 election, Miami-Dade County, Florida, allegedly engaged in practices that prevented the county's Creole-speaking Haitian-American voters with limited ability to speak English from securing assistance at the polls. In circumstances where the county permitted voter assistance from persons of the voters' choice, the scope of the assistance was limited (e.g., standing next to voters during poll worker demonstrations) and of little value to voters once they entered the voting booths. | After a full investigation, the Voting Section initiated litigation against Miami-Dade County because of its alleged violation of Section 208 of the Voting Rights Act. Prior to initiating litigation, the Voting Section conducted an investigation of the county's voter assistance practices during the 2000 election. DOJ filed a complaint with the U.S. District Court in the Southern District for Florida on June 7, 2002. | Evidence gathered during the investigation demonstrated that Creole-speaking Haitian-American voters at several precincts were denied assistance from persons of their choice in violation of Section 208 of the Voting Rights Act. Oftentimes, only poll workers, who did not speak Creole, were permitted to assist the voters, and they limited their assistance to voter demonstrations outside the voting booths. The Voting Section did not find evidence that noncompliance with Section 208 was the result of intentional discrimination. In this regard, it was noted that the Miami-Dade Board of County Commissioners passed ordinances in 1999 and 2000 mandating that Haitian-Creole ballot translations be available in voting booths located at precincts where "significant" numbers of Haitian-American people vote. | A consent order was entered into on June 17, 2002, that, in part, prohibited the county from denying Haitian-American voters assistance from persons of their choice and mandated that the county take certain steps to prevent violations of Section 208 and to redress the harm caused these voters, such as modifying poll worker training to include instruction on how to handle requests for language assistance. The consent order is in effect through December. 31, 2005. The case is open to monitor implementation of the consent order. |
| 12. As described in DOJ's complaint, DOJ alleged that various election practices and procedures in Orange County, Florida, unlawfully denied or abridged the voting rights of Spanish-speaking citizens. The challenged practices concerned the alleged failure of the county to: (1) provide an | After investigating these allegations, DOJ filed a complaint in the U.S. District Court for the Middle District of Florida on June 28, 2002, and entered into a consent decree with Orange County on October 9, 2002. | In the complaint, the Voting Section alleged that Orange County violated VRA Sections 203 and 208. | The case is open to monitor implementation of the consent decree. The consent decree permits DOJ to monitor elections in Orange County from October 9, 2002 until January 31, 2005. The consent decree also mandates policies and procedures that Orange County must adopt with |

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| adequate number of bilingual poll workers trained to assist Hispanic voters on Election Day; (2) ensure that poll officials allow Spanish-speaking voters to have persons of their choice assist them in casting their ballots; and (3) translate certain written election materials into Spanish. | | | regards to treatment of Spanish-speaking voters. The consent decree is valid until January 31, 2005. DOJ did not contend that Orange County's failure to adhere to VRA Sections 203 and 208 was the result of intentional discrimination. |
| 13. As described in DOJ's complaint, DOJ alleged that Osceola County, Florida, engaged in various election practices and procedures that unlawfully denied Spanish-speaking citizens an opportunity equal to that of other citizens to vote. The challenged practices concerned: (1) the failure of poll officials to communicate effectively to Spanish-speaking voters necessary information concerning their eligibility to vote, voter registration status, identification requirements, and polling place changes and assignments; (2) the refusal of poll officials to allow certain Spanish-speaking voters assistance in voting by persons of their choice; and (3) hostile remarks by poll officials directed towards Hispanic voters with limited English proficiency. | After investigating the matter, DOJ filed a complaint in the U.S. District Court for the Middle District of Florida on June 28, 2002, and entered into a consent decree with Osceola County on July 22, 2002. | In the complaint, the Voting Section alleged that Osceola County violated VRA Sections 2 and 208. | The case is open to monitor implementation of the consent decree. The consent decree allows DOJ to monitor elections held in Osceola County from the date of the consent decree through January 31, 2005. It specifies procedures that the Osceola County Board of Elections must implement with regards to the treatment of Spanish-speaking voters and efforts the county must engage in to facilitate voting by Spanish-speaking voters. The consent decree is valid through January 31, 2005. DOJ did not contend that Osceola County intended to deny Spanish-speaking voters an equal opportunity to participate in the political process. |
| 14. It was alleged that, in conducting elections in Reading City, Berks County, Pennsylvania, denied Hispanic citizens with limited English proficiency an equal opportunity to participate in the political process and elect the representatives of their choice. | After extensive investigation, which included the monitoring of several elections held in the county, the Voting Section initiated litigation against Berks County because of its alleged violation of several provisions of the Voting Rights Act. DOJ filed a complaint with the U.S. District Court for the Eastern District | In the complaint, the Voting Section alleged that actions contributing to the denial by Berks County to provide Hispanic citizens with limited English proficiency an equal opportunity to participate in the political process and elect the representatives of their choice included the following: poll officials directed hostile remarks | On July 17, 2003, DOJ filed a motion for (1) permanent injunction and entry of final judgment that sought to permanently enjoin the county's conduct of elections using policies, practices, procedures, and methods that violate certain VRA requirements and (2) the court to issue an order authorizing OPM to appoint federal |

DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| | of Pennsylvania on February 25, 2003. | at, and acted in a hostile manner toward, Hispanic voters to deter them from voting and make them feel unwelcome at the polls; poll officials engaged in election practices including the failure to communicate effectively with Spanish-speaking voters regarding necessary information about their eligibility to vote, voter registration status, identification requirements, and polling place changes and assignments, and turning away Hispanic voters at the 2001 and 2002 elections; and Berks County failed to recruit, train, and maintain an adequate pool of Hispanic and bilingual poll officials despite their knowledge of the needs of Hispanic voters with limited English proficiency. | examiners pursuant to VRA to serve in Berks County through June 30, 2007. The court granted the United States' motion on August 20, 2003. The case remains open for monitoring and several elections have been monitored since entry of the consent decree. |
| 15. As described in DOJ's complaint, DOJ alleged that the state of Tennessee engaged in practices that unlawfully denied certain citizens full and complete opportunities to register to vote in elections for federal office as mandated by NVRA. The challenged practices included the failure of the state and agency officials to: (1) provide applications to register to vote simultaneously with applications for motor vehicle driver's licenses (including renewal applications); (2) request only the minimum amount of information necessary to prevent duplicate voter registration and enable state election officials to assess the eligibility of the applicant and to administer voter registration and other part | After investigating this matter, DOJ filed a complaint against the state of Tennessee in the U.S. District Court of Tennessee on September 27, 2002. On that same day, the state of Tennessee entered into a consent decree with DOJ. | In the complaint, the Voting Section alleged that Tennessee violated provisions in NVRA. | The case is open to monitor implementation of the consent decree. The consent decree requires the state and state agencies to develop uniform procedures with regards to the voter application process and the implementation of NVRA and report progress to DOJ annually while the consent decree is in effect. The consent decree expires on August 1, 2005. |

**Attachment IV**

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| of the election process; (3) distribute voter registration applications with every application for public assistance or services to persons with disabilities; and (4) transmit completed voter registration applications in a timely manner. | | | |

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

Attachment IV

Election-Related Closed Preliminary Investigation and Matters and Closed Cases Initiated during Calendar Year 2002

| No. | Preliminary Investigation/Matter/Case | Jurisdiction | Date investigation or matter initiated | DJ No. |
|-----|----------------------------------------|--------------|----------------------------------------|--------|
| 1 | Preliminary investigation | Hinds County, Mississippi | November 2002 | No |
| 2 | Matter (election monitoring) | Apache and Navajo Counties, Arizona | September 2002 | Yes |
| 3 | Matter (election monitoring) | Broward County, Florida | November 2002 | Yes |
| 4 | Matter (election monitoring) | Duval County, Florida | November 2002 | Yes |
| 5 | Matter | Georgia | October 2002 | No[d] |
| 6 | Matter | Minnesota | October 2002 | Yes |
| 7 | Matter | New Jersey | October 2002 | Yes |
| 8 | Matter (election monitoring) | Bexar County, Texas | October 2002 | Yes |
| 9 | Matter | Hidalgo County, Texas | December 2002 | Yes |
| 10 | Case | Oklahoma | August 2002 (case filed in September 2002) | Yes |
| 11 | Case | Texas | March 2002 (case filed in March 2002) | Yes |

Source: DOJ Civil Rights Division.

[d] According to the Voting Section, this matter did not receive a DJ number inadvertently.

Summary of Election-Related Closed Preliminary Investigation and Matters and Closed Cases Initiated during Calendar Year 2002

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| 1. The wife of a soldier from Hinds County, Mississippi, assigned to Guantanamo, Cuba, alleged that her husband and approximately 500 other soldiers from that county did not receive their absentee ballots in the mail. Hinds County acknowledged receiving their requests in mid-September of 2002, and the circuit clerk confirmed they were mailed in the first week of October 2002.<br><br>The Mississippi Secretary of State's office suggested that the soldiers fax in federal ballots but was not sure the ballots would be counted. That office also suggested to the soldier's wife that she contact the Voting Section. She reported to the Voting Section that soldiers from Madison and Rankin counties, also in Mississippi, did not receive their ballots until after the election. She also contacted the Assistant U.S. Attorney (AUSA) for Hinds County. | A Voting Section official discussed the allegation with an official in the Federal Voting Assistance Program (FVAP) under the Department of Defense (DOD), who said that someone in Hinds County told FVAP on November 20, 2002, that about 20 ballots had been sent to soldiers in Guantanamo. Voting Section staff also phoned the AUSA in Jackson, Mississippi, and noted in a memo that the AUSA had directed a local Federal Bureau of Investigation (FBI) agent to interview the chancery clerk, the registrar, and all others in the chain of custody of the ballots. The Voting Section also discussed asking FVAP to monitor transit of absentee ballots to soldiers from Hinds and Brandon Counties | The AUSA told the soldier's wife that an investigation revealed the ballots had been lost in the mail. The FBI agent concluded that the county officials had mailed the ballots to the soldiers, but they had been lost or disappeared. The private company that processed mail for the county told the FBI agent that they were unable to check the zip codes of mail processed on a particular day. | The Voting Section closed the preliminary investigation after the AUSA concluded, and the Voting Section agreed, that there was no basis for bringing charges against anyone involved in the handling of the ballots because the ballots had been lost in the mail and no further action was needed. |

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| | during the next election in response to the soldier's wife January 2003 request that the Voting Section keep these counties on its "radar screen." | | |
| 2. On November 5, 2002, federal election observers and Voting Section staff monitored polling place activities at 21 locations in Apache and Navajo Counties, Arizona. The Attorney General, pursuant to VRA Section 6, had certified these counties for federal observers. Since then, federal observers have documented problems related to the counties' inability to provide consistently effective Navajo language assistance to voters and other related circumstances affecting the Navajo voting population.<br><br>The Voting Section was concerned about the following issues related to the primary held in September 10, 2002, and the general election held in November 5, 2002: (1) the counties' provision for Navajo language assistance, (2) voters being turned away at the polls, (3) crossover voting, and (4) polls not opening on time. During the 2000 election cycle and 2002 primary, federal observers documented several problems with the counties' provision of Navajo language assistance to voters. The Voting Section suggested that both counties distribute cassette tapes containing Navajo language ballot translations to poll workers. The counties committed to preparing and distributing the tapes to poll workers. Officials from both counties also informed the Voting Section that they would use updated flip charts for the November election. These charts, which were used for the September primary at the Voting Section's suggestion, displayed pictorial representations and written Navajo translations of each of the offices on the primary election ballot.<br><br>There had been confusion in previous elections among many | In September 2002, the Voting Section met with the Apache County Election Director, the Apache County Deputy County Attorney, the Navajo County Election Director, the Navajo County recorder, and two Navajo County outreach workers to discuss several issues related to elections in the two counties. The Voting Section provided suggestions on how to prevent prior problems from recurring. The Voting Section observed the November 2002 election.<br><br>The original poll worker training schedules that the two counties had provided to the Voting Section allotted approximately 2 hours for training. The Voting Section suggested having all-day training sessions, and the schedules were revised to allot 6-½ hours for training.<br><br>The Voting Section suggested that both counties provide each polling place on the Navajo Reservation with voter registration lists from both counties, and train poll workers to check both lists and check with the appropriate county election department before turning voters away. Both counties agreed to adopt this suggestion. The Voting | The counties' implementation of their Navajo Language election information program was inadequate. While the counties provided language assistance to many voters, the assistance was frequently insufficient and failed to provide consistent and accurate language translation of the offices and propositions on the ballot's 14 propositions. The Voting Section concluded that the counties must improve and expand their training program for interpreters.<br><br>The federal observers reported that the interpreters and poll workers believed more training in Navajo language translation was necessary. Some poll workers told the observers that the audiotapes containing Navajo translations were too long and confusing.<br><br>One polling place was not well organized, resulting in very long lines. The Voting Section reported this to the Navajo County Elections Director, who sent an outreach worker to remedy the problem. The line was moving more quickly by mid-afternoon.<br><br>The number of voters turned away from the polls was less than during the September | A November 22, 2002, memo discussing the monitoring of the November 5, 2002, election indicated that the Voting Section would meet in the future with election officials from both counties to discuss the November 5, 2002, election and develop methods to improve the counties' provision of language assistance and overall Election Day performance. The matter was closed after the election. According to the Voting Section, this is standard Voting Section procedure when irregularities are observed during election coverage.<br><br>In the case of Navajo language assistance in these counties, the Voting Section stated that such outreach has been continuous for many years. Another memo discussing compliance and outreach efforts since the 2002 election indicates many improvements in Navajo language assistance efforts as a result of this outreach, including: (1) improved poll worker training which included the use of pictorial flip charts to assist voters in |

Dawn v. Hobbs No. 18-15845 archived.pacificlegal.org 8/1/20

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| elderly Navajo voters who live near the Navajo/Apache county line about polling place and voter registration. These voters often vote in different locations for tribal and state/federal elections. Tribal elections do not recognize county boundaries. Poll workers at polling places near the county line apparently turned away dozens of elderly voters because of voting location confusion during the 2000 primary and general elections and the 2002 primary. In 2000, poll workers gave affidavit ballots to other crossover voters in the mistaken belief that the ballots would be accepted later. However, since these voters were not registered in the counties where they voted, their votes were considered invalid. | Section also expressed concern about polling places that opened late for the September primary. The counties agreed to address this prior to the November 2002 election. | primary. However, while all the polling places had both counties' registration books, poll workers at most locations did not use them. Some did not know the books were available. At one Apache County location, observers reported that the Navajo county list was not present. The Voting Section informed the county elections director, who showed the Navajo County book to the polling place inspector. The poll workers had not removed the book from the elections supply box. The Voting Section felt that more training and practice would make the poll workers more familiar with this new system. There were no complaints about polls not opening on time. | understanding the ballot; (2) outreach and voter registration efforts on the reservation at various events; (3) the opening of new early voting locations on the Navajo Reservation; (4) the opening of a new satellite election office on the reservation to disseminate voter information and register voters; and (5) greater cooperation among the counties providing Navajo language assistance. |
| 3. Voting Section personnel and 2 AUSAs monitored 84 precincts in Broward County, Florida, during the November 2002 election. | Actions taken by DOJ staff included interviewing the clerk of the precinct where a white male precinct worker who allegedly harassed African-American voters was employed about any complaints or problems with the assistant precinct clerk in question. DOJ staff spoke with four voters at this precinct regarding their experience voting and asked election officials to make chairs available for the disabled and elderly waiting in line to vote. They contacted county election officials about a voter who was told he could not vote because he had already sent an absentee ballot; the precinct clerk eventually verified that the voter | Voting Section staff provided assistance to help correct issues that arose during the monitoring. Examples of issues/problems observed were: (1) African-American voters felt somewhat harassed by a white male precinct worker; (2) a poll official did not want to allow a person to vote who said he had requested an absentee ballot but did not receive it; and (3) persons were turned away because of precinct changes due to redistricting, because they moved, and for other reasons. | The Voting Section closed the matter because the election being monitored was completed. |

DURBIN v. Hobbs No. 18-15845 archived on July 21, 2020

GAO-04-1041R DOJ Activities to Address Past Voting Irregularities

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| | had not been sent an absentee ballot, and the voter was allowed to cast his vote on election day.<br><br>With regard to the absentee ballot issue, DOJ staff advised the poll official to contact the Broward County Election Board. In addition, DOJ staff: (1) gave a voter the toll-free telephone number for the Voting Section because the voter wanted to complain about the lack of voting machines; (2) asked a poll clerk and poll workers if they had received complaints about not having enough voting machines; and (3) spoke with two voters who complained about a precinct being hard to find. | | |
| 4. At the request of Florida's Secretary of State, the Voting Section monitored the election in November 2002 in Duval County, Florida. | Voting Section attorneys monitored the election and facilitated the resolution of problems that arose by communicating proper election procedures to the Supervisor of Elections. Prior to monitoring the election, Voting Section attorneys met with the Supervisor of Elections, minority leaders in the community, leaders of the NAACP, and representatives from the local Democratic and Republican parties. They exchanged telephone information and invited each person or group to contact them with details of any problems that they might help address. They also provided guidance on issues that might arise to provide a | While monitoring the election, the Voting Section found various areas of clarification and improvement. One issue involved absentee ballots and Florida law allowing a person who requested an absentee ballot but did not submit it to vote at the polls. There was confusion when absentee ballots were submitted but rejected as being incomplete because they lacked voters' signatures and voters then being able to vote at the polls. Voters who submit absentee ballots are considered to have voted and cannot vote at the polls on election day if the absentee ballot is rejected.<br><br>Also, poll workers had given incorrect ballots to | The Voting Section closed the matter because the election being monitored was completed. |

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| | common understanding of action that should be taken if a particular problem arose.<br><br>The Voting Section attorneys worked with the Supervisor of Elections to improve election processes and were invited by the Supervisor of Elections to monitor elections in April and May 2003 to further improve upon their election processes. | some voters. Voters were turned away who lacked signed photo identification and were not allowed to vote by provisional ballot. There were also a few instances of insensitivity to minority voters and voters with disabilities. | |
| 5. Georgia state law requires counties to have absentee ballots on hand 45 days before a general election. Georgia missed the September 20, 2002, deadline for the November 5, 2002, general election because of the compressed election schedule in 2002. The 45-day deadline was set to comply with federal mandates to make it easier for U.S. military personnel stationed outside the United States to vote. Georgia had compressed its 2002 primary and runoff election schedules such that the runoff was held only 49 days before the November 5 general election. This precluded the printing of the general election ballot in time for the mailing deadline required under state law. Georgia election officials had contacted FVAP during the first week of October regarding the state's compliance with the Uniformed and Overseas Citizen Absentee Voting Act (UOCAVA).<br><br>Catoosa County ballots omitted the names of the Republican candidate for the U.S. Senate and the Republican gubernatorial candidate from the ballot. An allegation was made that this, among other absentee ballot irregularities, violated UOCAVA because the correct ballots, even if sent at the time this concern was raised on October 16, 2002, would not be received in time.<br><br>Georgia's Secretary of State asked DOJ to bring suit against the state to extend the deadline for receipt of | FVAP advised the Voting Section that a senior official in Georgia's Elections Division said that election officials in each of Georgia's counties would photocopy all necessary ballots and send them to every military and overseas citizen absentee voter from whom an application had been received in time. All 154 Georgia counties had done this by October 7.<br><br>A Voting Section attorney asked the source of the allegation in Catoosa County to keep in touch and gave the person who made the allegation the phone number and Web site for FVAP for additional information about FVAP's role in this process. The Voting Section attorney contacted FVAP, and a FVAP official agreed to contact officials in Catoosa and Ben Hill counties to get copies of their ballots and get back to the Voting Section attorney. The Voting Section attorney also contacted a state election official. | FVAP favored going forward with the suit that Georgia's Secretary of State had suggested, but the Voting Section did not because (1) the number of voters affected was very small, less than 132 overseas; (2) UOCAVA was amended in 1986 to add the federal write-in absentee ballot as a back-up ballot when timely requested ballots do not reach voters in a timely matter (the Voting Section relies on the use of the back-up ballot as a remedy in UOCAVA lawsuits brought in primary elections, and had no reason to believe it was an inadequate remedy); and (3) the Voting Section believed the Secretary of State's true interest in the lawsuit stemmed from the large number of regular absentee ballots that were mailed late, and such ballots could not be part of any UOCAVA remedy. | The Voting Section closed the matter. |

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| military and other absentee ballots. | | | |
| 6. The Voting Section conducted an investigation under UOCAVA and monitored a lawsuit in Minnesota over absentee ballots used in the November 2002 general election. At issue was the removal of Senator Paul Wellstone's name on the ballots and issuance of new ballots. Senator Wellstone died 11 days prior to the election, and former Vice President Mondale was designated the replacement candidate for the Democratic-Farmer-Labor party. This party argued for mass mailing of new absentee ballots, and the Republican party argued to do the mailing based on requests. | In an e-mail, the Voting Section attorney expressed concern about ballots being mailed, filled out, and returned between October 31 and November 5 (6 days). | The Voting Section monitored state actions to address this issue. | The Voting Section closed the matter after the state Supreme Court issued an order addressing the absentee ballot issue. The order specified the procedures for absentee ballots that included various options based on whether a voter had or had not already voted for Senator Wellstone. |
| 7. A suit arose from the resignation of Senator Robert Torricelli from the general election and ballot for Democratic nomination to the U.S. Senate. The New Jersey Democratic party brought suit to secure a declaration that the New Jersey Democratic State Committee was permitted to select a qualified candidate to replace Sen. Torricelli. The New Jersey Supreme Court ruled in favor of the state Democratic party and required that a new ballot be prepared under the direction of the state Attorney General and a state court judge. Military and overseas ballots were to be given precedence and an explanatory letter was to be sent to all voters who received the new ballots. The Voting Section was concerned about the late transmittal of ballots to military and overseas voters. | The Voting Section prepared a discussion memo evaluating the impact that the New Jersey Supreme Court ruling would have on overseas absentee voters. The Voting Section monitored the New Jersey Democratic party lawsuit and state remedies to address this issue. | The Voting Section noted that late transmittal of ballots to voters by airmail generally raises concerns that overseas voters would not have sufficient time to receive, mark, and return their ballots to local election officials. The Voting Section staff determined that New Jersey state law contains several unique features that obviate the need for 20-40 days of roundtrip airmailing. In addition, DOD provides a backup ballot available at military installations and U.S. embassies/consulates. This is referred to as a federal write-in absentee ballot.<br><br>The Voting Section noted that the question might arise regarding how the state would address ballots that had already been transmitted to overseas voters and may have already been returned. The Voting Section determined that this was a question for state officials to resolve, and that the Voting | The Voting Section concluded that New Jersey state law provides for several methods for UOCAVA voters to participate in federal elections over and above the use of regular absentee ballots sent by airmail. The Voting Section closed the matter due to lack of merit. |

**GAO-04-1041R DOJ Activities to Address Past Voting Irregularities**

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| | | Section planned to raise this issue when speaking with state officials in October 2002. | |
| 8. An attorney for Bexar County, Texas, requested, in a letter to the Voting Section dated October 18, 2002, expedited review of changes in the county's early voting process in the joint general and special election on November 5, 2002. Changes included: (1) the one-time use of two-page ballots for partisan contested races, (2) procedures for counting ballots with straight-party votes, and (3) one-time use of a single two-sided ballot for partisan contested races supplemented by a separate sheet with duplicate voting instructions for the November 5, 2002, general election. Prior to that request, the League of United Latin American Citizens filed suit in U.S. District Court for the Western District of Texas alleging that Bexar County implemented changes to the conduct of the November general election without obtaining preclearance from DOJ. | The Chief of the Voting Section wrote a letter back to the attorney for Bexar County. The Voting Section had telephone discussions with various people regarding the ballot format issues. | In a letter dated November 1, 2002, The Voting Section stated that the Attorney General did not interpose any objection to the specified changes, but noted that Section 5 of the Voting Rights Act provides that failure of the Attorney General to object does not bar subsequent litigation to enjoin enforcement of the changes.

After the League of United Latin American Citizens filed the lawsuit, Bexar County advised the court that they initiated Section 5 preclearance submission procedures on October 18, 2002, and October 21, 2002. The county had not obtained preclearance from DOJ at the time the lawsuit was filed. The court agreed with both parties that the changes were required and allowed the changes to proceed pending the preclearance. On October 31, 2002, the court decided to retain jurisdiction over the case through the conclusion of the 2002 election process and ordered the parties to advise the court as to their positions on the case on or before December 1, 2002. | The Voting Section closed the matter because it granted preclearance for the changes. |

## Attachment IV

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| 9. A U.S. Representative sent a letter to the Attorney General regarding possible voter suppression in Alabama, Arkansas, Florida, Indiana, Louisiana, Maryland, Michigan, New Jersey, New Mexico, Pennsylvania, and Texas. In Arkansas, Louisiana, and Maryland, it was alleged that African-Americans were victims of voter suppression. In New Jersey and Texas, allegations of voter suppression involved Hispanics. The victims of voter suppression in the other states were not specified.<br><br>According to the Voting Section, many of the matters referred to in the letter were matters under the jurisdiction of the Criminal Division and were being investigated by that Division when the letter was received. The Voting Section investigated two of the allegations referred to in the letter, including one in Hidalgo County, Texas, where it was alleged that the Republican party intimidated Hispanic voters countywide to dampen their turnout at the general election. The second allegation that the Voting Section investigated that was referred to in the letter was in New Jersey; the Voting Section opened a matter in 2003 to investigate this allegation (see information provided in this attachment for 2003).<br><br>The most direct form of alleged intimidation in Hidalgo County was reported to have occurred when two poll watchers for a Republican candidate challenged Hispanic voters at early voting on the basis that a study indicated that 13,000 dead or ineligible voters were in the county's voter registration rolls. The Republican party held a press conference two weeks before the election where party representatives alleged that voter fraud could be a significant problem with the number of people listed incorrectly on the voter rolls. | A Voting Section memo referred to an allegation received from the U.S. Representative regarding possible intimidation at the November 2002 election held in Hidalgo County, Texas. The Voting Section attorney requested several pieces of documentation from the county elections administrator, including newspaper articles, letters between the elections administrator and the Republican elections administrator, and information regarding a study regarding the possibility of 13,000 dead or ineligible voters on the county voter rolls. The Voting Section attorney spoke with Hispanic voters and other minority contacts. The Voting Section attorney also analyzed voter turnout data for Hidalgo County and compared it to the state of Texas for 2002 and previous elections. | The Voting Section determined that Hidalgo County's election administrator handled the situation well by expelling the poll watchers when the voting supervisors alerted the election administrator that two poll watchers for the Republican candidate were making random challenges to Hispanic voters.<br><br>The Voting Section further determined that efforts on the part of the Republican party did not dampen minority turnout and did not discover instances of voter intimidation at the polls on election day. The Voting Section noted that minority contacts in the county: (1) did not think that the allegations of dead voters on the rolls dampened turnout; (2) did not believe that the challenges made by the two poll watchers caused fewer Hispanic voters to vote; and (3) did not report problems of voter intimidation at the polls. The Voting Section did not find apparent differences between the voter turnout data in the 2002 election compared to other elections. | The Voting Section closed the matter on June 25, 2003, because it lacked merit. The Voting Section attorney observed that there was a tense atmosphere in Hidalgo County between some of the white Republicans and the Hispanic citizenry. The Voting Section recommended that this is an area that should be monitored in future elections. |
| 10. As described in DOJ's complaint, DOJ alleged that the state of Oklahoma was not in compliance with UOCAVA. Election | After an expedited investigation, DOJ filed a complaint in the U.S. District Court for the | In the complaint, the Voting Section alleged that the state of Oklahoma violated | The consent decree required the state to take corrective actions so that all |

GAO-04-1041R DOJ Activities to Address Past Voting Irregularities

**Attachment IV**

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| officials in Oklahoma could not mail absentee ballots to military and civilian overseas voters on a date sufficiently in advance of the September 17, 2002, primary runoff election to allow voters to receive the ballot, cast a vote, and return the ballot to election officials by the deadline established by state law. | Western District of Oklahoma on September 12, 2002, and entered into a consent decree with the state of Oklahoma on September 17, 2002. | UOCAVA. | uniformed military personnel and citizens living overseas who filed a timely request to receive an absentee ballot are given the opportunity to vote. The state did so through, among other things, the passage of UOCAVA compliance legislation in May 2003. |
| 11. As described in DOJ's complaint, DOJ alleged that as a result of the compressed period of time between the Texas primary and runoff elections, election officials in the state of Texas failed to mail absentee ballots to military and civilian overseas voters on a date sufficiently in advance of the April 9, 2002, federal primary runoff election to allow such voters to receive the ballot, cast a vote, and return the ballot to election officials by the deadline established by state law. | After an expedited investigation, DOJ filed a complaint and motion for a temporary restraining order and preliminary injunction in the U.S. District Court for the Western District of Texas on March 22, 2002. | In the complaint, the Voting Section alleged that the state of Texas violated UOCAVA. | The court entered a temporary restraining order and preliminary injunction on March 25, 2002, permitting qualified Texas voters to use federal write-in absentee ballots for the April 9, 2002, election. According to the terms of the court order, the state was required to take actions to remedy absentee ballot issues in the future. This included permitting voters to submit write-in ballots if their ballots are not sent to them in time and counting the write-in ballots as valid as long as the voters living outside the United States are qualified to vote in Texas. A stipulation of dismissal was entered in February 2004 following passage by the state legislature of legislation remedying the United States' complaint. |

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

## Attachment IV

**Election-Related Closed Matter Initiated during Calendar Year 2003**

| No. | Matter | Jurisdiction | Date matter initiated | DJ No. |
|-----|--------|--------------|----------------------|--------|
| 1 | Matter | New Jersey | January 2003 | Yes |

Source: DOJ Civil Rights Division.

**Summary of Election-Related Closed Matter Initiated during Calendar Year 2003**

| Description based on Voting Section information | Voting Section's actions taken to address allegation | Voting Section's assessment of allegations | Disposition by Voting Section |
|---|---|---|---|
| 1. This matter was the second matter opened by the Voting Section in response to the November 2002 letter from a U.S. Representative referred to in the previously described 2002 matter for Hidalgo County, Texas. There were allegations of voter intimidation in New Jersey. According to a newspaper article, e-mails were sent to Latino lawyers urging them to engage in an aggressive campaign to ensure ballot fairness. Attorneys for both the Democratic and Republican National Committees presented their case before the U.S. district court. The judge ruled a few days before the November 2002 election that there was "nothing sinister" in the Republican ballot fairness plan and characterized the plan as legitimate campaign activity. | The Voting Section attorney contacted a Latino political activist in the New York metropolitan area, the Treasurer of the New Jersey Hispanic Bar Foundation, and a community activist and attorney based in Newark, New Jersey. | The people that the Voting Section attorney contacted were not aware of the e-mail or any other threats or intimidation tactics against Latino voters. The Voting Section noted that its investigation yielded results similar to the judge's findings—that the ballot fairness plan mentioned in the e-mail did not raise concerns about Latino voter intimidation during the November 2002 general election. | The Voting Section closed the matter because it lacked merit. |

Attachment V

## Comments from the Department of Justice



**U.S. Department of Justice**

Civil Rights Division

*Office of the Deputy Assistant Attorney General*          *Washington, D.C. 20530*

August 27, 2004

William O. Jenkins, Jr.
Director
Homeland Security and Justice Issues
United States Government Accountability Office
Washington, D.C. 20548

Re: *Department Of Justice's Activities to Address Past Election-Related Voting Irregularities - Draft Report GAO-04-1041R*

Dear Mr. Jenkins:

Thank you for providing the Department of Justice with a copy of a draft of the Government Accountability Office (GAO) report entitled "Department of Justice: Activities to Address Past Election-Related Voting Irregularities." This letter constitutes the Justice Department's formal comments, and I request that it be included in the final report.

The Department appreciates the GAO's, and the requesting members', interest in this most important issue. Indeed, of all the areas of responsibility charged to the Civil Rights Division, none ranks more highly than protecting the franchise.

Since 2001, the Division has worked steadily to protect federal voting rights. We have directed substantial resources to implementing the electoral reforms of the Help America Vote Act of 2002 ("HAVA"), including working with all states and territories to facilitate their preparedness to comply with the HAVA provisions that took effect on January 1, 2004. We also have taken unprecedented steps to protect the rights of language minority voters. And we have moved strongly to ensure that all American citizens overseas, including our men and women in uniform, have an opportunity to participate in the democratic process. Finally, as your draft report demonstrates, the Division has significantly increased the numbers of monitors and observers deployed to ensure compliance with federal voting rights. In short, this Division has been fully attentive to the challenge of protecting federal voting rights, and we are gratified to see our successful record reflected in your draft report.

With regard to the specific recommendations your draft report has made, we are pleased to accept both. In the Division's view, each will be a salutary addition to the many steps already taken to improve protections of federal voting rights. For that reason, the Assistant Attorney

**Attachment V**

General for Civil Rights has already directed implementation of your recommendations.

With regard to the balance of the draft report, we appreciate the opportunity to have worked with GAO personnel on this audit. As with any report on an issue of such a critical nature, it is of the utmost importance that the report be both complete and accurate. Accordingly, we also appreciate the opportunity to provide comments. We must, however, register our disappointment that, while GAO took more than fifteen months to investigate and compile its draft report, you offered the Civil Rights Division only one week to review and comment on the voluminous document. Moreover, when the Division explained the difficulties and potential for error raised by such an abbreviated review, GAO offered just one additional week. This restriction has severely hampered our ability to provide the type of thorough review appropriate to such an important document, a particularly unfortunate consequence given that the draft report fails to capture accurately substantial portions of the Voting Section's work. Nevertheless, we have endeavored to provide as detailed and illuminating a set of comments as possible in the permitted time. Our specific comments follow:

1. Tracking Election Monitoring Activities

First, the GAO recommends establishing within the Department's ICM system a mechanism for tracking and reporting election-monitoring activities. As noted, the Assistant Attorney General has already taken steps to implement this recommendation, and the Division will implement an electronic means of tracking such data.

At the same time, however, it is important that the draft report not leave the reader with the suggestion that the Division presently lacks any system for tracking its election monitoring activities. See Letter at v; Draft Report at 45. This would be incorrect. The Voting Section does currently have procedures that effectively track election monitoring activities. Since the mid-1980s, the Voting Section has maintained logs detailing this information. As your records should show, the Division provided your investigators with a full explanation of these procedures in its May 25 response to your inquiries. The Division also provided you with the actual charts used for this tracking for the years 2000-2004. These charts provide detailed information about the state, the name of the jurisdiction monitored, the date of election, and the number of OPM observers and DOJ personnel who monitored the election. The Voting Section has found this system to be adequate and effective. Moreover, the existing logs are accurate and easily accessible.

2. Incorrect and Outdated Data Regarding Section 203 Work

It is also important that the final report reflect the most up-to-date information possible about the Voting Section's enforcement activities. Specifically, with regard to the Division's enforcement of Section 203 of the Voting Rights Act, while the draft report purports to have reviewed data through March 15, 2004, it discusses enforcement of Section 203 only through 2002. See Draft Report at 27. We have previously noted to you that the Division undertook a significant number of additional cases related to Section 203 and language minority issues in

2

**Attachment V**

2002, 2003, and 2004. Yet, the draft report fails to mention these. The Division thus respectfully requests that the draft report be corrected to reflect our full record. Specifically, Civil Rights Division attorneys contacted all, and personally visited many of, the 296 counties covered under Section 203 to help guide local election officials in complying with the law's dictates. In 2003, the Division also initiated an additional two lawsuits (one under Section 2 and Section 208 of the Voting Rights Act and one under Section 203 of the Voting Rights Act) not reflected in the draft report, and we filed an additional 5 cases in 2004 (each under Section 203 of the Voting Rights Act). The cases are referenced in Attachment 1 to this letter. To put this in perspective, the Division has filed as many Section 203 cases since May 2004 as were filed in the previous eight years. Moreover, the cases filed since May 2004 have provided comprehensive minority language election programs to more voters than all previous Section 203 cases combined.

In addition to the foregoing filings, a number of additional jurisdictions voluntarily modified their practices after being contacted by the Division. In this respect, it is important to note a substantial restraint on the Division's authority. The remedies provided under the voting rights laws only provide for prospective relief for violations. In other words, even if the Department's investigation reveals that a particular jurisdiction may have violated the law in the past, if the jurisdiction changes its election procedures to comply with the law so it is no longer in violation, our investigation becomes moot and we cannot litigate to ask for remedies that are no longer needed. Unlike private plaintiffs filing litigation in tort cases, the Department cannot obtain relief for past violations that are no longer occurring. This is especially important to keep in mind when reviewing matters in states that passed voting reform legislation changing their election administration.

3. Updated Information on UOCAVA Work

On page 28 of the draft report, the third bullet point about the lawsuit filed in Georgia under the Uniformed and Overseas Citizens Absentee Voting Act of 1986 should be corrected to reflect that a court order was granted:

"~~Filed~~ Obtained a court order in an UOCAVA lawsuit in July against the state of Georgia ~~requesting a~~ for similar emergency relief ~~order~~ for its primary election."

4. Updated Information on HAVA Work

On page 29 of the draft report, the summary of the Division's activities under the Help America Vote Act of 2002 fails to mention the first HAVA enforcement action filed by the Voting Section. We respectfully request that the following bullet point be added:

Filed its first enforcement action in California against a county for failing to fully implement HAVA

3

**Attachment V**

The case is *United States v. San Benito County, California* (N.D. Cal.). A complaint was filed on May 26, 2004 alleging, in addition to a violation of Section 203, a violation of the voter information provisions of HAVA. A consent decree requiring actions by the county to remedy the violations is pending review and approval by the court.

5. Documentation of Complaints of Alleged Election 2000 Voting Irregularities

As the GAO draft report itself notes, "[c]onfidence in our election processes is of utmost importance." Draft Report at vi. Moreover, confidence is assisted by "accurately recording and documenting [election related] activities in as clear a manner as possible." *Id.* This is no less true for your report as for our record-keeping. Accordingly, it is imperative that the final report accurately capture the full facts surrounding the Division's efforts during the 2000 election. At present, the draft report fails to do so.

Your draft letter to Congress and draft report repeatedly references the Division's documenting of public telephone calls during the 2000 Presidential election. These references may be construed to imply that an alternate means of documenting such public contacts would have enabled the Division to identify the existence of violations of federal law warranting further investigation. It is important that the GAO be clear that it is reaching no such conclusion, because such a conclusion simply would not be accurate.

The chief difficulty in the draft report's summary is its nearly exclusive focus on telephone logs maintained by contractors hired by the Department to record calls coming into the Department's main switchboard in the days after the 2000 election. The draft report contends that these logs were insufficiently detailed. However, the draft report fails to note that these logs made up only a small portion of all of the records of phone calls received by the Division. Therefore, any shortcomings in these logs are extremely unlikely to have changed the course of subsequent investigations.

As we previously advised GAO, (DOJ Response to April 7 Information Request), these contractors were hired to take phone calls from the public only during the weekend following the election, when the Division's offices would normally otherwise have been closed. The Division decided to afford the public this extra service after the Department's main switchboard received thousands of calls from around the country inquiring into the situation in Florida. In addition, the Voting Section's telephone lines received an elevated number of calls.

In focusing almost exclusively on the contractor logs, the draft report overlooks the call logs maintained by the Voting Section itself in 2000. These provided extensive documentation about callers and a description of the callers' complaints, and have proved reliable and accurate. Moreover, the vast majority of calls received were tracked through these logs. Therefore, the Division respectfully notes that during the 2000 election it did have an effective means of tracking election-related phone calls.

4

**Attachment V**

In our April 2004 response, we provided you substantial detail regarding this additional means for tracking public election-related inquiries. Specifically, the Division's 800 number system was modified to permit as many persons as possible to express their views. It was temporarily reconfigured to provide four caller options to: (1) allow persons to express general opinions about the election (which represented the overwhelming majority of the calls); (2) provide specific information about voting-related incidents outside Florida; (3) provide specific information about voting-related incidents inside Florida; or (4) provide specific information about non-2000 election-related matters.

This modified system took effect late in the day on Thursday, November 9, 2000, and was discontinued following resolution of the Presidential election. The calls coming into the temporary 800 system were reviewed regularly by Voting Section personnel beginning on November 13, 2000. Return calls were made when there was some indication that the caller had substantive information about a specific voting rights violation[1] Separate log forms tracked each of the 800 number options. Calls expressing general views without conveying specific information about voting rights violations were recorded on forms similar to the contractor logs, with category columns listed for each state (although these forms were changed periodically to reflect the changing Florida election situation). Calls made under the other options were recorded on log forms providing for much more specific information, including name, phone number, and a detailed description of the complaint. We recently provided GAO with these logs. In addition, we invited GOA staff to meet with Voting Section staff involved in dealing with the public during the 2000 election. Regrettably, GAO declined this invitation.

6. Nature of the Calls Received After the 2000 Election

In addition to focusing on only a subsection of the calls received, the draft report also fails to properly note the substance of the vast majority of phone calls received by the Department following the November 2000 election.

First, the draft report fails to note the fact that of the thousands of calls received by the Department's switchboard during this period, upwards of 95 percent did not provide specific complaints of possible violations of federal voting rights laws, but rather simply reflected citizen frustration or anger over the ongoing election dispute. This assessment was made by the Voting Section's experienced, career professional staff, including both trial attorneys and management. Moreover, determinations were made by staff only after receiving initial reports from the Department's switchboard operators, engaging in hundreds of conversations with citizens calling into the Voting Section's phone lines, and reviewing the contractor logs that were faxed to the Voting Section on an hourly basis.

---

[1] In our suggested changes to the section entitled "November 2000 Election Telephone Logs" of your draft Statement of Facts, which we sent to you on August 4, 2004, we explained the specifics of this additional call tracking system. Unfortunately, these changes were not incorporated in GAO's draft report.

5

Reproduced/archived on January 22, 2020

cited in DNC v. Hobbs, No. [...]

**Attachment V**

Second, the draft report fails to note that the vast majority of the calls received by the contractor lines came from New York and California; the number of calls from Florida was relatively small. The vast majority of these expressed frustration over the situation in Florida, and were based on second-hand information and media stories.

The same was also true for the majority of calls originating from Florida. Voting Section personnel followed up with callers from Florida to determine whether they had substantive information about the Florida election. Again, however, the vast majority of these callers were calling to express frustration at the ongoing election dispute and had no specific information about federal law violations. In addition to following up with these callers, Voting Section personnel also pursued other avenues of complaints (*e.g.*, calls made by voters directly to the Voting Section, complaint logs generated by the NAACP Voter Fund, hearings conducted by the U.S. Commission on Civil Rights and the NAACP, incidents receiving a large amount of publicity, etc.) to determine if federal laws had been violated.

As noted at the outset, it is imperative that the draft report accurately reflect these facts. At the same time, the Division fully concurs in the GAO's recommendation that an expanded recording system be implemented. For the 2004 election, the Division will continue to refine its tools for recording election-related calls to allow the public access to the Voting Section's complaint process.

7. Criminal Investigations

As you are aware, the GAO audit also examined the work done by the Criminal Division's Public Integrity Section, which is responsible, along with United States Attorneys' Offices, for investigating and prosecuting federal election crimes. The Chief of the Public Integrity Section, Noel Hillman, has asked us to include his comments to the portion of the draft report that pertains to the work of the Criminal Division. The first paragraph on page 22 of the draft report provides incorrect information about the training received by Assistant U.S. Attorneys. There are annual public corruption training conferences held by the Justice Department for Assistant United States Attorneys (AUSAs), and these include presentations on federal election crimes. These conferences are available to all AUSAs, including the AUSAs who are the designated district election officers. Some, but not all, of the 93 AUSAs who are their district's designated election officers may attend these conferences. In addition to these public corruption conferences, the district election officers are now attending the annual Ballot Access and Voting Integrity Conference, the first of which was held in 2002, to receive training on both civil rights issues important to ballot access as well as voting integrity issues important to election crime matters. Please note that the name of this annual conference is the "Ballot Access and Voting Integrity Conference," not the "Voting Integrity Conference."

In conclusion, we appreciate the opportunity to work with your staff concerning the important work of the Voting Section in enforcing federal voting rights. We are hopeful that the

6

**Attachment V**

misstatements and inaccurate characterizations in this draft report will be corrected prior to its release.

Sincerely,

Bradley J. Schlozman
Deputy Assistant Attorney General

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

7

(440350)

**GAO-04-1041R DOJ Activities to Address Past Voting Irregularities**



THE UNITED STATES
DEPARTMENT *of* JUSTICE

Search this site [Search]

ABOUT | OUR AGENCY | PRIORITIES | NEWS | RESOURCES | CAREERS | CONTACT

Home » Civil Rights Division

SHARE ➦

## VOTING DETERMINATION LETTERS FOR ARIZONA

The Civil Rights Division has prepared this site to make Civil Rights Division documents more available to the public.

To the extent that any documents do not currently comply with Section 508 of the Rehabilitation Act because of the poor quality of the original documents used to prepare this site, the Division is applying its available resources in an effort to create alternative records that are readable.

Determination Letters for Arizona, by date.

| Jurisdiction and date | Description and submission numbers | Notes |
|---|---|---|
| State of Arizona 10/09/1973 (pdf) | Chapter 159--method of circulating recall petitions (V5782) | Withdrawn 3-15-74 |
| Cochise Cty. College Board 02/03/1975 (pdf) | Redistricting (7071A) | |
| Apache Cty. High School District No. 90 10/04/1976 (pdf) | Bond election; multilingual procedures (X7759) | Declaratory judgment denied in Apache County High School District No. 90 v. United States, No. 77-1815 |
| Apache Cty. High School District No. 90 03/20/1980 (pdf) | Special dissolution election and changes relating to election, including polling places and multilingual procedures (D.D.C. June 12, 1980) (7X-0067) | Withdrawn 5-7-80 |
| State of Arizona 03/08/1982 (pdf) | H.B. No. 2001--House and Senate reapportionment (82-1539) | |
| Douglas (Cochise Cty.) 12/05/1983 (pdf) | At-large method of election; residency districts; staggered terms; majority vote requirements; limitation on the | Withdrawn 6-23-98 |

*cited in DNC v. Hobbs, No. 18-15845 archived on January 27, 2020*

### GENERAL INFORMATION
OFFICE OF THE ASSISTANT ATTORNEY GENERAL

**LEADERSHIP**

**Eric S. Dreiband**

Assistant Attorney General

**CONTACT**

**Civil Rights Division**

(202) 514-4609
Telephone Device for the Deaf (TTY) (202) 514-0716



DEPARTMENT *of* JUSTICE
ACTION CENTER

Report a Violation
Get a Job
Contact Us

LEARN ABOUT
PROSECUTING AND PREVENTING HATE CRIMES

PROTECTING THE RIGHTS OF SERVICE MEMBERS
WWW.SERVICEMEMBERS.GOV

| | number of terms councilmembers may serve; special election (83-1403; 83-1404) |
|---|---|
| Navajo County 08/31/1984 (pdf) | Redistricting for the five supervisor districts (84-1778) |
| Navapache Hospital District (Navajo and Apache Ctys.) 08/16/1985 (pdf) | Elimination of two polling places, the implementation of a five-polling place rotation system, and the reduction in the polling hours (85-1768) |
| Cochise Cty. Community College District 11/03/1986 (pdf) | 1983 redistricting plan (83-1398) |
| Apache County 07/17/1987 (pdf) | Navajo-language bilingual election procedures (80-1278) |
| Apache County 02/10/1988 (pdf) | Navajo-language bilingual election procedures (87-1799) |
| Coconino County 11/04/1991 (pdf) | Voter registration challenge and purge procedures (91-3167) |
| State of Arizona 06/10/1992 (pdf) | Act No. 1 (1992)--Senate and House redistricting plan (92-1347) |
| La Paz County 07/17/1992 (pdf) | 1992 redistricting plan for the board of supervisors (92-2285) |
| State of Arizona 08/12/1992 (pdf) | Act No. 240 (1992)--House and Senate redistricting plan (92-3395) |
| Arizona Western College District (Yuma and La Paz Ctys.) 09/28/1992 (pdf) | 1992 and existing redistricting plans for Yuma County portion of the district (88-2479) |

cited in Dwyer, Hobbs, No. 18-15845 archived on January 22, 2020

LEARN ABOUT
**SEXUAL HARASSMENT IN HOUSING INITIATIVE**

LEARN ABOUT
**PLACE TO WORSHIP INITIATIVE**

VISIT   WWW.ADA.GOV

| Yuma County 09/28/1992 (pdf) | 1992 redistricting plan for the board of supervisors (92-2355) |
| Graham County 02/22/1993 (pdf) | 1992 redistricting plan for the board of supervisors (92-2466) |
| Coconino County 04/08/1994 (pdf) | Two additional superior court judgeships (93-0681) |
| Navajo County 05/16/1994 (pdf) | Two additional superior court judgeships (93-0684) |
| State of Arizona 05/20/2002 (html | pdf) | 2001 legislative redistricting plan (2002-0276) |
| Coconino Association for Vocations, Industry, and Technology (Coconino Cty.) 02/04/2003 (html | pdf) | Method of election (2002-3844) |

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

*Updated August 7, 2015*

---

**Was this page helpful?**
Yes    No

---

**U.S. Department of Justice**
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Stay Connected with Justice:**

  

**Email Updates** 

en ESPAÑOL
Contact DOJ

Archive
Accessibility
Information Quality
Privacy Policy
Legal Policies & Disclaimers
Social Media

Budget & Performance
Office of the Inspector General
No FEAR Act
For Employees
FOIA
USA.gov

| LOG IN

ADVERTISEMENT

# Error and Fraud at Issue as Absentee Voting Rises



An absentee ballot in Florida. Almost 2 percent of mailed ballots are rejected, double the rate for in-person voting.  Sarah Beth Glicksteen for The New York Times

**By Adam Liptak**

Oct. 6, 2012



TALLAHASSEE, Fla. — On the morning of the primary here in August, the local elections board met to decide which absentee ballots to count. It was not an easy job.

The board tossed out some ballots because they arrived without the signature required on the outside of the return envelope. It rejected one that said "see inside" where the signature should have been. And it debated what to do with ballots in which the signature on the envelope did not quite match the one in the county's files.

"This 'r' is not like that 'r,' " Judge Augustus D. Aikens Jr. said, suggesting that a ballot should be rejected.

Ion Sancho, the elections supervisor here, disagreed. "This 'k' is like that 'k,' " he replied, and he persuaded his colleagues to count the vote.

Scenes like this will play out in many elections next month, because Florida and other states are swiftly moving from voting at a polling place toward voting by mail. In the last general election in Florida, in 2010, 23 percent of voters cast absentee ballots, up from 15 percent in the midterm election four years before. Nationwide, the use of absentee ballots and other forms of voting by mail has more than tripled since 1980 and now accounts for almost 20 percent of all votes.

Yet votes cast by mail are less likely to be counted, more likely to be compromised and more likely to be contested than those cast in a voting booth, statistics show. Election officials reject almost 2 percent of ballots cast by mail, double the rate for in-person voting.

"The more people you force to vote by mail," Mr. Sancho said, "the more invalid ballots you will generate."

Election experts say the challenges created by mailed ballots could well

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

affect outcomes this fall and beyond. If the contests next month are close enough to be within what election lawyers call the margin of litigation, the grounds on which they will be fought will not be hanging chads but ballots cast away from the voting booth.

In 2008, 18 percent of the votes in the nine states likely to decide this year's presidential election were cast by mail. That number will almost certainly rise this year, and voters in two-thirds of the states have already begun casting absentee ballots. In four Western states, voting by mail is the exclusive or dominant way to cast a ballot.

The trend will probably result in more uncounted votes, and it increases the potential for fraud. While fraud in voting by mail is far less common than innocent errors, it is vastly more prevalent than the in-person voting fraud that has attracted far more attention, election administrators say.

In Florida, absentee-ballot scandals seem to arrive like clockwork around election time. Before this year's primary, for example, a woman in Hialeah was charged with forging an elderly voter's signature, a felony, and possessing 31 completed absentee ballots, 29 more than allowed under a local law.

The flaws of absentee voting raise questions about the most elementary promises of democracy. "The right to have one's vote counted is as important as the act of voting itself," Justice Paul H. Anderson of the Minnesota Supreme Court wrote while considering disputed absentee ballots in the close 2008 Senate election between Al Franken and Norm Coleman.

Voting by mail is now common enough and problematic enough that election experts say there have been multiple elections in which no one can say with confidence which candidate was the deserved winner. The list includes the 2000 presidential election, in which problems with absentee ballots in Florida were a little-noticed footnote to other issues.

In the last presidential election, 35.5 million voters requested absentee

January 22, 2020
cited in DNC v. Hobbs, No. 18-15845 archived on

ballots, but only 27.9 million absentee votes were counted, according to a study by Charles Stewart III, a political scientist at the Massachusetts Institute of Technology. He calculated that 3.9 million ballots requested by voters never reached them; that another 2.9 million ballots received by voters did not make it back to election officials; and that election officials rejected 800,000 ballots. That suggests an overall failure rate of as much as 21 percent.

Some voters presumably decided not to vote after receiving ballots, but Mr. Stewart said many others most likely tried to vote and were thwarted. "If 20 percent, or even 10 percent, of voters who stood in line on Election Day were turned away," he wrote in the study, published in The Journal of Legislation and Public Policy, "there would be national outrage."

The list of very close elections includes the 2008 Senate race in Minnesota, in which Mr. Franken's victory over Mr. Coleman, the Republican incumbent, helped give Democrats the 60 votes in the Senate needed to pass President Obama's health care bill. Mr. Franken won by 312 votes, while state officials rejected 12,000 absentee ballots. Recent primary elections in New York involving Republican state senators who had voted to allow same-sex marriage also hinged on absentee ballots.

There are, of course, significant advantages to voting by mail. It makes life easier for the harried, the disabled and the elderly. It is cheaper to administer, makes for shorter lines on election days and allows voters more time to think about ballots that list many races. By mailing ballots, those away from home can vote. Its availability may also increase turnout in local elections, though it does not seem to have had much impact on turnout in federal ones.

Still, voting in person is more reliable, particularly since election administrators made improvements to voting equipment after the 2000 presidential election.

There have been other and more controversial changes since then, also in the name of reliability and efficiency. Lawmakers have cut back on early

voting in person, cracked down on voter registration drives, imposed identification requirements, made it harder for students to cast ballots and proposed purging voter rolls in a way that critics have said would eliminate people who are eligible to vote.

But almost nothing has been done about the distinctive challenges posed by absentee ballots. To the contrary, Ohio's Republican secretary of state recently sent absentee ballot applications to every registered voter in the state. And Republican lawmakers in Florida recently revised state law to allow ballots to be mailed wherever voters want, rather than typically to only their registered addresses.

"This is the only area in Florida where we've made it easier to cast a ballot," Daniel A. Smith, a political scientist at the University of Florida, said of absentee voting.

He posited a reason that Republican officials in particular have pushed to expand absentee voting. "The conventional wisdom is that Republicans use absentee ballots and Democrats vote early," he said.



In Florida, a Look at the Challenges of Mailed Ballots

10 Photos  |  View Slide Show ›

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

Sarah Beth Glicksteen for The New York Times

Republicans are in fact more likely than Democrats to vote absentee. In the 2008 general election in Florida, 47 percent of absentee voters were Republicans and 36 percent were Democrats.

There is a bipartisan consensus that voting by mail, whatever its impact, is more easily abused than other forms. In a 2005 report signed by President Jimmy Carter and James A. Baker III, who served as secretary of state under the first President George Bush, the Commission on Federal Election Reform concluded, "Absentee ballots remain the largest source of potential voter fraud."

On the most basic level, absentee voting replaces the oversight that exists at polling places with something akin to an honor system.

"Absentee voting is to voting in person," Judge Richard A. Posner of the United States Court of Appeals for the Seventh Circuit has written, "as a take-home exam is to a proctored one."

### Fraud Easier Via Mail

Election administrators have a shorthand name for a central weakness of voting by mail. They call it granny farming.

"The problem," said Murray A. Greenberg, a former county attorney in Miami, "is really with the collection of absentee ballots at the senior citizen centers." In Florida, people affiliated with political campaigns "help people vote absentee," he said. "And help is in quotation marks."

Voters in nursing homes can be subjected to subtle pressure, outright intimidation or fraud. The secrecy of their voting is easily compromised. And their ballots can be intercepted both coming and going.

The problem is not limited to the elderly, of course. Absentee ballots also make it much easier to buy and sell votes. In recent years, courts have invalidated mayoral elections in Illinois and Indiana because of fraudulent

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

absentee ballots.

Voting by mail also played a crucial role in the 2000 presidential election in Florida, when the margin between George W. Bush and Al Gore was razor thin and hundreds of absentee ballots were counted in apparent violation of state law. The flawed ballots, from Americans living abroad, included some without postmarks, some postmarked after the election, some without witness signatures, some mailed from within the United States and some sent by people who voted twice. All would have been disqualified had the state's election laws been strictly enforced.

In the recent primary here, almost 40 percent of ballots were not cast in the voting booth on the day of the election. They were split between early votes cast at polling places, which Mr. Sancho, the Leon County elections supervisor, favors, and absentee ballots, which make him nervous.

"There has been not one case of fraud in early voting," Mr. Sancho said. "The only cases of election fraud have been in absentee ballots."

Efforts to prevent fraud at polling places have an ironic consequence, Justin Levitt, a professor at Loyola Law School, told the Senate Judiciary Committee September last year. They will, he said, "drive more voters into the absentee system, where fraud and coercion have been documented to be real and legitimate concerns."

"That is," he said, "a law ostensibly designed to reduce the incidence of fraud is likely to increase the rate at which voters utilize a system known to succumb to fraud more frequently."

**Clarity Brings Better Results**

In 2008, Minnesota officials rejected 12,000 absentee ballots, about 4 percent of all such votes, for the myriad reasons that make voting by mail far less reliable than voting in person.

The absentee ballot itself could be blamed for some of the problems. It had to be enclosed in envelopes containing various information and signatures,

including one from a witness who had to attest to handling the logistics of seeing that "the voter marked the ballots in that individual's presence without showing how they were marked." Such witnesses must themselves be registered voters, with a few exceptions.

Absentee ballots have been rejected in Minnesota and elsewhere for countless reasons. Signatures from older people, sloppy writers or stroke victims may not match those on file. The envelopes and forms may not have been configured in the right sequence. People may have moved, and addresses may not match. Witnesses may not be registered to vote. The mail may be late.

But it is certainly possible to improve the process and reduce the error rate.

Here in Leon County, the rejection rate for absentee ballots is less than 1 percent. The instructions it provides to voters are clear, and the outer envelope is a model of graphic design, with a large signature box at its center.

The envelope requires only standard postage, and Mr. Sancho has made arrangements with the post office to pay for ballots that arrive without stamps.

Still, he would prefer that voters visit a polling place on Election Day or beforehand so that errors and misunderstandings can be corrected and the potential for fraud minimized.

"If you vote by mail, where is that coming from?" he asked. "Is there intimidation going on?"

Last November, Gov. Rick Scott, a Republican, suspended a school board member in Madison County, not far from here, after she was arrested on charges including absentee ballot fraud.

The board member, Abra Hill Johnson, won the school board race "by what appeared to be a disproportionate amount of absentee votes," the arrest affidavit said. The vote was 675 to 647, but Ms. Johnson had 217 absentee

cited in DHSSv. Hobbs, No. 18-15845 archived on January 22, 2020

votes to her opponent's 86. Officials said that 80 absentee ballots had been requested at just nine addresses. Law enforcement agents interviewed 64 of the voters whose ballots were sent; only two recognized the address.

Ms. Johnson has pleaded not guilty.

Election law experts say that pulling off in-person voter fraud on a scale large enough to swing an election, with scores if not hundreds of people committing a felony in public by pretending to be someone else, is hard to imagine, to say nothing of exceptionally risky.

There are much simpler and more effective alternatives to commit fraud on such a scale, said Heather Gerken, a law professor at Yale.

"You could steal some absentee ballots or stuff a ballot box or bribe an election administrator or fiddle with an electronic voting machine," she said. That explains, she said, "why all the evidence of stolen elections involves absentee ballots and the like."

ADVERTISEMENT

Go to Home Page »

**NEWS**

**OPINION**

**ARTS**

**LIVING**

**LISTINGS & MORE**

© 2020 The New York Times Company

NYTCo    Contact Us    Work with us    Advertise    T Brand Studio    Your Ad Choices    Privacy    Terms of Service    Terms of Sale

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

Login | Create Account | Contact | Help



cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

ABOUT US ▾

LEGISLATORS & STAFF ▾

RESEARCH ▾

MEETINGS & TRAINING ▾

NCSL IN D.C. ▾

MAGAZINE ⌄

BLOG

Custom Search

TABLE OF CONTENTS

Introduction

Federal Law

Why Are Provisional Ballots Used?

Legislative Role

How Investigated?

Partial Count

Reasons for Acceptance/Reje

Inform the Voter

Time to Determine Status

Which States Don't Use

# Provisional Ballots

10/15/2018

## Introduction

Provisional ballots ensure that voters are not excluded from the voting process due to an administrative error. They provide a fail-safe mechanism for voters who arrive at the polls on Election Day and whose eligibility to vote is uncertain.



Also referred to as "challenger ballots" or "affidavit ballots" in some states, they are required by the federal Help America Vote Act of 2002 (HAVA). When there is uncertainty about a voter's eligibility—the potential voter's name is not on the voter rolls, a required identification document isn't available or other issues—the election official is required to offer the voter a provisional ballot instead of a regular ballot.

In nearly all of the states, after being cast, the provisional ballot is kept separate from other ballots until after the election. A determination is then made as to whether the voter was eligible to vote, and therefore whether the ballot is

Redistricting Law | 2020
Let us help you and your team prepare for this complex, once-a-decade task.
ORDER NOW

*cited in DNC v. Hobbs, No. 18-15845, archived January 22, 2020*

Provisional
Ballots?

Methodology

Additional
Resources

About
This
Project

CONTACT

NCSL's
Elections
Team,
303-364-
7700

Elections
and
Campaigns

All
Documents

Initiative
and
Referendum

Election
Administration

StateVote
Election
Results
and
Analysis

Campaign
Finance

to be counted. Generally, a board of elections or local election officials will investigate the provisional ballots within days of the election. Since this is an additional administrative step, a large number of provisional ballots can increase costs for jurisdictions.

States vary greatly in how provisional ballots are handled and in the number that are issued and rejected, and both the processes and the data are tracked by the U.S. Election Assistance Commission (EAC). States can have as few as 100 provisional ballots cast statewide, or as many as 100,000.

Often standards for handling provisional ballots are determined by state law.

This Web page provides a general overview of state provisional ballot laws and practices. The information was gathered from several sources, including the EAC's 2014 Statutory Summary, state election manuals, state statutes and regulations, and through consultation with state election administrators.

NOTE: Idaho, Minnesota and New Hampshire do not issue provisional ballots, therefore, we do not provide information regarding those states in any of the material below. For explanation of why they do not issue provisional ballots see What states do not use provisional ballots, and why?

Because state laws vary so greatly we recommend consulting your state's laws and regulations if you have specific questions.

This page answers the following questions:

- What does federal law require regarding provisional ballots?

- Why are provisional ballots used?

- What is the legislative role regarding provisional ballots?

- How is a provisional ballot investigated?

- Is any part of a provisional ballot counted if it is cast in the wrong precinct?

- What are the reasons for rejecting a provisional ballot?

- How does a voter find out if his or her provisional ballot

was counted?

- What time is allotted to determine the status of provisional ballots?

- Which states do not use provisional ballots, and why?

- Methodology

## What Does Federal Law Require Regarding Provisional Ballots?

Provisional ballots are mandated by section 15482 of the Help America Vote Act of 2002 (HAVA), but even before HAVA, some states offered "provisional," "challenge" or "affidavit" ballots to ensure that no eligible voters were turned away. HAVA exempts only a few states: Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin, and Wyoming (see below).

The law states: "If an individual declares that such individual is a registered voter in the jurisdiction in which the individual desires to vote and that the individual is eligible to vote in an election for Federal office, but the name of the individual does not appear on the official list of eligible voters for the polling place or an election official asserts that the individual is not eligible to vote, such individual shall be permitted to cast a provisional ballot…"

HAVA sets out what actions are required of voters and of election officials:

**Voters:** To use a provisional ballot, each voter whose eligibility to vote is uncertain must provide a written affirmation, signed in front of an election official at the polling place, stating that he or she is a registered voter and is eligible to vote in the election.

**Election officials:** Election officials and poll workers must notify potential voters that they have a right to use a provisional ballot, provide the ballot, witness the affirmation, and receive the ballot for later processing. Additionally, election officials must provide information to the voter on how the process works and how to find out if his or her ballot was cast—and if not, why not.

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

# Why Are Provisional Ballots Issued?

For a voter to cast a provisional ballot, there must be some question as to his or her eligibility to vote. These questions vary across states. The most common reasons, as identified by the EAC, are:

- The voter's name is not on the poll or registration list.

- The voter's eligibility cannot be otherwise established.

- The voter's identity and/or eligibility to vote has been challenged by a poll-worker or election official.

- The voter does not have identification as required by that state.

- The voter requested an absentee ballot but claims he or she either didn't receive it or didn't cast it.

- The voter's address or name has changed but their voter registration information does not reflect the change.

- For primaries, the voter registration reflects an error in party listing.

Most states have additional reasons specific to those states. In addition, HAVA requires all states to issue provisional ballots if the polling place hours are extended by court order.

Below is a chart of the most common reasons voters may need to cast a provisional ballot and the states that will allow a voter to cast a provisional ballot in those instances.

### Common Reasons Voters May Need to Cast a Provisional Ballot

| Reason | States |
|--------|--------|
| Voter eligibility cannot be immediately established—i.e., name is not on registration list | 46 states, plus D.C.: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, |

cited in RNC v. Hobbs, No. 18-15845 archived on January 22, 2020

| | North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming |
|---|---|
| The voter's eligibility is challenged by a poll watcher | 27 states, plus D.C.: Alabama, Alaska, Arizona, Colorado, Connecticut, Delaware, District of Columbia, Florida, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Montana, Nevada, Ohio, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, West Virginia, Wyoming |
| Voter did not present ID as required by the state | 36 states, plus D.C.: Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Virginia, Washington, Wisconsin |
| Voter requested an absentee ballot and has not cast it | 16 states, plus D.C.: Alabama, Arizona, Arkansas, California, District of Columbia, Illinois, Kansas, Maryland, Montana, Nebraska, Nevada, New Jersey, Ohio, Rhode Island, Texas, Virginia, Washington/td> |
| Registration reflects an error in party listing (primary election only) | Nine states, plus D.C.: District of Columbia, Maine, Maryland, Massachusetts, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, West Virginia |
| Address and/or name has changed | Nine states, plus D.C.: Alaska, Arizona, California, District of Columbia, Florida, Maryland, Mississippi, New Jersey, |

cited in DNC v. Hobbs, 18-15845, archived on January 22, 2020

Ohio, Texas

# What Is the Legislative Role Regarding Provisional Ballots?

Because it takes longer to process provisional ballots than regular ballots, legislators and administrators may be motivated to reduce the use of provisional ballots. While the availability of provisional ballots is mandated by federal law—the Help America Vote Act of 2002—state laws determine how and why provisional ballots are used. They may also want to make procedures for the use of provisional ballots uniform throughout their state. Here are issues relating to provisional ballots that legislators may address:

- **Same Day Registration**. In some states that offer same day registration, they may implement it by requiring the use of provisional ballots for Election Day registrants. In these cases, voters can indeed register and vote at the same time, but if they cannot immediately provide the required identification and proof of residency, their ballots are not counted until their eligibility is determined. (Other states may provide same day registration through other mechanisms). Montana uses provisional ballots for this purpose and OK S 314, from 2015, would have created same day registration through the use of provisional ballots.

- **Voter ID**. Many states who have strict voter ID requirements ask voters who do not provide the appropriate ID at the time of voting to cast a provisional ballot. Voters have the opportunity to show ID within a few days of the election, and if not, the provisional ballot is not counted.

- **Voted the Wrong Ballot**. In states where several precincts may be housed in one polling place, it is not uncommon for a voter to get in the wrong line. In this case, the voter is offered the opportunity to either get in the right line for the correct ballot, or be issued a provisional ballot that would be partially counted. This is called the "right church, wrong pew" situation. In Ohio, in 2014 SB 216 was enacted to set procedures for these

cases that allow a portion of the ballot to be counted.

- **Issued an Absentee Ballot**. In many states, voters who have been issued an absentee ballot are not able to vote on Election Day even if they haven't cast the absentee ballot. States can permit voters who say this is the case to vote on Election Day on a provisional ballot; that way, if the original absentee ballot does get submitted, the provisional ballot will not be counted. For instance, RI S 639, from 2015, would permit voters to vote on a provisional ballot even if they had requested an absentee ballot.

- **Name Not on the Voter List**. One of the most common reasons provisional ballots are issued is that the voter's name does not appear on the voter list, even if the voter says he or she has registered. In 2015, TX H 2987, which failed, proposed giving each new registrant a receipt saying they had applied to register. If the name is not on the voter list, the receipt could be attached to a provisional ballot, thus proving the voter had done their part by registering.

- **Voting Outside One's Precinct**. In some states, provisional ballots can be used by voters who are voting outside their own jurisdiction. State law governs whether these ballots will be rejected, or whether the portion of the ballot the voters were eligible to vote will be counted. In 2013, Illinois and Utah passed legislation to count partial ballots. Also in 2013, North Carolina enacted HB 589, which clarified that provisional ballots cast in the wrong precinct will not be counted.

- **Uniform Time Frames**. States can create uniform time periods for handling provisional ballots. Illinois' HB 2418, enacted in 2013, requires election officials to transmit information about provisional ballots cast to the state board within two calendar days of the election, and increases from two to seven days the time period during which a provisional voter may submit additional information to election authorities. Also in 2013, Texas established a time frame for counting provisional ballots.

- **Uniform Procedures**: States can also establish statewide procedures for counting provisional ballots. In 2013, Virginia addressed two procedural issues. With HB 63, it established who can be present when provisional ballots

cited in NC v. Hirst, No. 18-15845, archived on January 22, 2020

are counted, and with HB 2143, the state now requires that provisional ballots be "promptly" put in the ballot box.

## How Is a Provisional Ballot Investigated?

Once a provisional ballot is cast, it is stored separately from other ballots and investigated by local election officials. Generally, this process entails verifying the voter's identity and eligibility to vote, and may require the voter to provide further information. If the identity of the voter and the voter's eligibility can be established through reviewing the voter rolls or verifying a signature, all or a portion of the ballot will be counted (see below). If their eligibility cannot be established, the ballot will not be counted.

In some states, the voter may be asked to take action after Election Day to have his or her provisional ballot.  In these cases, the voter may be required to return to an election office following the election to verify his or her identity and/or eligibility to vote. In most cases, these voters were issued a provisional ballot because they did not present voter identification as required by that state. In Alabama, Arizona, Georgia, Indiana, Kansas, Ohio, South Carolina, Tennessee, Texas, Virginia and Wisconsin voters have a few days after Election Day to show required identification (see NCSL's Voter ID Requirements page.)

Occasionally a voter may be asked to return to provide proof of residence, such as a utility bill, or other eligibility verifications depending on the reason for the issuance of the provisional ballot. These states are likely to be those that offer Election Day registration.

## Is Any Part of a Provisional Ballot Counted If it Is Cast in the Wrong Precinct?

States vary in how they handle provisional ballots cast in the wrong precinct.  This most commonly happens when a voter goes to the wrong precinct because he or she can't get to the home precinct, and therefore votes on a provisional ballot. (As part of get-out-the-vote efforts toward the end of Election

cited in DNC v. Hobbs, No. 18-15845, received on January 22, 2020

Day, candidates, campaigns and advocacy groups may encourage this choice.)

Some states count a portion of the provisional ballot if it is cast in the wrong precinct or jurisdiction. Generally, they will count the votes for races that the voter would have been eligible to vote in, if they did so in the correct precinct or jurisdiction. This may include just votes for federal offices, as in Rhode Island, or for state or local races that would be shared among precincts.

In other states, the entire ballot will be rejected.

Exceptions may exist. For example, in Maine, the full ballot is counted first. If the number of provisional ballots cast would change the outcome of the election, and only then is the validity of the provisional ballots investigated.

In Ohio, there may be certain polling places holding elections for more than one precinct. In that situation, if the voter is in the right polling place but the wrong precinct, they will first be directed to the correct precinct. If they chose not to get back in line they can choose to vote a provisional ballot in the wrong precinct (Ohio Code § 3505.183)

*cited in DNC v. Hobbs, No. 18-15845, archived on January 22, 2020*

State Handling of Provisional Ballots Cast in the Wrong Precinct.

| Full Count | Maine** |
|---|---|
| Partial Count | Alaska, Arizona, Arkansas, California, Colorado District of Columbia, Georgia, Kansas, Louisiana*, Maryland, Massachusetts, New Jersey, New Mexico, New York, Ohio***, Oregon, Rhode Island*, Utah, Washington, West Virginia |
| Does Not Count | Alabama, Connecticut, Delaware, Florida, Hawaii, Illinois, Indiana, Iowa, Kentucky, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Wisconsin, Wyoming |

*Only Federal races

** Validity is only reviewed if the number of provisional ballots cast is a large enough number to affect the results of the election

*** See Ohio Code § 3505.183

# What Are the Reasons for Rejecting/Accepting a Provisional Ballot?

Once the provisional ballot has been investigated, the election officials will either accept the ballot and count all or part of it, or reject the ballot and not count it.

According to the EAC the most common reasons for rejection of a provisional ballot are: (1) the voter was not registered; (2) the voter cast a provisional ballot in the wrong jurisdiction; (3) the vote was cast in the wrong precinct; (4) the voter lacked required ID or did not provide the proper ID within the allotted time after Election Day as described above; (5) the provisional ballot was incomplete, or the ballot or envelope was illegible; (6) the voter had already voted in that election; or (7) there was no signature on the provisional ballot or the ballot envelope.

Some states provide lists of the reasons for rejecting provisional ballots. The chart below includes 50-state information regarding how states have defined the reasons for rejecting or accepting provisional ballots. When possible the language listed is directly from state sources.

Reasons for rejecting provisional ballots

| | A provisional ballot is rejected when: |
|---|---|
| | ■ The provisional ballot voter is not registered to vote |
| | ■ The provisional ballot voter cast the provisional ballot in a precinct where he/she does not reside |
| | ■ The provisional ballot voter is determined to be ineligible to vote |

| | |
|---|---|
| | based on a challenge<br>■ **The provisional ballot voter fails to provide proper photo ID**<br>■ **It is determined that the provisional ballot voter requested and voted an absentee ballot despite the claim that the provisional ballot voter did not vote his/her absentee ballot** |
| **Alabama**<br>Information provided by a state election official | |
| **Alaska**<br>Alaska Stat. §15.15.198 | A person whose registration is inactive under AS 15.07.130(b) and who votes a questioned or absentee ballot *shall have the ballot counted* if:<br>■ The person was registered to vote in the last four calendar years<br>■ The person signs a statement to that effect; and<br>■ The earlier registration is verified by the director |
| **Arizona**<br>Ariz. Rev. Stat. §16-584(E) | A provisional ballot is *rejected* when:<br>■ Not registered<br>■ No ballot in envelope<br>■ Registered after 29-day cut-off<br>■ No signature<br>■ Insufficient/illegible information<br>■ Signature does not match<br>■ Wrong party<br>■ Outside jurisdiction ballot<br>■ Voter challenge upheld<br>■ Voted in wrong precinct<br>■ Voted and returned an early ballot<br>■ Proper identification not provided by deadline<br>■ Administrative error<br>■ Not eligible |

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

| | |
|---|---|
| **Arkansas**<br>Rules on Poll Watchers, Vote Challenges, and Provisional Voting | A provisional ballot is *counted* when:<br>■ It is cast by a registered voter and is the correct ballot for the precinct of the voter's residence<br>■ It is cast by a registered voter who presents proof of identity or an affidavit of indigence or religious objection to having his or her photograph made to the county clerk or the county board no later than the first Monday following the election; or<br>■ It is an absentee ballot and the county board determines that the voter is eligible to vote in the precinct. |
| **California**<br>Election Officer's Digest, 2014<br>Elections Observation Rights and Responsibilities, 2014 | A provisional ballot is *rejected* when:<br>■ Signature doesn't match voter registration signature<br>■ NOT for failure to cast a ballot in correct precinct |
| **Colorado**<br>Provisional Ballot FAQ, SOS Website | A provisional ballot is *rejected* when:<br>■ Choosing to vote a provisional ballot than vote in correct county<br>■ If the elector's registration cannot be verified, the ballot shall not be counted |
| **Connecticut**<br>Conn. Gen. Stat. §9-232n | A provisional ballot is *rejected* when:<br>■ Not registered in proper precinct at time of casting ballot |
| **Delaware**<br>Del. Code tit. 15, §4948 | A provisional ballot is *rejected* when:<br>■ Incomplete provisional ballot |

cited in DNC v. Hobbs, No. 18-15845 altered on January 22, 2020

| | affidavit that does not include all of the following information: full name, complete address, political party affiliation (primary elections only), and date of birth |
| | ▪ No suitable identification |
| | ▪ Not registered to vote in the state or are not registered to vote in the election district in which they were cast |
| **District of Columbia** <br> D.C. Mun. Regs. Tit. 3, §807.3 | A provisional ballot (aka special ballot) is *counted when*: <br> ▪ The voter registered to vote at the polls or an early voting center, the voter cast the Special Ballot at the precinct in which the voter maintains residence or at an early voting center designated by the Board; <br> ▪ The voter is a qualified elector of the District of Columbia; and <br> ▪ The voter did not otherwise vote in the same election. |
| **Florida** <br> Fla. Stat. §101.048 | A provisional ballot is *rejected* when: <br> ▪ Not registered <br> ▪ Not entitled to vote at the precinct where the person cast a vote |
| **Georgia** <br> Ga. Code §21-2-419 (c)(3) | A provisional ballot is *rejected* when: <br> ▪ No registered <br> ▪ Not otherwise eligible <br> ▪ Registrars unable to determine within three days following the election whether the voter was registered or eligible to vote |
| **Hawaii** <br> Haw. Admin. Rules § 3-172- | A provisional ballot is *rejected* when: <br> ▪ Any part of the provisional ballot application form or affirmation |

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

140

statement is incomplete, not executed, or altered, the provisional ballot shall be not be counted

- The county clerk determines the individual is eligible under state law to vote in the precinct the individual wishes to vote in, the individual's provisional ballot shall be counted in accordance with state law

- The county clerk determines the individual is not eligible to vote in the precinct where the provisional ballot was cast, the provisional ballot shall not be counted

| | |
|---|---|
| **Idaho** | N/A |
| **Illinois**<br>10 ILCS 5/18A-15 | A provisional ballot is *rejected* when:<br>- Information available to the election authority from five specifically-identified sources opposes registration status. If a conflict exists among the information available, the election authority shall make a determination by a totality of the circumstances<br><br>- The affidavit executed by the voter fails to contain the voter's first and last name, house number and street name and signature or mark<br><br>- The voter is determined to have voted by mail in the election concerned; or<br><br>- The voter does not provide the election authority with the necessary registration documentation (ID) within 7 days of the election |
| **Indiana**<br>2015 Election Administrator's Manual | A provisional ballot is *rejected* when:<br>- The provisional voter affidavit has not been properly executed |

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

| | |
|---|---|
| Ind. Code § 3-11.7-5-5 | ■ The provisional voter is not a qualified voter of the precinct |
| | ■ The provisional voter failed to provide photo ID, if required |
| | ■ The provisional voter did not register to vote at a registration agency on a date within the registration period; or |
| | ■ Ballot does not contain the initials of the poll clerks |
| **Iowa** <br> Election Administrator's Handbook | A provisional ballot is *rejected* when: <br> ■ Voter did not provide ID and was required to do so <br><br> ■ Voter was not registered in the precinct on election day <br><br> ■ Voter already returned an absentee ballot that was counted <br><br> ■ Voter is not qualified to vote; or <br><br> ■ Voter is inactive/pending and has not provided ID as required by the time the board meets to consider provisional and challenged absentee ballots |
| **Kansas** <br> Kan. Admin. Regs. § 7-36-7 | A provisional ballot is *rejected* when: <br> ■ The voter did not provide additional information, an updated signature, or an additional photocopy upon request by the county election officer or if the information, signature, or photocopy is inconsistent with the information on the voter registration list |
| **Kentucky** <br> Ky. Admin. Regs. tit. 31, § 6:020 | A provisional ballot is *rejected* when: <br> ■ The county board of elections determines the individual is ineligible to vote in the precinct in the election |

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

| | |
|---|---|
| **Louisiana** *Information provided by a state election official* | A provisional ballot is rejected when: <br> ■ The voter is not a registered voter or <br> ■ Fails to vote in the precinct where he is eligible to vote in the federal election |
| **Maine** Me. Rev. Stat. tit. 21-A §673 | All challenged ballots are initially counted in the same manner as regular ballots. No further determination is made on the challenge unless a recount occurs and it is determined that the challenged ballot could affect the outcome of the election. If there are enough challenged ballots to affect the outcome of an election, then the challenged ballots in that district will be segregated, and the basis for each challenge may be determined by the appropriate authority designated by statute or by state or federal constitution. |
| **Maryland** Md. Election Law §11-308 | A provisional ballot is *rejected* when: <br> ■ The voter is determined not to be qualified <br> ■ The voter failed to sign the oath on the provisional ballot application <br> ■ The individual cast more than one ballot for the same election <br> ■ The local board determines that a provisional ballot is intentionally marked with an identifying mark that is clearly evident and placed on the ballot for the purpose of identifying the ballot; or <br> ■ If the intent of the voter with respect to a particular contest is not clearly demonstrated, the local board shall reject only the vote for that contest |
| **Massachusetts** Mass. Gen. | A provisional ballot is *rejected* when: <br> ■ The city or town clerk determines |

| | |
|---|---|
| Laws. ch. 54, §76C | that the individual is ineligible to vote in the precinct in the election under the law of the commonwealth |
| **Michigan** Mich. Comp. Laws Ann. § 168.813 | A provisional ballot is *rejected* when: <br>▪ The voter is not registered <br>▪ The voter did not show a proper ID or verification of residence |
| **Minnesota** | N/A |
| **Mississippi** *Information provided by a state election official* | A provisional ballot is *rejected* when: <br>▪ The voter is not a registered voter <br>▪ The voter is registered, but in wrong precinct <br>▪ The voter failed to return to the circuit clerk's office to present an acceptable form of photo ID within 5 business days of the election <br>▪ The voter failed to sign an affidavit of religious objection to being photographed in the circuit clerks' office within 5 business days of the election |
| **Missouri** Mo. Rev. Stat. §115.430 Rules of Elected Officials | A provisional ballot is *rejected* when: <br>▪ Not registered <br>▪ Not eligible <br>▪ Voted in wrong polling place |
| **Montana** Mont. Code § 13-15-107 | A provisional ballot is *rejected* when: <br>▪ Officials cannot verify the voter's identity or eligibility |
| Nebraska Neb. Rev. Stat. §32-1002(5) | A provisional ballot is *rejected* when: <br>▪ The voter is not registered <br>▪ Already voted in county or elsewhere <br>▪ The voter failed to complete and |

cited in DNC v. Hobbs, No. 18-15845 argued on January 22, 2020

|  |  |
|---|---|
|  | ■ sign a registration application |
|  | ■ Residence on registration is in a different county or in a different precinct |
|  | ■ Party affiliation on the registration application completed prior to voting the provisional ballot is different than the party affiliation that appears on the voter's voter registration record |
|  | ■ Failed to complete and sign the certification on the envelope or attached form |
| **Nevada** Nev. Rev. Stat. §293.3085 | A provisional ballot is *rejected* when: ■ Person who cast the provisional ballot cast the wrong ballot for the address at which the person resides |
| **New Hampshire** | N/A |
| **New Jersey** N.J. Stat. Ann. §19:53C-17 N.J. Stat. Ann. §19:53C-13 | A provisional ballot is *rejected* when: ■ If the voter already cast a provisional ballot ■ If the name, signature, or address does not match the voter registration record and cannot be verified. If a provisional ballot voter votes a ballot in a district other than the one in which the voter is qualified to vote, the votes for those offices and questions for which the voter would be otherwise qualified to vote are counted. All other votes are not counted. |
| **New Mexico** 2013 Election Handbook NM ADC 1.10.22 | A provisional ballot is *rejected* when: ■ No signature ■ Not registered ■ Voter is registered to vote in another county in the state ■ If they already cast an absentee |

filed in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

ballot

| | |
|---|---|
| **New York**<br>N.Y. Election Law § 5-403<br>N.Y. Election Law § 9-209 | A provisional ballot is *rejected* or *accepted* when:<br>▪ research at the county board supports the claim the voter makes in their oath on the ballot envelope, the ballot will be counted. If research proves otherwise, the ballot is not counted. Provisional ballots cast by voters who were in the correct poll site but at the wrong voter sign-in table, will be counted, however only those contests and questions which the two different districts had in common will be counted. |
| **North Carolina**<br>N.C. Gen. Stat. Ann. § 163-182.2 | A provisional ballot is *rejected* when the voter:<br>▪ Did not vote in the proper precinct under G.S. 163-55 and G.S. 163-57<br>▪ Is not registered in the county as provided in G.S. 163-82.1, or<br>▪ Is otherwise not eligible to vote |
| **North Dakota**<br>NDCC § 16.1-13-34 | North Dakota does not require voters to register and only uses provisional ballots if a court order has extended the polling hours. If this happens, the secretary of state would proscribe procedures. |
| **Ohio**<br>Ohio Rev. Stat. §3505.183 | A provisional ballot is *rejected* when::<br>▪ The voter is not registered<br>▪ The voter Is not eligible to cast a ballot in that precinct or for that election<br>▪ The voter did not provide the required information<br>▪ The voter already voted<br>▪ The voter did not provide any |

cited in DNC v. Hobbs, No. 18-15845, archived on January 22, 2020

- additional information required within 7 days of the election

- The voeter did not provide a current and valid identification

- The voter's information does not match the information in the voter registration database

- The voter's date of birth is different

| **Oklahoma** *Information provided by a state election official* | A provisional ballot is *rejected* when:<br><br>- Voter is not registered to vote in the county or the voter's residence address is located in another precinct<br><br>- Voter's change of party affiliation was not timely received or voter's residence address is not located within the boundaries of the school district or municipality for which the provisional ballot was cast<br><br>- Voter's identity cannot be verified as required by state law based upon the information provided on the Provisional Ballot Affidavit<br><br>- The US/OV voter does not provide an address of residence within the county or the address provided is located in another precinct |
| --- | --- |
| **Oregon** Or. Rev. Stat. §254.408 | A provisional ballot is *counted* when:<br><br>- The elector is validly registered to vote and the vote was properly cast<br><br>- The county clerk determines the registration of the elector is considered active or inactive<br><br>- The elector is qualified to vote for the particular office or on the measure |
| **Pennsylvania** | A provisional ballot |

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

| | |
|---|---|
| **Provisional Balloting Procedures** | is *rejected* or *accepted* when:<br>■ If the board of elections determines that the elector has knowingly voted in an improper election district, the board of elections may declare the ballot to be invalid. However, absent a determination of willfulness by the elector, the board should dispose of the provisional ballot as a ballot cast in the proper county but at an improper election district and count the ballot as to those offices for which, and questions on which, the elector was qualified to vote. |
| **Rhode Island** Rules and Regulations for Provisional Voting | A provisional ballot is *rejected* when:<br>■ Voter not registered or in the wrong congressional district<br>■ Signature on latest voter reg. form on record does not match signature on provisional ballot application<br>■ Signature on latest voter reg. form on record does not match signature on provisional ballot application and voter has not submitted valid ID by 4 p.m. day following election<br>■ The individual has cast a mail ballot, emergency ballot or military ballot in the same election |
| **South Carolina** S.C. Code § 7-7-910 | A provisional ballot is *rejected* when:<br>■ Case in wrong precinct |
| **South Dakota** S.D. Codified Laws § 12-20-5.1 | A provisional ballot is rejected when:<br>■ Not registered |
| **Tennessee** Tenn. Code Ann. §2-7-112 | A provisional ballot is *rejected* when:<br>■ The voter is not properly registered in that precinct |

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

|  | ▪ The voter already voted in a different precinct |
|---|---|
| **Texas**<br>Tex. Elec. Code §65.054 | A provisional ballot is *counted* when:<br>▪ The person is eligible to vote in the election and has not previously voted in that election; or<br><br>▪ The person:<br>  ○ meets the identification requirements<br><br>  ○ the voter executes an affidavit under penalty of perjury that states the voter has a religious objection to being photographed and the voter has consistently refused to be photographed for any governmental purpose from the time the voter has held this belief; or<br><br>  ○ executes an affidavit under penalty of perjury that states the voter does not have any identification as a result of a natural disaster that was declared by the president of the United States or the governor, occurred not earlier than 45 days before the date the ballot was cast; and<br><br>▪ The voter has not been challenged for any reason other than lack of identification. |
| **Utah**<br>Utah Code § 20A-4-107 | A provisional ballot is *counted* when:<br>▪ The person provides valid voter identification to the county clerk or an election officer who is administering the election by the close of normal office hours on Monday after the date of the election |

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

| | |
|---|---|
| **Vermont**<br>Vt. Stat. Ann. Title 17 § 2555<br>Vt. Stat. Ann. Title 17 § 2557<br>Vt. Stat. Ann. Title 17 § 2121 | If a voter chooses to vote by provisional ballot, the clerk reviews the application and determine eligibility after the close of the polls. The following eligibility conditions must be met:<br>■ a citizen of the United States;<br>■ a resident of the state of Vermont;<br>■ has taken the voter's oath; and<br>■ 18 years of age or more.<br>■ Any person meeting the requirements of subdivisions (a)(1)-(3) of this section who will be 18 years of age on or before the date of a general election may register and vote in the primary election immediately preceding that general election. |
| **Virginia**<br>Va. Code § 24.2-653 | A provisional ballot is *rejected* when:<br>■ Not eligible to vote in precinct<br>■ Unable to determine right to vote<br>■ No proper ID |
| **Washington**<br>Wash. Admin. Code § 434-262-032 | A provisional ballot is *rejected* when:<br>■ Not registered<br>■ Already voted a regular ballot<br>■ Signature on provisional ballot envelope does not match the voter registration record and/or they do not present a proper ID |
| **West Virginia**<br>W. Va. Code § 3-1-41 | A provisional ballot is *rejected* or *counted* when:<br><br>Provisional ballots may not be counted by the election officials. The county commission shall, on its own motion, at the time of canvassing of the election returns, sit in session to determine the validity of any challenges according to |

cited in DNC v. Hobbs, archived on January 22, 2020

the provisions of this chapter. If the county commission determines that the challenges are unfounded, each provisional ballot of each challenged voter, if otherwise valid, shall be counted and tallied together with the regular ballots cast in the election. The county commission, as the board of canvassers, shall protect the privacy of each provisional ballot cast. The county commission shall disregard technical errors, omissions or oversights if it can reasonably be ascertained that the challenged voter was entitled to vote.

Note: Guidance on deciding whether or not to count provisional ballots is provided in the Secretary of State's manual 2014 Best Practices Guide for Canvass and Recount.

| State | |
|---|---|
| **Wisconsin**<br>Wis. Stat. § 7.52 | A provisional ballot is *rejected* when:<br>■ If voter does not provide the proper documentation to prove eligibility to vote (ID or proof of residency) by 4 p.m. the Friday after the election. |
| **Wyoming**<br>Wyo. Stat. § 22-15-105 | A provisional ballot is *rejected* when:<br>■ The voter is not on the registration rolls and is registering for the first time on Election Day but did not present documentation at the polls or by close of business on the following day. |

*cited in DNC v. Hobbs, No. 18-15845, archived on January 22, 2020*

# How Does a Voter Find Out If a Provisional Vote Was Counted?

HAVA requires the state or local election official to give the person casting a provisional ballot information on how he or she can find out whether the voted was counted, and, if not,

the reason why not. The law says this may be "a toll-free telephone number or an Internet website" established for that purpose.

This requirement often is reflected in state statute, rule, or in the election manual. In 2012, 20 states offered an online tool for voters to find out if their provisional ballot was counted, according to the Election Performance Index from The Pew Charitable Trusts.

## What Time Is Allotted to Determine the Status of Provisional Ballots?

Each state establishes when provisional ballots are processed. For example, some states base this timeframe on how long the voter has to prove eligibility as detailed above, or they use the same timeframe as the official election canvass.

Time Allotted to Determine the Status of Provisional Ballots

| State | When Provisional Ballots Are Counted |
|---|---|
| **Alabama**<br>Provisional Voting in Alabama | By noon, seven days after the election. |
| **Alaska**<br>Alaska Stat. §15.20.205 | Fifteen days. |
| **Arizona**<br>Elections Procedures Manual, 2014 | Ten business days following the general federal election and five days for all other elections. |
| **Arkansas**<br>Rules on Poll Watchers, Vote Challenges, and Provisional Voting | Forty-eight hours—15 days after the election. |
| **California**<br>Cal. Elec. Code § 14310 | The canvass shall commence no later than the Thursday following the election, shall be open to the public, and, for state or statewide elections, shall |

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

| | |
|---|---|
| | result in a report of results to the Secretary of State. The canvass shall be continued daily, Saturdays, Sundays, and holidays excepted, for not less than six hours each day until completed. |
| **Colorado**<br>Colo. Rev. Stat. § 1-8.5-105 (5) | Ten days after a primary or 14 days after a general election. |
| **Connecticut**<br>Conn. Gen. Stat. § 9-232n | Not later than six days after the election or primary. |
| **Delaware**<br>Del. Code tit. 15, § 4948 | The day following an election in which provisional ballots were used, the Department shall meet to examine the provisional ballots, determine which of the ballots should be tallied in accordance with the rules stated below, and then tally those ballots. |
| **District of Columbia**<br>Voting by Special Ballot FAQ | Ten days after the election. |
| **Florida**<br>*Information provided by a state election official* | The provisional ballot count must be completed by noon on the third day after a primary election, and noon on the fourth day after a general election. |
| **Georgia**<br>Ga. Code. § 21-2-419 (c) (1) | Three days to prove identity or for county registrar to verify registration. |
| **Hawaii**<br>Hawaii Rev. Stat. § 11-174.5 | Twenty days. |
| **Idaho** | N/A |
| **Illinois**<br>10 ILCS 5/18A-15 | Fourteen days following the election. |
| **Indiana** | Ten days after the election. |

cited in SNC v. Hobbs, No. 18-15845 archived on January 22, 2020

Ind. Code § 3-11.7-5-1

| | |
|---|---|
| **Iowa**<br>Election Administrator's Handbook | Thursday after Election Day. |
| **Kansas**<br>Kan. Stat. Ann. § 25-3104, The Kansas Election Standards | Provisional ballots are counted as part of the intermediate canvass conducted by the county board of canvassers on either the Monday or second Thursday following the election. |
| **Kentucky**<br>Ky. Admin. Regs. tit. 13, § 6:020 | Not later than 12 p.m., prevailing time, on the Friday following the election. |
| **Louisiana**<br>La. Rev. Stat. § 18:566.2 | Provisional ballots shall be counted on the third day following the election. |
| **Maine**<br>Me. Rev. Stat. tit. 21-A §673 | Reasonable time after the election. |
| **Maryland**<br>Maryland State Board of Elections Challengers, Watchers & Other Election Observers Manual | If provisional ballot because of lack of proper ID, the voter has until 10 a.m. on the second Wednesday after the election to provide proper ID to local board of elections. |
| **Massachusetts**<br>Mass. Gen. Laws ch. 54, § 76C | Twelve days. |
| **Michigan**<br>Election Inspector's Manual | Six calendar days after the election. |
| **Minnesota** | N/A |
| **Mississippi**<br>Mississippi Poll Manager Guide | Five business days. |
| **Missouri**<br>Miss. Code Ann. §115.511 | Same time as official canvass, two weeks following the election. |

18-15845 archived on January 22, 2020
Cited in DNC v. Hobbs, No.

| State | |
|---|---|
| **Montana**<br>Mont. Code § 13-15-107 | Six days. |
| **Nebraska**<br>Neb. Rev. Stat. § 32-1002 | The verification and investigation shall be completed within seven days after the election. |
| **Nevada**<br>Nev. Rev. Stat. § 293.387 | Six working days following the election. |
| **New Hampshire** | N/A |
| **New Jersey**<br>N.J. Stat. § 19:19-1 | Before the Monday following the election when the Board of County Canvassers meets. |
| **New Mexico**<br>N.M. Stat. Ann. § 1-12-7.1 | Voter has until 5 p.m. on the second day following the election to provide proper identification. |
| **New York**<br>N.Y. Election Law, § 9-209 | No more than 14 days after a general or special election and no more than eight days after a primary election at which such ballots are voted. |
| **North Carolina**<br>N.C. Gen. Stat. § 163-182.2 | Vote counting at the precinct shall occur immediately after the polls close and shall be continuous until completed. |
| **North Dakota** | N/A |
| **Ohio**<br>Ohio Code § 3505.183 | Until any hearing required to be conducted under section 3503.24 of the Revised Code with regard to the provisional voter is held, or until the eleventh day after the day of the election, whichever is earlier. |
| **Oklahoma**<br>Okla. Admin. Code 230:35-5-177 | After 5 p.m. on Friday after Election Day. |
| **Oregon** | Fourteen days. |

cited in DNC v. Hobbs, No. 18-15845, archived on January 22, 2020

| | |
|---|---|
| Or. Rev. Stat. § 254.426 | |
| **Pennsylvania** About Provisional Voting | Seven days. |
| **Rhode Island** Provisional Ballot Overview | Forty-eight hours after the election. |
| **South Carolina** S.C. Code Ann. § 7-13-830,  § 7-17-10, § 7-17-510 | Before the board of canvassers meet, on the Thursday following a primary/runoff or the Friday following a general or special election. |
| **South Dakota** S.D. Codified Laws § 12-20-13.2, 12-20-13.3 | Seven-17 days following the election, just prior to the official canvass. |
| **Tennessee** Tenn. Code Ann. §2-7-112 | The counting of all provisional ballots must be completed within four business days of the close of polls on Election Day. |
| **Texas** Tex. Election Code § 65.051 | Seven-13 days. |
| **Utah** Utah Code 20A-4-301(1)(b) | Counted during the official canvass no later than 14 days after the election. |
| **Vermont** Vt. Stat. Ann. tit. 17, § 2557 | Two days after the election. |
| **Virginia** Va. Code § 24.2-653 | Seven calendar days from the date of the election. |
| **Washington** Wash. Rev. Code § 29A.60.190 | Fourteen-21 days after the election. |
| **West Virginia** W. Va. Code, § 3-6-9 | Provisional ballots are investigated during canvass, on the fifth day after the election. |
| **Wisconsin** | At 4 p.m. the Friday after the |

Cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

| | |
|---|---|
| Wis. Stat. § 7.52 | election. |
| **Wyoming**<br>Wyo. Stat. § 22-16-103 | The first Friday following the election. |

## Which States Do Not Use Provisional Ballots?

States that offered same-day voter registration at the time the National Voter Registration Act was enacted (1993) are also exempt from HAVA's provisional ballot requirements. Those states are: Idaho, Minnesota, New Hampshire, North Dakota (which does not require voter registration although it does keep a list of voters), Wisconsin and Wyoming.

While those state are not required to provide provisional ballots under HAVA, they are also not prohibited from using provisional ballots.

North Dakota, for instance, uses them in cases where the hours at a polling place have been extended. Wisconsin uses provisional ballots for same-day registration when a voter is not able to provide required identification. In this case, a provisional ballot is not counted until identification is shown, allowing the voter to register.

Similarly, Wyoming uses provisional ballots if the voter is not on the registration list and does not have proper identification in order to register on Election Day, if they are challenged by a poll watcher or if there are extended polling hours. The voter is then required to provide additional information, such as proof of residence or identification, in order for the ballot to be counted. The provisional ballot will not be counted if the voter does not provide the requisite information needed for registration.

Idaho, Minnesota and New Hampshire do not issue provisional ballots at all.

## Methodology

This information was compiled from various sources, including state statutes and regulations, state election

manuals, the Election Assistance Commission Statutory Survey, and conversations with state election directors.

To offer comments or corrections, please contact elections-info@ncsl.org.

### Additional Resources

- NCSL LegisBrief on Provisional Ballots

- - - - - - - - - - - - - - - -

## About This NCSL Project

The development of this Web page was generously support by The Pew Charitable Trusts.

NCSL tracks election and campaign issues in four major categories: election laws and procedures, campaign finance, initiative and referendum, and election results and analysis. We provide comprehensive 50-state research and analysis on a wide variety of topics related to these issues.

For redistricting, NCSL provides similar data that covers redistricting laws, commissions and litigation.

Additionally, NCSL's Redistricting and Elections Standing Committee works on issues that affect all states, including voting technology and redistricting systems and technology.

If you don't find the information you need, please contact our elections team at 303-364-7700 or election-info@ncsl.org. NCSL staff can do specialized searches for legislators and legislative staff.



We are the nation's most respected bipartisan organization providing states support, ideas, connections and a strong voice on Capitol Hill.

Members Resources

- Get Involved With NCSL
- Jobs Clearinghouse
- Legislative Careers
- NCSL Staff Directories
- Staff Directories
- StateConnect Directory
- Terms and Conditions

Policy & Research Resources
- Bill Information Service
- Legislative Websites
- NCSL Bookstore
- State Legislatures Magazine

Accessibility Support
- Tel: 1-800-659-2656 or 711
- Accessibility Support
- Accessibility Policy

Meeting Resources
- Calendar
- Online Registration

Press Room
- Media Contact
- NCSL in the News
- Press Releases

Go 29490 [        ]    [   Go   ]

Denver
7700 East First Place
Denver, CO 80230
Tel: 303-364-7700 | Fax: 303-364-7800

Washington
444 North Capitol Street, N.W., Suite 515
Washington, D.C. 20001
Tel: 202-624-5400 | Fax: 202-737-1069

Copyright 2020 by National Conference of State Legislatures

Terms Of Use | Privacy Statement

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

About Us     Take Action     The Latest     Built By Us

DONATE

SHARE:

# PROVISIONAL VOTING EXPLAINED.

Tagged: Handout

# What is Provisional Voting?

## What is a provisional ballot?

A provisional ballot is a safety net for voters when there is some confusion or question about their ability to vote.

Federal law requires that anyone who presents to vote be given the opportunity to vote, and provisional ballots guarantee that every voter is given that chance.

## Do provisional ballots count?

Yes. Many provisional ballots do count, and no official election results are final until every provisional ballot is reviewed.

In 2016, just under half of all provisional ballots counted entirely or partially (44%). But for voters who cast provisional ballots because they were at the wrong precinct (called "out of precinct" voting), or because they moved within county and did not update their registration, more than 90% of ballots counted in whole or in part.

Note: An out-of-precinct voter's ballot will count in all state- and countywide races, and in many other races at the top of the ticket. But, because an out-of-precinct voter is voting a ballot different from the one at their own precinct, there may be some local races where their vote doesn't count.

*cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020*

# How do voters cast provisional ballots? What happens to them?

1. If a voter gets to the front of the line to vote and the poll worker cannot find their registration, tells them they are at the wrong precinct, or finds some other problem with their voting record, the voter can still vote using a provisional ballot.

2. In the case of out-of-precinct voting, a voter should be offered the choice between voting a provisional ballot at their current polling place, or going to their own precinct where they will be able to vote a regular ballot. In other cases, a provisional ballot is the voter's only option for casting a ballot that day.

3. The poll worker will direct the voter to the help desk, where a help desk worker will give them a form, called a "provisional ballot application." After filling out the form, the voter will be given the ballot and vote it.

4. Then, the form and the ballot will be placed in a sealed envelope and sent to the Board of Elections for review after the election. The voter will be given a phone number and PIN they can use to find out if their ballot was counted.

5. Following the election, nonpartisan Board of Elections staff will conduct research to determine whether the voter was properly registered and if the ballot can be counted, in whole or in part.

6. Even for voters whose votes do not ultimately count, casting a provisional ballot will get them registered for the next election.

**Still have questions? Call Democracy North Carolina at 888-OUR-VOTE or visit www.ncvoter.org to learn more about voting in North Carolina.**

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020



What is Provisional Voting? Explained.

Download our one-page explainer on Provisional Ballots here.

DOWNLOAD



Contact Us     Media Center     Email Alerts     Annual Reports     Donate

cited in DNC v. Hobbs, No. 18-15845 archived on January 22, 2020

## United States Court of Appeals for the Ninth Circuit

### Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

## Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)    A.    Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.    Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or

► The proceeding involves a question of exceptional importance; or

► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)  Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)  Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)  Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

**Attorneys Fees**
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

**Petition for a Writ of Certiorari**
- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

**Counsel Listing in Published Opinions**
- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  - ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 10. Bill of Costs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form10instructions.pdf*

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                    **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| TOTAL: | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 10**                    *Rev. 12/01/2018*